Justin J. Fields (SBN 259491)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: +1 415 957 3000
Facsimile: +1 415 957 3001
E-Mail:     jfields@duanemorris.com

Lucas C. Wohlford (admitted *Pro Hac Vice*)
**DUANE MORRIS LLP**
100 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: +1 214 257 7200
Facsimile: +1 214 257 7201
E-Mail:         lwohlford@duanemorris.com

Attorneys for Defendant
OPTIME CARE, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CORCEPT THERAPEUTICS, INC., AND OPTIME CARE INC., <br><br> Defendants. | Case No. 5:24-CV-03567-BLF <br><br> **DEFENDANT OPTIME CARE, INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:       December 5, 2024 <br> Time:       9:00 a.m. <br> Dept.:      Courtroom 3 <br> Judge:      Hon. Beth Labson Freeman <br><br> Complaint filed:       June 13, 2024 |

## NOTICE OF MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 5, 2024 at 9:00 a.m., before the Honorable Beth Labson Freeman, of the United States District Court of the Northern District of California, San Jose Division, 280 South 1st Street, San Jose, California, Courtroom 3, 5th Floor, Defendant Optime Care, Inc. will and hereby does move to dismiss Plaintiff Teva Pharmaceuticals USA, Inc.'s Complaint (Dkt. 1) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, and any such evidence or argument as may be requested or permitted by the Court.

Dated: August 26, 2024                    **DUANE MORRIS LLP**

By: /s/ Lucas C. Wohlford
    Justin J. Fields
    Lucas C. Wohlford (admitted *Pro Hac Vice*)
    Attorneys for Defendant
    OPTIME CARE, INC.

## **TABLE OF CONTENTS**

NOTICE OF MOTION TO DISMISS..................................................................................... i

TABLE OF CONTENTS....................................................................................................... ii

TABLE OF AUTHORITIES……………………………………………………………….iii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

INTRODUCTION AND PRELIMINARY STATEMENT...............................................1

FACTUAL BACKGROUND .............................................................................................3

LEGAL STANDARD.........................................................................................................5

ARGUMENT ......................................................................................................................5

I.     TEVA FAILS TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT...................................................................................................................................5

     A.   Teva's Section 1 Claims are Time Barred. ...........................................................5

     B.   Teva Fails to Plausibly Allege Substantial Foreclosure.......................................6

II.    TEVA FAILS TO STATE A CLAIM UNDER CAL. BUS. & PROF. CODE § 17200...11

     A.   Teva's UCL Claims Against Optime are Time Barred..........................................11

     B.   Teva Fails to Plead that it Lacks an Adequate Legal Remedy................................12

     C.   Teva Fails to Plausibly Allege Entitlement to Restitution or Injunctive Relief.........13

     D.   Teva Fails to Plead any Unlawful or Unfair Acts by Optime....................................14

III.   TEVA FAILS TO STATE A CLAIM UNDER CAL. BUS. & PROF. CODE § 16600...16

     A.   Teva's Section 16600 Claims Against Optime are Time Barred..............................16

     B.   Teva Fails to Plausibly Allege that Optime Violated Section 16600. .....................16

IV.   TEVA FAILS TO STATE A CLAIM UNDER VARIOUS STATE ANTITRUST AND  CONSUMER PROTECTION LAWS. ...................................................................17

V.    TEVA FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT. ..........................17

CONCLUSION...................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied Orthopedic Appliances v. Tyco Health Care Group, LP*
    592 F.3d 991 (9th Cir. 2010) ................................................................................................ 7-8, 10

*Bay Area Surgical Mgmt., LLC v. Aetna Life Ins. Co.*
    166 F.Supp.3d 988 (N.D. Cal. 2015) ............................................................................................ 5-6

*Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*
    2017 WL 8943149 (C.D. Cal. Oct. 20, 2017) ..................................................................................15

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) .........................................................................................................................11

*Cal. Crane Sch., Inc. v. Google, LLC*
    ---F.Supp.3d----, 2024 WL 1221964 (N.D. Cal. March 21, 2024) ..............................................18

*Chavez v. Wal-Mart Stores, Inc.*
    2014 WL 12591244 (C.D. Cal. March 3, 2014) .............................................................................17

*In re EpiPen (Epinepherine Injection USP) Marketing, Sales Practices and Antitrust Litig.*
    44 F.4th 959 (10th Cir. 2022) ..........................................................................................................7

*Feitelson v. Google, Inc.*
    80 F.Supp.3d 1019 (N.D. Cal. 2015) .....................................................................................5, 7, 11

*Forrett v. Gourmet Nut, Inc.*
    634 F.Supp.3d 761 (N.D. Cal. 2022) ..............................................................................................12

*FTC v. Qualcomm Inc.*
    969 F.3d 974 (9th Cir. 2020) .............................................................................................................7

*Garrison v. Oracle Corp.*
    159 F.Supp.3d 1044 (N.D. Cal. 2016) ................................................................................. 11-12, 16

*In re Google Assistant Priv. Litig.*
    457 F.Supp.3d 797 (N.D. Cal. 2020) ..............................................................................................14

*Hafiz v. Greenpoint Mortg. Funding, Inc.*
    652 F.Supp.2d 1039 (N.D. Cal. 2009) ............................................................................................13

*Hip Hop Bev. Corp. v. Monster Energy Co.*
    733 Fed.Appx. 380 (9th Cir. 2018) ............................................................................................... 7-8

*LiveUniverse, Inc. v. MySpace, Inc.*
    304 Fed.Appx. 554 (9th Cir. 2008) ................................................................................................16

*Los Gatos Merc., Inc. v. E.I. DuPont De Nemours and Co.*
   2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ...................................................18

*Omega Env't, Inc. v. Gilbarco, Inc.*
   127 F.3d 1157 (9th Cir. 1997) ................................................... 6-8, 10, 15

*In re Plavix Indirect Purchaser Antitrust Litig.*
   2011 WL 335034 (S.D. Ohio Jan. 31, 2011) .................................................17

