1   **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Robert W. Stone (Bar No. 163513)
2     robertstone@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
3   Redwood Shores, California 94065
    Telephone:    (650) 801-5000
4   Fax:          (650) 801-5100

5   Adam B. Wolfson (Bar No. 262125)
      adamwolfson@quinnemanuel.com
6   50 California Street, 22nd Floor
    San Francisco, California 94111
7   Telephone:    (415) 875-6600
    Fax:          (415) 875-6700

8
9   *Attorneys for Defendant Corcept Therapeutics, Inc.*

    [Additional Counsel Listed On Signature Page]
10

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                   **SAN JOSE DIVISION**

14

15  | TEVA PHARMACEUTICALS USA, INC., | Case No. 5:24-cv-03567-BLF |

16                Plaintiff,          Honorable Beth Labson Freeman

17          vs.                       **DEFENDANT CORCEPT THERAPEUTICS, INC.'S NOTICE OF MOTION TO DISMISS**
18  CORCEPT THERAPEUTICS, INC., et al.,  **PLAINTIFF'S COMPLAINT AND MEMORANDUM OF POINTS AND**
19                Defendants.          **AUTHORITIES IN SUPPORT THEREOF**

20                                     Hearing Date: December 5, 2024 at 9:00 a.m.

21

22

23

24

25

26

27

28

## NOTICE OF MOTION TO DISMISS

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 5, 2024, at 9:00 a.m., or at another time to be determined by the Court, before the Honorable Beth Labson Freeman, of the United States District Court of the Northern District of California, San Jose Division, 280 South 1st Street, San Jose, California, Courtroom 3, 5th Floor, Defendant Corcept Therapeutics, Inc., will and hereby does move to dismiss Plaintiff Teva Pharmaceuticals USA, Inc.'s complaint (Dkt. 1) under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, and any such evidence or argument as may be requested or permitted by the Court.

DATED:  August 26, 2024

By  _/s/ Robert W. Stone_
QUINN EMANUEL URQUHART & SULLIVAN, LLP

Robert W. Stone (Bar No. 163513)
robertstone@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:                (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Fax:                (415) 875-6700

Steig D. Olson (admitted _pro hac vice_)
steigolson@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Fax:                (212) 849-7100

_Attorneys for Defendant Corcept Therapeutics, Inc._

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ....................................................................................................3

LEGAL STANDARD ...............................................................................................................6

ARGUMENT .............................................................................................................................6

I.  TEVA'S ORANGE BOOK LISTING AND SHAM LITIGATION ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM ............................................................................6

    A.  Teva's Orange Book Listing Allegations Fail ..........................................................6

        1.  Teva's Orange Book Listing Claims Are Time-Barred ................................6

        2.  Teva Fails to Plausibly Allege That Corcept's Orange Book Listings Caused Teva Antitrust Injury ........................................................7

    B.  Teva's Allegations Regarding the 2018 Patent Claims Fail .....................................9

        1.  Any Claim Based On the '348/'495 Litigation Is Time-Barred ....................9

        2.  Teva Fails to Establish Antitrust Injury From the '348/'495 Litigation ....................................................................................................9

    C.  Teva's Allegations Regarding the 2019 Patent Claims Fail ...................................10

        1.  Any Claim Based On the '214 Litigation Is Time-Barred ..........................10

        2.  Teva Fails to Establish Antitrust Injury From the '214 Litigation ...............10

        3.  Teva Fails to Plausibly Allege That the '214 Litigation Was A Sham ........11

    D.  Teva's Allegations Regarding the 2023 Patent Claims Fail ...................................12

        1.  Teva Fails to Establish Antitrust Injury From the '800/'801 Litigation ..................................................................................................12

        2.  Teva Fails to Plausibly Allege That the '800/'801 Litigation Was A Sham ....................................................................................................13

    E.  Teva's Allegations Regarding A "Series" of Supposed Sham Cases Fail ..............13

II.  TEVA FAILS TO STATE A SECTION 1 OR 2 EXCLUSIVE DEALING CLAIM .........14

    A.  Teva's Exclusive Dealing Claims Are Time-Barred ..............................................14

    B.  Teva Fails to Plausibly Allege Substantial Foreclosure .........................................14

III.  TEVA'S BRIBERY ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM ...........17

A.      Teva's "Bribery" Allegations Are Conclusory and Implausible ..............................17

B.      Teva Fails to Establish Harm to Competition From the Alleged Payments ............20

IV.   TEVA'S VARIOUS STATE LAW CLAIMS FAIL ............................................................21

A.      Teva Fails to State a UCL Claim ..............................................................21

B.      Section 16600 Does Not Save Teva's Failed Exclusive Dealing Claim ................23

C.      Teva's Omnibus Antitrust and Consumer Protection Claim Fails ..........................24

D.      Teva's Unjust Enrichment Claim Fails ....................................................25

CONCLUSION ....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u> **Page**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ............................................................................... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 6

*Associated Oil Co. v. Myers*,
217 Cal. 297 (1933) ............................................................................................ 23

*AstraZeneca AB v. Mylan Lab'ys, Inc.*,
2010 WL 2079722 (S.D.N.Y. May 19, 2010) .................................................. 4, 5

*In re Auto. Parts Antitrust Litig.*,
2013 WL 2456612 (E.D. Mich. June 6, 2013) ................................................. 24

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
166 F. Supp. 3d 988 (N.D. Cal. 2015) .............................................................. 14

*Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*,
2017 WL 8943149 (C.D. Cal. Oct. 20, 2017) ............................................. 22, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 6, 21

*California Crane Sch., Inc. v. Google LLC*,
2024 WL 1221964 (N.D. Cal. Mar. 21, 2024) .................................................. 25

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
532 F.2d 674 (9th Cir. 1976) ............................................................................. 21

*In re Canadian Import Antitrust Litig.*,
470 F.3d 785 ........................................................................................................ 9

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012) ............................................................................................ 4

*Chavez v. Wal-Mart Stores, Inc.*,
2014 WL 12591244 (C.D. Cal. Mar. 3, 2014) .................................................. 24

*Cobb v. JPMorgan Chase Bank, N.A.*,
2013 WL 6201414 (N.D. Cal. Nov. 27, 2013) .................................................. 18

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
2018 WL 5263278 (D.N.J. Oct. 23, 2018) .................................................. 4, 18

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
    2023 WL 9017081 (D.N.J. Dec. 29, 2023) ............................................................. 4

*Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*,
    52 Cal. App. 3d 1 (Ct. App. 1975) ....................................................................... 23

*Distance Learning Co. v. Maynard*,
    2020 WL 2995529 (N.D. Cal. June 4, 2020) ....................................................... 23

*U.S. ex rel. Dooley v. Metic Transplantation Lab, Inc.*,
    2016 WL 11746912 (C.D. Cal. Apr. 8, 2016) ..................................................... 19

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ............................................................................... 6

*E & J Gallo Winery v. Mira Enterprises, Inc.*,
    2007 WL 9734494 (N.D. Cal. Nov. 9, 2007) ..................................................... 14

*Eastman v. Quest Diagnostics Inc.*,
    2015 WL 7566805 (N.D. Cal. Nov. 25, 2015) ................................................... 15

*Evans Hotels, LLC v. Unite Here! Loc. 30*,
    2021 WL 10310815 (S.D. Cal. Aug. 26, 2021) ................................................. 18

*Fed. Paper Bd. Co. v. Amata*,
    693 F. Supp. 1376 (D. Conn. 1988) ................................................................... 21

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ............................................................................... 21

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
    2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ................................................... 19

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
    501 F. Supp. 3d 735 (N.D. Cal. 2020) ............................................................... 17

*Forrett v. Gourmet Nut, Inc.*,
    634 F. Supp. 3d 761 (N.D. Cal. 2022) ............................................................... 21

*Garon v. eBay, Inc.*,
    2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) ................................................... 22

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ............................................................... 6

*Great W. Distillery Prod. v. John A. Wathen Distillery Co.*,
    10 Cal. 2d 442 (1937) ......................................................................................... 23

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ....................................................................... 15

*In re German Auto. Mfrs. Antitrust Litig.*,
   392 F. Supp. 3d 1059 (N.D. Cal. 2019) ............................................................... 20

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) .................................................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................... 20

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017) ............................................................................ 9, 10

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
   2016 WL 264909 (D. Del. Jan. 21, 2016) ........................................................... 16

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
   863 F.3d 1178 (9th Cir. 2017) ............................................................................ 13

*Ixchel Pharma, LLC v. Biogen Inc.*,
   2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ....................................................... 24

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130 (2020) ....................................................................................... 23

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
   552 F.3d 1033 (9th Cir. 2009) ...................................................................... 11, 13

*Kelsey K. v. NFL Enterprises LLC*,
   2017 WL 3115169 (N.D. Cal. July 21, 2017) ............................................... 10, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .............................................................................. 20

*Krasnyi Oktyabr, Inc. v. Trilini Imports*,
   578 F. Supp. 2d 455 (E.D.N.Y. 2008) .................................................................. 4

*Lamba v. ASML US, L.P.*,
   2023 WL 4865966 (N.D. Cal. July 31, 2023) .................................................... 25

*Laughlin v. Evanston Hosp.*,
   133 Ill. 2d 374 (1990) ......................................................................................... 24

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014) ............................................................................ 23

*In re Lipitor Antitrust Litig.*,
   336 F. Supp. 3d 395 (D.N.J. 2018) .................................................................... 25

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   42 F. Supp. 3d 231 (D. Mass. 2014) .................................................................. 10

*In re Nexus 6P Prod. Liab. Litig.,*
    293 F. Supp. 3d 888 (N.D. Cal. 2018) ........................................................ 25

