**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Fax:               (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Fax:               (415) 875-6700

*Attorneys for Defendant Corcept Therapeutics, Inc.*

**DUANE MORRIS LLP**
Lucas C. Wohlford (admitted *Pro Hac Vice*)
100 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: +1 214 257 7200
Facsimile: +1 214 257 7201
E-Mail: lwohlford@duanemorris.com

*Attorney for Defendant Optime Care Inc.*

[Additional Counsel Listed On Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CORCEPT THERAPEUTICS, INC., et al.,<br><br>Defendants. | Case No. 5:24-cv-03567-BLF<br><br>Honorable Beth Labson Freeman<br><br>**DEFENDANTS' JOINT NOTICE OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT WITH PREJUDICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: February 20, 2025 at 9:00 a.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF DEFENDANTS' JOINT MOTION TO DISMISS ....................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND .............................................................................................3

LEGAL STANDARD .......................................................................................................6

ARGUMENT ....................................................................................................................6

I.    TEVA'S PATENT LISTING AND SHAM LITIGATION ALLEGATIONS FAIL
TO STATE A SECTION 2 CLAIM ....................................................................7

    A.    Teva's Patent Listing Allegations Fail ................................................7

        1.    Teva's Patent Listing Claims Are Time-Barred.............................7

        2.    Teva Fails to Plausibly Allege that Corcept's Patent Listings Caused
Teva Antitrust Injury ..................................................................7

    B.    Teva's Allegations Regarding the 2018 Patent Claims Fail .........................9

        1.    Any Claim Based On the '348/'495 Litigation Is Time-Barred.................9

        2.    Teva Fails to Establish Antitrust Injury From the '348/'495 Litigation
..................................................................................................9

        3.    Teva Fails to Plausibly Allege that the '348/'495 Litigation Was A
Sham.........................................................................................10

    C.    Teva's Allegations Regarding the 2019 Patent Claims Fail .....................11

        1.    Any Claim Based On the '214 Litigation Is Time-Barred .........................11

        2.    Teva Fails to Establish Antitrust Injury From the '214 Litigation...............12

        3.    Teva Fails to Plausibly Allege that the '214 Litigation Was A Sham .........12

    D.    Teva's Allegations Regarding the 2023 Patent Claims Fail ....................13

        1.    Teva Fails to Establish Antitrust Injury From the '800/'801 Litigation
..................................................................................................13

        2.    Teva Fails to Plausibly Allege that the '800/'801 Litigation Was A
Sham.........................................................................................14

    E.    Teva's Allegations Regarding A "Series" of Supposed Sham Cases Fails..............14

II.    TEVA FAILS TO STATE A SECTION 1 OR 2 EXCLUSIVE DEALING CLAIM .........15

A.    Teva's Exclusive Dealing Claims Are Time-Barred...............................................15

B.    Teva Fails to Plausibly Allege Substantial Foreclosure..........................................17

III.    TEVA'S BRIBERY ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM ...........20

A.    Teva's "Bribery" Allegations Are Conclusory and Implausible.............................20

B.    Teva Fails to Establish Harm to Competition From the Alleged Payments ............24

IV.    TEVA'S VARIOUS STATE LAW CLAIMS FAIL ..........................................................25

A.    Teva Fails to State a UCL Claim .............................................................................25

     1.    Teva Fails to Allege that Legal Remedies Are Inadequate .........................25

     2.    Teva Fails to Allege Any "Unlawful" Conduct ..........................................26

     3.    Teva Fails to Allege Any "Unfair" Conduct ..............................................27

B.    Section 16600 Does Not Salvage Teva's Failed Exclusive Dealing Claim ............27

C.    Teva's Omnibus Antitrust and Consumer Protection Claim Fails ..........................28

D.    Teva's Unjust Enrichment Claim Fails ...................................................................29

V.    THE COURT SHOULD DISMISS TEVA'S CLAIMS WITH PREJUDICE....................30

CONCLUSION ................................................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010)............................................................................. 17

*Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*,
   2016 WL 9450472 (C.D. Cal. Sept. 28, 2016)............................................... 12, 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................... 6, 11

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
   166 F. Supp. 3d 988 (N.D. Cal. 2015) ............................................................. 7, 16

*Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*,
   2017 WL 8943149 (C.D. Cal. Oct. 20, 2017) ................................................. 26, 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 6, 24

*California Crane Sch., Inc. v. Google LLC*,
   2024 WL 1221964 (N.D. Cal. Mar. 21, 2024) ...................................................... 30

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
   532 F.2d 674 (9th Cir. 1976).............................................................................. 24

*Chavez v. Wal-Mart Stores, Inc.*,
   2014 WL 12591244 (C.D. Cal. Mar. 3, 2014) ...................................................... 28

*Cobb v. JPMorgan Chase Bank, N.A.*,
   2013 WL 6201414 (N.D. Cal. Nov. 27, 2013) ...................................................... 22

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
   2018 WL 5263278 (D.N.J. Oct. 23, 2018)......................................................... 4, 11

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
   709 F. Supp. 3d 138 (D.N.J. 2023) .................................................................... 4, 5

*Dairy, LLC v. Milk Moovement, Inc.*,
   2022 WL 4387981 (E.D. Cal. Sept. 22, 2022) ...................................................... 14

*Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*,
   52 Cal. App. 3d 1 (Ct. App. 1975) ..................................................................... 27

*Distance Learning Co. v. Maynard*,
   2020 WL 2995529 (N.D. Cal. June 4, 2020) ........................................................ 27

*U.S. ex rel. Dooley v. Metic Transplantation Lab*, *Inc.*,
  2016 WL 11746912 (C.D. Cal. Apr. 8, 2016) ................................................ 23

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ................................................................ 6

*E & J Gallo Winery v. Mira Enterprises*, *Inc.*,
  2007 WL 9734494 (N.D. Cal. Nov. 9, 2007) ................................................ 15

*Eastman v. Quest Diagnostics Inc.*,
  2015 WL 7566805 (N.D. Cal. Nov. 25, 2015) ........................................ 17, 18

*Ervin Equip. Inc. v. Wabash Nat'l Corp.*,
  2017 WL 416304 (N.D. Ind. Jan. 31, 2017) ................................................ 11

*Evans Hotels, LLC v. Unite Here! Loc. 30*,
  2021 WL 10310815 (S.D. Cal. Aug. 26, 2021) ............................................ 22

*Fed. Paper Bd. Co. v. Amata*,
  693 F. Supp. 1376 (D. Conn. 1988) ........................................................ 25

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................ 17, 24

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
  2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ............................................ 23

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
  501 F. Supp. 3d 735 (N.D. Cal. 2020) ............................................ 20, 21, 23

*Formula One Licensing v. Purple Interactive*,
  2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ........................................ 12, 14

*Forrett v. Gourmet Nut, Inc.*,
  634 F. Supp. 3d 761 (N.D. Cal. 2022) ...................................................... 25

*Garon v. eBay, Inc.*,
  2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) ............................................ 26

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) .................................................. 7, 27

*Gen-Probe, Inc. v. Amoco Corp.*,
  926 F. Supp. 948 (S.D. Cal. 1996) .......................................................... 13

*Gibson v. Jaguar Land Rover N. Am., LLC*,
  2020 WL 5492990 (C.D. Cal. Sept. 9, 2020) ............................................ 25

*GolTV, Inc. v. Fox Sports Latin Am., Ltd.*,
  2018 WL 1393790 (S.D. Fla. Jan. 26, 2018) ............................................ 25

*Harris Custom Builders, Inc. v. Hoffmeyer*,
    834 F. Supp. 256 (N.D. Ill. 1993) ........................................................... 13

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018)............................................................. 18

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000)................................................................... 20

*In re Auto. Parts Antitrust Litig.*,
    2013 WL 2456612 (E.D. Mich. June 6, 2013) ........................................ 29

*In re Canadian Import Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006).................................................................... 9

*In re German Auto. Mfrs. Antitrust Litig.*,
    392 F. Supp. 3d 1059 (N.D. Cal. 2019) .................................................. 24

*In re German Auto. Mfrs. Antitrust Litig.*,
    497 F. Supp. 3d 745 (N.D. Cal. 2020) ...................................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................. 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) .................................................... 29

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ......................................................... 29

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017) ............................................................ 10, 12

*In re Nexus 6P Prod. Liab. Litig.*,
    293 F. Supp. 3d 888 (N.D. Cal. 2018) .................................................... 30

*In re Optical Disk Drive Antitrust Litig.*,
    2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)........................................... 23

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) ..................................................... 29

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
    2024 WL 2861865 (D.N.J. June 6, 2024) ........................................ 9, 12, 14, 28

*In re Tamoxifen Citrate Antitrust Litig.*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003)..................................................... 29

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017) .......................................................... 8, 10, 11

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
  2016 WL 264909 (D. Del. Jan. 21, 2016) ............................................................. 18

*Ixchel Pharma, LLC v. Biogen Inc.*,
  2018 WL 558781 (E.D. Cal. Jan. 25, 2018) ........................................................... 28

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ............................................................................................ 27

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
  552 F.3d 1033 (9th Cir. 2009) ............................................................................... 10

*Kelsey K. v. NFL Enterprises LLC*,
  2017 WL 3115169 (N.D. Cal. July 21, 2017) .................................................. 10, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................. 23

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ......................................................................................... 25

*Krasnyi Oktyabr, Inc. v. Trilini Imports*,
  578 F. Supp. 2d 455 (E.D.N.Y. 2008) .................................................................. 11

*Lamba v. ASML US, L.P.*,
  2023 WL 4865966 (N.D. Cal. July 31, 2023) ....................................................... 30

*Laughlin v. Evanston Hosp.*,
  133 Ill. 2d 374 (1990) ............................................................................................ 29

*Levitt v. Yelp! Inc.*,
  765 F.3d 1123 (9th Cir. 2014) ............................................................................... 27

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
  2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ...................................................... 28

*Maximum Availability Ltd. v. Vision Sols., Inc.*,
  2010 WL 11508470 (C.D. Cal. Dec. 16, 2010) ..................................................... 18

*Miami Prod. & Chem. Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021) ................................................................. 29

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ............................................................................... 26

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
  2018 WL 4904918 (N.D. Cal. Oct. 9, 2018) ......................................................... 17

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ................................................................... 17, 18, 19

*Oregon Nat. Res. Council v. Mohla*,
  944 F.2d 531 (9th Cir. 1991) ................................................................................ 10

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) ............................................................................. 9, 11

*People v. Riley*,
  240 Cal. App. 4th 1152 (2015) ............................................................................ 26

*Perrigo Co. v. AbbVie Inc.*,
  2022 WL 2870152 (3d Cir. July 21, 2022) ............................................................. 9

*Peterson v. Sutter Med. Found.*,
  2022 WL 316677 (N.D. Cal. Feb. 2, 2022) ............................................................. 7

*Peterson v. Sutter Med. Found.*,
  615 F. Supp. 3d 1097 (N.D. Cal. 2022) ............................................................... 16

*Petrick v. Stars Bay Area, Inc.*,
  2021 WL 843183 (N.D. Cal. Mar. 5, 2021) .......................................................... 27

*Pistacchio v. Apple Inc.*,
  2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ........................................................ 30

*PNY Techs., Inc. v. SanDisk Corp.*,
  2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ...................................................... 18

*PNY Techs., Inc. v. SanDisk Corp.*,
  2014 WL 2987322 (N.D. Cal. July 2, 2014) ......................................................... 19

*Pool Water Prod. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ............................................................................... 7