*PNY Tech., Inc. v. SanDisk Corp.*
   2014 WL 1677521 (N.D. Cal. April 25, 2014) .................................... 8-9, 11

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*
   2013 WL 3936394 (C.D. Cal. July 30, 2013) .................................................11

*In re Qualcomm Antitrust Litig.*
   2023 WL 121983 (N.D. Cal. Jan. 6, 2023) .................................................15

*Roffman v. Rebbl, Inc.*
   653 F.Supp.3d 723 (N.D. Cal. 2023) .................................................12

*Roland Machinery Co. v. Dresser Indus., Inc.*
   749 F.2d 380 (7th Cir. 1984) .................................................10

*Ryan v. Microsoft Corp.*
   147 F.Supp.3d 868 (N.D. Cal. 2015) ................................................. 6, 15-16

*Ryan v. Microsoft Corp.*
   2015 WL 178352 (N.D. Cal. April 10, 2015) .................................................12, 16

*Screen Capital Int'l Corp. v. Library Asset Acquisition Co.*
   510 B.R. 266 (E.D. Cal. 2014).................................................13

*Sonner v. Premier Nutrition Corp.*
   971 F.3d 834 (9th Cir. 2020) .................................................12

*United Food and Commercial Workers Local 1776 & Participating Employers*
   *Health and Welfare Fund v. Teikoku Pharma USA, Inc.*
   74 F.Supp.3d 1052 (N.D. Cal. 2014) .................................................17

*United States v. Teva Pharms. USA, Inc.*
   13-cv-3701-CM-OTW (S.D.N.Y.), Dkt. 33.................................................9, 18

*Whitaker v. Tesla Motors, Inc.*
   985 F.3d 1173 (9th Cir. 2021) .................................................11

*Winter v. Natural Res. Defense Council, Inc.*
   555 U.S. 7 (2008).................................................13

**California Cases**

*Dayton Time Lock Svc., Inc. v. Silent Watchmen Corp.*
        52 Cal.App.3d 1 (Cal. App. 1975) ................................................................. 15-16

*Ixchel Pharma, LLC v. Biogen, Inc.*
        9 Cal. 5th 1130, 1160-1162 (2020) ................................................................ 16

*Kolling v. Dow Jones & Co.*
        137 Cal.App.3d 709 (Cal. App. 1982) ............................................................ 16

*Korea Supply Co. v. Lockheed Martin Corp.*
        29 Cal. 4th 1134 (Cal. 2003) ...................................................................... 12-14

**Federal Statutes**

15 U.S.C. § 15b ................................................................................................. 15

**State Statutes**

Cal. Bus. & Prof. Code § 16600 ................................................................. 1-2, 15-17

Cal. Bus. & Prof. Code § 17200 ..................................................................... 1, 11, 14

Cal. Bus. & Prof. Code § 17208 ......................................................................... 11

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 5

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Optime Care, Inc. ("Optime") files this Memorandum of Points and Authorities in support of its Motion to Dismiss Plaintiff Teva Pharmaceuticals USA, Inc.'s ("Teva") Complaint, and would respectfully show the Court as follows:

## INTRODUCTION AND PRELIMINARY STATEMENT

Teva's claims against Optime are not merely implausible, they are entirely fanciful. Teva asserts claims against Optime under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count III), California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (Count IV), Cal. Bus. & Prof. Code § 16600 (Count V), a litany of various states' antitrust and consumer protection statutes (Count VI), and for unjust enrichment (Count VII). (Dkt. 1 ¶¶ 218-273). All of Teva's claims against Optime are based solely on Optime's agreement to exclusively distribute Defendant Corcept Therapeutics, Inc.'s ("Corcept") branded drug, Korlym (the "Distribution Agreement"). (*Id.* ¶¶ 134-136, 224-227, 229, 240, 248). As discussed herein, all of Teva's claims against Optime also suffer from fundamental and fatal defects that require their dismissal.

First, Teva's Sherman Act, UCL, and Section 16600 claims are all subject to four-year statutes of limitations. Teva readily acknowledges that Corcept and Optime entered into the supposedly anticompetitive Distribution Agreement in August 2017, (Dkt. 1 ¶ 136), and Teva alleges that the Distribution Agreement has injured it by "blocking Teva's access to the key distribution channel and cutting off patients from accessing Teva's lower-priced generic product." (*Id.* ¶ 5). Although Teva alleges the Distribution Agreement was renewed in 2024, (*id.* ¶ 136), that renewal is not a new and independent overt act that could restart the limitations clock. Accordingly, Teva was required to challenge the Distribution Agreement under the Sherman Act, the UCL, and Section 16600 no later than 2021. Because Teva waited until 2024 to bring these claims, they are all time barred.

Second, to prevail on its claims against Optime, Teva is required to demonstrate that the Distribution Agreement substantially forecloses competition in the relevant market. However, Teva readily acknowledges that there are myriad existing and potential channels through which it could distribute, and is currently distributing, its product. (Dkt. 1 ¶ 156). Because the availability of these alternative distribution channels precludes Teva from establishing substantial foreclosure of

competition, Teva makes the facially implausible claim that none of these alternative distribution channels is viable, and that Optime—a small specialty pharmacy in Missouri—is the only effective means of distributing Teva's product.  Teva attempts to support this dubious claim by repeating conclusory allegations that Optime is a "sticky" distribution channel, (*id.* ¶¶148, 151), that prescribing physicians have "developed entrenched physician prescribing behavior" and would face "high switching costs" if they sent prescriptions to a pharmacy other than Optime, (*id.* ¶¶ 148, 150, 151, 157, 159), and by misrepresenting the terms of the agreement between Corcept and Optime.  These conclusory and demonstrably incorrect allegations are woefully insufficient to push Teva's claims against Optime across the plausibility threshold.  Ultimately, because Teva has not plausibly alleged, and cannot plausibly allege, substantial foreclosure of competition in the relevant market, it fails to state a claim against Optime under the Sherman Act, the UCL, and Section 16600.