*In re Optical Disk Drive Antitrust Litig.,*
    2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ................................................ 19

*In re Revlimid & Thalomid Purchaser Antitrust Litig.,*
    2024 WL 2861865 (D.N.J. June 6, 2024) .................................................. 9, 24

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,*
    868 F.3d 132 (3d Cir. 2017) .................................................................... 8, 11

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.,*
    2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ............................................ 24

*Maximum Availability Ltd. v. Vision Sols., Inc.,*
    2010 WL 11508470 (C.D. Cal. Dec. 16, 2010) ........................................... 16

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers,*
    795 F.3d 1124 (9th Cir. 2015) ................................................................... 22

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.,*
    2018 WL 4904918 (N.D. Cal. Oct. 9, 2018) ............................................... 15

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,*
    838 F. App'x 231 (9th Cir. 2020) ................................................................. 7

*Omega Env't, Inc. v. Gilbarco, Inc.,*
    127 F.3d 1157 (9th Cir. 1997) .............................................................. 15, 16

*Pace Indus., Inc. v. Three Phoenix Co.,*
    813 F.2d 234 (9th Cir. 1987) ................................................................... 9, 10

*People v. Riley,*
    240 Cal. App. 4th 1152 (2015) .................................................................. 22

*Perrigo Co. v. AbbVie Inc.,*
    2022 WL 2870152 (3d Cir. July 21, 2022) ................................................... 9

*Peterson v. Sutter Med. Found.,*
    2022 WL 316677 (N.D. Cal. Feb. 2, 2022) ................................................... 7

*Petrick v. Stars Bay Area, Inc.,*
    2021 WL 843183 (N.D. Cal. Mar. 5, 2021) ................................................ 23

*Pistacchio v. Apple Inc.,*
    2021 WL 949422 (N.D. Cal. Mar. 11, 2021) .............................................. 25

*PNY Techs., Inc. v. SanDisk Corp.,*
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............................................. 16

*Power Analytics Corp. v. Operation Tech., Inc.*,
   2018 WL 10231437 (C.D. Cal. July 24, 2018) ...................................................... 14

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993) .................................................................................................. 11

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
   2024 WL 1975478 (N.D. Cal. May 3, 2024) ................................................... 13, 14

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................................... 7

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
   2013 WL 3242245 (N.D. Cal. June 25, 2013) ......................................................... 15

*Robert Half Int'l, Inc. v. Ainsworth*,
   2015 WL 1197882 (S.D. Cal. Mar. 16, 2015)........................................................... 22

*Ryan v. Microsoft Corporation*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ..................................................................... 14

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014)................................................................................... 14

*Shahinian v. Med. Staff of Los Robles Hosp. & Med. Ctr.*,
   2016 WL 9045473 (C.D. Cal. Feb. 2, 2016) ............................................................. 6

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .................................................................................... 21

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001)............................................................................... 11, 12

*Sterling Merch., Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011) .................................................................................... 15

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2010) ......................................................................... 20

*Swift Harvest USA, LLC v. Boley Int'l HK Ltd*,
   2020 WL 7380148 (C.D. Cal. Sept. 22, 2020)......................................................... 25

*Teva Pharm. USA, Inc. v. Corcept Therapeutics, Inc.*,
   18 F.4th 1377 (Fed. Cir. 2021).................................................................................. 10

*United States v. Carson*,
   2011 WL 7416975 (C.D. Cal. Sept. 20, 2011).......................................................... 22

*United States v. Novartis Pharms. Corp.*,
   2022 WL 4217749 (S.D.N.Y. Sept. 13, 2022) .......................................................... 18

*United States v. Valley Campus Pharmacy, Inc.*,
   2021 WL 4816648 (C.D. Cal. June 23, 2021)............................................................... 22

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) .......................................................................................... 13

*Vance v. Google LLC*,
   2024 WL 1141007 (N.D. Cal. Mar. 15, 2024) ........................................................... 25

*Wag Hotels, Inc. v. Wag Labs, Inc.*,
   2022 WL 1212012 (N.D. Cal. Apr. 25, 2022) ............................................................ 24

*Whitaker v. Tesla Motors, Inc.*,
   985 F.3d 1173 (9th Cir. 2021) ...................................................................................... 21

*Witt Co. v. RISO, Inc.*,
   948 F. Supp. 2d 1227 (D. Or. 2013) ............................................................................ 14

**Statutes**

21 U.S.C. § 355(b)(1) ............................................................................................................. 4

21 U.S.C. § 355(c)(2) ............................................................................................................. 4

21 U.S.C. § 360cc(a)(2) ......................................................................................................... 8

Cal. Bus. & Prof. Code § 16600 ................................................................ 2, 3, 6, 21, 22, 23, 24

Cal. Ins. Code § 1871.7 .................................................................................................. 22, 23

**Other Authorities**

21 C.F.R. § 314.53(b)(1) ........................................................................................................ 4

42 C.F.R. § 1001.952(d) ....................................................................................................... 18

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2022 ed., Supp. 2024) ........................................... 8, 11, 16

Fed. R. Civ. P. 8 ......................................................................................................... 21, 22, 24

Fed. R. Civ. P. 8(a)(2) .......................................................................................................... 24

Fed. R. Civ. P. 9 ................................................................................................................... 22

Fed. R. Civ. P. 9(b) .............................................................................................................. 23

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 6, 21

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Corcept pioneered Korlym, the first FDA-approved drug for certain patients suffering from the rare disease known as Cushing's syndrome, also called hypercortisolism. Korlym reflects significant investment by Corcept, which has worked to educate and support doctors and patients with valuable and life-changing medication, information, and support-services. Corcept has obtained—and, when necessary, enforced—patents for its research, development, and inventorship regarding the treatment of Cushing's. The Food and Drug Administration ("FDA") awarded Corcept's Korlym drug Orphan Drug Exclusivity ("ODE"), reflecting Corcept's willingness to focus on the small patient population served by Korlym. Corcept primarily distributes Korlym through a specialty pharmacy, Optime.

Coasting on Corcept's years of work, Teva decided to introduce a generic version of Korlym. Like all other generics, Teva's product was subject to an abbreviated regulatory approval process. That entailed the statutory requirements that Teva wait until Corcept's ODE ended, and that Teva demonstrate that it did not infringe any of Corcept's patents. When Teva's abbreviated new drug application ("ANDA") included a "Paragraph IV" certification—a statutory act of infringement—Corcept sought to enforce its patents in good faith, and Teva and Corcept litigated their disputes. While this litigation was pending, Teva obtained final FDA approval for its generic, which meant Teva could begin marketing its drug, should it have wished to do so. Despite having received approval to launch its generic *four years ago*, Teva voluntarily waited to enter the market until January 2024.

Now, years later and apparently unhappy with its product's weak performance, global giant Teva blames Corcept with this sour grapes lawsuit. In reality, Teva's drug has likely flopped due to its high price (a mere 13% discount from Korlym), its failure to cultivate its own sales and distribution channel (despite having its own sales force and access to major pharmacies and wholesalers), and its failure to offer any value-added services to prescribers or patients (unlike Corcept). Rather than take accountability for its own shortcomings, Teva brings baseless claims based on a supposed "multi-pronged scheme" consisting of Corcept's listing of patents in the FDA's Orange Book nearly a decade ago, its good-faith assertion of patent rights through litigation, its contracts with Optime, and its proper payment of speaker fees to practitioners. Each of Teva's claims is fatally defective.

*First*, Teva's allegations based on Corcept's Orange Book listings and supposed "sham litigation" fail to state a claim under Section 2 of the Sherman Act (Counts I–II). Teva's Orange Book allegations are based on Corcept listing the '348 and '495 patents in 2015 and 2017, conduct squarely time-barred because it occurred outside the four-year statute of limitations period. Teva's Orange Book allegations also fail for lack of antitrust injury because they do not plausibly establish that Teva's generic was delayed due to Corcept's Orange Book listings, rather than an independent statutory bar (Corcept's ODE) and/or Teva's own choice to not launch "at risk" during the parties' patent litigation. Teva's "sham litigation" allegations fail because they are time-barred (resting on patent suits filed years ago), do not plausibly establish antitrust injury (given Corcept's ODE and Teva's voluntary decision to wait to launch), and barred by *Noerr-Pennington* immunity (Teva fails to meet the exacting standards required to establish that either the "sham" or "serial" exceptions apply).

*Second*, Teva's exclusive dealing allegations based on Corcept's contract with Optime fail to state a claim under either Section 1 or Section 2 of the Sherman Act (Counts I–III). Teva's allegations fail at the outset because they are time-barred. Corcept first contracted with Optime in 2017, years outside of the limitations period, and Corcept's renewal of that contract in 2024 is merely a reaffirmation of a prior act, not a new overt act that restarts the limitations period under the continuing violation doctrine. Teva's allegations separately fail because they do not define the relevant distribution market or plausibly establish substantial foreclosure from any market.

*Third*, Teva's allegations that Corcept's payment of routine speaker fees to practitioners are "bribes" to induce them to prescribe Corcept's Korlym over Teva's generic fail to state a Section 2 claim (Counts I–II). Teva's allegations that the payments were "bribes" are both conclusory and implausible, undermined by Teva's own use and defense of similar payments. Even accepting as true the few specific allegations by Teva of particular payments by Corcept, they establish no more than that isolated payments were made, which the Ninth Circuit and other courts have made clear do not establish the harm to competition that the antitrust laws require.