*Power Analytics Corp. v. Operation Tech., Inc.*,
  2018 WL 10231437 (C.D. Cal. July 24, 2018) ..................................................... 17

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
  2013 WL 3936394 (C.D. Cal. July 30, 2013) ....................................................... 19

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
  508 U.S. 49 (1993) ......................................................................................... 10, 13

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
  2024 WL 1975478 (N.D. Cal. May 3, 2024) ........................................................ 15

*Relevant Grp., LLC v. Nourmand*,
  -- F.4th --, 2024 WL 4048894 (9th Cir. Sept. 5, 2024) ........................................ 15

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ............................................................ 7, 16

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.,*
    2013 WL 3242245 (N.D. Cal. June 25, 2013) ........................................ 17

*Robert Half Int'l, Inc. v. Ainsworth,*
    2015 WL 1197882 (S.D. Cal. Mar. 16, 2015) ........................................ 26

*Ryan v. Microsoft Corporation,*
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ........................................ 16, 17

*Schroeder v. United States,*
    569 F.3d 956 (9th Cir. 2009) ........................................ 25

*Schulz v. Cisco Webex, LLC,*
    2014 WL 2115168 (N.D. Cal. May 20, 2014) ........................................ 19

*Shahinian v. Med. Staff of Los Robles Hosp. & Med. Ctr.,*
    2016 WL 9045473 (C.D. Cal. Feb. 2, 2016) ........................................ 6

*Sonner v. Premier Nutrition Corp.,*
    971 F.3d 834 (9th Cir. 2020) ........................................ 25

*Sterling Merch., Inc. v. Nestle, S.A.,*
    656 F.3d 112 (1st Cir. 2011) ........................................ 17

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.,*
    738 F. Supp. 2d 505 (D. Del. 2010) ........................................ 24

*Swift Harvest USA, LLC v. Boley Int'l HK Ltd,*
    2020 WL 7380148 (C.D. Cal. Sept. 22, 2020) ........................................ 30

*Teva Pharm. USA, Inc. v. Corcept Therapeutics, Inc.,*
    18 F.4th 1377 (Fed. Cir. 2021) ........................................ 12

*Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag,*
    207 F. Supp. 2d 221 (S.D.N.Y. 2002) ........................................ 13, 14

*United States v. Carson,*
    2011 WL 7416975 (C.D. Cal. Sept. 20, 2011) ........................................ 26

*United States v. Novartis Pharms. Corp.,*
    2022 WL 4217749 (S.D.N.Y. Sept. 13, 2022) ........................................ 22

*United States v. Valley Campus Pharmacy, Inc.,*
    2021 WL 4816648 (C.D. Cal. June 23, 2021) ........................................ 27

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO,*
    31 F.3d 800 (9th Cir. 1994) ........................................ 15

*Vance v. Google LLC,*
    2024 WL 1141007 (N.D. Cal. Mar. 15, 2024) ........................................ 29

Case No. 5:24-cv-03567-BLF
DEFENDANTS' JOINT MOTION TO DISMISS TEVA'S FIRST AMENDED COMPLAINT WITH PREJUDICE

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ................................................................... 19

*Wag Hotels, Inc. v. Wag Labs, Inc.*,
    2022 WL 1212012 (N.D. Cal. Apr. 25, 2022) ........................................................ 28

*Whitaker v. Tesla Motors, Inc.*,
    985 F.3d 1173 (9th Cir. 2021) ............................................................................... 24

*Willett v. United States*,
    2020 WL 906724 (N.D. Cal. Feb. 25, 2020) ......................................................... 30

*Witt Co. v. RISO, Inc.*,
    948 F. Supp. 2d 1227 (D. Or. 2013) ...................................................................... 16

## **Statutes**

21 U.S.C. § 360cc(a)(2) ...................................................................................................... 8

Cal. Ins. Code § 1871.7 ............................................................................................... 26, 27

Cal. Bus. & Prof. Code § 16600 ........................................................................ 3, 6, 26, 27, 28

Cal. Penal Code § 641.3 ...................................................................................................... 26

## **Other Authorities**

42 C.F.R. § 1001.952(d) ..................................................................................................... 21

Fed. R. Civ. P. 8 ................................................................................................................. 28

Fed. R. Civ. P. 9 ................................................................................................................. 27

Fed. R. Civ. Proc. 12(b)(6) .............................................................................................. 1, 6

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ................................................. 9

## NOTICE OF DEFENDANTS' JOINT MOTION TO DISMISS

**PLEASE TAKE NOTICE** that on February 20, 2025, at 9:00 a.m., or at another time set by the Court, Defendants Corcept Therapeutics, Inc. and Optime Care Inc. will and hereby do jointly move to dismiss Plaintiff Teva Pharmaceuticals USA's Inc.'s first amended complaint (Dkt. 39, "FAC") with prejudice for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6). This motion is based upon this Notice and Memorandum of Points and Authorities, the declaration of Robert W. Stone and supporting exhibits, and any such evidence or argument requested or permitted by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Corcept pioneered Korlym, the first FDA-approved drug for certain patients suffering from the rare disease known as Cushing's syndrome, also called hypercortisolism. Korlym reflects significant investment by Corcept, which has worked to educate and support doctors and patients with valuable and life-changing medication, information, and support-services. Corcept has obtained—and, when necessary, enforced—patents for its research, development, and inventorship regarding the treatment of Cushing's. The Food and Drug Administration ("FDA") awarded Corcept's Korlym drug Orphan Drug Exclusivity ("ODE"), reflecting Corcept's willingness to focus on the small patient population served by Korlym. Corcept primarily distributes Korlym through a small specialty pharmacy, Optime.

Coasting on Corcept's years of work, Teva decided to introduce a generic version of Korlym. Like all other generics, Teva's product was subject to an abbreviated regulatory approval process. That process required that Teva wait until Corcept's ODE ended, and that Teva demonstrate that it did not infringe any of Corcept's patents. When Teva's abbreviated new drug application ("ANDA") included a "Paragraph IV" certification—a statutory act of infringement—Corcept sought to enforce its patents by filing an infringement suit. While that litigation was pending, Teva obtained final FDA approval for its generic, which meant Teva could begin marketing its drug, if it wished to do so and had confidence in its infringement defenses. But Teva did not display such confidence: despite being approved to launch its generic ***four years ago***, Teva waited to enter the market until January 2024.

Now, apparently unhappy with its product's weak performance, Teva blames Corcept with this sour grapes lawsuit and seeks to lump in Optime, a small pharmacy based in Missouri. But neither

Corcept nor Optime are to blame for Teva's limited success. Rather, it was Teva that set a high price for its generic drug and (in stark contrast to Corcept and Optime) failed to offer any helpful support to prescribers or patients. Teva now brings baseless and untimely claims based on a supposed "multi-pronged scheme" consisting of Corcept's listing of patents with the FDA nearly a decade ago, its reasonable assertion of patent rights through litigation, its contracts with a single small pharmacy (Optime), and its proper payment of speaker fees to healthcare practitioners. Each of Teva's claims is fatally defective and should be dismissed now with prejudice.

***First***, Teva's claims about Corcept's patent listings and supposed "sham litigation" (Counts I–II) fail on both timeliness and merits grounds. Teva alleges that Corcept improperly listed two patents (Corcept's '348 and '495 patents) in an FDA publication called the Orange Book. But those allegations are clearly time-barred because the listings occurred in 2015 and 2017 respectively, well outside the Sherman Act's four-year statute of limitations period. Similarly, Teva's "sham litigation" allegations concern lawsuits filed more than four years ago and are thus time-barred as well. Separately, on the merits, these claims both fail for lack of antitrust injury because they do not plausibly establish that Teva's generic was delayed due to Corcept's patent listings, rather than an independent statutory bar (the FDA's award of ODE to Korlym) and Teva's own choice to not launch "at risk" during the parties' patent litigation. And Teva's "sham litigation" claim additionally fails because it is barred by *Noerr-Pennington* immunity, as Teva fails to meet the exacting standards required to plausibly allege that Corcept's lawsuit was so objectively unreasonable as to be a "sham" or part of a "series" of baseless lawsuits.

***Second***, Teva's exclusive dealing allegations based on Corcept's contract with Optime (Counts I–III) also fail. Again, these claims are time-barred because they challenge a relationship Corcept first entered into with Optime in 2017, over seven years ago. Teva's allegations separately fail because they do not define the relevant distribution market or plausibly establish substantial foreclosure from any market, which is unsurprising given Optime is just one small pharmacy among many operating in the U.S., and Teva admits it has access to many wholesalers and pharmacies.

***Third***, Teva's allegations that Corcept's payment of routine speaker fees to practitioners are "bribes" to induce them to prescribe Corcept's Korlym over Teva's generic also fail to support Teva's

Section 2 claims (Counts I–II). Teva's allegations that the payments were "bribes" are both conclusory and implausible, as confirmed by Teva's own use of similar payments. Even accepting as true the few specific allegations by Teva of particular payments by Corcept, they establish no more than that Corcept made isolated payments, which the Ninth Circuit and other courts hold do not establish the necessary harm to competition required under the antitrust laws.

***Finally***, Teva's jumble of state law claims fail. The Unfair Competition Law (Count IV) claim fails because Teva does not allege, as it must: (i) the inadequacy of legal remedies, (ii) illegal conduct under the "unlawful" prong, or (iii) improper conduct under the "unfair" prong. The Section 16600 claim (Count V) fails since it is time-barred, does not establish substantial foreclosure, and cannot be used to repackage Teva's failed (and time-barred) federal exclusive dealing claim. The omnibus state-law antitrust and consumer protection claim (Count VI) fails to satisfy even basic pleading standards for the ***85 statutes*** it does reference, let alone for the laws it relies on but does not identify; it also fails alongside the flawed exclusive dealing and bribery allegations it seeks to tag along to. The unjust enrichment claim (Count VII) fails because it does not: (i) specify the applicable state law, (ii) assert any quasi-contract, or (iii) establish any "benefit" Teva provided ***to*** Defendants that should be returned.

Teva's amended complaint thus fails to state even a single cause of action. No matter how they are combined, Teva's flawed allegations do not add up to a well-pleaded claim. The FAC is Teva's second bite at the apple after it amended its original complaint in response to the many defects in Teva's claims that Defendants identified in their prior motions to dismiss. Those defects, however, remain. As a result, because the FAC is fatally flawed and amendment would be futile, Defendants respectfully request that the Court dismiss Teva's claims (and this case) with prejudice.

## **FACTUAL BACKGROUND**

**Corcept Develops and Launches Korlym**: Corcept is a small pharmaceutical company committed to developing novel treatments for serious disorders and providing patients and physicians with the support they need to use those treatments optimally. To date, Corcept has brought one product to market: Korlym. (¶2.)[1] Korlym was the first drug approved by the FDA to treat certain patients with endogenous Cushing's syndrome (hypercortisolism), a "rare, debilitating disease" that

---

[1] Unless noted, "¶" refers to Teva's FAC, internal citations are omitted, and emphases are added.

"occurs when the body is exposed to high levels of cortisol" often caused by a pituitary or adrenal gland tumor. Cushing's "severely impacts quality of life" and can cause, *e.g.*, weight gain, muscle weakness, depression, memory loss, hypertension, infections, heart attacks, and death. (¶¶2, 59–63.) Korlym launched with FDA approval in 2012, pioneering the use of mifepristone to treat certain patients with endogenous Cushing's syndrome (and was the first such FDA-approved treatment). (¶¶3, 68–69.) Due to the lack of "adequate treatments" for clinical manifestations of Cushing's, Korlym is an "orphan" drug, and the FDA awarded Corcept "certain benefits," including seven years of marketing exclusivity. (¶¶65–67.) Corcept's ODE ran from February 17, 2012–2019. (¶¶68–69.)