Third, Teva's UCL claims suffer from additional fundamental and fatal defects.  Specifically, Teva fails to allege that it lacks an adequate remedy at law and it fails to plead entitlement to restitution or injunctive relief, which are the only remedies available under the UCL.  Teva's UCL claims should be dismissed for these additional reasons.

Fourth, Teva purports to assert claims against Optime under 48 separate state antitrust statutes and 37 separate state consumer protection statutes.  However, Teva does not even identify the specific statutory provisions it claims Optime violated, nor does it plead any facts whatsoever explaining how Optime supposedly violated these statutes.  Accordingly, Teva fails to state a claim against Optime under any of these statutes.

Fifth, Teva purports to assert a claim against Optime for unjust enrichment under California law and the laws of all other states and territories in the United States.  However, unjust enrichment is not a standalone claim under California law, and Teva fails to allege that it conferred any benefit on Optime that should be returned to it under a quasi-contract theory of unjust enrichment.  Further, Teva fails to identify the unjust enrichment laws of any of the other states or territories under which it seeks to recover, and does not even attempt to plead facts demonstrating its entitlement to recovery under any of those laws.  For all these reasons, Teva's claims for unjust enrichment should be dismissed.

In short, Teva fails to plausibly allege any cognizable claim for relief against Optime.

CASE NO. 5:24-CV-03567-BLF

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

Accordingly, Optime respectfully requests that the Court dismiss all of the claims Teva asserts against it in this action.

## FACTUAL BACKGROUND

Although Teva's prolix Complaint spans more than 65 pages, it contains few allegations against Optime.  Notably, Teva's only allegation of supposed wrongdoing by Optime is that Optime entered into the Distribution Agreement, in which it agreed to distribute Korlym exclusively and to refrain from performing services for any third party with respect to a treatment for any disorder treated by Korlym. (Dkt. 1 ¶¶ 134-136, 224-227, 229, 240, 248).

Optime is a small specialty pharmacy based in Earth City, Missouri. (Dkt. 1 ¶ 14).  On August 4, 2017, Optime entered into the Distribution Agreement with Corcept, under which Optime agreed to distribute, and provide services related to, Korlym.  (*Id.* ¶ 135-136)  The Distribution Agreement also provides: "Optime shall not, directly or indirectly, perform services for any third party with respect to a treatment or potential treatment (whether generic or otherwise) for any disorder treated by a Product [*i.e.*, Korlym], unless otherwise specifically agreed to by the Parties." (*Id.* ¶ 135)  Optime and Corcept renewed the Distribution Agreement effective April 1, 2024.  (*Id.*).

Teva alleges that the Distribution Agreement has injured it by blocking its access to the relevant market.  (Dkt. 1 ¶ 5).  Specifically, Teva alleges that the Distribution Agreement has "block[ed] Teva's access to the key distribution channel and cut[] off patients from accessing Teva's lower-priced generic product."  (*Id.*).

Teva also alleges that, on May 1, 2024, it met with unidentified Optime representatives "to persuade Optime to distribute Teva's generic Korlym product immediately—or at least to explain what Teva would need to do to persuade Optime to distribute Teva's generic Korlym product in the future." (Dkt. 1 ¶ 137).  Teva alleges that "Optime's representatives made clear that there was nothing Teva could do to gain access to the Optime distribution channel," and that "Optime's employees described the agreement with Corcept as an 'evergreen' contract that effectively has no expiration date and that Optime is not free to terminate."  (*Id.*).

Even if Optime's unidentified representatives and employees actually made these statements

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

to Teva, such statements do not accurately describe the terms of the Distribution Agreement.[1]  Indeed, Section 14 of the Distribution Agreement that was renewed in 2024 provides that it has a three (3) year term and that either party may elect not to renew the agreement upon notice to the other party made within a confidential number of days prior to the expiration of the term.  (A true and correct copy of the redacted, publicly available Distribution Agreement, which is expressly referenced in Teva's Complaint, is attached hereto as <u>Exhibit A</u>).  Accordingly, contrary to Teva's allegations about statements supposedly made by some unidentified Optime representatives and employees, the Distribution Agreement plainly contains an expiration date and provides Optime with the right to forgo renewal of the agreement at the end of its term.

Significantly, Teva acknowledges that Optime is but one of many specialty pharmacies throughout the United States that could distribute Teva's generic alternative to Korlym, and that Teva "has active pricing with all major national specialty pharmacies, several regional specialty pharmacies, and several other national retail pharmacies."  (Dkt. 1 ¶ 156).  Teva also acknowledges that its "product is available and stocked at all major wholesalers and a specialty wholesaler," and that "Teva has also secured pricing on government contracts."  (*Id.*).

Nevertheless, Teva alleges that Optime is the only effective distribution channel for its drug, that the Distribution Agreement "has a nearly 100% foreclosure effect in the relevant market," and that "access to the Optime distribution channel is a prerequisite to effectively compete in this market." (*See, e.g., id.* ¶¶ 24, 146, 149, 151, 155, 159).  Teva attempts to support these conclusory and facially dubious allegations with additional repetitive conclusory allegations that Optime is a "sticky distribution channel," (*id.* ¶ 148, 151), that prescribing physicians have developed "entrenched prescribing and referral patterns," (*id.* ¶¶ 148, 151, 157, 159), and that prescribing physicians would

---

[1] Optime disputes Teva's allegations regarding the statements its representatives and employees supposedly made during the meeting with Teva, which was arranged by Teva based on a false premise of discussing rebate aggregation business.  For purposes of this Motion to Dismiss, however, Optime acknowledges that Teva's allegations are generally accepted as true.

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

somehow "face high switching costs" if they were to send prescriptions for Teva's product to any of the many other pharmacies in the United States that could distribute it. (*Id.* ¶¶ 150, 151, 159).

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint." *Feitelson v. Google, Inc.*, 80 F.Supp.3d 1019, 1025 (N.D. Cal. 2015) (Freeman, J.). "Dismissal under Rule 12(b)(6) may be based on the 'lack of a cognizable legal theory,' or 'the absence of sufficient facts alleged.'" *Id.* (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2s 696 (9th Cir. 1988)). "In assessing the sufficiency of the pleadings, the court 'accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the non-moving party.'" *Id.* (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). However, the Court does not accept as true allegations that are "'merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" *Id.* (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).