*Finally*, Teva's jumble of state law claims fail. The Unfair Competition Law (Count IV) claim fails because Teva does not allege, as it must: (i) the inadequacy of legal remedies, (ii) illegal conduct under the "unlawful" prong, or (iii) improper conduct under the "unfair" prong. The Section 16600

1  claim (Count V) fails since it does not establish substantial foreclosure, and Teva cannot use Section

2  16600 to repackage its failed (and time-barred) federal exclusive dealing claim. The omnibus state-

3  law antitrust and consumer protection claim (Count VI) fails to satisfy even basic pleading standards

4  for the *85 statutes* it does reference, let alone for the laws it relies on but does not identify. The unjust

5  enrichment claim (Count VII) fails because it does not: (i) specify the applicable state law, (ii) assert

6  any quasi-contract, or (iii) establish any "benefit" that Teva provided *to* Corcept that should be returned.

7      Under scrutiny, Teva's complaint fails to properly state even a single cause of action. No

8  matter how they are combined, Teva's flawed allegations do not add up to a well-pleaded claim.

9  Nothing plus nothing still equals nothing, and Teva's complaint must therefore be dismissed.

10                              **FACTUAL BACKGROUND**

11      **Corcept Develops and Launches Korlym**: Corcept is a small, innovative pharmaceutical

12  company committed to developing novel treatments for serious disorders and providing patients and

13  physicians with the support they need to use those treatments optimally. To date, Corcept has brought

14  one product to market: Korlym. (¶2.)[1] Korlym was the first drug approved by the FDA to treat certain

15  patients with endogenous Cushing's syndrome (hypercortisolism), a "rare, debilitating disease" that

16  "occurs when the body is exposed to high levels of cortisol" often caused by a pituitary or adrenal

17  gland tumor. Cushing's "severely impacts quality of life" and can cause, *e.g.*, weight gain, muscle

18  weakness, depression, memory loss, hypertension, infections, heart attacks, and death. (¶¶2, 59–63.)

19      Korlym's active ingredient is mifepristone. (¶68.) In other dosages and applications,

20  mifepristone is also used to terminate pregnancies. Korlym launched with FDA approval in 2012,

21  pioneering the use of mifepristone to treat certain patients with endogenous Cushing's syndrome, and

22  was the first FDA-approved treatment for such patients with endogenous Cushing's. (¶¶3, 68–69.)

23  Due to the lack of "adequate treatments" for clinical manifestations of Cushing's, Korlym qualified

24  as an "orphan" drug, and the FDA awarded Corcept "certain benefits," including seven years of

25  marketing exclusivity. (¶¶65–67.) Corcept's ODE ran from Feb. 17, 2012 to Feb. 17, 2019. (¶¶68–69.)

26      **Corcept's Orange Book Listings and Assertions of Its Patents**: The FDA publishes

27  approved pharmaceutical drugs and their associated patents in a list known as the Orange Book. (¶27.)

28

---

[1] Unless noted, "¶" refers to Teva's complaint, internal citations are omitted, and emphases are added.

The Orange Book allows generic manufacturers to understand the scope of a brand manufacturer's regulatory and patent protections in evaluating whether to launch a competing generic. (¶28.) To enable this analysis, the Hatch-Waxman Act and FDA regulations *require* a brand manufacturer to list certain patents in the Orange Book. 21 U.S.C. §§ 355(b)(1), 355(c)(2); 21 C.F.R. § 314.53(b)(1). Pursuant to these obligations, Corcept listed two patents related to Korlym in the Orange Book—the **'348 patent** on January 27, 2015, and the **'495 patent** on November 28, 2017. (¶82.)

Having decided to launch a competing generic, on January 31, 2018, Teva provided Corcept with a Paragraph IV certification indicating Teva's position that its generic did not infringe either of Corcept's '348 or '495 patents. (¶106). The Hatch-Waxman Act treats a Paragraph IV certification as an act of infringement, and thus gave Corcept an immediate right to sue. *See Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 407 (2012). On March 15, 2018, Corcept filed suit against Teva for patent infringement over the '348 and '495 patents in the District of New Jersey (the "2018 Patent Claims"), which triggered an automatic, 30-month regulatory stay of Teva's generic application with the FDA. (¶¶42–43, 76.) After Teva moved to dismiss, the court *denied* its motion on October 23, 2018. *Corcept Therapeutics*, *Inc. v. Teva Pharms. USA*, *Inc.*, 2018 WL 5263278, at *1 (D.N.J. Oct. 23, 2018); *see also Krasnyi Oktyabr*, *Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y. 2008) (lawsuit that survives motion to dismiss is not baseless and thus not a "sham").

In February 2019, Corcept obtained the **'214 patent**, which involves a method of safely co-administering Korlym with drugs known as strong CYP3A inhibitors. (¶116.) Corcept promptly brought infringement claims against Teva on February 8, 2019 (the "2019 Patent Claim"). *Corcept Therapeutics, Inc. v. Teva Pharms. USA*, *Inc.*, Case No. 19-cv-5066 (D.N.J.). The court denied the parties' cross-motions for summary judgment as to infringement of the '214 patent, later finding non-infringement after a bench trial. *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, 2023 WL 9017081 (D.N.J. Dec. 29, 2023). Notwithstanding that Corcept's suit was, for now, unsuccessful—the court's order is on appeal to the Federal Circuit—the denial of summary judgment highlights the merit in Corcept's claim over the '214 patent. *See AstraZeneca AB v. Mylan Lab'ys, Inc.*, 2010 WL 2079722, at *3–4 (S.D.N.Y. May 19, 2010) (explaining that "an unsuccessful lawsuit, without more, is not a sham," and denial of summary judgment is "strong evidence" that suit is not a "sham").

Corcept was issued the **'800 and '801 patents** in November 2020. (¶117.) The '800 patent is a continuation of the '214 patent. Given the parties' pending infringement litigation over the earlier patents—including the case dispositive, cross-motions for summary judgment on the '214 patent—Corcept chose to file suit over the '800 and '801 patents in March 2023 (*id.*) only after the court denied the parties' cross-motions for summary judgment on the '214 patent immediately before on February 27, 2023. *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, Case No. 18-cv-3632 (D.N.J.), Dkt. 229. Corcept's assertion of the '800 and '801 patents (the "2023 Patent Claims") did not delay trial over the '214 patent, as the court ordered a consolidated trial over the '214 and the later-asserted patents on the previously-existing schedule. Dkts. 235 (at 2), 239. The parties thereafter proceeded to a bench trial on the '800 patent (along with the '214 patent) in September 2023. (¶121.)

**Distribution of Corcept's Korlym and Teva's Generic**: Corcept primarily distributes Korlym through Optime, which Teva describes as "a specialty pharmacy." (¶¶1, 5.) Teva alleges that Corcept entered into its first agreement with Optime years ago in August 2017 and that Corcept renewed this deal in April 2024. (¶136.) Teva acknowledges that Corcept and Optime each provide "certain services" to physicians that make Optime "the most efficient, effective, profit-maximizing" and "preferred" distribution channel (¶¶149, 163). Teva admits that since launching its generic, it has been "working through other channels" for distribution. (¶156.) Teva alleges that its generic "is available and stocked at all major wholesalers and a specialty wholesaler," and that it has pricing with "all major national specialty pharmacies, several regional specialty pharmacies, and several other national retail pharmacies," as well as "government contracts." (*Id.*)

**The Use of "Speaker" Fees to Educate the Marketplace**: Teva alleges Corcept's payments to physicians and practitioners were "bribes and kickbacks" to prescribe Corcept's Korlym over Teva's generic. Teva alleges that these alleged "bribes" have been "years-long" dating back to at least as early as 2017, even though Teva did not launch its generic until much later in January 2024. (¶¶171–72, 190.) The data Teva relies on makes clear the alleged payments are ordinary speaker, consulting, honorarium, food/travel, and similar fees that many pharmaceutical companies—including Teva—routinely make to properly educate physicians and healthcare practitioners about rare, complex diseases and the medicines approved to treat them. *See* Exs. A, B, C.

## LEGAL STANDARD

Dismissal is required "when a complaint lacks either a cognizable legal theory or sufficient facts alleged under such a theory." *In re German Auto. Mfrs. Antitrust Litig.,* 497 F. Supp. 3d 745, 753 (N.D. Cal. 2020) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "motion to dismiss is particularly sensible in an antitrust case," *Shahinian v. Med. Staff of Los Robles Hosp. & Med. Ctr.*, 2016 WL 9045473, at *1 (C.D. Cal. Feb. 2, 2016), where the extraordinary expense of discovery mandates that courts "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). In evaluating a complaint's allegations, "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d at 753–54.

## ARGUMENT

Teva asserts claims under the federal Sherman Act (Counts I–III), California's Unfair Competition Law (Count IV), California Business & Professions Code Section 16600 (Count V), various states' antitrust and consumer protection statutes (Count VI), and for unjust enrichment (Count VII). While Teva asserts multiple theories of anticompetitive conduct for purposes of its federal antitrust claims, none state a claim under either Section 1 or Section 2 of the Sherman Act. *See Dreamstime.com*, *LLC v. Google LLC*, 54 F.4th 1130, 1141–42 (9th Cir. 2022) (addressing each alleged anticompetitive act individually on motion to dismiss and explaining that "[b]ecause each individual action alleged . . . does not rise to anticompetitive conduct . . . their collective sum likewise does not."). Teva's tag-along state law claims likewise fail and must be dismissed.

## I. TEVA'S ORANGE BOOK LISTING AND SHAM LITIGATION ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM

### A. Teva's Orange Book Listing Allegations Fail

#### 1. Teva's Orange Book Listing Claims Are Time-Barred

Sherman Act claims are subject to a four-year statute of limitations and accrue "at the time of the alleged anticompetitive conduct." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D.