**Corcept's Patent Listings and Litigation**: The Hatch-Waxman Act and FDA regulations require new drug applicants to identify the patents associated with their drug and its use, which the FDA lists in a publication known as the Orange Book. (¶¶27–28.) The Orange Book allows generic manufacturers to understand the scope of a brand manufacturer's regulatory and patent protections in evaluating whether to launch a competing generic. (¶28.) As the Hatch-Waxman Act required, Corcept listed two Korlym-related patents in the Orange Book—the **'348 patent** on January 27, 2015, and the **'495 patent** on November 28, 2017. (¶82.)

Having decided to launch a competing generic, on January 31, 2018, Teva provided Corcept with a Paragraph IV certification indicating Teva's position that its generic did not infringe Corcept's '348 and '495 patents. (¶106). Consistent with the Hatch-Waxman Act, Corcept sued Teva on March 15, 2018, for infringement over the '348 and '495 patents in the District of New Jersey (the "2018 Patent Claims"), triggering an automatic, 30-month regulatory stay of Teva's generic application with the FDA. (¶¶42–43, 76.) The court *denied* Teva's motion to dismiss on October 23, 2018. *Corcept Therapeutics*, *Inc. v. Teva Pharms. USA*, *Inc.*, 2018 WL 5263278, at *1 (D.N.J. Oct. 23, 2018).

In February 2019, Corcept obtained the **'214 patent**. (¶116.) Corcept promptly brought infringement claims against Teva on February 8, 2019 (the "2019 Patent Claim"). *Corcept Therapeutics, Inc. v. Teva Pharms. USA*, *Inc.*, Case No. 19-cv-5066 (D.N.J.). The court *denied* the parties' cross-motions for summary judgment as to infringement of the '214 patent, later finding non-infringement after a bench trial (a ruling that is currently on appeal). *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, 709 F. Supp. 3d 138, 142 (D.N.J. 2023).

Corcept was issued the **'800 and '801 patents** in November 2020. (¶117.) The '800 patent is a continuation of the '214 patent. Given the parties' pending infringement litigation over the earlier patents—including the case dispositive, cross-motions for summary judgment on the '214 patent—Corcept chose to file suit over the '800 and '801 patents in March 2023 (*id.*) only after the court had just then denied the parties' cross-motions for summary judgment on the '214 patent on February 27, 2023. *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, Case No. 18-cv-3632 (D.N.J.), Dkt. 229. Corcept's assertion of the '800 and '801 patents (the "2023 Patent Claims") did not delay trial over the '214 patent, as the court ordered a consolidated trial over the '214 and the later-asserted patents on the previously-existing schedule. *Id.*, Dkts. 235 (at 2), 239. The parties thereafter proceeded to a bench trial on the '800 patent (along with the '214 patent) in September 2023. (¶121.)

Teva challenges Corcept's listing of the '348 and '495 patents in the Orange Book. It also asserts Corcept's litigation over the '348, '495, '214, '800, and '801 patents was a "sham."

**Distribution of Corcept's Korlym and Teva's Generic**: Corcept primarily distributes Korlym through Optime, a "specialty" pharmacy. (¶¶1, 5.) Teva challenges Corcept's relationship with Optime—a single, small pharmacy—as "exclusive dealing" that supposedly forecloses competition. Corcept entered into its first agreement with Optime years ago in August 2017, and Corcept and Optime renewed this deal in April 2024. (¶137.) Corcept and Optime each provide "certain services" to physicians that make Optime "the most efficient, effective, profit-maximizing" and "preferred" distribution channel (¶¶151, 165). Teva admits that since launching its generic, it has been "working through other channels" for distribution. (¶158.) Teva's generic "is available and stocked at all major national wholesalers and a specialty wholesaler," is available to "all major national specialty pharmacies, several regional specialty pharmacies, and several other national retail pharmacies," and has "pricing" on "government contracts." (*Id.*)

**The Use of "Speaker" Fees to Educate the Marketplace**: Teva alleges Corcept's payments to physicians and practitioners were "bribes and kickbacks" to prescribe Corcept's Korlym over Teva's generic. Teva alleges that these alleged "bribes" have been "years-long" dating back to at least as early as 2017, even though Teva did not launch its generic until much later in January 2024. (¶¶167–68, 192.) The data Teva relies on makes clear the alleged payments are ordinary speaker,

consulting, honorarium, food/travel, and similar fees that many pharmaceutical companies—including Teva—routinely make to educate physicians and healthcare practitioners about rare, complex diseases and the medicines approved to treat them. *See* Exs. A, B, C.

## LEGAL STANDARD

Dismissal is required "when a complaint lacks either a cognizable legal theory or sufficient facts alleged under such a theory." *In re German Auto. Mfrs. Antitrust Litig.,* 497 F. Supp. 3d 745, 753 (N.D. Cal. 2020) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "motion to dismiss is particularly sensible in an antitrust case," *Shahinian v. Med. Staff of Los Robles Hosp. & Med. Ctr.*, 2016 WL 9045473, at *1 (C.D. Cal. Feb. 2, 2016), where the extraordinary expense of discovery mandates that courts "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). In evaluating a complaint's allegations, "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d at 753–54.

## ARGUMENT

Teva brings claims under the federal Sherman Act (monopolization and attempted monopolization (Counts I–II) and exclusive dealing (Count III)), California's Unfair Competition Law (Count IV), California Bus. & Prof. Code Section 16600 (Count V), various states' antitrust and consumer protection statutes (Count VI), and for unjust enrichment (Count VII). Teva asserts all seven claims against Corcept and all but the monopolization claims (Counts I–II) against Optime. (¶¶211–275.) While Teva asserts multiple theories of anticompetitive conduct for purposes of its federal antitrust claims—patent listings, sham litigation, exclusive dealing, and bribery against Corcept, and exclusive dealing only against Optime—none state a claim under either Sections 1 or 2 of the Sherman Act. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141–42 (9th Cir. 2022) (addressing each alleged anticompetitive act individually on motion to dismiss and explaining that "[b]ecause each individual action alleged . . . does not rise to anticompetitive conduct . . . their

1    collective sum likewise does not.”). Teva's tag-along state law claims also fail and must be dismissed.

2    **I.    TEVA'S PATENT LISTING AND SHAM LITIGATION ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM**

3        **A.    Teva's Patent Listing Allegations Fail**

4            **1.    Teva's Patent Listing Claims Are Time-Barred**

5        "[S]tatute of limitations defenses are appropriately considered on a motion to dismiss." *Bay*

6    *Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (Freeman,

7    J.). Sherman Act claims are subject to a four-year statute of limitations and accrue "***at the time of the***

8    ***alleged anticompetitive conduct***." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D. Cal.

9    2016). Here, Teva sued on June 13, 2024, meaning the limitations period begins on June 13, 2020.

10       It is straightforward that Teva's Orange Book claims are untimely because they accrued long

11   before the limitations period. Teva's patent listing claims accrued when Corcept allegedly improperly

12   listed the '348 patent in the Orange Book on January 27, 2015, and the '495 patent on November 28,

13   2017. (¶82.) Both events happened years before the limitations period. Even if Teva's claims accrued

14   later on March 15, 2018, when Corcept sued over the '348 and '495 patents, they would still be

15   untimely by over two years. *Reveal Chat Holdco*, *LLC v. Facebook*, *Inc.*, 471 F. Supp. 3d 981, 991

16   (N.D. Cal. 2020) (Freeman, J.) (dismissing antitrust claims based on more than four-years-old conduct

17   as untimely). The continuing violations doctrine does not apply as Teva points to no act within the

18   limitations period related to allegedly improper Orange Book listings. *Peterson v. Sutter Med. Found.*,

19   2022 WL 316677, at *10 (N.D. Cal. Feb. 2, 2022) (continuing violation doctrine not met and claim

20   dismissed as late where "no overt act within the limitations period.").

21           **2.    Teva Fails to Plausibly Allege that Corcept's Patent Listings Caused Teva Antitrust Injury**

22       In addition to being untimely, Teva's Orange Book listing claims separately fail because there

23   is no plausible basis to establish causation between this conduct and any injury to Teva or competition.

24   To state an antitrust claim, Teva must plausibly allege "causal antitrust injury," which requires that

25   injuries "flow from[] an *anticompetitive* aspect or effect of the defendant's behavior[.]" *Pool Water*

26   *Prod. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (emphasis in original). Teva asserts it was

27   harmed by Corcept's Orange Book listings because "[i]f the '348 and '495 patents had not been listed

28   . . . at the time Teva filed its ANDA, Corcept could not have triggered a 30-month stay of FDA

-7-    Case No. 5:24-cv-03567-BLF

1   approval for Teva's generic," and Teva would have launched its generic in **October 2018** (when it

2   received tentative FDA approval) or soon thereafter. (¶¶76, 79.) But Teva cannot establish antitrust

3   injury from Corcept's Orange Book listings of the '348 and '495 patents because the FDA's award

4   of ODE to Corcept precluded Teva's entry until **February 2019**, and even after ODE expiration, Teva

5   **chose** not to enter the market for reasons other than the 30-month stay, which expired in August 2020.

6        Teva's FAC here and its admissions in the patent litigation recognize the FDA granted Corcept

7   ODE on February 17, 2012, that exclusivity expired on February 17, 2019, and that exclusivity is

8   what prevented Teva from receiving final FDA approval to enter the market. (¶¶65–69); *Corcept*

9   *Therapeutics*, *Inc. v. Teva Pharmaceuticals USA*, *Inc.*, 18-cv-3632 (D.N.J.), Dkt. 37 (Teva's Nov. 20,

10  2018 Answer) at pp. 18–19; *Corcept Therapeutics, Inc. v. Teva Pharmaceuticals USA*, Inc., 23-cv-

11  1505 (D.N.J.), Dkt. 26 (Teva's May 2, 2023 Answer) at p. 15. Contrary to these admissions, Teva

12  now vaguely and implausibly suggests (¶¶77–78) that because the FDA's October 12, 2018 letter

13  providing tentative approval to Teva's ANDA did not expressly mention Korlym's ODE status, such

14  status was somehow sub silentio extinguished or invalidated. But the FDA does not cancel the

15  statutorily-mandated 7-year ODE period, *see* 21 U.S.C. § 360cc(a)(2), simply by not mentioning it in

16  a particular letter. Because Teva's complaint references "the FDA's tentative approval letter," ¶77 &

17  n.48, it is incorporated by reference, and the Court may consider it now. *See infra* at 23. Contrary to

18  Teva's allegation that "the FDA stated expressly that the **only** barriers to Teva receiving final approval

19  were the existence of the 30-month stay and the pending litigation over the '348 and '495 patents,"

20  ¶78, the FDA's tentative approval letter makes no such statement. Instead, it indicates the FDA is

21  "unable to grant final approval to your ANDA at this time because of the patent issue noted below"

22  but does not state—"expressly" or otherwise—that the ODE period set to expire in February 2019

23  was somehow nullified. Ex. D. The FDA's own website—which is also judicially noticeable, *see*

24  *infra* at 20—clearly establishes the ODE lasted until "02/17/2019." Ex. E.