Ultimately, "[t]o survive a Rule 12(b)(6) motion, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (internal quotations omitted). "[A]s our Supreme Court has noted precisely in the context of private antitrust litigation, 'it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "As such, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive controversy to proceed." *Id.* (internal quotations omitted).

## ARGUMENT

## I.    TEVA FAILS TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

### A.    Teva's Section 1 Claims are Time Barred.

A motion to dismiss is an appropriate procedural vehicle for asserting a statute of limitations defense. *Bay Area Surgical Mgmt., LLC v. Aetna Life Ins. Co.*, 166 F.Supp.3d 988, 999 (N.D. Cal. 2015) (Freeman, J.). Claims under the Sherman Act are subject to a four-year statute of limitations.

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

*Ryan v. Microsoft Corp.*, 147 F.Supp.3d 868, 869 (N.D. Cal. 2015).  A claim accrues under the Sherman Act at the time the allegedly illegal conduct first injured the plaintiff, regardless of the plaintiff's knowledge.  *Id.*

Here, Teva acknowledges that Corcept and Optime entered into the Distribution Agreement in 2017. (Dkt. 1 ¶ 136).  Further, Teva alleges that the Distribution Agreement has injured it by "blocking Teva's access to the key distribution channel and cutting off patients from accessing Teva's lower-priced generic product."  (*Id.* ¶ 5).  Consequently, Teva's Sherman Act Section 1 claims accrued in 2017, and Teva was required to bring those claims by 2021.  Because Teva did not commence this action until 2024, its Sherman Act Section 1 claims are time barred.

Although Teva alleges the Distribution Agreement was renewed effective April 1, 2024, the renewal of the Distribution Agreement is not a "new and independent" overt act that could have restarted Teva's statute of limitations clock.  *See Bay Area Surgical Mgmt.*, 166 F.Supp.3d at 999 ("Plaintiffs must sufficiently allege that Defendants engaged in a new and independent act that was not merely a reaffirmation of a previous act, which inflicted new and accumulating injury on Plaintiffs to restart the statute of limitations.") (internal quotations omitted); *see also Ryan*, 147 F.Supp.3d at 885 ("the maintenance and renewal of the preexisting non-solicitation agreements does not qualify as an overt act").  Moreover, Teva's conclusory allegation that "Defendants have engaged in, and continue to engage in, a course of wrongful conduct, including conduct within the applicable limitations periods," (Dkt. 1 ¶ 208), is insufficient to establish a continuing violation that could render its claims timely.  *See Ryan*, 147 F.Supp.3d at 883 (explaining why plaintiff's conclusory allegations of continuing violations were insufficient).  Accordingly, Teva's Sherman Act Section 1 claims are time barred and should be dismissed for this reason alone.

### B.      Teva Fails to Plausibly Allege Substantial Foreclosure.

"The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement."  *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  However, "'virtually *every* contract to buy forecloses or excludes alternative sellers from *some* portion of the market, namely the portion consisting of what was bought.'"  *Id.* (quoting *Barry Wright Corp.*

*v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983)).   Moreover, there are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition." *Id.*; *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020); *Allied Orthopedic Appliances v. Tyco Health Care Group, LP*, 592 F.3d 991, 996 (9th Cir. 2010); *Feitelson*, 80 F.Supp.3d at 1030.   Indeed, "[c]ourts repeatedly explain that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist." *In re EpiPen (Epinepherine Injection USP) Marketing, Sales Practices and Antitrust Litig.*, 44 F.4th 959, 983 (10th Cir. 2022). This is particularly true where, as here, an exclusive dealing arrangement operates at the distributor level.   *Omega Env't, Inc.*, 127 F.3d at 1162 ("exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern.").   Because of this, some courts and commentators have suggested that "exclusive dealing contracts should be treated as 'presumptively lawful in all but a few carefully defined circumstances.'" *In re EpiPen*, 44 F.4th at 983 (quoting 11 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1810, at 161).   Although the Ninth Circuit has never expressly held that exclusive dealing arrangements are presumptively lawful, it has long held that, because such arrangements are frequently procompetitive, they must be analyzed under the rule of reason.   *Omega Env't, Inc.*, 127 F.3d at 1162; *Feitelson*, 80 F.Supp.3d at 1030.

"Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of commerce affected." *Allied Orthopedic*, 592 F.3d at 996 (internal quotations omitted); *Feitelson*, 80 F.Supp.3d at 1030. "'Substantial share' has been quantified as foreclosure of 40% to 50% of the relevant market." *Feitelson*, 80 F.Supp.3d at 1030.

"If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market." *Omega Env't, Inc.*, 127 F.3d at 1163.   Accordingly, in assessing whether an exclusive dealing arrangement that operates at the distributor level substantially forecloses competition, the Court must consider all existing or potential alternative distribution channels.   *Id.*; *see also Hip Hop Bev. Corp. v. Monster Energy Co.*, 733 Fed.Appx. 380, 381 (9th Cir.

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

2018) (affirming district court's dismissal of exclusive dealing claims where plaintiff "alleged that (at most) four brokers refused to do business" with it and "did not allege how many total brokers were in the market in order to establish that Monster foreclosed competition").

In addition, the short duration and easy terminability of exclusive dealing arrangements "negate substantially their potential to foreclose competition." *Id.*; *Allied Orthopedic*, 592 F.3d at 997; *PNY Tech., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *4 (N.D. Cal. April 25, 2014). "[O]ne judge on this Court has characterized a contract term of three years as having a 'relatively short duration.'" *PNY Tech., Inc.*, 2014 WL 1667521, at *5 (citing *W. Parcel Exp. V. United Parcel Serv. Of Am., Inc.*, 65 F.Supp.2d 1052 (N.D. Cal. 1998)). "And at least one other district court in this circuit granted a motion to dismiss an exclusive-dealing challenge against five contracts, three of which had terms of three years and one of which had a term of five years." *Id.* (citing *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394 (C.D. Cal. July 30, 2013)).