Cal. 2016). Teva sued on June 13, 2024, challenging a "scheme" that originated "many years" ago with Corcept's listing of the '348 and '495 patents in the Orange Book. (¶¶1, 82, 143.) But for Corcept's conduct, Teva alleges it would have launched its generic by February 2019. (¶¶77–81.) The Orange Book claims accrued long before the start of the limitations period (June 13, 2020) and are untimely.

Teva alleges that Corcept listed the '348 patent in the Orange Book on January 27, 2015, and the '495 patent on November 28, 2017. (¶82.) Teva's Orange Book claims accrued at that time. Even if its claims accrued on March 15, 2018, when Corcept sued Teva for infringing the '348 and '495 patents, Teva "acknowledge[s] that the initial events giving rise to these claims occurred more than four years" before the filing of the complaint. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991 (N.D. Cal. 2020) (Freeman, J.) (dismissing claims based on more than four-years-old anticompetitive conduct as untimely). Moreover, the continuing violations doctrine does not apply because Teva fails to point to *any* act within the limitations period related to allegedly improper Orange Book listings. *Peterson v. Sutter Med. Found.*, 2022 WL 316677, at *10 (N.D. Cal. Feb. 2, 2022) (continuing violation doctrine not met and claim dismissed as time-barred where "no overt act within the limitations period."). Teva's Orange Book claims should be dismissed on this basis alone.

### 2. Teva Fails to Plausibly Allege That Corcept's Orange Book Listings Caused Teva Antitrust Injury

To state an antitrust claim, Teva must plausibly allege "causal antitrust injury," which requires that "injuries flow from an anticompetitive aspect or effect of the defendant's behavior." *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 235 (9th Cir. 2020). In addition to being untimely, Teva's Orange Book listing claims separately fail because there is no plausible basis to establish causation between this conduct and any injury to Teva or competition.

Teva asserts it was harmed by Corcept's Orange Book listings because "[i]f the '348 and '495 patents had not been listed . . . at the time Teva filed its ANDA, Corcept could not have triggered a 30-month stay of FDA approval for Teva's generic," and Teva would have launched its generic in October 2018 (when it received tentative FDA approval) or soon thereafter. (¶¶76, 79.) Teva's claim fails, however, because Corcept's orphan drug exclusivity (ODE) precluded Teva's entry until February 2019, and even after ODE expiration, Teva voluntarily declined to enter the market for reasons other than the 30-month stay, which expired in August 2020.

Teva acknowledges that the FDA determined that Korlym qualified for "orphan" status under the Orphan Drug Act. (¶¶65–67.) Teva's complaint here and its binding admissions in the patent litigation recognize that the FDA granted Corcept ODE on February 17, 2012, that exclusivity expired on February 17, 2019, and that exclusivity is what prevented Teva from receiving final FDA approval to enter the market. (¶¶68–69); *Corcept Therapeutics, Inc. v. Teva Pharmaceuticals USA, Inc.*, 18-cv-3632 (D.N.J.), Dkt. 37 (Teva's Nov. 20, 2018 Answer) at p. 18–19; *Corcept Therapeutics, Inc. v. Teva Pharmaceuticals USA, Inc.*, 23-cv-1505 (D.N.J.), Dkt. 26 (Teva's May 2, 2023 Answer) at p. 15.

Contrary to these admissions, Teva now vaguely suggests (¶¶77–78) that because the FDA's October 12, 2018 letter providing tentative approval to Teva's ANDA did not expressly mention Korlym's orphan drug status, such status was somehow *sub silentio* extinguished or invalidated. But it is clearly implausible that the statutorily-mandated 7-year ODE period, *see* 21 U.S.C. § 360cc(a)(2), was silently canceled simply because the FDA's tentative approval letter didn't mention it. Because Teva's complaint references "the FDA's tentative approval letter," ¶78 & n.48, it is incorporated by reference, and the Court may consider it now. *Infra* at 20. Contrary to Teva's allegation that "the FDA stated expressly that the *only* barriers to Teva receiving final approval were the existence of the 30-month stay and the pending litigation over the '348 and '495 patents," ¶78, the FDA's tentative approval letter makes no such statement. Instead, it indicates the FDA is "unable to grant final approval to your ANDA at this time because of the patent issue noted below" but does not state— "expressly" or otherwise—that the ODE period set to expire in February 2019 is somehow nullified. Ex. D. Moreover, the FDA's own website—which is judicially noticeable, *infra* at 17—clearly establishes the ODE lasted until "02/17/2019" and makes no mention of an earlier end-date. Ex. E.

Teva could not have launched prior to February 17, 2019 because of Corcept's ODE, as the FDA website confirms and as Teva has elsewhere conclusively admitted. Notwithstanding Teva's current about-face, its alleged inability to launch during the ODE period thus stems from *statutory* barriers to launching, not Corcept's alleged anticompetitive conduct. "That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017) (collecting cases); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

*Application* § 338b (2022 ed., Supp. 2024). Teva cannot and does not allege how it could have launched during the ODE period, defeating antitrust injury and mandating dismissal of Teva's Orange Book claims. *See In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 787, 790–92 (8th Cir. 2006 (claim dismissed for lack of antitrust injury where exclusion caused by statute); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *84 (D.N.J. June 6, 2024) (similar).

### B.   Teva's Allegations Regarding the 2018 Patent Claims Fail

#### 1.   Any Claim Based On the '348/'495 Litigation Is Time-Barred

Teva's claim that the '348 and '495 lawsuit was an anticompetitive sham is also time-barred. "In the sham litigation context, the injury generally occurs when the lawsuit, which is alleged to have been a sham, is filed." *Perrigo Co. v. AbbVie Inc.*, 2022 WL 2870152, at *4 (3d Cir. July 21, 2022) (affirming dismissal); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237–239 (9th Cir. 1987) ("the initiation of judicial proceedings is the last overt act for purposes of the statute of limitations" for sham litigation claims). Corcept filed suit as to the '348 and '495 patents on March 15, 2018. (¶116.) Teva's sham litigation claims based on the '348 and '495 litigation thus accrued in March 2018, which is more than four years before Teva filed the present case, making these claims untimely.

#### 2.   Teva Fails to Establish Antitrust Injury From the '348/'495 Litigation

Teva's allegations regarding the '348 and '495 patent litigation also cannot support antitrust liability because Teva fails to plausibly allege causation between that lawsuit and competitive injury in the form of Teva's delayed entry. Teva conclusorily alleges that but for the '348 and '495 litigation, it would have entered the market in or near October 2018, else in or near February 2019. (¶¶79–80). As stated above (*supra* I.A.2.), Teva cannot establish antitrust injury attributable to the '348 and '495 litigation *prior to February 2019* due to Korlym's ODE. To the extent Teva claims that the '348 and '495 litigation somehow kept Teva off the market *following February 2019*, its allegations are implausible. As detailed below, by the time the ODE had expired, Corcept had sued Teva for infringing its '214 patent. It was Teva's unwillingness to launch "at risk" of infringing the '214 patent that led Teva to keep its own generic off the market when there was no barrier to its introduction. Teva's own business decision is thus the cause of any "delay" it suffered. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 241 (3d Cir. 2017) (if infringement litigation still pending when automatic 30-month

stay ends, FDA may give final approval "to the generic drug manufacturer," which "then has the option to launch 'at risk'"); *Kelsey K. v. NFL Enterprises LLC*, 2017 WL 3115169, at *5 (N.D. Cal. July 21, 2017) (allegations failed to plausibly establish antitrust injury where they made it "impossible to infer any reason why it was not wholly plaintiff's own decision" that caused plaintiff's injury).

### C.   Teva's Allegations Regarding the 2019 Patent Claims Fail

#### 1.   Any Claim Based On the '214 Litigation Is Time-Barred

Teva's claim that the '214 patent lawsuit was an anticompetitive sham fails at the outset because it is time-barred. Teva alleges that Corcept obtained the '214 patent "in February 2019," and "then immediately sued Teva for infringing" that patent. (¶116.) Indeed, the '214 patent was issued on February 5, 2019, and Corcept filed its suit over it on February 8, 2019. *Supra* at 4. Teva cannot now challenge Corcept's '214 infringement suit, as it occurred more than four years ago, making any sham litigation claim arising out of the '214 patent untimely. *Pace,* 813 F.2d at 237–239 (initiation of alleged sham suit, not "continued prosecution" of suit, relevant act for timeliness inquiry).

#### 2.   Teva Fails to Establish Antitrust Injury From the '214 Litigation

Teva's claims based on the '214 ligation likewise fail because Teva does not plausibly allege that litigation—rather than Teva's decision to not launch "at risk"—dictated the timing of its generic's launch. In such circumstances, there is no antitrust injury, and Teva's claims must be dismissed.

Teva obtained final FDA approval for its generic in August 2020, but made the decision to not launch its drug at that time. Instead, it waited 3.5 years after that to enter the market in January 2024. (¶¶77, 123.) The Patent Trial and Appeal Board rejected Teva's post-grant review challenge to the '214 patent, and the Federal Circuit affirmed. *Teva Pharm. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021). Corcept's '214 infringement claim proceeded all the way to trial. While the strength of the '214 patent and Corcept's infringement claim related to it may have led Teva to make the business decision to delay entering the market, the pendency of the '214 litigation did not prevent Teva from entering the market, as Teva was legally able to enter the market "at risk" at any time following the FDA's final approval, irrespective of Corcept's '214 infringement suit. *Lipitor*, 868 F.3d at 241; *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 245 (D. Mass. 2014). Accordingly, Teva's attempt to attribute antitrust injury to Corcept's '214 patent

claims also fails. Areeda & Hovenkamp, *Antitrust Law* § 338d (2022 ed., Supp. 2024) ("The plaintiff whose claimed loss was caused by its own shortcoming is not a victim of relevant injury or cause-in-fact."); *Kelsey*, 2017 WL 3115169, at *5 (no antitrust injury from "plaintiff's own decision").