25        Notwithstanding Teva's implausible theory of ODE-cancellation-by-omission, its alleged

26  inability to launch during the ODE period plainly stems from statutory barriers to launching, not

27  Corcept's alleged anticompetitive conduct. "That a regulatory or legislative bar can break the chain

28  of causation in an antitrust case is beyond fair dispute." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d

132, 165 (3d Cir. 2017) (collecting cases); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 338b (2022 ed., Supp. 2024). Teva cannot plausibly allege that it could have launched during the ODE period (until February 2019), defeating antitrust injury and mandating dismissal of Teva's Orange Book claims. *See In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 787, 790–92 (8th Cir. 2006) (claim dismissed for lack of antitrust injury where exclusion caused by statute); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at \*84 (D.N.J. June 6, 2024) (similar). Moreover, to the extent Teva claims that Corcept's Orange Book listings somehow caused Teva antitrust injury by delaying Teva's entry until after February 2019, its allegations are implausible, unsupported, and undermined by its own conduct. That conduct makes clear that Teva voluntarily declined to enter the market for reasons other than the 30-month stay, which expired in August 2020. *See infra* at Sections I.B.2 & I.C.2.

### B.   Teva's Allegations Regarding the 2018 Patent Claims Fail

#### 1.   Any Claim Based On the '348/'495 Litigation Is Time-Barred

Teva's claims that the '348 and '495 lawsuit were a "sham" are time-barred. "In the sham litigation context, the injury generally occurs when the lawsuit, which is alleged to have been a sham, is filed." *Perrigo Co. v. AbbVie Inc.*, 2022 WL 2870152, at \*4 (3d Cir. July 21, 2022) (affirming dismissal); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237–239 (9th Cir. 1987) ("the initiation of judicial proceedings is the last overt act for purposes of the statute of limitations" for sham litigation claims). Corcept filed suit as to the '348 and '495 patents on March 15, 2018. (¶76.) Again, this is more than four years before Teva filed the present case, making these claims untimely.

#### 2.   Teva Fails to Establish Antitrust Injury From the '348/'495 Litigation

Teva's allegations regarding the '348 and '495 patent litigation also cannot support antitrust liability because Teva fails to plausibly allege causation between that lawsuit and competitive injury in the form of Teva's delayed entry. Teva conclusorily alleges that but for the '348 and '495 litigation, it would have entered the market in or near October 2018, else in or near February 2019. (¶¶79–80). As stated above, Teva cannot establish antitrust injury attributable to the '348 and '495 litigation *prior to February 2019* due to Korlym's ODE. *See supra* Section I.A.2.

To the extent Teva claims that the '348 and '495 litigation somehow kept Teva off the market *following February 2019*, its allegations are implausible. As detailed below, by the time the ODE

had expired, Corcept had sued Teva for infringing its '214 patent. It was Teva's unwillingness to launch "at risk" of infringing the '214 patent that led Teva to keep its own generic off the market when there was no barrier to its introduction. Teva's own business decision is thus the cause of any "delay" it suffered. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 241 (3d Cir. 2017) (if infringement litigation still pending when automatic 30-month stay ends, FDA may give final approval "to the generic drug manufacturer," which "then has the option to launch 'at risk'"); *Kelsey K. v. NFL Enterprises LLC*, 2017 WL 3115169, at \*5 (N.D. Cal. July 21, 2017) (allegations failed to plausibly establish antitrust injury where they made it "impossible to infer any reason why it was not wholly plaintiff's own decision" that caused plaintiff's injury).

### 3.      Teva Fails to Plausibly Allege that the '348/'495 Litigation Was A Sham

*Noerr-Pennington* immunity—which prohibits antitrust liability premised on the filing of lawsuits unless they are, *inter alia*, objectively baseless—also bars Teva's claims based on the '348/'495 litigation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc*., 508 U.S. 49, 56–57 (1993) ("*PREI*") ("Those who petition government for redress are generally immune from antitrust liability."). Teva cannot invoke the "sham" exception as Teva does not plausibly allege the '348/'495 litigation (or any other lawsuit by Corcept) was "objectively baseless and [Corcept's] motive in bringing it was unlawful." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc*., 552 F.3d 1033, 1045 (9th Cir. 2009). For a suit to be objectively baseless, "no reasonable litigant could realistically expect success on the merits." *Wellbutrin*, 868 F.3d at 148. The burden is on "the plaintiff to disprove the challenged lawsuit's legal viability." *PREI*, 508 U.S. at 61. A plaintiff seeking to satisfy an exception to *Noerr-Pennington* immunity must meet a "heightened pleading standard." *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991). Teva comes nowhere close.

Teva conclusorily alleges that Corcept's assertion of the '348 and '495 patents in the parties' patent litigation was "objectively baseless" because "every reasonable drug manufacturer would have known" that those "patents were not infringed by Teva's proposed generic." (¶102.) The hurdle for pleading the "sham" exception to *Noerr-Pennington* is high, and it is even "higher still in the context of an ANDA case," as "an infringement suit filed in response to an ANDA with a paragraph IV certification could only be objectively baseless ***if no reasonable person could disagree with the***

***assertions of noninfringement or invalidity*** in the certification." *Wellbutrin*, 868 F.3d at 149. For one, individuals ***did*** disagree with Teva's claims that its proposed generic would not violate Corcept's '348 and '495 patents. As one example—and as Teva is well aware—Corcept in the underlying patent litigation on November 2, 2020, served technical expert disclosures from Dr. Joseph Belanoff and Dr. Andreas Moraitis—the respective inventors—and they detailed their infringement theories in their depositions, including how the '348 and '495 patents covered Korlym (and thus Teva's generic).

Moreover, as Teva admits, the court denied Teva's motion to dismiss Corcept's claims based on the '348 and '495 patents. (¶112.) And while Teva asserts that the court "refused to review Teva's proposed label as part of its analysis," (*id.*), the court found the parties' competing interpretations as to whether Teva's generic infringed the patents "present[] a factual dispute that can only be properly resolved with expert input and claim construction." *Corcept*, 2018 WL 5263278, at *3 n.3. In other words, the court determined that there was ***some*** possibility that Corcept could prevail on its claims. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (explaining that "only a complaint that states a plausible claim for relief survives a motion to dismiss," and plausibility "***asks more than a sheer possibility*** that a defendant has acted unlawfully."). In such circumstances, courts have found a lawsuit is not objectively baseless and the sham exception is not met. *See Krasnyi Oktyabr*, *Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y. 2008) (lawsuit that survives motion to dismiss not baseless and thus not a "sham"); *Ervin Equip. Inc. v. Wabash Nat'l Corp.*, 2017 WL 416304, at *3 (N.D. Ind. Jan. 31, 2017) (similar, collecting cases, and dismissing sham litigation antitrust claim at pleading stage where motion to dismiss in underlying case partially denied).

### C.   <u>Teva's Allegations Regarding the 2019 Patent Claims Fail</u>

#### 1.   Any Claim Based On the '214 Litigation Is Time-Barred

Teva's claim that the '214 litigation was a sham is also time-barred. Teva alleges that Corcept obtained the '214 patent "in February 2019," and "then immediately sued Teva for infringing" that patent. (¶116.) Indeed, Corcept filed its suit over it on February 8, 2019. *See* s*upra* at 4. Teva cannot now challenge Corcept's '214 infringement suit, as it was initiated more than four years ago, making any sham litigation claim arising out of the '214 patent untimely. *See Pace,* 813 F.2d at 237–239.

### 2. Teva Fails to Establish Antitrust Injury From the '214 Litigation

Teva's claims based on the '214 ligation separately fail because Teva does not plausibly allege that litigation—rather than Teva's decision to not launch "at risk"—dictated the timing of its generic's launch. In such circumstances, there is no antitrust injury, and Teva's claims must be dismissed.

Teva obtained final FDA approval for its generic in August 2020, but made the decision to not launch its drug at that time. Instead, it waited 3.5 years to enter the market in January 2024. (¶¶77, 123.) The Patent Trial and Appeal Board rejected Teva's post-grant review challenge to the '214 patent, and the Federal Circuit affirmed. *Teva Pharm. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021). Corcept's '214 infringement claim proceeded to trial. While these developments, the strength of the '214 patent, and Corcept's infringement claim may have led Teva to make the business decision to delay entering the market, the '214 litigation's pendency did not prevent Teva from entering the market, as Teva was legally able to enter the market "at risk" at any time following the FDA's final approval, irrespective of Corcept's '214 infringement suit. *Lipitor*, 868 F.3d at 241. Accordingly, Teva cannot attribute antitrust injury to Corcept's '214 patent claims. Areeda & Hovenkamp, *Antitrust Law* § 338d (2022 ed., Supp. 2024) ("The plaintiff whose claimed loss was caused by its own shortcoming is not a victim of relevant injury or cause-in-fact."); *Kelsey*, 2017 WL 3115169, at *5 (no antitrust injury from "plaintiff's own decision").

### 3. Teva Fails to Plausibly Allege that the '214 Litigation Was A Sham

Teva's failure to plausibly allege that the '214 litigation was a sham provides another independent basis for dismissal. For one, Teva's threadbare allegations regarding the '214 litigation are woefully inadequate. The FAC merely states "[]it was objectively baseless and a sham for Corcept to sue Teva for infringing the '214 patent, because there was no basis to suggest that Teva's proposed label would encourage infringement of the '214 patent." (¶116.) But Teva nowhere explains *why* it was supposedly baseless for Corcept to claim infringement of the '214 patent. Teva offers only an unsupported conclusion, which does not suffice. *E.g.*, *Revlimid*, 2024 WL 2861865, at *91 (dismissing sham litigation antitrust claim at pleading stage, as no "specific allegations regarding *why*" suit objectively baseless); *Formula One Licensing v. Purple Interactive*, 2001 WL 34792530, at *2 (N.D. Cal. Feb. 6, 2001) (similar); *Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*, 2016 WL

1    9450472, at *4 (C.D. Cal. Sept. 28, 2016) (similar).

2    If anything, Teva's allegations demonstrate that the '214 litigation was not a sham. While

3    Teva points out Corcept did not prevail at the parties' bench trial (¶121), that Corcept lost at trial does

4    not make the case a sham. *PREI*, 508 U.S. at 60 n.5. To the contrary, that the trial court *denied* Teva's

5    summary judgment motion, *see supra* at 4, and Corcept's claim proceeded all the way to trial indicate

6    the '214 litigation was *not* a sham. *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 958 (S.D. Cal.

7    1996) (claims that survive summary judgment motion not objectively baseless); *Harris Custom*

8    *Builders, Inc. v. Hoffmeyer*, 834 F. Supp. 256, 261–62 (N.D. Ill. 1993) (sham litigation claim

9    dismissed at pleading stage where summary judgment denied in underlying suit); *Twin City Bakery*

10   *Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 224 (S.D.N.Y. 2002) (same).

11   ### D.   Teva's Allegations Regarding the 2023 Patent Claims Fail

12   #### 1.   Teva Fails to Establish Antitrust Injury From the '800/'801 Litigation

13   Teva's claim that the '800/'801 litigation was a sham fails because Teva fails to plausibly

14   establish how Corcept's assertion of the '800 and '801 patents caused it antitrust injury. As an initial

15   matter, Teva confirms it received final FDA approval for its generic in August 2020 (¶77). Yet, Teva

16   alleges that Corcept sued Teva over the '800 and '801 patents more than two-and-a-half years later

17   in March 2023. (¶117.) Given that Teva received final FDA approval in August 2020, it could have

18   begun marketing its generic at that time but chose not to. Teva does not plausibly explain how

19   Corcept's suing over the '800 and '801 patents years after Teva could have begun selling its generic

20   in August 2020 somehow delayed its entry.