For multiple reasons, Teva fails to plausibly allege that the Distribution Agreement results in substantial foreclosure of competition in the relevant market. First, Teva readily acknowledges that Optime is far from the only distribution channel for its product. Indeed, Teva alleges that its product "is available and stocked at all major wholesalers and a specialty wholesaler," and that "Teva has active pricing with all major national specialty pharmacies, several regional specialty pharmacies and several other national retail pharmacies." (Dkt. 1 ¶ 156). As the Ninth Circuit has long acknowledged, "[t]hese alternatives eliminate substantially any foreclosure effect [the Distribution Agreement] might have." *Omega Env't, Inc.*, 127 F.3d at 1163; *see also Hip Hop Bev. Corp.*, 733 Fed.Appx. at 381 (upholding dismissal of antitrust claims when plaintiff "alleged that (at most) four brokers refused to do business" with it, "did not allege how many total brokers were in the market," and made only conclusory allegations that consumer prices had increased).

Second, Teva fails to plead sufficient facts to support its conclusory assertion that, even though it has access to every other existing and potential distribution channel for its product, Optime is the *only* effective distribution channel. Teva's use of conclusory buzzwords like that Optime is a "sticky distribution channel," (Dkt. ¶¶ 148, 151), that prescribing physicians have developed "entrenched prescribing and referral patterns," (*id.* ¶¶ 148, 151, 157, 159), and that prescribing physicians would

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

somehow "face high switching costs" if they were to send prescriptions to another pharmacy (*id.* ¶¶ 150, 151, 159), fall well short of making it plausible that Optime is the only effective distribution channel for Teva's product. *See PNY Tech., Inc.*, 2014 WL 1677521, at *7-*8 (holding that plaintiff's "bare assertions" that exclusive dealing arrangement barred plaintiff from the only cost-efficient means of distribution failed to state a plausible claim for relief).

Third, Teva's conclusory allegations that Corcept has paid prescribing physicians illicit bribes and kickbacks to route prescriptions to Optime are also insufficient.  Teva characterizes payments that Corcept has allegedly made to five (5) physicians and one (1) nurse practitioner as illicit bribes and kickbacks.  (Dkt. 1 ¶¶ 172-181).  But simply labeling payments to physicians as bribes and kickbacks does not make them so.  To be sure, it is undisputed that Teva has made similar payments to physicians and has argued that paying physicians to educate "other healthcare professionals and patients about the features and established benefits" of certain drugs is "an entirely lawful practice." *See United States v. Teva Pharms. USA, Inc.*, 13-cv-3701-CM-OTW (S.D.N.Y.), Dkt. 33 at 1.  Moreover, even assuming, *arguendo*, that Corcept's alleged payments to these six (6) health care professionals could be characterized as bribes or kickbacks (and to be clear, they should not be), Teva's allegations fall well short of giving rise to a plausible inference that every health care professional who treats Cushing's syndrome, or even a substantial percentage of such health care professionals, will only send prescriptions to Optime because they have accepted purported bribes and kickbacks from Corcept.  To the extent even cognizable under antitrust law, much more is required to plausibly allege such a wide-ranging conspiracy, which necessarily must count as co-conspirators all or most of the hundreds of health care professionals in the country who treat Cushing's syndrome to even arguably give rise to the requisite level of harm to competition.  (Dkt. 1 ¶ 64 (alleging that, in 2013, "approximately 300 endocrinologists treated approximately 70% of all Cushing's syndrome patients in the United States")).

Fourth, Teva's vague and conclusory allegations about its failure to capture its expected share of the market in the few months its product has been available do not make it any more plausible that Optime is the only effective distribution channel for its product.  Teva conspicuously fails to specify what percentage of the market it was able to capture in the few months between the time its product

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

became available and the time it filed this lawsuit.  Instead, Teva vaguely alleges that it has "captured close to zero market share," (Dkt. 1 ¶¶ 9, 128), or "virtually no market share."  (*Id.* ¶ 190).  Although these vague allegations confirm that Teva has not been completely shut out of the market, they do not provide any meaningful detail regarding the actual share of the market Teva has been able to capture. Without such information, it is impossible to discern how far short Teva has fallen in capturing the supposedly average market share for a generic drug, rendering Teva's allegations about its supposedly below-average sales effectively meaningless.

Fifth, Teva's own allegations point to an entirely legitimate and procompetitive reason for its supposedly below-average sales in the first few months its drug has been on the market.  Specifically, Teva acknowledges that Optime provides services and support to prescribing physicians and patients that Teva and its distributors apparently do not provide.  (Dkt. 1 ¶¶ 149, 160).  Teva is wrong to suggest that Optime's provision of these services is cause for competitive concern or that antitrust law mandates that Teva be allowed to free ride on the substantial investment Corcept and Optime have made in developing these services.  Indeed, incentivizing distributors to provide enhanced services related to a manufacturer's product, which, in turn, enhance interbrand competition in the market for the product, are precisely the procompetitive benefits of exclusive dealing arrangements that courts have long recognized.  *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (Posner, J.) (explaining that, if "exclusive dealing leads dealers to promote each manufacturer's brand more vigorously than would be the case under nonexclusive dealing, the quality-adjusted price to the consumer (where quality includes the information and other services that dealers render to their customers) may be lower with exclusive dealing than without, even though a collateral effect of exclusive dealing is to slow the pace at which new brands . . . are introduced"); *see also Omega Env't, Inc.*, 127 F.3d at 1162 (citing *Roland Machinery Co.*, 749 F.2d at 395).  Moreover, the Ninth Circuit has long rejected the notion that antitrust laws require established market participants to permit competitors to free ride on their "legitimate competitive advantage."  *Omega Env't, Inc.*, 127 F.3d at 1163.