### 3.    Teva Fails to Plausibly Allege That the '214 Litigation Was A Sham

*Noerr-Pennington* immunity bars Teva's Section 2 claims based on the '214 litigation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 56–57 (1993) ("*PREI*") ("Those who petition government for redress are generally immune from antitrust liability."). Teva cannot invoke the "sham" exception to *Noerr Pennington* as it does not plausibly allege any lawsuit by Corcept was "objectively baseless and [Corcept's] motive in bringing it was unlawful." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1045 (9th Cir. 2009). For a suit to be objectively baseless, "no reasonable litigant could realistically expect success on the merits." *Wellbutrin*, 868 F.3d at 148. And the burden is on "the plaintiff to disprove the challenged lawsuit's legal viability." *PREI*, 508 U.S. at 61. The hurdle for pleading sham litigation "is higher still in the context of an ANDA case," as "an infringement suit filed in response to an ANDA with a paragraph IV certification could only be objectively baseless if no reasonable person could disagree with the assertions of noninfringement or invalidity in the certification." *Wellbutrin*, 868 F.3d at 149.

Teva only contends that the '214 patent claim was a sham "prior to November 2019," *i.e.*, from the limited period between February 2019 and November 2019. (¶116.) But this Court "need not . . . accept as true allegations[.] that contradict matters properly subject to judicial notice[.]" *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Here, Teva's claim that the '214 litigation was a "sham" hinges on a single allegation that judicially noticeable documents prove false.

Teva admits that the '214 patent claims a method of treating Cushing's syndrome whereby a dose of 600 mg of mifepristone is administered alongside another class of drugs called a "CYP3A inhibitor." (¶116.) But it alleges that when Corcept brought the '214 infringement claim in February 2019, "Korlym's label (and accordingly, Teva's proposed generic label) . . . specifically *forbade* concomitant administration of strong CYP3A inhibitors with mifepristone doses *above 300 mg*," and Corcept's label was not revised until November 2019 to contain dosing information "above 300 mg," such that Teva's proposed label could not have induced infringement of the '214 patent at the time

1    Corcept sued. (*Id.*) This claim about the timing of the Korlym label-change is demonstrably false.

2        The FDA maintains an easily-accessible, public database of "Drug Safety-related Labeling

3    Changes," including an entry for Korlym. Ex. F. This database—found on a government website,

4    which is judicially noticeable, *infra* at 17—shows the FDA revised the Korlym label in *May 2017* to

5    state, "KORLYM should be used in combination with strong CYP3A inhibitors only when necessary,

6    and in such cases the dose should be limited to *600 mg* per day." *Id*. Thus, when Corcept filed the

7    '214 infringement claim (*February 2019*), Korlym's label had already specifically allowed the '214

8    patent's method of use for almost two years. Teva's allegations as to the timing of the Korlym label-

9    change therefore "contradict matters properly subject to judicial notice" and should not be taken as

10   true. *Sprewell*, 266 F.3d at 988. Apart from these demonstrably false allegations—the sole basis for

11   its '214 claims—Teva pleads no facts to plausibly satisfy the demanding sham litigation standard.

12       **D.   Teva's Allegations Regarding the 2023 Patent Claims Fail**

13           **1.   Teva Fails to Establish Antitrust Injury From the '800/'801 Litigation**

14       Teva's own allegations reveal that the strength of the '214 patent deterred it from bringing its

15   potentially infringing generic to the market. Corcept's assertion of the '800 (a continuation of the

16   '214 patent, which involves co-administration of 900 mg mifepristone with strong CYP3A inhibitors)

17   and '801 patents did not change that, and no antitrust injury can plausibly be attributed to them.

18       In the spring of 2021, Corcept and Teva cross-moved for summary judgment on the '214

19   patent. Nearly two years later, in February 2023, the patent litigation was reassigned to Judge Bumb,

20   who denied both motions. Soon thereafter (in March), Corcept sued Teva for infringing on the '800

21   and '801 patents, and these claims were consolidated into the existing litigation on the previously-set

22   schedule. Teva alleges that the delay between Corcept obtaining the '800 and '801 patents and suing

23   on them "can only be explained as a bad-faith tactic to push off the trial date." (¶117.) To the contrary,

24   because the '800 patent issued as a continuation of the '214 patent, and the '800 infringement claim

25   asserted by Corcept was similar to the infringement claim already pending over the '214 patent, there

26   was no need for Corcept to assert the '800 claim while the summary judgment motions were pending.

27   Summary judgment for either Corcept or Teva on the '214 infringement claim would likely have

28   obviated any need or ability to assert infringement of the continuation ('800) patent. Only when Judge

1    Bumb denied both cross-motions did it become necessary to assert the '800 patent.

2            In any event, even if the desired "delay" *was* tactical, Judge Bumb did *not* push off the trial

3    dates. *Supra* at 5. Teva's allegation that assertion of the '800 and '801 patents reveals that "Corcept's

4    piecemeal litigation strategy against Teva had no legitimate purpose and was pursued in bad faith as

5    a means of stifling competition and illicitly prolonging Corcept's monopoly by delaying resolution

6    of the patent case and Teva's eventual launch" (¶118) makes no sense. The assertion of these patents

7    did *not* delay resolution of the patent case or Teva's eventual launch (the suit itself triggered no stay),

8    which Teva *elected* to not do during the pendency of the '214 (and '800 and '801) patent litigation.

9            **2.      Teva Fails to Plausibly Allege That the '800/'801 Litigation Was A Sham**

10           Teva also fails to plausibly allege that Corcept's assertion of either the '800 or '801 patents

11   was a sham. While it references the March 2023 *timing* of Corcept's suit (¶117), Teva offers *no*

12   *explanation* of how this litigation was substantively frivolous. Indeed, one of the patents (the '800)

13   proceeded to trial. (¶121). Moreover, were the '800/'801 litigation a sham, Teva would not have

14   waited for its resolution to launch. Teva offers no contrary explanation, and its '800/'801 claims fail.

15           **E.      Teva's Allegations Regarding A "Series" of Supposed Sham Cases Fail**

16           Teva's allegation of a "series of objectively baseless infringement cases" (¶122) is also highly

17   conclusory and does not suffice to invoke the "series" exception to *Noerr-Pennington* immunity. Teva

18   fails to plausibly allege that Corcept's lawsuits were undertaken pursuant to "a policy of starting legal

19   proceedings without regard to the merits and for an unlawful purpose." *Kaiser*, 552 F.3d at 1045.

20   Indeed, Teva's allegations of a "series" are inconsistent with the fact that all of Corcept's patent cases

21   were efficiently consolidated into a single lawsuit. *See Int'l Longshore & Warehouse Union v. ICTSI*

22   *Oregon, Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017) (two suits insufficient in number to satisfy series

23   exception); *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 2024 WL 1975478, at *8 (N.D. Cal. May

24   3, 2024) (similar, based on two infringement suits, a related ITC action, and a foreign action).

25           Nor does Teva attempt to plead that Corcept's litigation exacted a "crushing burden" on Teva.

26   *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800,

27   811 (9th Cir. 1994). As its own website confirms, Teva is an enormously profitable, deeply-resourced

28   global pharmaceutical company that sells more than 3,600 different drug products (to Corcept's one),

produces nearly 76 billion tablets and capsules a year, operates 53 facilities in more than 33 countries, and enjoys billions of dollars in revenue. Ex. G; Ex. H; *E & J Gallo Winery v. Mira Enterprises, Inc.*, 2007 WL 9734494, at *3 (N.D. Cal. Nov. 9, 2007) ("information contained on" plaintiff's own website subject to judicial notice). Teva's perfunctory "series" allegations thus fail. *Realtek*, 2024 WL 1975478, at *8–9 (sham litigation claim dismissed and series exception not satisfied where plaintiff did "not contend . . . that the litigation directly interfered with its ability to do business").

## II.   TEVA FAILS TO STATE A SECTION 1 OR 2 EXCLUSIVE DEALING CLAIM

### A.   Teva's Exclusive Dealing Claims Are Time-Barred

Teva alleges that Corcept and Optime entered into an exclusive contract on August 4, 2017, which was "renewed" on April 1, 2024. (¶136.) Teva's claims based on the first contract—which accrued in August 2017, when it was implemented—are untimely. *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1236 (D. Or. 2013) (dismissing claim based on alleged anticompetitive contract as untimely where contract was entered into outside limitations period). As to the 2024 contract, Teva alleges no substantive differences between the 2017 and 2024 contracts. Simply renewing a contract is "merely a reaffirmation of a previous act"—not a "new and independent" overt act that satisfies the continuing violation doctrine. *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (Freeman, J.); *Ryan v. Microsoft Corporation*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015) (dismissing antitrust claim as untimely, as "maintenance and renewal of the preexisting . . . agreements does not qualify as an overt act."); *cf. Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014) (license that added substantive terms not found in prior license was overt act, as it was not merely "a reiteration or extension of the prior agreement"). Corcept's mere renewal of its Optime contract is not an overt act and thus does not satisfy the continuing violation doctrine. Claims based on either Optime contract are thus time barred.

### B.   Teva Fails to Plausibly Allege Substantial Foreclosure

Teva's allegations about Corcept's relationship with Optime fare no better. Exclusive dealing agreements are "often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *14 (C.D. Cal. July 24, 2018). That is particularly true where, as here, they are "imposed on distributors rather

1   than end-users." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Exclusive

2   dealing contracts are thus "analyzed under the rule of reason." *Nicolosi Distrib., Inc. v. FinishMaster,*

3   *Inc.*, 2018 WL 4904918, at *4–5 (N.D. Cal. Oct. 9, 2018) (Freeman, J.) (dismissing claim).