21   Given that Corcept's suit over the '800 and '801 patents in 2023 did not trigger any stay or

22   otherwise affect Teva's FDA approval (which it had already received years earlier), Teva instead

23   alleges that Corcept's assertion of these patents was "a bad-faith tactic to push off the trial date" and

24   "delay[] resolution of the patent case and Teva's eventual launch." (¶¶117–18). Teva's allegations

25   make no sense. In the spring of 2021, Corcept and Teva cross-moved for summary judgment on the

26   '214 patent. *Corcept*, Case No. 18-cv-3632 (D.N.J.), Dkts. 197, 203. Nearly two years later, in

27   February 2023, the patent litigation was reassigned to Judge Bumb, who denied both motions. *Id.*,

28   Dkts. 228, 229. Soon thereafter (in March), Corcept sued Teva for infringing the '800 and '801

1    patents, and these claims were consolidated into the existing litigation on the previously-set schedule.

2    *Id.,* Dkts. 235 (at 2), 239. The '800 patent issued as a continuation of the '214 patent, and the '800

3    infringement claim asserted by Corcept was similar to the infringement claim already pending over

4    the '214 patent. Therefore, there was no need for Corcept to assert the '800 claim while the summary

5    judgment motions were pending. Summary judgment for either Corcept or Teva on the '214

6    infringement claim would likely have obviated any need or ability to assert infringement of the

7    continuation ('800) patent. Only when Judge Bumb denied both cross-motions on the '214 patent did

8    it become necessary for Corcept to assert the '800 patent, and it promptly did so.

9        In any event, even if the desired "delay" was tactical, Judge Bumb did not push off the trial

10   dates. *See supra* at 5. Teva's allegation that assertion of the '800 and '801 patents reveals that

11   "Corcept's piecemeal litigation strategy against Teva had no legitimate purpose and was pursued in

12   bad faith as a means of stifling competition and illicitly prolonging Corcept's monopoly by delaying

13   resolution of the patent case and Teva's eventual launch" is illogical. The assertion of these patents

14   did not delay resolution of the patent case or Teva's eventual launch (the suit itself triggered no stay),

15   which Teva ***elected*** to not do during the pendency of the '214 (and '800 and '801) patent litigation.

16       **2.     Teva Fails to Plausibly Allege that the '800/'801 Litigation Was A Sham**

17       Teva also fails to plausibly allege that Corcept's assertion of either the '800 or '801 patents

18   was a sham. While it references the March 2023 ***timing*** of Corcept's suit (¶117), Teva offers no

19   specific allegations establishing that this litigation was ***substantively*** frivolous. *Revlimid*, 2024 WL

20   2861865, at \*91; *Formula*, 2001 WL 34792530, at \*2; *Am. Nat'l Mfg.*, 2016 WL 9450472, at \*4; *see*

21   *also Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 4387981, at \*2 (E.D. Cal. Sept. 22, 2022)

22   (dismissing sham litigation antitrust counterclaim at pleading stage where premised on allegation that

23   "timing" of lawsuit "demonstrates that the lawsuit is a sham"). Indeed, one of the patents (the '800)

24   proceeded to trial. (¶121). Moreover, were the '800/'801 litigation a sham, Teva would not have

25   waited for its resolution to launch. Teva offers no contrary explanation, and its '800/'801 claims fail.

26       **E.     Teva's Allegations Regarding A "Series" of Supposed Sham Cases Fails**

27       Teva's allegation of a "series of objectively baseless infringement cases" (¶122) is also highly

28   conclusory and does not suffice to invoke the "series" exception to *Noerr-Pennington* immunity. The

"series" exception allows a sham litigation claim to proceed in certain circumstances where a defendant brings "a series of lawsuits . . . pursuant to a policy of starting legal proceedings without regards to the merits and for an unlawful purpose." *Relevant Grp., LLC v. Nourmand*, -- F.4th --, 2024 WL 4048894, at *6 (9th Cir. Sept. 5, 2024) (cleaned up). Teva cannot meet the exception's elements.

As an initial matter, it is not even clear that the series exception is available to Teva. Some courts have declined to apply the series exception in antitrust cases like this one involving underlying patent claims under the Hatch-Waxman Act. *Wellbutrin*, 868 F.3d at 157–58. Even assuming the series exception were theoretically available, Teva's allegations of a "series" are inconsistent with the fact that all of Corcept's patent cases were consolidated into a ***single*** lawsuit. Even were the consolidated lawsuits counted separately, the Ninth Circuit recently confirmed that "four actions" (the number Teva alleges here, ¶120) are insufficient to trigger the series exception test. *Relevant*, 2024 WL 4048894, at *9; *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 2024 WL 1975478, at *8 (N.D. Cal. May 3, 2024) (dismissing antitrust claim at pleading stage and finding series exception inapplicable based on two infringement suits, a related ITC action, and a foreign action).

Nor does Teva plead that Corcept's litigation exacted a "crushing burden" on Teva. *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). As its own website confirms, Teva is an enormously profitable, deeply-resourced global pharmaceutical company which sells 3,600 different drug products, produces nearly 76 billion tablets and capsules a year, operates 53 facilities in more than 33 countries, and makes billions of dollars in revenue. Ex. G; Ex. H; *E & J Gallo Winery v. Mira Enterprises, Inc.*, 2007 WL 9734494, at *3 n.3 (N.D. Cal. Nov. 9, 2007) ("information contained on" plaintiff's own website subject to judicial notice). Corcept's patent lawsuits were plainly no crushing burden for the behemoth Teva. *Realtek*, 2024 WL 1975478, at *8–9 (sham litigation claim dismissed and series exception not met where plaintiff did "not contend . . . the litigation directly interfered with its ability to do business").

## II.   <u>TEVA FAILS TO STATE A SECTION 1 OR 2 EXCLUSIVE DEALING CLAIM</u>

### A.   <u>Teva's Exclusive Dealing Claims Are Time-Barred</u>

Teva challenges a contract between Corcept and Optime entered into on August 4, 2017, which Teva claims was improperly "exclusive" and "renewed" on April 1, 2024. (¶¶135, 137.)

1    Teva's exclusive dealing claims are time-barred. Teva's claims based on the first contract

2   accrued in August 2017, when it was implemented.  Teva then had four years to sue but waited nearly

3   seven years (until June 2024), rendering its claims untimely. *Witt Co. v. RISO*, *Inc.*, 948 F. Supp. 2d

4   1227, 1236 (D. Or. 2013) (dismissing claim based on alleged anticompetitive contract as untimely,

5   as contract entered into outside limitations period).

6    Defendants' 2024 renewal does not save Teva's stale exclusive dealing claims. Simply

7   renewing a contract is "merely a reaffirmation of a previous act"—not a "new and independent" overt

8   act that satisfies the continuing violation doctrine. *BASM*, 166 F. Supp. 3d at 999; *Ryan v. Microsoft*

9   *Corporation*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015) (dismissing antitrust claim as untimely,

10   as "maintenance and renewal of the preexisting" agreements not "an overt act.").

11    In an attempt to plead around the continuing violation doctrine, the FAC adds two main

12   conclusory allegations (¶¶138, 143). Teva alleges that, over the course of the renewals, "Corcept and

13   Optime have made numerous adjustments to the terms of their relationship," including with respect

14   to "fees, services, and other obligations," and that the 2024 amendments "expanded Corcept's right

15   to relieve itself of its obligation to distribute Korlym exclusively through Optime[.]" (*id.*). But the

16   FAC never explains why these alleged revisions change the allegedly anticompetitive nature of the

17   contract. In fact, it is the opposite; Teva's claims concern ***Optime's*** alleged "express, blanket

18   obligation not to distribute products that can compete with" Corcept's Korlym, which Teva admits

19   has remained "in place" since 2017. (¶¶ 137, 143.) That is dispositive. *Reveal Chat*, 471 F. Supp. 3d

20   at 995 (dismissing claim as untimely, as plaintiffs did not "plausibly allege[] in a non-conclusory

21   manner ***how***" supposed conduct "constitute[] new and independent acts").

22    Nor do Teva's allegations regarding a supposed May 2024 meeting with Optime

23   "representatives" satisfy the continuing violation doctrine. (¶¶139, 142.) For one, Teva's allegations

24   are completely conclusory; they do not identify with whom from Optime specifically Teva claims to

25   have met. *Peterson v. Sutter Med. Found.*, 615 F. Supp. 3d 1097, 1112–13 (N.D. Cal. 2022) (alleged

26   conduct of "unidentified individuals" was "insufficient" to satisfy continuing violations doctrine).

27   Moreover, Teva alleges that during the supposed meeting, unnamed Optime employees stated Optime

28   could not "distribute Teva's product" because of "the exclusivity provisions" in the Corcept-Optime

1   contract (¶142.) But "[m]aintaining and reaffirming prior agreements do not suffice to show an overt

2   act." *Ryan*, 147 F. Supp. 3d at 885 (dismissing claim as time-barred).

3       **B.**    <u>**Teva Fails to Plausibly Allege Substantial Foreclosure**</u>

4          Teva's allegations about the Corcept-Optime contract fare no better on substance. Exclusive

5   dealing agreements are "often entered into for entirely procompetitive reasons, and generally pose

6   little threat to competition." *Power Analytics Corp. v. Operation Tech., Inc*., 2018 WL 10231437, at

7   *14 (C.D. Cal. July 24, 2018). That is particularly true where, as here, they are "imposed on

8   distributors rather than end-users." *Omega Env't, Inc. v. Gilbarco, Inc*., 127 F.3d 1157, 1162 (9th Cir.

9   1997). Indeed, the Ninth Circuit has recognized that "there are well-recognized economic benefits to

10  exclusive dealing arrangements, including the enhancement of interbrand competition[.]" *Fed. Trade*

11  *Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (cleaned up).

12         For these reasons, exclusive dealing arrangements are "analyzed under the rule of reason."

13  *Nicolosi Distrib., Inc. v. FinishMaster, Inc*., 2018 WL 4904918, at *4–6 (N.D. Cal. Oct. 9, 2018)

14  (Freeman, J.) (exclusive dealing claim dismissed). Under the rule of reason, an exclusive dealing

15  agreement violates the Sherman Act "only if its effect is to foreclose competition in a substantial

16  share of the line of commerce affected." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*

17  *LP*, 592 F.3d 991, 996 (9th Cir. 2010). "[F]oreclosure levels are unlikely to be of concern where they

18  are less than 30 or 40 percent," *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc*., 2013 WL

19  3242245, at *13 (N.D. Cal. June 25, 2013), and "low numbers make dismissal easy," *Sterling Merch.,*

20  *Inc. v. Nestle, S.A*., 656 F.3d 112, 124 (1st Cir. 2011). Teva's allegations fail this test for several reasons.

21         ***First***, Teva makes no attempt to define the relevant distribution market from which it alleges

22  it has been foreclosed. But "in all [exclusive dealing] cases the plaintiff must both define the relevant

23  market and prove the degree of foreclosure." *Eastman v. Quest Diagnostics Inc*., 2015 WL 7566805,

24  at *11 (N.D. Cal. Nov. 25, 2015). Teva alleges that Corcept's agreement with a single distributor

25  (Optime) "has a nearly 100% foreclosure effect in the relevant market" (¶148), but it never explains

26  what downstream distribution channels it includes in that calculation, or why. The number it gives

27  seems to indicate the "relevant market" ***only*** includes Optime, which makes no sense. "[W]ithout

28  providing more information regarding the players in and dynamics of the relevant market," Teva

1   cannot "plausibly establish foreclosure of a substantial share." *Eastman*, 2015 WL 7566805, at *12;

2   *Hip Hop Beverage Corp. v. Monster Energy Co*., 733 F. App'x 380, 381 (9th Cir. 2018) (antitrust

3   claim properly dismissed because plaintiff "did not allege how many total brokers were in the market

4   in order to establish that [defendant] foreclosed competition").