Sixth, the relatively short term of the Distribution Agreement and its relatively easy terminability "negate substantially [its] potential to foreclose competition."  *Id.*; *see also Allied*

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

*Orthopedic*, 592 F.3d at 997; *PNY Tech., Inc.*, 2014 WL 1677521, at *4.  It is telling that Teva repeatedly mischaracterizes the Distribution Agreement as "a long-term" arrangement, (Dkt. 1 ¶ 130, 134, 142, 145, 201, 224, 230, 240, 248), that is "perpetually-renewing" (*id.* ¶ 7), and that "effectively has no expiration date," (*id.* ¶ 137), and that Teva relies on unidentified Optime employees' and representatives' supposed statements about the Distribution Agreement, which do not accurately describe the actual terms of the Distribution Agreement.  (*Id.* ¶ 137, 140).  In reality, the Distribution Agreement that was renewed in 2024 has only a three-year term and Optime is free to not renew the Distribution Agreement upon notice to Corcept made within a certain number of days prior to the expiration of the term.  (Exhibit A, § 14).  As noted above, at least one judge on this Court has characterized a three-year contract term as having a "'relatively short duration,'" and other judges in this circuit have dismissed at the pleading stage exclusive dealing challenges against contracts with terms of three and five years.  *See PNY Tech., Inc.*, 2014 WL 1667521, at *5; *see also Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394, at *2-*3 (C.D. Cal. July 30, 2013).

Apparently realizing that its allegations fall short of the plausibility threshold, Teva alleges that "[d]iscovery will allow Teva to uncover more details about how the Optime distribution channel functions . . ." (Dkt. 1 ¶ 150).  On this point, Teva has it exactly backwards.  Teva cannot force Optime to incur the significant costs of antitrust discovery until it pleads a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007); *see also Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021) ("Our case law does not permit plaintiffs to rely on anticipated discovery to satisfy Rules 8 and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to discovery"); *Feitelson*, 80 F.Supp.3d at 1025.  For all the reasons discussed above, Teva has failed to plausibly allege that the Distribution Agreement substantially forecloses competition in the relevant market.  Because Teva cannot prevail on its Section 1 claim without establishing substantial foreclosure, the Court should dismiss Teva's Section 1 claim for this additional reason.

## II.   TEVA FAILS TO STATE A CLAIM UNDER CAL. BUS. & PROF. CODE § 17200.

### A.   Teva's UCL Claims Against Optime are Time Barred.

Like its claims under Section 1 of the Sherman Act, Teva's UCL claims are subject to a four-year statute of limitations.  *See* Cal. Bus. & Prof. Code § 17208; *see also Garrison v. Oracle Corp.*,

159 F.Supp.3d 1044, 1063 (N.D. Cal. 2016); *Ryan v. Microsoft Corp.*, 2015 WL 178352, at *11 (N.D. Cal. April 10, 2015).  Where, as here, a plaintiff's UCL claims are based on the defendant's allegedly anticompetitive agreement or conspiracy, the claims generally accrue when the defendant entered into the agreement or conspiracy.  *See Garrison*, 159 F.Supp.3d at 1063; *Ryan*, 2015 WL 178352, at *16 (holding plaintiff's UCL claims accrued at the time defendant entered into an anticompetitive conspiracy).

Teva unequivocally alleges that its UCL claims against Optime are "based *only* upon Corcept and Optime's unlawful and anticompetitive exclusive agreement regarding the marketing of Korlym for the treatment of Cushing's syndrome . . . ." (Dkt. 1 ¶ 229).  As discussed above, Teva acknowledges that the Distribution Agreement was entered into in 2017, and Teva alleges the Distribution Agreement has injured it by preventing it from entering the relevant market.  Accordingly, Teva was required to bring its UCL claims against Optime no later than 2021.  Because Teva waited until 2024 to assert its UCL claims against Optime, those claims are time barred and should be dismissed.

**B.      Teva Fails to Plead that it Lacks an Adequate Legal Remedy.**

"It is well-established that claims for relief under . . . the UCL are limited to restitution and injunctive relief."  *Roffman v. Rebbl, Inc.*, 653 F.Supp.3d 723, 731 (N.D. Cal. 2023); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 144 (Cal. 2003) ("We have stated that under the UCL, prevailing plaintiffs are generally limited to injunctive relief and restitution").  Because the UCL limits recovery to these equitable remedies, a plaintiff asserting a UCL claim must allege that it has no adequate remedy at law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming dismissal of UCL claim because "the operative complaint does not allege that Sonner lacks an adequate legal remedy"); *Forrett v. Gourmet Nut, Inc.*, 634 F.Supp.3d 761, 768-69 (N.D. Cal. 2022) (Freeman, J.) (dismissing UCL claim because plaintiff failed to plead the inadequacy of a legal remedy).

Here, in pleading its UCL claim, Teva fails to allege that it lacks an adequate legal remedy. (Dkt. 1 ¶¶ 229-238).  Quite the contrary, Teva seeks monetary damages under various legal (albeit flawed) theories in this case.  Because Teva fails to allege that it lacks an adequate legal remedy, the Court should dismiss Teva's UCL claim for this additional reason.

**C.      Teva Fails to Plausibly Allege Entitlement to Restitution or Injunctive Relief.**

"While the scope of conduct covered by the UCL is broad, its remedies are limited." *Korea Supply Co.*, 29 Cal. 4th at 1144.  Specifically, UCL remedies are limited to restitution and injunctive relief; "damages cannot be recovered." *Id.*  "[A]n order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Id.* at 1149.  "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.*  A monetary award that "would not replace any money or property that defendants took directly from plaintiff" is not restitutionary, and, therefore, is not permitted under the UCL. *Id.*

Injunctive relief is an equitable remedy that is derivative of an underlying substantive claim. *Hafiz v. Greenpoint Mortg. Funding, Inc.*, 652 F.Supp.2d 1039, 1049 (N.D. Cal. 2009).  To obtain injunctive relief, a plaintiff must establish, among other things, that it is likely to succeed on the merits of an underlying claim.  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Accordingly, when a plaintiff fails to plead an underlying claim for relief, the plaintiff cannot obtain injunctive relief.  *Screen Capital Int'l Corp. v. Library Asset Acquisition Co.*, 510 B.R. 266, 278-79 (E.D. Cal. 2014).