4        Under the rule of reason, an exclusive dealing agreement violates the Sherman Act "only if

5   its effect is to foreclose competition in a substantial share of the line of commerce affected." *Allied*

6   *Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).

7   "[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,"

8   *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 3242245, at *13 (N.D. Cal. June 25,

9   2013), and "low numbers make dismissal easy," *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112,

10  124 (1st Cir. 2011). Teva's exclusive dealing allegations fail under this test for at least two reasons.

11       *First*, Teva makes no attempt to define the relevant distribution market from which it alleges

12  it has been foreclosed. But "in all [exclusive dealing] cases the plaintiff must both define the relevant

13  market and prove the degree of foreclosure." *Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805,

14  at *11 (N.D. Cal. Nov. 25, 2015). Teva states that Corcept's agreement with a single distributor

15  (Optime) "has a nearly 100% foreclosure effect in the relevant market" (¶146), but it never explains

16  what downstream distribution channels it includes in that calculation, or why. The number it gives

17  seems to indicate the "relevant market" *only* includes Optime, which makes no sense. "[W]ithout

18  providing more information regarding the players in and dynamics of the relevant market," Teva

19  cannot "plausibly establish foreclosure of a substantial share." *Eastman*, 2015 WL 7566805, at *12;

20  *Hip Hop Beverage Corp. v. Monster Energy Co*., 733 F. App'x 380, 381 (9th Cir. 2018) (antitrust

21  claim properly dismissed because plaintiff "did not allege how many total brokers were in the market

22  in order to establish that [defendant] foreclosed competition").

23       *Second*, Teva's allegations cannot plausibly demonstrate substantial foreclosure. Courts take

24  into account all "existing or potential alternative channels of distribution." *Omega*, 127 F.3d at 1163.

25  Here, Teva alleges only one agreement with a small distributor. It admits it has access to every other

26  channel for distributing its generic, including "all major wholesalers," "a specialty wholesaler," "all

27  major national specialty pharmacies," "several regional specialty pharmacies," and "several other

28  national retail pharmacies." (¶156.) Taking these alternatives into account, Teva cannot show

1   foreclosure of more than a negligible share of any distribution market. *Maximum Availability Ltd. v.*

2   *Vision Sols., Inc.*, 2010 WL 11508470, at \*4–5 (C.D. Cal. Dec. 16, 2010) (antitrust claim dismissed

3   as "the existence of a single exclusive dealing arrangement with a distributor is insufficient").

4          Teva offers no plausible basis for excluding every single distributor other than Optime, and

5   there is none. Teva fails to describe a single barrier preventing doctors from sending prescriptions for

6   Teva's product to CVS, Walgreens, or any of the numerous other distribution channels it admits it

7   utilizes today. (¶156.) Teva uses terms like "entrenched physician prescribing behavior," "sticky

8   distribution channel," and "high switching costs" to justify its sole focus on Optime (¶151), but pleads

9   no *facts* to make plausible its extraordinary proposition that doctors are somehow only able to write

10  a prescription to a single pharmacy. *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at \*7–8

11  (N.D. Cal. Apr. 25, 2014) (unsupported allegations existing channels "insufficient" fails to state claim).

12         Indeed, Teva itself alleges that Optime is a "*preferred*" distribution channel for

13  mifepristone—one that is "efficient, effective, and profit-maximizing"—but not the only channel.

14  (¶¶149, 151, 163.) The Ninth Circuit is clear that antitrust plaintiffs may not exclude alternative

15  distribution channels from the market merely because they are less preferable. *See Omega*, 127 F.3d

16  at 1163. To exclude an alternative distribution channel from consideration, a plaintiff must therefore

17  show not merely that it is less preferable, but that it is not viable at all. *Id.* Teva has not done so here.

18  *See, e.g.*, *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 2016 WL 264909, at \*5–6 (D. Del. Jan. 21,

19  2016) (dismissing exclusive dealing claim because allegation that "multiple alternative means of

20  distribution" were "inferior" is insufficient to establish substantial foreclosure).

21         Teva concedes that the specialty "services" Optime and Corcept jointly provide for Korlym

22  patients and doctors make Optime the most preferable distribution channel. (¶149.) Teva's attempt to

23  state an antitrust claim based on others providing better services than Teva turns antitrust law on its

24  head. Preventing firms from free-riding on the product-specific co-investments their competitors

25  make with distributors is one of the chief *procompetitive* benefits of exclusive dealing. Areeda &

26  Hovenkamp, *Antitrust Law* ¶¶1810, 1812. Teva is free to compete with Corcept by developing its

27  own sales and support services. But Teva cannot state an antitrust claim based on its inability to free-

28  ride on its competitor's investments in consumer benefits.

1    **III.    TEVA'S BRIBERY ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM**

2        **A.    Teva's "Bribery" Allegations Are Conclusory and Implausible**

3        Teva's Section 2 claims rest on the unfounded notion that routine payments Corcept makes to

4    physicians and other practitioners for speaker, consulting, honorarium, and similar fees are "bribes"

5    to induce them to prescribe Corcept's product instead of Teva's. But adequately stating a claim takes

6    more than innuendo and bald conclusions; it requires alleging specific *facts* that render a claim

7    plausible. Teva provides none. Virtually every pharmaceutical company that has developed an

8    innovative medication makes similar payments to practitioners as part of efforts to educate the market

9    about its medication and the conditions that they treat. Teva itself makes these payments as part of its

10   speaker programs, and it touts them as "nothing inherently illegal," "unremarkable," "customary and

11   appropriate" for "educating physicians and patients about medications," and ultimately a "benefit,"

12   *United States v. Teva Pharms. USA, Inc.*, 13-cv-3702 (S.D.N.Y.), Dkt. 33 at 1, 3; Dkt. 141 at 9–10.

13   This highlights the implausibility of its claims that Corcept's payments are somehow bribes. Teva's

14   claimed reliance on supposed "data," "allegations" in a securities lawsuit, "investigative" reporting,

15   and an alleged "ongoing investigation into Corcept" (¶165) do not save its baseless Section 2 claims.

16       **CMS Data**: Teva relies on data from the Centers for Medicare and Medicaid Services

17   ("CMS"). (¶170.) Because Teva relies on CMS data found on a government website, it is judicially

18   noticeable and can be considered now. *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501

19   F. Supp. 3d 735, 752–53 (N.D. Cal. 2020). The data does not support Teva's claims. For example,

20   Teva alleges that CMS data shows Corcept made payments to physicians and practitioners that were

21   not "for research-related activities[.]" (¶¶169–82.) That the data shows non-research payments merely

22   points to speaker, consulting, honoraria, and related food/travel fees. Ex. B (Corcept CMS Data 2017–

23   2023). Such payments are permissible and not bribes. Indeed, the same data Teva relies on shows that

24   between 2017 and 2023, Corcept made about 76,200 non-research payments amounting to less than

25   $9.27 million; by comparison, Teva over the same period made almost 707,400 payments amounting

26   to more than $78.6 million. *Id.*; Ex. C (Teva CMS Data 2017–2023). In other words, Teva made more

27   than *nine times* as many payments as Corcept in number and *eight times* as many in amount.

28       When Teva itself makes these payments, it touts them as common, customary, and above

board. *Teva*, 13-cv-3702 (S.D.N.Y.), Dkt. 33 at 1, 3; Dkt. 141 at 9–10. Teva offers zero allegations that differentiate the payments Corcept makes from the payments that Teva itself makes and defends. It does not, for example, allege that a single payment was above fair market value; was made for a speaker event that was a sham, had no educational value, lacked attendance, or was cancelled; nor that any payment was improper "wining and dining." *See, e.g.*, 42 C.F.R. § 1001.952(d) (regulation describing when payments to practitioner-speakers fall within "safe harbor"); Ex. M at 5–6 (Office of Inspector General guidance on when payments for speaker programs potentially improper). Courts dismiss at the pleading stage claims that a firm "bribed" physicians to prescribe its product through consulting, speaker, and similar fees even where a plaintiff includes *some* of these basic allegations. *United States v. Novartis Pharms. Corp.*, 2022 WL 4217749, at *1–9 (S.D.N.Y. Sept. 13, 2022). Teva offers none here, and its claim that the speaker payments were "bribes" fails and should be disregarded.

Based on CMS and "Medicare Part D claims data" regarding a handful of prescribers, Teva also asserts that as Corcept increased its payments to those prescribers, they dispensed more Corcept prescriptions. (¶¶172, 176, 179–81.) Even assuming that were true, it does not make Teva's allegations of *bribes* plausible. Teva admits Corcept "provid[es] certain services to physicians," including at and after "intake," which "is tremendously valued by doctors[.]" (¶¶149, 160.) And Teva itself explains how payments like the at-issue speaker fees *legitimately* lead to an increase in prescriptions: "[d]octors and patients benefit from education programs that increase their awareness of disease states and the medicines used to treat them" such that "[i]t is to be expected that speakers will also often prescribe the products they discuss." *Teva*, 13-cv-3702 (S.D.N.Y.), Dkt. 33 at 3. Teva at best establishes mere correlation between payments and prescriptions, which does not plausibly establish the payments were bribes. *Cobb v. JPMorgan Chase Bank*, *N.A.*, 2013 WL 6201414, at *13 (N.D. Cal. Nov. 27, 2013) (dismissing bribery claim at pleading stage since "equally plausible to infer that [bribee's] rulings were legitimate" notwithstanding payments); *Evans Hotels, LLC v. Unite Here! Loc. 30*, 2021 WL 10310815, at *24 (S.D. Cal. Aug. 26, 2021) (similar, based on mere correlation).