5       ***Second***, to establish substantial foreclosure, Teva would have to address all "existing or

6   potential alternative channels of distribution," which it has failed to do. *Omega*, 127 F.3d at 1163.

7   Teva's allegations concern Optime alone. Yet Teva admits it has access to every other channel for

8   distributing its generic, including many national and specialty wholesalers and pharmacies. (¶158.)

9   Taking these alternatives into account, Teva cannot show foreclosure of more than a negligible share

10   of any distribution market. *Maximum Availability Ltd. v. Vision Sols., Inc.*, 2010 WL 11508470, at

11   *4–5 (C.D. Cal. Dec. 16, 2010) (exclusive dealing claim dismissed as "existence of a single exclusive

12   dealing arrangement with a distributor is insufficient"); *Hip Hop*, 733 F. App'x at 381 (similar, where

13   due to alleged exclusive deal, "(at most) four brokers refused to do business" with plaintiff).

14       Teva offers no plausible basis for excluding every single distributor other than Optime. Teva

15   fails to describe a single barrier preventing doctors from sending prescriptions for its product to CVS,

16   Walgreens, or any of the numerous other distribution channels it admits it utilizes today. (¶158.) Teva

17   uses buzz words like "entrenched physician prescribing behavior," "sticky distribution channel," and

18   "high switching costs" to justify its sole focus on Optime (¶153) but pleads no ***facts*** to make plausible

19   its extraordinary proposition that doctors somehow can only write a prescription to a single pharmacy.

20   *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7–8 (N.D. Cal. Apr. 25, 2014) (unsupported

21   allegations that existing channels "insufficient" fails to state exclusive dealing claim).

22       Indeed, Teva itself alleges that Optime is a "***preferred***" distribution channel for

23   mifepristone—one that is "efficient, effective, and profit-maximizing"—but not the only channel.

24   (¶¶151, 153, 165.) The Ninth Circuit is clear that antitrust plaintiffs may not exclude alternative

25   distribution channels from the market merely because they are less preferable. *See Omega*, 127 F.3d

26   at 1163. To exclude an alternative distribution channel from consideration, a plaintiff must therefore

27   show not merely that it is less preferable, but that it is not viable at all. *Id.* Teva has not done so here.

28   *See, e.g.*, *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *5–6 (D. Del. Jan. 21,

2016) (dismissing exclusive dealing claim because allegation that "multiple alternative means of distribution" were "inferior" is insufficient to establish substantial foreclosure).

**Third**, Teva's attempt to state an antitrust claim based on others providing better services than Teva turns antitrust law on its head. Teva concedes that the specialty "services" Optime and Corcept jointly provide for Korlym patients and doctors make Optime the most preferable distribution channel. (¶151.) Preventing firms from free-riding on the product-specific co-investments their competitors make with distributors is one of the chief **procompetitive** benefits of exclusive dealing. Areeda & Hovenkamp, *Antitrust Law* ¶¶1810, 1812. Teva is free to compete with Corcept by developing its own sales apparatus and support services. But Teva cannot state an antitrust claim based on its inability to free-ride on its competitor's investments in consumer benefits. *Omega*, 127 F.3d at 1163. Teva's concession Defendants provide "services" that support patients' and doctors' use of Corcept's product provides an entirely legitimate and pro-competitive reason for Corcept's success, undermining Teva's exclusive dealing claim. *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *7 (N.D. Cal. July 2, 2014) (dismissing exclusive dealing claims at pleading stage where plaintiff's own complaint "contains allegations suggesting valid reasons for retailers to want exclusive relationships with [defendant]" and such arrangements were "achieved" pro-competitively).

**Finally**, the short term of the operative Corcept-Optime agreement and its easy terminability "negate substantially [any] potential to foreclose competition." *Omega*, 127 F.3d at 1163. Teva mischaracterizes the agreement as a "long-term" contract that is "perpetually-renewing," that "effectively has no expiration date," and that "Optime is not free to terminate." (¶¶7, 139, 226). Because the FAC cites and relies upon the agreement (¶138 n.109), it is incorporated by reference and the Court can consider it at the pleading stage. *Schulz v. Cisco Webex, LLC*, 2014 WL 2115168, at *3 (N.D. Cal. May 20, 2014) (Freeman, J.). Teva concedes (¶137) and the 2024 agreement makes clear that it has a **three-year** term. Ex. F § 14. Courts have held a three-year contract has a "relatively short duration," and contracts with three or even five-year durations do not substantially foreclose competition and thus do not suffice to state an exclusive dealing claim. *See W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) (exclusive deals that ranged up "to 3 years" had "relatively short" durations); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013

WL 3936394, at *2, *4 (C.D. Cal. July 30, 2013) (dismissing exclusive dealing claims at pleading stage where contacts had durations of three and five years). Moreover, contrary to Teva's allegation, the 2024 contract makes clear it is **not** perpetually-renewing; before the contract's expiration, either Corcept or Optime can choose not to renew it for any reason. Ex. F, § 14; *cf. Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977–978 (6th Cir. 2000) (exclusive dealing claim failed as matter of law where customers "free to seek other" suppliers at end of exclusive deals).

### III.   TEVA'S BRIBERY ALLEGATIONS FAIL TO STATE A SECTION 2 CLAIM

#### A.   Teva's "Bribery" Allegations Are Conclusory and Implausible

Teva's Section 2 claims rest on the unfounded notion that routine payments Corcept makes to physicians and other practitioners for speaker, consulting, honorarium, and similar fees are "bribes" to induce them to prescribe Corcept's product instead of Teva's. But adequately stating a claim takes more than innuendo and bald conclusions; it requires alleging specific **facts** that render a claim plausible. Teva provides none. Virtually every pharmaceutical company that has developed an innovative medication makes similar payments to practitioners as part of efforts to educate the market about its medication and the conditions that they treat. Teva itself makes these payments as part of its speaker programs, and it touts them as "nothing inherently illegal," "unremarkable," "customary and appropriate" for "educating physicians and patients about medications," and ultimately a "benefit." *United States v. Teva Pharms. USA, Inc.*, 13-cv-3702 (S.D.N.Y.), Dkt. 33 at 1, 3; Dkt. 141 at 9–10. This highlights the implausibility of Teva's claims that Corcept's payments are somehow bribes. Teva's reliance on supposed "data," "allegations" in a securities lawsuit, "investigative" reporting, and an alleged "ongoing investigation into Corcept" (¶167) do not save its baseless Section 2 claims.

**CMS Data**: Teva relies on data from the Centers for Medicare and Medicaid Services ("CMS"). (¶172.) Because Teva relies on CMS data found on a government website, it is judicially noticeable and can be considered now. *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 752–53 (N.D. Cal. 2020). The data does not support Teva's claims. For example, Teva alleges that CMS data shows Corcept made payments to physicians and practitioners that were not "for research-related activities[.]" (¶¶171–84.) That the data shows non-research payments merely points to speaker, consulting, honoraria, and related food/travel fees. Ex. B (Corcept CMS Data 2017–

1   2023). Such payments are permissible and not bribes, and Teva points to nothing to the contrary.

2       Teva instead offers vague innuendo that purports to compare—with no citation—the fees that

3   various practitioners supposedly received from Corcept to the average fees "comparable"

4   practitioners received from other "pharmaceutical companies." (¶184.) Teva alleges—again with zero

5   support—that Corcept's "payments are astronomical and far outside the norm." (*Id.*) But the same

6   data Teva relies on shows that between 2017 and 2023, Corcept made about 76,200 non-research

7   payments amounting to less than $9.27 million; by comparison, Teva over the same period made

8   almost 707,400 payments amounting to more than $78.6 million. Ex. B (Corcept CMS Data 2017–

9   2023); Ex. C (Teva CMS Data 2017–2023). In other words, Teva made more than ***nine times*** as many

10  payments as Corcept in number and ***eight times*** as many in amount.

11      Similarly, while Teva claims that between 2017 and 2023, "Corcept's top 10 payment

12  recipients each received between $187,441.86 and $443,531.01 individually, for an average of

13  $250,588.89," (¶184) the data for Teva in the same period shows that Teva's top 10 payment

14  recipients each received between $602,517.81 and $1,147,758.45. Put differently, the lowest of

15  Teva's top 10 payment recipients received more than Corcept's top recipient, and each of Teva's top

16  recipients received multiples more than their counterpart on Corcept's list. Exs. B, C. All of this

17  confirms Corcept's payments are ***not*** outside the norm, and the mere number and amount of payments

18  says nothing about their legality (otherwise, Teva could not defend its own payments, which it does).

19      When Teva itself makes these payments, it touts them as common, customary, and above

20  board. *Teva*, 13-cv-3702 (S.D.N.Y.), Dkt. 33 at 1, 3; Dkt. 141 at 9–10. It offers zero allegations that

21  differentiate the payments Corcept makes from the payments that Teva itself makes and defends. It

22  does not, for example, allege that a single payment was above fair market value; was made for a

23  speaker event that was a sham, had no educational value, lacked attendance, or was cancelled; nor

24  that any payment was improper "wining and dining." *See, e.g.*, 42 C.F.R. § 1001.952(d) (regulation

25  describing when payments to practitioner-speakers fall within "safe harbor"); Ex. M at 5–6 (Office

26  of Inspector General guidance on when payments for speaker programs potentially improper). Courts

27  dismiss at the pleading stage claims that a firm "bribed" physicians to prescribe its product through

28  consulting, speaker, and similar fees even where a plaintiff includes ***some*** of these basic allegations.

1    *United States v. Novartis Pharms. Corp.*, 2022 WL 4217749, at \*1–9 (S.D.N.Y. Sept. 13, 2022). Teva

2    offers ***none*** here, and its claim the speaker payments were "bribes" fails and should be disregarded.

3            Based on CMS and "Medicare Part D claims data" regarding a handful of prescribers, Teva

4    also asserts that as Corcept increased its payments to those prescribers, they dispensed more Corcept

5    prescriptions. (¶¶171–83.) Even assuming that were true, it does not make Teva's allegations of ***bribes***

6    plausible. Teva itself explains how payments like the at-issue speaker fees legitimately lead to an

7    increase in prescriptions: "[d]octors and patients benefit from education programs that increase their

8    awareness of disease states and the medicines used to treat them" such that "[i]t is to be expected that

9    speakers will also often prescribe the products they discuss." *Teva*, 13-cv-3702 (S.D.N.Y.), Dkt. 33

10   at 3. Even if Teva could establish correlation between payments and prescriptions, that does not

11   plausibly establish the payments were bribes. *Cobb v. JPMorgan Chase Bank, N.A.*, 2013 WL

12   6201414, at \*13 (N.D. Cal. Nov. 27, 2013) (dismissing bribery claim at pleading stage since "equally

13   plausible to infer that [bribee's] rulings were legitimate" notwithstanding payments); *Evans Hotels,*

14   *LLC v. Unite Here! Loc. 30*, 2021 WL 10310815, at \*24 (S.D. Cal. Aug. 26, 2021) (similar, based on

15   mere correlation).