Here, Teva fails to plausibly allege entitlement to either restitution or injunctive relief, which are the only remedies it could obtain on its UCL claim.  Teva alleges that, as a result of Optime's supposed violations of the UCL, "Teva has been harmed because it has been blocked from effectively competing in the market," while "Corcept has enjoyed ill-gotten gains from the overly inflated cost and sales of its branded drug." (Dkt. 1 ¶ 236).  Notably, Teva fails to allege that Optime has obtained any money in which Teva has an ownership interest, which is required to plausibly allege entitlement to restitution from Optime.  Moreover, Teva cannot state a cognizable UCL claim simply by recasting its supposed monetary damages from lost sales as restitution.  Indeed, more than 20 years ago, the California Supreme Court admonished: "'Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims.'" *Korea Supply Co.*, 29 Cal. 4th at 1151 (quoting *MAI Sys. Corp. v. UIPS*, 856 F.Supp. 538 (N.D. Cal. 1994)).  Despite Teva's attempt to characterize

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

1    the relief it seeks as restitution, it is clear that Teva is seeking monetary damages that are not

2    recoverable under the UCL.  Finally, for the reasons discussed herein, Teva has failed to state any

3    underlying claim for relief against Optime that could be the basis for injunctive relief.  Because Teva

4    fails to plausibly allege entitlement to restitution or injunctive relief, it fails to state a claim under the

5    UCL.

6            **D.     Teva Fails to Plead any Unlawful or Unfair Acts by Optime.**

7            "Section 17200 'borrows' violations from other laws by making them independently actionable

8    as unfair competitive practices." *Korea Supply Co.*, 29 Cal. 4th at 1143.  "In other words, to be

9    'unlawful' under the UCL, Defendants' conduct must violate another 'borrowed' law." *In re Google*

10   *Assistant Priv. Litig.*, 457 F.Supp.3d 797, 841 (N.D. Cal. 2020) (Freeman, J.).  "Virtually any state,

11   federal or local law can serve as the predicate for an action under section 17200." *Id.* (internal

12   quotations omitted).

13           "In addition, under section 17200, a practice may be deemed unfair even if not specifically

14   proscribed by some other law." *Korea Supply Co.*, 29 Cal. 4th at 1143.  Although the UCL does not

15   define the term "unfair," the California Supreme Court has "appeared to confine 'unfair' to 'conduct

16   that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

17   laws because its effects are comparable to or the same as a violation of the law, or otherwise

18   significantly threatens to harm competition.'" *In re Google Assistant Priv. Litig.*, 457 F.Supp.3d at

19   843 (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)).  "It

20   further required that any finding of unfairness to competitors under section 17200 be tethered to some

21   legislatively declared policy or proof of some actual or threatened impact on competition." *Id.*

22   (internal quotations omitted).

23           Here, Teva alleges that Optime's acts—*i.e.*, entering into the Distribution Agreement—were

24   unlawful because they violated a panoply of California and federal antitrust laws, "including the

25   federal Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2, 15, and 26, California's Cartwright Act, Cal.

26   Bus. & Prof. Code §§ 16720 and 16727, and California's prohibition on contracts in restraint of trade,

27

28

OPTIME CARE, INC.'S MOTION TO DISMISS TEVA'S COMPLAINT

Cal. Bus. & Prof. Code § 16600 . . ."[2] (Dkt. 1 ¶ 231).  As an initial matter, Teva cannot state a plausible UCL claim simply by listing various statutes that it contends Optime violated.  *Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*, 2017 WL 8943149, at *10-*11 (C.D. Cal. Oct. 20, 2017).  Moreover, as discussed above, Teva fails to plausibly allege that Optime violated Section 1 of the Sherman Act, because those claims are time-barred and Teva failed to plausibly allege substantial foreclosure of competition in the relevant market.  Teva fails to state a claim against Optime under the Clayton Act, the Cartwright Act, and Section 16600 for the same reasons.  *See* 15 U.S.C. § 15b (providing for four-year statute of limitations on Clayton Act claims); *see also Ryan*, 2015 WL 1738352, at *10-*12 (holding claims under Cartwright Act and Section 16600 are subject to four-year statute of limitations); *Omega Env't, Inc.*, 127 F.3d at 1162 ("Only those arrangements whose probable effect is to foreclose competition in a substantial share of the line of commerce affected violate Section 3"); *In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at *19 (N.D. Cal. Jan. 6, 2023) ("To violate the Cartwright Act, an exclusive deal must cause 'significant foreclosure' of the market to competitors"); *Dayton Time Lock Svc., Inc. v. Silent Watchmen Corp.*, 52 Cal.App.3d 1, 6 (Cal. App. 1975) (holding exclusive dealing arrangements violate Section 16600 only "when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce").  Because Teva fails to plausibly allege that Optime violated any of these statutes, it fails to plausibly allege that Optime committed any "unlawful" acts under the UCL.

Likewise, Teva fails to plausibly allege that Optime committed any "unfair" acts under the UCL.  Indeed, because Teva fails to plausibly allege that the Distribution Agreement substantially forecloses competition in the relevant market, it fails to plausibly allege that Optime's acts threaten an

---

[2] Teva also alleges violations of California's commercial bribery statute and California's prohibition against the provision of things of value in exchange for the prescription of drugs covered by insurance.  (Dkt. 1 ¶ 231).  Because Teva does not allege that Optime paid any bribes or provided anything of value in exchange for the prescription of drugs covered by insurance, Optime will not address these two statutes.

1    incipient violation of state or federal antitrust laws or that they violate the policy or spirit of such laws.

2    *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed.Appx. 554, 557 (9th Cir. 2008) ("Where, however,

3    the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair

4    competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair

5    competition").