Teva admits it did not even launch its generic until January 2024. (¶123.) Yet many of the payments Teva characterizes as bribes occurred *years* before it launched, such as between 2017 and 2020. (¶¶172, 176.) Teva nowhere explains why it is plausible that Corcept would illegally bribe

practitioners (and why they would risk their livelihoods by taking the bribes) to prescribe Corcept's drug, instead of Teva's, which was not even on the market yet and would not launch for years. Worse, the CMS data actually shows that Corcept's payments to some of the identified practitioners actually *decreased* as Teva's launch approached. *Compare*, *e.g.*, ¶176 (describing alleged increased payments and prescriptions to Dr. Mathews), *with* Ex. I (data showing lowest payments to Dr. Mathews in 2023, year immediately prior to Teva's launch). Teva also highlights payments to Drs. Back and Yau. (¶¶172–175, 177.) That Dr. Back—who also received payments *from Teva* and others, Ex. J—agreed to a settlement for alleged bribes from a different company for a different product says absolutely nothing about Corcept and Korlym. As to Dr. Yau, the public Florida Department of Health website confirms he remains a doctor in good standing, indicating nothing came of Teva's innuendo. Ex. K.

Where, as here, "[c]ommon sense dictates" that allegations of bribery are "not plausible," the Court need not consider those allegations at the pleading stage. *U.S. ex rel. Dooley v. Metic Transplantation Lab, Inc.*, 2016 WL 11746912, at *7 (C.D. Cal. Apr. 8, 2016) (partially dismissing bribery-based claim on this basis). Teva's reliance on payment data does not establish otherwise.

***Ferraro* Allegations**: Teva's claim that another court "in this District has already credited" bribery allegations "in a federal securities lawsuit against Corcept," (¶¶ 165, 167 & n.110), is deeply misleading and false. The *Ferraro* decision Teva invokes arose on a motion to dismiss, where the court acknowledged it must "accept[] factual allegations in the complaint as true[.]" *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *10 (N.D. Cal. Aug. 24, 2021). Even then, the court *rejected* as conclusory allegations "that the purpose or intent of Corcept's physician education programs were to advance or promote" Korlym. *Id.* at *15. In any event, *Ferraro* involved allegations Corcept paid practitioners to prescribe Korlym for "off-label" uses—"uses not approved by the FDA," *id.* at *3—*not* to prescribe Korlym over Teva's generic. Even if the off-label allegations were true (they are not), that lends no credence to Teva's *different* claim that Corcept paid practitioners *to prescribe Korlym over Teva's generic. In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing antitrust claim, as "[d]escriptions of *other* instances in which" defendants "engaged in price-fixing is provocative, but" does not itself show "commonalities between those circumstances and the present case to make those allegations probative").

**Boyd Article**: While Teva refers to supposed "reporting by investigative journalists," it cites only a single online source from Mr. Boyd. (¶¶165, 177 & n.114.) Given that Teva's complaint cites Mr. Boyd's article, it is incorporated by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Far from "uncover[ing] substantial evidence of illegal payments paid by Corcept" as Teva misstates (¶177), the article *agrees* that "the concept of a speakers bureau is a *fully legal,* well-used strategy" that "*serve[s] both marketing and educational purposes*," and that, at worst, Corcept has "exploit[ed] gaps" in regulation. Ex. L at 1, 3–4 (Boyd Article). In the internet era, anyone can crown themselves a "journalist" and post a "report" online. But referring to such a source does not, itself, make an antitrust claim plausible. Were that true, a plaintiff need only cite a single supposedly corroboratory "article" to state an antitrust claim. Clearly, that does not suffice. *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 509, 517 (D. Del. 2010) (dismissing antitrust claim as conclusory despite references to "news articles" suggesting conspiracy); *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063, 1074 (N.D. Cal. 2019) (similar, despite articles suggesting existence of conspiracy in "German news magazine *Der Spiegel*").

**U.S.A.O. Subpoena**: Teva asserts Corcept more than two years ago received a subpoena from prosecutors as to practitioner payments. (¶183.) Teva alleges the investigation "is still ongoing[,]" *id.*, a concession there have been *zero* findings of wrongdoing. Courts have explained the fact that a defendant receives a government subpoena and is being investigated—which could well result in no charges—"*carries no weight*" in establishing plausibility of antitrust wrongdoing. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (dismissing claim).

**B.**    **Teva Fails to Establish Harm to Competition From the Alleged Payments**

Teva's bribery claims also fail because they do not plausibly establish harm to competition. Teva conclusorily alleges that "Corcept's unlawful payments to physicians are a material factor that has caused physicians to continue prescribing brand Korlym" (¶184), without any specifics. It does not, *e.g.*, allege what portion of the alleged payments were supposedly bribes versus legitimate payments, how many practitioners—as compared to the total universe of Korlym prescribers—were purportedly bribed, or how many prescriptions were allegedly influenced by the payments. Instead, Teva urges "[d]iscovery will allow Teva to uncover more details[.]" (*E.g.*, ¶¶171, 185.) But that gets

it backwards: the "law does not permit plaintiffs to rely on anticipated discovery to satisfy Rules 8 and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to discovery." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021); *Twombly*, 550 U.S. at 558.

Stripped of Teva's "sue first, discover later" empty promises, all that remains are allegations of payments to six individual prescribers. (¶¶172, 176–77, 179–81.) The Sherman Act requires that there be an "anticompetitive effect," meaning harm to "the competitive process." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). Courts across the country have been clear that allegations of isolated incidents of sporadic bribes fail to meet that standard and thus do not give rise to a Sherman Act claim. *E.g.*, *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 687 (9th Cir. 1976) ("commercial bribery, standing alone, does not constitute a violation of the Sherman Act"); *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383 (D. Conn. 1988) (dismissing bribery-based claim as payment of bribes "does not support an inference that the bribes restrained competition").

## IV.   TEVA'S VARIOUS STATE LAW CLAIMS FAIL

### A.   Teva Fails to State a UCL Claim

Teva asserts that Corcept's Optime contract and its alleged practitioner payments violate the UCL's "unlawful" and "unfair" prongs. (¶¶229–38.) Teva's failure to allege the inadequacy of legal remedies bars its UCL claim—under both prongs—at the threshold. Teva's UCL claim should separately be dismissed since it fails to adequately allege any conduct that is either unlawful or unfair.

*First*, Teva's UCL claim fails because it does not allege that legal remedies are inadequate. Because the UCL provides only equitable relief, a UCL claim must be dismissed where the "complaint does not allege that" the plaintiff "lacks an adequate legal remedy." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Teva's UCL claim fails to allege—much less explain why—legal remedies (damages) are inadequate, dooming it. *Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 768–69 (N.D. Cal. 2022) (Freeman, J.) (dismissing UCL claim on this basis).

*Second*, Teva's UCL claim under the unlawful prong separately fails as it does not establish a violation of any "borrowed" law. While Teva vaguely refers to various statutes (¶231)—the Sherman and Clayton Acts, and California's Cartwright Act, Section 16600, prohibition on commercial bribery, and prohibition on things of value in exchange for the prescription of drugs covered by

1  insurance—conclusorily "throwing" a "laundry list" of supposedly-violated statutes "against the wall

2  to see what sticks" does not state an unlawful prong claim. *Bay City Surgery Ctr.*, *Inc. v. ILWU-PMA*

3  *Welfare Plan Bd. of Trustees*, 2017 WL 8943149, at \*10–11 (C.D. Cal. Oct. 20, 2017). In any case,

4  Teva fails to allege a violation of any of these laws, so its unlawful prong claim fails.

5      Because, as discussed above, Teva fails to state a claim under the Sherman Act, it fails to state

6  a claim under the Cartwright Act, *Name.Space*, *Inc. v. Internet Corp. for Assigned Names & Numbers*,

7  795 F.3d 1124, 1131 n.5 (9th Cir. 2015); therefore, neither statute can form the basis for its UCL

8  unlawful prong claim. *Garon v. eBay*, *Inc.*, 2011 WL 6329089, at \*6 (N.D. Cal. Nov. 30, 2011). As

9  explained *infra* with respect to the Section 16600 claim, Teva fails to state a claim under that statute.

10  Section 16600, then, cannot serve as the predicate for its unlawful prong claim either. *Robert Half*

11  *Int'l, Inc. v. Ainsworth*, 2015 WL 1197882, at \*4 (S.D. Cal. Mar. 16, 2015).

12      Teva also raises California's commercial bribery statute, Penal Code Section 641.3. But that

13  law requires "that one of the parties to the illicit transaction must *be an employee of the entity alleged*

14  *to have been injured* by the transaction," or, that there be "*corrupt payments* that injure *competitors*

15  of the *bribery recipient*." *People v. Riley*, 240 Cal. App. 4th 1152, 1162 (2015); *United States v.*

16  *Carson*, 2011 WL 7416975, at \*5 (C.D. Cal. Sept. 20, 2011). As discussed above, there are zero

17  adequate allegations of "corrupt payments"—only speaker fees and the like, which Teva itself makes

18  and touts the legality of. Moreover, the at-issue payments are between Corcept and prescribers, neither

19  of whom are employees of Teva, *i.e.*, "the entity alleged to have been injured by the" payments. *Riley*,

20  240 Cal. App. 4th at 1162. Similarly, Teva never alleges that the payments "injure competitors of the

21  bribery recipients," *Carson*, 2011 WL 7416975, at \*5—*i.e.*, *the recipient prescribers'* competitors—

22  instead, Teva alleges injury to itself (Teva is a competitor of Corcept, not of the recipient prescribers).