16           Further highlighting the implausibility of its claims, Teva admits it did not even launch its

17   generic until January 2024. (¶123.) Yet many of the payments Teva characterizes as bribes occurred

18   ***years*** before it launched, such as between 2017 and 2020. (¶¶174, 178.) Teva nowhere explains why

19   it is plausible that Corcept would illegally bribe practitioners (and why they would risk their

20   livelihoods by taking the bribes) to prescribe Corcept's drug, instead of Teva's, which was not even

21   on the market yet and would not launch for years. Worse, the CMS data actually shows that Corcept's

22   payments to some of the identified practitioners ***decreased*** as Teva's launch approached. *Compare*,

23   *e.g.*, ¶178 (describing alleged increased payments and prescriptions to Dr. Mathews), *with* Ex. I (data

24   showing lowest payments to Dr. Mathews in 2023, year immediately prior to Teva's launch).

25           Teva also highlights payments to Drs. Back and Yau. (¶¶174–177, 179.) That Dr. Back—who

26   also received payments ***from Teva*** and others, Ex. J—agreed to a settlement for alleged bribes from

27   a different company for a different product says absolutely nothing about Corcept and Korlym. As to

28   Dr. Yau, the public Florida Department of Health website confirms he remains a doctor in good

standing, indicating nothing came of Teva's innuendo. Ex. K; *Ferraro*, 501 F. Supp. 3d at 752–53 (information on government website judicially noticeable).

Where, as here, "[c]ommon sense dictates" that allegations of bribery are "not plausible," the Court need not consider those allegations at the pleading stage. *U.S. ex rel. Dooley v. Metic Transplantation Lab*, *Inc.*, 2016 WL 11746912, at *7 (C.D. Cal. Apr. 8, 2016) (partially dismissing bribery-based claim on this basis). Teva's reliance on payment data does not establish otherwise.

**_Ferraro_ Allegations**: Teva's claim that another court "in this District has already credited" bribery allegations "in a federal securities lawsuit against Corcept," (¶¶ 167, 169 & n.117), is deeply misleading and false. The *Ferraro* decision Teva invokes arose on a motion to dismiss, where the court acknowledged it must "accept[] factual allegations in the complaint as true[.]" *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *10 (N.D. Cal. Aug. 24, 2021). Even then, the court *rejected* as conclusory allegations "that the purpose or intent of Corcept's physician education programs were to advance or promote" Korlym. *Id.* at *15. In any event, *Ferraro* involved allegations Corcept paid practitioners to prescribe Korlym for "off-label" uses—"uses not approved by the FDA," *id.* at *3—*not* to prescribe Korlym over Teva's generic. Even if the off-label allegations were true (they are not), that lends no credence to Teva's different claim that Corcept paid practitioners *to prescribe Korlym over Teva's generic*. *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing antitrust claim, as "[d]escriptions of *other* instances in which" defendants "engaged in price-fixing is provocative, but" does not itself show "commonalities between those circumstances and the present case to make those allegations probative").

**Boyd Article**: While Teva refers to supposed "reporting by investigative journalists," it cites only a single online source from Mr. Boyd. (¶¶167, 179 & n.121.) Given that Teva's complaint cites and relies on Mr. Boyd's article, it is incorporated by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Far from "uncover[ing] substantial evidence of illegal payments paid by Corcept" as Teva misstates (¶179), the article *agrees* that "the concept of a speakers bureau is a *fully legal*, well-used strategy" that "*serve[s] both marketing and educational purposes*," and that, at worst, Corcept has "exploit[ed] gaps" in regulation. Ex. L at 1, 3 (Boyd Article). In the internet era, anyone can crown themselves a "journalist" and post a "report" online. But referring to such a

1   source does not, itself, make an antitrust claim plausible. Were that true, a plaintiff need only cite a

2   single supposedly corroboratory "article" to state an antitrust claim. Clearly, that does not suffice.

3   *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 509, 517 (D. Del. 2010)

4   (dismissing antitrust claim as conclusory despite references to "news articles" suggesting conspiracy);

5   *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063, 1074 (N.D.Cal.2019) (similar,

6   despite articles suggesting existence of conspiracy in "German news magazine *Der Spiegel*").

7       **U.S.A.O. Subpoena**: Teva asserts Corcept more than two years ago received a subpoena from

8   prosecutors as to practitioner payments. (¶185.) Teva alleges the investigation "is still ongoing[,]" *id.*,

9   a concession there have been ***zero*** findings of wrongdoing. Courts have explained the fact that a

10   defendant receives a government subpoena and is being investigated—which could well result in no

11   charges—"***carries no weight***" in establishing plausibility of antitrust wrongdoing. *In re Graphics*

12   *Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (dismissing claim).

13              **B.     Teva Fails to Establish Harm to Competition From the Alleged Payments**

14       Teva's bribery claims also fail because they do not plausibly establish harm to competition.

15   Teva conclusorily alleges that "Corcept's unlawful payments to physicians are a material factor that

16   has caused physicians to continue prescribing brand Korlym" (¶186), without any specifics. It does

17   not, *e.g.*, allege what portion of the alleged payments were supposedly bribes versus legitimate

18   payments, how many practitioners—as compared to the total universe of Korlym prescribers—were

19   purportedly bribed, or how many prescriptions were allegedly influenced by the payments. Instead,

20   Teva urges "[d]iscovery will allow Teva to uncover more details[.]" (*E.g.*, ¶¶173, 187.) But that gets

21   it backwards: the "law does not permit plaintiffs to rely on anticipated discovery to satisfy Rules 8

22   and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to discovery."

23   *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021); *Twombly*, 550 U.S. at 558.

24       Stripped of Teva's "sue first, discover later" empty promises, all that remains are allegations

25   of payments to six individual prescribers. (¶¶174, 177–79, 181–83.) The Sherman Act requires that

26   there be an "anticompetitive effect," meaning harm to "the competitive *process*." *Qualcomm*, 969

27   F.3d at 990. Courts across the country have been clear that allegations of isolated incidents of sporadic

28   bribes fail to meet that standard and thus do not give rise to a Sherman Act claim. *E.g.*, *Calnetics*

*Corp. v. Volkswagen of Am.*, *Inc.*, 532 F.2d 674, 687 (9th Cir. 1976) ("commercial bribery, standing alone, does not constitute a violation of the Sherman Act"); *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383 (D. Conn. 1988) (dismissing bribery-based claim as mere payment of bribes "does not support an inference that the bribes restrained competition"); *see also GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, 2018 WL 1393790, at *15 (S.D. Fla. Jan. 26, 2018) (bribery-based antitrust claims akin to forcing "square peg . . . into the round hole").

## IV.   TEVA'S VARIOUS STATE LAW CLAIMS FAIL

### A.   Teva Fails to State a UCL Claim

Teva asserts that Corcept's Optime contract and its alleged practitioner payments violate the UCL's "unlawful" and "unfair" prongs. (¶¶231–40.) Teva's failure to allege the inadequacy of legal remedies bars its UCL claim—under both prongs—at the threshold. Teva's UCL claim should separately be dismissed since it fails to adequately allege any conduct that is either unlawful or unfair.

#### 1.   Teva Fails to Allege that Legal Remedies Are Inadequate

Teva's UCL claim initially fails because it does not allege that legal remedies are inadequate. Because the UCL provides only equitable relief, a UCL claim must be dismissed where the "complaint does not allege that" the plaintiff "lacks an adequate legal remedy." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Teva's UCL claim fails to allege—much less explain why—legal remedies (damages) are inadequate, dooming it. *Forrett v. Gourmet Nut*, *Inc.*, 634 F. Supp. 3d 761, 768–69 (N.D. Cal. 2022) (Freeman, J.) (dismissing UCL claim on this basis).

Nor can Teva establish that legal remedies are inadequate so as to justify the limited relief available under the UCL, which Teva in any case does plead its entitlement to. "[E]quitable relief is not appropriate where an adequate remedy exists at law." *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009). While Defendants dispute that Teva is entitled to ***any*** remedy, Teva expressly also seeks damages (¶277), an acknowledgement that an adequate remedy exists here (damages). Courts regularly dismiss UCL claims under similar circumstances. *Gibson v. Jaguar Land Rover N. Am.*, *LLC*, 2020 WL 5492990, at *3–4 (C.D. Cal. Sept. 9, 2020). Moreover, under the UCL, only injunctive relief and restitution—not damages or non-restitutionary disgorgement—are available. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144, 1152 (2003). As to injunctive relief, the FAC nowhere explains why an injunction is necessary, it seeks damages (indicating legal

remedies are adequate), and states no underlying violation that can serve as the predicate. And as to restitution, despite its incantation of the word, the FAC describes no money that Teva provided *to* either Corcept or Optime that should be returned—so there is nothing for Defendants to restore.

### 2.    Teva Fails to Allege Any "Unlawful" Conduct

Teva's unlawful prong claim separately fails as it does not establish a violation of any "borrowed" law. While Teva vaguely refers to various statutes (¶233), conclusorily "throwing" a "laundry list" of statutes "against the wall to see what sticks" does not state an unlawful prong claim. *Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*, 2017 WL 8943149, at *10–11 (C.D. Cal. Oct. 20, 2017). In any case, Teva fails to allege a violation of any of the identified laws.

Because, as discussed above, Teva fails to state a claim under the Sherman Act, it fails to state a claim under the Cartwright Act, *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015); therefore, neither statute can form the basis for its UCL unlawful prong claim. *Garon v. eBay, Inc.*, 2011 WL 6329089, at *6 (N.D. Cal. Nov. 30, 2011). As explained *infra* with respect to the Section 16600 claim, Teva fails to state a claim under that statute. Section 16600, then, cannot serve as the predicate for its unlawful prong claim either. *Robert Half Int'l, Inc. v. Ainsworth*, 2015 WL 1197882, at *4 (S.D. Cal. Mar. 16, 2015).

Teva also raises California's commercial bribery statute, Penal Code Section 641.3. But that law requires "that one of the parties to the illicit transaction must *be an employee of the entity alleged to have been injured* by the transaction," or, that there be "*corrupt payments* that injure *competitors* of the *bribery recipient*." *People v. Riley*, 240 Cal. App. 4th 1152, 1162 (2015); *United States v. Carson*, 2011 WL 7416975, at *5 (C.D. Cal. Sept. 20, 2011). As discussed above, there are zero adequate allegations of "corrupt payments"—only speaker fees and the like, which Teva itself makes and touts the legality of. Moreover, the at-issue payments are between Corcept and prescribers, neither of whom are employees of Teva, *i.e.*, "the entity alleged to have been injured by the" payments. *Riley*, 240 Cal. App. 4th at 1162. Similarly, Teva never alleges that the payments "injure competitors of the bribery recipients," *Carson*, 2011 WL 7416975, at *5—*i.e.*, *the recipient prescribers'* competitors. Instead, Teva alleges injury to itself (Teva is a competitor of Corcept, not of the recipient prescribers). Teva also asserts that Corcept's alleged payments to prescribers violate Cal. Ins. Code §

1871.7. But Teva fails to allege basic requirements such as which patients were supposedly steered, the amount of individual payments to prescribers, what insurance plans are at issue, and the like. Teva thus cannot satisfy Rule 8, let alone Rule 9 (which some courts have held applies to Section 1871.7). *United States v. Valley Campus Pharmacy, Inc.*, 2021 WL 4816648, at *14 (C.D. Cal. June 23, 2021) (dismissing Section 1871.7 claim for lack of "***specific*** allegations of doctors referring patients"); *Petrick v. Stars Bay Area, Inc.*, 2021 WL 843183, at *7 (N.D. Cal. Mar. 5, 2021) (similar, since Rule 9(b) not met). Teva simply incants Section 1871.7 but does not explain how its requirements are met, thereby failing to state a claim under the UCL's unlawful prong. *Bay City*, 2017 WL 8943149.