6        In short, Teva fails to plausibly allege any "unlawful" or "unfair" acts by Optime on which its

7    UCL claim could be based.  For this additional reason, the Court should dismiss Teva's UCL claim.

8    **III.  TEVA FAILS TO STATE A CLAIM UNDER CAL. BUS. & PROF. CODE § 16600.**

9        **A.  Teva's Section 16600 Claims Against Optime are Time Barred.**

10       Teva's Section 16600 claims are subject to a four-year statute of limitations.  *See Garrison*,

11   159 F.Supp.3d at 1062-63; *Ryan*, 2015 WL 1738352, at *11-*12.  Where, as here, a plaintiff's Section

12   16600 claims are based on the defendant's allegedly anticompetitive agreement or conspiracy, the

13   claims generally accrue when the defendant entered into the agreement or conspiracy.  *See Garrison*,

14   159 F.Supp.3d at 1063; *Ryan*, 2015 WL 178352, at *16 (holding plaintiff's UCL claims accrued at the

15   time defendant entered into an anticompetitive conspiracy).

16       Teva's Section 16600 claims against Optime are based solely on the Distribution Agreement.

17   (Dkt. 1 ¶ 240).  As discussed above, Teva acknowledges that the Distribution Agreement was entered

18   into in 2017, and Teva alleges the Distribution Agreement has injured it by preventing it from entering

19   the relevant market.  Accordingly, Teva was required to bring its Section 16600 claims against Optime

20   no later than 2021.  Because Teva waited until 2024 to assert its Section 16600 claims against Optime,

21   those claims are time barred and should be dismissed.

22       **B.  Teva Fails to Plausibly Allege that Optime Violated Section 16600.**

23       Under Section 16600, as under federal law, exclusive dealing arrangements are not per se

24   illegal; rather, they are subject to the rule of reason.  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th

25   1130, 1160-1162 (2020); *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 809 (Cal. App. 1982).

26   Much like under federal antitrust laws, exclusive dealing agreements violate Section 16600 only

27   "when it is probable that performance of the contract will foreclose competition in a substantial share

28   of the affected line of commerce."  *Dayton Time Lock Svc.*, 52 Cal.App.3d at 6.

For all the reasons discussed above, Teva fails to plausibly allege that the effect of the Distribution Agreement is to substantially foreclose competition in the relevant market. Accordingly, Teva fails to state a plausible claim that Optime violated Section 16600. For this additional reason, the Court should dismiss Teva's Section 16600 claims.

## IV.   TEVA FAILS TO STATE A CLAIM UNDER VARIOUS STATE ANTITRUST AND CONSUMER PROTECTION LAWS.

A plaintiff's broad allegation that a defendant has violated various state statutes is insufficient to state a claim under those statutes. *Chavez v. Wal-Mart Stores, Inc.*, 2014 WL 12591244, at *4 (C.D. Cal. March 3, 2014). Nor is it sufficient for a plaintiff to simply list the various state statutes that it claims the defendant violated. *See id.* (collecting cases).

Here, Teva alleges that, by entering into the Distribution Agreement, Optime violated 48 state antitrust statutes and 37 state consumer protection statutes. (Dkt. 1 ¶¶ 248-249). Teva fails, however, to plead any facts explaining how Optime's entering into the Distribution Agreement violated each, or any, of the panoply of state statutes it lists in its Complaint. In fact, Teva does not even identify the specific provision of the statutes it claims Optime violated; rather, it simply lists the first section of each state statute followed by "*et seq.*" (*Id.*). Teva's shotgun pleading fails to plausibly allege a violation of any of the statutes it lists and fails to provide Optime fair notice of the basis for Teva's claims under those statutes.

Moreover, as discussed above, Teva's allegations against Optime fail to establish a violation of federal antitrust law. Accordingly, those same allegations fail to state a claim under state antitrust or consumer protection statutes. *See In re Plavix Indirect Purchaser Antitrust Litig.*, 2011 WL 335034, at * 5 (S.D. Ohio Jan. 31, 2011) dismissing claims under state antitrust and consumer protection statutes when state-law claims were predicated on same allegations that failed to state a claim under federal antitrust law).

For all these reasons, the Court should dismiss Teva's claims under various state antitrust and consumer protection statutes.

## V.   TEVA FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Under California law, unjust enrichment is not an independent cause of action. *See United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v.*

17

*Teikoku Pharma USA, Inc.*, 74 F.Supp.3d 1052, 1091 (N.D. Cal. 2014) (dismissing with prejudice unjust enrichment claim under California law).  However, "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Cal. Crane Sch., Inc. v. Google, LLC*, ---F.Supp.3d----, 2024 WL 1221964, at *10 (N.D. Cal. March 21, 2024).  To plead a cognizable claim for unjust enrichment under a quasi-contract theory, the plaintiff must allege that the plaintiff, itself, conferred a benefit on the defendant that should be returned to the plaintiff.  *Id.*

Here, Teva improperly attempts to assert a stand-alone claim against Optime for unjust enrichment under California law.  For this reason alone, the Court should dismiss Teva's unjust enrichment claim under California law.  To the extent Teva purports to assert an unjust enrichment claim under a quasi-contract theory, its claim fails because Teva fails to plausibly allege any entitlement to restitution—*i.e.,* Teva fails to allege that *Teva* conferred any benefit on Optime that should be returned to Teva.  Finally, to the extent Teva purports to assert an unjust enrichment claim against Optime under the laws of "all states and territories in the United States," (Dkt. 1 ¶ 268), "it does not identify the relevant laws of the [] states in question or attempt to set forth facts showing that claims lie under each of those laws."  *Los Gatos Merc., Inc. v. E.I. DuPont De Nemours and Co.*, 2014 WL 4774611, at *11 (N.D. Cal. Sept. 22, 2014) (Freeman, J.).  For all these reasons, the Court should dismiss Teva's claims for unjust enrichment.

## CONCLUSION

For the foregoing reasons, Optime respectfully requests that the Court dismiss all of the claims Teva asserts against it in this action.


Dated: August 26, 2024                    **DUANE MORRIS LLP**


                                          By:/s/ Lucas C. Wohlford
                                             Justin J. Fields
                                             Lucas C. Wohlford (admitted *Pro Hac Vice*)
                                             Attorneys for Defendant
                                             OPTIME CARE, INC.