23      Teva also asserts that Corcept's alleged payments to prescribers violate Cal. Ins. Code §

24  1871.7. But Teva fails to allege basic requirements such as which patients were supposedly steered,

25  the amount of individual payments to prescribers, what insurance plans are at issue, and the like. Teva

26  thus cannot satisfy Rule 8, let alone Rule 9 (which some courts have held applies to Section 1871.7).

27  *United States v. Valley Campus Pharmacy*, *Inc.*, 2021 WL 4816648, at \*14 (C.D. Cal. June 23, 2021)

28  (dismissing Section 1871.7 claim for lack of "*specific* allegations of doctors referring patients");

1   *Petrick v. Stars Bay Area*, *Inc.*, 2021 WL 843183, at *7 (N.D. Cal. Mar. 5, 2021) (similar, since Rule

2   9(b) not met). Teva simply incants Section 1871.7 but does not explain how its requirements are met,

3   thereby failing to state a claim under the UCL's unlawful prong. *Bay City*, 2017 WL 8943149.

4       *Third*, Teva attempts to salvage its failed exclusive dealing and bribery theories by recasting

5   them under the UCL's unfair prong. Where, as here, there is a business dispute between competitors,

6   the "competitor test" applies, and conduct is "unfair" where it "threatens an incipient violation of an

7   antitrust law" or harms competition. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136–37 (9th Cir. 2014).

8   Teva acknowledges this standard (¶232), but fails to meet it. Since the exclusive dealing and bribery

9   allegations fail to state an antitrust claim, they cannot support an unfair prong claim under the

10  competitor test. *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *10–11 (N.D. Cal. June 4,

11  2020) (collecting cases, dismissing unfair prong claim where underlying antitrust claims dismissed).

12      **B.   Section 16600 Does Not Save Teva's Failed Exclusive Dealing Claim**

13      Teva alleges that Corcept's contract with Optime violates Section 16600. (¶¶239–46.) But

14  Teva cannot repackage its failed federal exclusive dealing claim under Section 16600. The rule of

15  reason—not the *per se* rule—is used to evaluate alleged exclusive dealing arrangements under Section

16  16600. *Ixchel Pharma*, *LLC* v. *Biogen*, *Inc.*, 9 Cal. 5th 1130, 1162 (2020). And California courts have

17  noted businesses "routinely employ" exclusive dealing arrangements, extolled their virtues, and

18  recognized they are often procompetitive. *Id.* at 1160–62. Courts have thus regularly upheld exclusive

19  dealing agreements under Section 16600 and its predecessor statute under the rule of reason. *See*

20  *Great W. Distillery Prod. v. John A. Wathen Distillery Co.*, 10 Cal. 2d 442, 445–46 (1937) (contract

21  which limited ability of whiskey distiller to transact with buyer's competitors); *Associated Oil Co. v.*

22  *Myers*, 217 Cal. 297, 306 (1933) (contract that required lessor to only sell lessee's petroleum).

23      Section 16600 only prohibits exclusive dealing arrangements under the rule of reason "when

24  it is probable that performance of the contract will foreclose competition in a *substantial share* of the

25  affected line of commerce." *Dayton Time Lock Serv.*, *Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d

26  1, 6 (Ct. App. 1975). As explained above, beyond being time-barred, Teva's own allegations confirm

27  Corcept's Optime deal does not substantially lessen competition because, notwithstanding that

28  contract, Teva enjoys—and has put in place—many alternative channels to distribute its product.

1   *Ixchel Pharma, LLC v. Biogen Inc.*, 2018 WL 558781, at *4 (E.D. Cal. Jan. 25, 2018) (Section 16600

2   claim dismissed where defendant's contract barred party from working with plaintiff and others as to

3   pharmaceutical product, as "d[id] not sufficiently allege harm to competition"); *Wag Hotels, Inc. v.*

4   *Wag Labs, Inc.*, 2022 WL 1212012, at *5–6 (N.D. Cal. Apr. 25, 2022) (Freeman, J.) (Section 16600

5   defense stricken, as one firm's "being unable to 'freely compete'" is "speculative" harm to competition).

6   ### C.   Teva's Omnibus Antitrust and Consumer Protection Claim Fails

7       Teva asserts that its failed exclusive dealing and bribery allegations give rise to a single claim

8   under a hodgepodge of states' antitrust and consumer protection statutes. (¶¶247–55.) Teva invokes

9   at least *85 different* statutory provisions under a single count, offering only threadbare allegations and

10  lists of statutes (it admits even these are only "exemplars" and not complete). (¶¶248–49 & n.117.)

11  Rule 8, however, requires "a short and plain statement of the claim showing that [Teva] is entitled to

12  relief[.]" Fed. R. Civ. P. 8(a)(2). Merely lumping an assortment of state law claims under a single

13  count and listing statutes is improper. Doing so does not identify "the elements of the various statutes"

14  or account for "significant differences among" them. *Revlimid*, 2024 WL 2861865, at *109–10, *112

15  (dismissing omnibus state law claim based on 36 statutes). It is also "insufficient to satisfy *Twombly*

16  and *Iqbal*'s pleading requirements." *Chavez v. Wal-Mart Stores, Inc.*, 2014 WL 12591244, at *4 (C.D.

17  Cal. Mar. 3, 2014) (dismissing omnibus claim based on "cursory listing" of "consumer protection

18  laws of all states"). And it makes zero "attempt to set forth facts showing that claims lie under each"

19  of the listed laws. *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 4774611,

20  at *11 (N.D. Cal. Sept. 22, 2014) (Freeman, J.) (dismissing omnibus state law claim based on "thirty-

21  two states"). Since merely listing statutes is insufficient, Teva's claim, which is a mere list—and,

22  even then, does not even identify all the statutes it relies on (¶248 & n.117)—fails.

23      Highlighting the infirmity of its approach, several of the laws that Teva invokes—*e.g.*, the

24  Illinois Consumer Fraud Act, ¶249(g)—cover deception (not at issue here), and do not bar allegedly

25  anticompetitive conduct. *E.g.*, *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 390 (1990). Some—like

26  the Montana Consumer Protection Act (¶249(s))—only provide a private right of action to consumers,

27  *not businesses* like Teva. *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *30 (E.D. Mich.

28  June 6, 2013). And others—like the antitrust statutes of Arizona and Nevada, ¶248(b)(z)—have pre-

1    filing notice requirements that mandate a plaintiff provide notice to the respective State Attorney

2    General (which Teva fails to allege it did). *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 412–

3    13, 416 (D.N.J. 2018). Teva's lump pleading simply pretends these unique requirements do not exist.

4            **D.    Teva's Unjust Enrichment Claim Fails**

5            Teva asserts an unjust enrichment claim based on the same Orange Book, sham litigation,

6    exclusive dealing, and bribery allegations. (¶¶256–73.) It refers to the "principles of California, or

7    alternatively, all states and territories." (¶¶268, 273.) This failure to commit to a state law warrants

8    dismissal: plaintiffs must "identify the state" due to "variances among state laws" so the Court can

9    "determine whether" the "claim has been adequately pled" under each state law. *Vance v. Google LLC*,

10   2024 WL 1141007, at *5 (N.D. Cal. Mar. 15, 2024) (Freeman, J.) (unjust enrichment claim dismissed);

11   *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 933 (N.D. Cal. 2018) (Freeman, J.) (same).

12           Even were Teva's claim construed under California law, it fails. "[T]here is no standalone

13   cause of action for . . . unjust enrichment in California," though "a court may construe" an unjust

14   enrichment claim "as a quasi-contract claim seeking restitution." *Lamba v. ASML US, L.P.*, 2023 WL

15   4865966, at *5 (N.D. Cal. July 31, 2023) (Freeman, J.). Teva fails each of these requirements. *First,*

16   Teva alleges no quasi-contractual relationship between it and Corcept; instead, it concedes they are

17   competitors. (¶152.) Where there is no quasi-contract, no unjust enrichment claim may lie under

18   California law. *Swift Harvest USA, LLC v. Boley Int'l HK Ltd*, 2020 WL 7380148, at *16 (C.D. Cal.

19   Sept. 22, 2020) (claim dismissed on this basis). *Second*, Teva's claim separately fails because Teva

20   provided no "benefit" *to* Corcept (*i.e.,* there is no basis for "restitution"). While it avers "it has

21   conferred upon" Corcept "an economic benefit, in the nature of" Corcept's alleged "supracompetitive

22   profits" that stem from Teva's "lost revenue" (¶259), such indirect and threadbare allegations fail.

23   *California Crane Sch., Inc. v. Google LLC*, 2024 WL 1221964, at *10 (N.D. Cal. Mar. 21, 2024)

24   (unjust enrichment claim dismissed since plaintiff "does not identify what benefit the Apple

25   defendants received *from*" plaintiff); *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *3 (N.D. Cal.

26   Mar. 11, 2021) (allegations of "supracompetitive prices" did not state unjust enrichment claim).

27                                   **CONCLUSION**

28           For the foregoing reasons, Corcept respectfully requests that the Court dismiss Teva's claims.

DATED:  August 26, 2024

By      */s/ Robert W. Stone*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:         (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Fax:         (415) 875-6700

Steig D. Olson (admitted *pro hac vice*)
  steigolson@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Fax:         (212) 849-7100

*Attorneys for Defendant Corcept Therapeutics, Inc.*

1

## CIVIL LOCAL RULE 5-1 ATTESTATION

I, Robert W. Stone, am the ECF user whose credentials were utilized in the electronic filing of this document.  In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the signatories listed above.

DATED:  August 26, 2024

By _____/s/ Robert W. Stone_____
      Robert W. Stone

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By _____/s/ Robert W. Stone_____
      Robert W. Stone