### 3.   Teva Fails to Allege Any "Unfair" Conduct

Teva also cannot save its failed exclusive dealing and bribery theories by recasting them under the UCL's unfair prong. Where, as here, there is a business dispute between competitors, the "competitor test" applies, and conduct is "unfair" where it "threatens an incipient violation of an antitrust law" or harms competition. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136–37 (9th Cir. 2014). Teva acknowledges this standard (¶234), but fails to meet it. Since the exclusive dealing and bribery allegations fail to state an antitrust claim, they cannot support an unfair prong claim under the competitor test. *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *10–11 (N.D. Cal. June 4, 2020) (collecting cases, dismissing unfair prong claim where underlying antitrust claims dismissed).

### B.   Section 16600 Does Not Salvage Teva's Failed Exclusive Dealing Claim

Teva alleges that Corcept's contract with Optime violates Section 16600. (¶¶241–48.) But Teva cannot repackage its failed federal exclusive dealing claim under Section 16600.

***First***, Teva's claim is untimely. Section 16600 has a four-year statute of limitations; Teva's claim is late like its federal exclusive dealing claims, as stated above. *Garrison*, 159 F. 3d at 1062–63.

***Second***, Teva's claim fails under the rule of reason, which is the test used to evaluate alleged exclusive dealing arrangements under Section 16600. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1162 (2020). Section 16600 only prohibits exclusive dealing contracts under the rule of reason "when it is probable that performance of the contract will foreclose competition in a ***substantial share*** of the affected line of commerce." *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 6 (Ct. App. 1975). As explained above, Teva's own allegations confirm Corcept's Optime

deal does not substantially lessen competition because, notwithstanding that contract, Teva enjoys—and has put in place—many alternative channels to distribute its product. *Ixchel Pharma*, *LLC v. Biogen Inc.*, 2018 WL 558781, at *4 (E.D. Cal. Jan. 25, 2018) (Section 16600 claim dismissed where defendant's contract barred party from working with plaintiff and others as to pharmaceutical product, as "d[id] not sufficiently allege harm to competition"); *Wag Hotels, Inc. v. Wag Labs*, *Inc.*, 2022 WL 1212012, at *5–6 (N.D. Cal. Apr. 25, 2022) (Freeman, J.) (Section 16600 defense stricken, as one firm's "being unable to 'freely compete'" is "speculative" harm to competition).

### C.   Teva's Omnibus Antitrust and Consumer Protection Claim Fails

Teva asserts that its failed exclusive dealing and bribery allegations give rise to a single claim under many states' antitrust and consumer protection statutes. (¶¶249–57.) Its omnibus claim fails.

***First***, Teva invokes at least ***85 different*** statutory provisions under a single count, improperly offering only threadbare allegations and lists of statutes (it admits even these are only "exemplars" and not complete). (¶¶250–51 & n.124.) Making matters worse, Teva does not even identify the specific provision of the statutes it claims Defendants violated. Instead, Teva simply lists the first section of each state statute followed by "*et seq.*" Rule 8, however, requires "a short and plain statement of the claim showing that [Teva] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

Merely lumping an assortment of state law claims under a single count and listing statutes is improper. Doing so does not identify "the elements of the various statutes" or account for "significant differences among" them. *Revlimid*, 2024 WL 2861865, at *109–10, *112 (dismissing omnibus state law claim). It is also "insufficient to satisfy *Twombly* and *Iqbal*'s pleading requirements." *Chavez v. Wal-Mart Stores*, *Inc.*, 2014 WL 12591244, at *4 (C.D. Cal. Mar. 3, 2014) (dismissing omnibus claim based on "cursory listing" of "consumer protection laws of all states") (collecting cases). And it makes zero "attempt to set forth facts showing that claims lie under ***each***" of the listed laws. *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 4774611, at *11 (N.D. Cal. Sept. 22, 2014) (Freeman, J.) (dismissing omnibus state law claim). Since merely listing statutes is insufficient, Teva's claim, which is a mere list—and, even then, does not even identify all the laws it relies on—fails.

The additional, disparate requirements of the state laws that Teva invokes highlight the claim's infirmity. For example, various asserted laws—*e.g.*, the Illinois Consumer Fraud Act, Michigan

Consumer Protection Act, Minnesota Consumer Fraud and Deceptive Trade Practices Acts, and South Dakota Deceptive Trade Practices Act (¶¶251(g)(n)(o)(p)(ee))—only bar deception (not at issue here), not anticompetitive conduct. *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 390 (1990); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 785–87 (D. Minn. 2020). Several—like the Missouri Merchandising Practices Act and Montana Consumer Protection Act (¶251(r)(s))—only provide a private right of action to consumers, **not businesses** like Teva. *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *30 (E.D. Mich. June 6, 2013). Some—like the Mississippi Antitrust Act, Massachusetts Consumer Protection Act, New Hampshire Consumer Protection Act, Maryland Antitrust Act, and Utah Antitrust Act (¶¶250(v)(pp), 251(m)(v))—have territorial restrictions requiring the conduct to have a substantially "intrastate" effect in **that** state or the plaintiff to be a citizen of **that** state; Teva establishes neither and resides in Delaware and New Jersey (¶12). *Pork*, 495 F. Supp. 3d at 788–89; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 267 (S.D.N.Y. 2019); *Miami Prod. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 244, 247 (W.D.N.Y. 2021). And others—like the antitrust statutes of Arizona and Nevada (¶250(b)(z))—have pre-filing requirements mandating notice to the applicable State Attorney General (which Teva fails to allege it provided). *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 412–13, 416 (D.N.J. 2018). Teva's lump pleading pretends these unique requirements do not exist, illustrating the problem.

  **Second**, the gravamen of Teva's omnibus claim is alleged exclusive dealing and "bribes." (¶¶250–51.) Those allegations fail to state a federal antitrust claim, so they likewise do not state a tag-along state law antitrust or consumer protection claim either. *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139–40 (E.D.N.Y. 2003) (dismissing state antitrust law and consumer protection claims where "based on the same allegations" as defective Sherman Act claims).

### D. Teva's Unjust Enrichment Claim Fails

  Teva asserts an unjust enrichment claim based on the same Orange Book, sham litigation, exclusive dealing, and bribery allegations. (¶¶258–75.) It refers to the "principles of California, or alternatively, all states and territories." (¶¶270, 275.) This failure to commit to a state law warrants dismissal: plaintiffs must "identify the state" due to "variances among state laws" so the Court can "determine whether" the "claim has been adequately pled" under each state law. *Vance v. Google LLC*,

2024 WL 1141007, at *5 (N.D. Cal. Mar. 15, 2024) (Freeman, J.) (unjust enrichment claim dismissed); *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 933 (N.D. Cal. 2018) (Freeman, J.) (same).

Even were Teva's claim construed under California law, it fails. "[T]here is no standalone cause of action for . . . unjust enrichment in California," though "a court may construe" an unjust enrichment claim "as a quasi-contract claim seeking restitution." *Lamba v. ASML US, L.P.*, 2023 WL 4865966, at *5 (N.D. Cal. July 31, 2023) (Freeman, J.). Teva fails each of these requirements. *First*, Teva alleges no quasi-contractual relationship between it and Defendants; instead, it concedes Corcept is its competitor and Optime is a pharmacy with whom it would like to (but does not) deal. (¶154, 161.) Where there is no quasi-contract, no unjust enrichment claim may lie under California law. *Swift Harvest USA, LLC v. Boley Int'l HK Ltd*, 2020 WL 7380148, at *16 (C.D. Cal. Sept. 22, 2020) (claim dismissed on this basis). *Second*, Teva's claim separately fails because Teva provided no "benefit" *to* Defendants (*i.e.,* there is no basis for "restitution"). While Teva avers "it has conferred upon" Defendants "an economic benefit, in the nature of" their alleged "supracompetitive profits" that stem from Teva's "lost revenue" (¶262), such indirect and threadbare allegations fail. *California Crane Sch., Inc. v. Google LLC*, 2024 WL 1221964, at *10 (N.D. Cal. Mar. 21, 2024) (unjust enrichment claim dismissed since plaintiff "does not identify what benefit the Apple defendants received *from*" plaintiff); *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *3 (N.D. Cal. Mar. 11, 2021) (allegations of "supracompetitive prices" did not state unjust enrichment claim).

## V.   THE COURT SHOULD DISMISS TEVA'S CLAIMS WITH PREJUDICE

The FAC reflects Teva's second bite at the apple after it amended its initial complaint in response to Defendants' earlier dismissal motions, and it still fails to state any claim. That demonstrates further amendment would be futile, and the Court should therefore dismiss Teva's claims with prejudice. *See Willett v. United States*, 2020 WL 906724, at *4 (N.D. Cal. Feb. 25, 2020) (denying leave to amend as "likely to be" futile since defective pleading was "second Complaint").

### CONCLUSION

For these reasons, Defendants request that the Court dismiss Teva's claims with prejudice.

1    DATED:  October 14, 2024

2                                                By:    /s/ Robert W. Stone
                                                       **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
3
                                                       Robert W. Stone (Bar No. 163513)
4                                                        robertstone@quinnemanuel.com
                                                       555 Twin Dolphin Drive, 5th Floor
5                                                      Redwood Shores, California 94065
                                                       Telephone:    (650) 801-5000
6                                                      Fax:            (650) 801-5100

7                                                      Adam B. Wolfson (Bar No. 262125)
                                                        adamwolfson@quinnemanuel.com
8                                                      50 California Street, 22nd Floor
                                                       San Francisco, California 94111
9                                                      Telephone: (415) 875-6600
                                                       Fax:            (415) 875-6700
10
                                                       Steig D. Olson (admitted *pro hac vice*)
11                                                       steigolson@quinnemanuel.com
                                                       51 Madison Avenue, 22nd Floor
12                                                     New York, New York 10010
                                                       Telephone:    (212) 849-7000
13                                                     Fax:            (212) 849-7100

14
                                                       *Attorneys for Defendant Corcept Therapeutics, Inc.*
15

16                                               By:    /s/ Lucas C. Wohlford
17                                                     Lucas C. Wohlford (admitted *Pro Hac Vice*)
                                                       **DUANE MORRIS LLP**
18                                                     100 Crescent Court, Suite 1200
                                                       Dallas, TX 75201
19                                                     Telephone: +1 214 257 7200
                                                       Facsimile: +1 214 257 7201
20                                                     E-Mail: lwohlford@duanemorris.com

21                                                     Justin J. Fields (SBN 259491)
                                                       **DUANE MORRIS LLP**
22                                                     Spear Tower
                                                       One Market Plaza, Suite 2200 San Francisco, CA
23                                                     94105-1127
                                                       Telephone: +1 415 957 3000
24                                                     Facsimile: +1 415 957 3001
                                                       E-Mail: jfields@duanemorris.com
25

26                                                     *Attorneys for Defendant Optime Care Inc.*

27

28

DEFENDANTS' JOINT MOTION TO DISMISS TEVA'S FIRST AMENDED COMPLAINT WITH PREJUDICE

**CIVIL LOCAL RULE 5-1 ATTESTATION**

I, Robert W. Stone, am the ECF user whose credentials were utilized in the electronic filing of this document.  In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the signatories listed above.


DATED:  October 14, 2024


By _____*/s/ Robert W. Stone*_____
         Robert W. Stone


**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.


By _____*/s/ Robert W. Stone*_____
         Robert W. Stone

DEFENDANTS' JOINT MOTION TO DISMISS TEVA'S FIRST AMENDED COMPLAINT WITH PREJUDICE