1   **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Robert W. Stone (Bar No. 163513)
2     robertstone@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
3   Redwood Shores, California 94065
    Telephone:    (650) 801-5000
4   Fax:             (650) 801-5100

5   Adam B. Wolfson (Bar No. 262125)
      adamwolfson@quinnemanuel.com
6   50 California Street, 22nd Floor
    San Francisco, California 94111
7   Telephone:    (415) 875-6600
    Fax:             (415) 875-6700

8
    *Attorneys for Defendant Corcept Therapeutics, Inc.*
9
    **DUANE MORRIS LLP**
10  Lucas C. Wohlford (admitted *Pro Hac Vice*)
    100 Crescent Court, Suite 1200
11  Dallas, TX 75201
    Telephone: +1 214 257 7200
12  Facsimile: +1 214 257 7201
    E-Mail: lwohlford@duanemorris.com
13
    *Attorney for Defendant Optime Care Inc.*
14
    [Additional Counsel Listed On Signature Page]
15

16                  **UNITED STATES DISTRICT COURT**

17                  **NORTHERN DISTRICT OF CALIFORNIA**

18                          **SAN JOSE DIVISION**

19
    TEVA PHARMACEUTICALS USA, INC.,          Case No. 5:24-cv-03567-BLF
20
                Plaintiff,                     Honorable Beth Labson Freeman
21
          vs.                                  **DEFENDANTS' REPLY IN SUPPORT OF**
22                                             **JOINT MOTION TO DISMISS PLAINTIFF'S**
    CORCEPT THERAPEUTICS, INC., et al.,       **FIRST AMENDED COMPLAINT WITH**
23                                             **PREJUDICE**
                Defendants.
24                                             Hearing Date: February 20, 2025 at 9:00 a.m.

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................2

I.      TEVA'S EXCLUSIVE DEALING SHERMAN ACT CLAIMS FAIL ..............................2

     A.      Corcept's Agreement With A Single Pharmacy Does Not Foreclose
        Competition ....................................................................................................2

     B.      Teva's Other "Considerations" Do Not Save Its Exclusive Dealing Claims ............5

     C.      Teva's Exclusive Dealing Claims Are Time-Barred....................................................6

II.     TEVA'S ORANGE BOOK SHERMAN ACT CLAIMS FAIL ...........................................6

     A.      Teva's Orange Book Claims Are Time-Barred........................................................6

     B.      Teva's Allegations of Orange Book-Related Antitrust Injury Are Implausible
        ................................................................................................................8

III.    TEVA SHAM LITIGATION SHERMAN ACT CLAIMS FAIL ......................................10

     A.      Teva's Claims Based On Seven of the Nine At-Issue Patents Are Time-
        Barred ........................................................................................................10

     B.      *Noerr-Pennington* Immunity Bars Teva's Claims, and No Exception Applies
        ................................................................................................................11

     C.      The "*Hynix* Test" Does Not Save Teva's Sham Litigation Claims..........................13

     D.      Teva Fails to Plausibly Establish Antitrust Injury from Alleged Sham
        Litigation ....................................................................................................14

IV.     TEVA'S BRIBERY SHERMAN ACT CLAIMS FAIL.....................................................14

     A.      Teva's Allegations that the Payments Are Illicit "Bribes" Are Implausible............14

     B.      Teva's Allegations of Sporadic Payments Do Not Establish Harm to
        Competition ..................................................................................................15

V.      TEVA'S STATE LAW CLAIMS ALL FAIL .................................................................16

VI.     TEVA'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE..................................18

CONCLUSION ......................................................................................................................18

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

### <u>Cases</u>

4

*Al George, Inc. v. Envirotech Corp.*,
  939 F.2d 1271 (5th Cir. 1991) ................................................................. 11

5

6

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
  2018 WL 11230167 (N.D. Cal. May 21, 2018) ............................................. 13, 14

7

*Aventis Pharma S.A. v. Amphastar Pharms., Inc.*,
  2009 WL 10674453 (C.D. Cal. May 15, 2009) ...................................... 7, 10, 13

8

9

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ...................................................... 6

10

11

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
  532 F.2d 674 (9th Cir. 1976) ................................................................ 15

12

13

*Chemi SpA v. GlaxoSmithLine*,
  356 F. Supp. 2d 495 (E.D. Pa. 2005) ........................................................ 10

14

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
  868 F. Supp. 2d 876 (N.D. Cal. 2012) ........................................................ 3

15

16

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
  2018 WL 5263278 (D.N.J. Oct. 23, 2018) ................................................ 12

17

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
  709 F. Supp. 3d 138 (D.N.J. 2023) ........................................................ 13

18

19

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016) ................................................................ 2

20

21

*Ethypharm S.A. France v. Abbott Lab'ys*,
   707 F.3d 223 (3d Cir. 2013) ................................................................ 8

22

*Fed. Paper Bd. Co. v. Amata*,
  693 F. Supp. 1376 (D. Conn. 1988) ........................................................ 16

23

24

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................... 4

25

26

*Forrett v. Gourmet Nut, Inc.*,
  634 F. Supp. 3d 761 (N.D. Cal. 2022) ...................................................... 16

27

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  733 F. App'x 380 (9th Cir. 2018) ........................................................... 5

28

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) .......................................................... 13, 14

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................ 12

*In re Relafen Antitrust Litig.*,
    346 F. Supp. 2d 349 (D. Mass. 2004) .......................................................... 12, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 4345435 (N.D. Cal. Sept. 15, 2011) ...................................................... 18

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017) .............................................................................. 9

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
    2016 WL 264909 (D. Del. Jan. 21, 2016) ............................................................ 3

*IPtronics Inc. v. Avago Techs. U.S., Inc.*,
    2015 WL 5029282 (N.D. Cal. Aug. 25, 2015) ..................................................... 12

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ...................................................................................... 8

*Koller v. Monsanto Co.*,
    2023 WL 8429796 (N.D. Cal. Dec. 4, 2023) ....................................................... 18

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) .............................................................................. 4

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
    2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ..................................................... 18

*Med. Mut. of Ohio, Inc. v. Braintree Lab'ys*,
    2011 WL 2708818 (D. Del. July 12, 2011) ......................................................... 10

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    605 F. Supp. 3d 1218 (N.D. Cal. 2022) .............................................................. 17

*Netflix, Inc. v. Blockbuster, Inc.*,
    2006 WL 2458717 (N.D. Cal. Aug. 22, 2006) ..................................................... 12

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*,
    2018 WL 4904918 (N.D. Cal. Oct. 9, 2018) ......................................................... 5

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ........................................................................... 7

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ........................................................................... 3

DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION TO DISMISS TEVA'S FAC WITH PREJUDICE

*Pace Industries, Inc. v. Three Phoenix*,
    813 F.2d 234 ............................................................................................................. 11

*Perrigo Co. v. AbbVie Inc.*,
    2022 WL 2870152 (3d Cir. July 21, 2022) ............................................... 7, 8, 10, 11

*PNY Techs., Inc. v. SanDisk Corp.*,
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ......................................................... 5

*PNY Techs., Inc. v. SanDisk Corp.*,
    2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................................................... 3

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................................. 13

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
    2024 WL 1975478 (N.D. Cal. May 3, 2024) ........................................................ 14

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ................................................................................ 16

*Samsung Elecs. Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ................................................................................ 7

*Shire US, Inc. v. Allergan, Inc.*,
    375 F. Supp. 3d 538 (D.N.J. 2019) ......................................................................... 6

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .................................................................. 17

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ......................................................... 8

*Tevra Brands LLC v. Bayer HealthCare LLC*,
    2024 WL 1909156 (N.D. Cal. May 1, 2024) ...................................................... 4, 5

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .................................................................................... 4

*United States v. Google LLC*,
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) ............................................................. 4

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................................. 4

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) .................................................................................... 4

*Whitaker v. Tesla Motors, Inc.*,
    985 F.3d 1173 (9th Cir. 2021) .............................................................................. 16

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) ........................................................................................................... 8

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ............................................................................................ 4

## <u>Statutes</u>

Cal. Ins. Code § 1871.7 ........................................................................................................... 16

Cal. Penal Code § 641.3 ........................................................................................................... 16

## PRELIMINARY STATEMENT

Teva's Opposition (Dkt. 65, "Opp.") glaringly fails to respond to many of the arguments and authorities in Defendants' motion to dismiss (Dkt. 55, "MTD"). The "focus" of Teva's claims is a single agreement that Corcept has with a single, small specialty pharmacy: Optime. Oct. 31, 2024 Hrg. Tr. at 4:7. Teva is trying to dress that single agreement with a single pharmacy into an "exclusive dealing" claim by alleging it somehow blocks any opportunity for Teva to compete. That effort is entirely implausible, and Teva does not cite a single case supporting such a theory.

Teva admits that Optime is just one possible distributor in a marketplace full of options. Teva admits it can and does distribute its product through numerous other pharmacies—specialty and retail, regional and national. Of course, Teva could also provide benefits beyond medication (as Teva admits Corcept does), engage with a new pharmacy channel (as Corcept did with Optime), or cultivate other channels of distribution. Under both the case law (which Teva misstates) and common sense, these undeniable facts doom Teva's exclusive dealing claim. A single contract with just one of many available actual or potential distributors does not foreclose competition or give rise to antitrust liability.

Teva's Orange Book allegations also fail, including because they concern conduct that is more than four years old and are thus time-barred. Teva's allegations also fail to establish antitrust injury from the Orange Book conduct, notwithstanding Teva's efforts to contradict its own admissions and the FDA's website regarding Corcept's seven years of FDA-awarded Orphan Drug Exclusivity. Teva likewise fails to establish antitrust injury for the period after Corcept's ODE expired, as it establishes nothing other than that Teva made its own choice to delay entering the market after that expiration.

Teva's sham litigation theory also fails. Its claims based on seven of the nine patents are clearly time-barred because Corcept sued Teva over those patents outside the four-year limitations period in this case. Nor does Teva overcome the *Noerr-Pennington* immunity that protects Corcept's suits over all of the nine patents. While Teva makes a bare-bones attempt to invoke the "*Hynix* test" that would allow even non-sham litigation to be included as part of an overall anticompetitive scheme, it does not and cannot meet the test's requirements, even assuming that test is cognizable. Teva also fails to establish antitrust injury from the alleged sham litigation, as Teva's entry was separately barred by ODE, and Teva does not explain how Corcept's later suits that caused Teva no FDA stay,

much less those suits that came *after* Teva received FDA approval, somehow delayed Teva's entry.

Teva's theory that Corcept "bribed" prescribers to prescribe Corcept's Korlym over Teva's generic also fails. Teva argues that Corcept makes more speaker payments than other companies, but that is wrong and in any case does not plausibly establish those payments were illicit bribes. Separately, Teva's allegations that Corcept's payments materially harmed competition are the very definition of conclusory and thus fail under Ninth Circuit law.

Confirming the weakness of its four state law claims, Teva relegates its "defenses" of them to the last page of its brief. Once again, Teva largely ignores Defendants' arguments and authorities.

Teva's claims should be dismissed with prejudice. Defendants pointed out many of these flaws in their prior motions to dismiss, Teva's first amended complaint (Dkt. 39, "FAC" and "¶") did nothing to address them, and its opposition identifies no curative facts it could add through amendment.

## ARGUMENT

## I.    TEVA'S EXCLUSIVE DEALING SHERMAN ACT CLAIMS FAIL

### A.    Corcept's Agreement With A Single Pharmacy Does Not Foreclose Competition

*First*, Teva's assertion that "Defendants do not dispute" that "Korlym is in a [relevant] market of its own" is false and irrelevant. Opp. at 2, 8. Even accepting Teva's market definition allegations as true for now, its claims fail since it cannot plausibly establish that Corcept's contract with a single small pharmacy foreclosed Teva from that alleged relevant market. MTD at 17–20; *infra* at 2–5.

*Second*, while Teva admits "alternative channels" exist in its alleged market and must be considered in the foreclosure analysis, it oddly insists that the Court should disregard the existence of any distributor other than Optime. Teva argues that "alternative distribution channels are relevant only if they are *practically effective*" in allowing the plaintiff to reach end-users, and that its failure to capture market share using these other channels means they are not. Opp. at 10. But that is not the law. The relevant inquiry for assessing alternative channels is not whether a *competitor* has had past success selling through those channels, but whether there are barriers preventing *consumers* from freely choosing those channels. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403–04 (3d Cir. 2016) (foreclosure question "is not about which products a consumer chooses to purchase, but about which products are reasonably available to that customer" such that "if customers are free to

switch to a different product . . . but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share."). Thus, a plaintiff's "own inability to exploit" an alternative channel "does not indicate harm to competition" or that the alternative channel should be disregarded. *PNY Techs., Inc. v. SanDisk Corp*., 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014). The foreclosure analysis "does not require competitors to be able to *succeed* in alternative channels; it merely requires them to have the opportunity to succeed." *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 915 (N.D. Cal. 2012) (partially vacated on other grounds).

Teva alleges only that it has not succeeded as much as it would like with its chosen distributors. That is not enough to state an antitrust claim. Teva makes no plausible allegations explaining why the only possible choice to distribute its product is Optime, and why every other pharmacy that exists could not suffice (indeed, Corcept distributed Korlym through a different pharmacy, Dohmen, before Optime). Instead, Teva resorts to conclusory buzzwords like "entrenched," "sticky," and "switching costs." Opp. at 12–13. But what Teva means is left unsaid— for example, what "switching costs" do prescribers face? And even assuming, as Teva suggests, that *prescribers* are used to writing prescriptions through Optime, so what? No antitrust claim makes illegal what prescribers "get used to." Teva never describes, much less alleges, how that affects consumer *choice*. For example, Teva does not explain how a patient that wants Teva's supposedly discounted generic cannot get it—if a patient requests Teva's generic and asks their prescriber, insurer, and/or non-Optime pharmacy for it, then what? The FAC does not say, which matters because Teva's complaint must "*plausibly suggest* a lack of alternative distribution channels" for its generic. *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *5–6 (D. Del. Jan. 21, 2016) (dismissing exclusive dealing claim as conclusory where plaintiff "simply concludes—without any relevant factual support—that it is deprived of 'any feasible way to reach consumers'").

Ninth Circuit law makes clear that "foreclosure of even a large percentage of one mode of distribution"—here, allegedly, Optime—"will have little anticompetitive effect *if another mode is available*." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997). The mere fact of Teva's difficulties with other *existing* channels so far does not mean they are unavailable and that Teva must be allowed to sell through Optime. Were that right, the Ninth Circuit's exclusive dealing

pronouncements that a defendant "does not have to share the fruits" of its labor, "existing *or potential* alternative channels of distribution" must be considered, and competitors "are free to sell directly" or "to *develop alternative distributors*" would make no sense. *Id.* at 1663. Teva boasts it has access to other "wholesalers," "distributors," *and* "pharmacies." (¶158.) Teva's silence as to why it cannot sell through CVS, Walgreens, Dohmen (the pharmacy Corcept used for years before Optime), develop its own pharmacy channel (as Corcept did with Optime), or sell its generic in other ways speaks volumes.

**Third**, Teva largely ignores or miscites Defendants' authorities and also misstates its own cited cases. Defendants cited case law explaining that the "existence of a single exclusive dealing arrangement with a distributor is insufficient." MTD at 18 (citing, *e.g.*, *Maximum Availability*). Teva does not acknowledge this authority at all. Instead, Teva's cases involve situations where a defendant has entered into a web of exclusive agreements with *multiple* distributors that together substantially "lock up" *entire channels* (not just a single distributor in that channel). *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 1909156, at *1 (N.D. Cal. May 1, 2024) (multiple "retailers and distributors"); *United States v. Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001) ("*all* the leading" internet providers); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 267 (3d Cir. 2012) ("*all* heavy duty truck manufacturers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) (multiple "key dealers"); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1023 (N.D. Cal. 2015) ("panoply" of mobile device manufacturers); *United States v. Google LLC*, 2024 WL 3647498, at *95 (D.D.C. Aug. 5, 2024) (multiple web browsers and substantially "all Android devices"); *LePage's Inc. v. 3M*, 324 F.3d 141, 157–58 (3d Cir. 2003) (at least seven "large customers"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003) ("horizontal restraint adopted by 20,000 competitors"). That is a far cry from here, where Teva challenges one contract with one pharmacy (*i.e.*, one distributor in a single channel), while acknowledging, as it must, that other pharmacies and channels are available and *not* subject to any exclusivity requirement at all.

Teva's efforts to distinguish Defendants' cited cases fall flat. Opp. at 14. For example, Teva suggests that the *Omega* decision provides Defendants "no help because it is a post-trial decision[.]" *Id.* Yet, many of the decisions that **Teva** relies on—*e.g.*, *Microsoft*, *Dentsply*, *Google*, and *LePage's*— are post-trial decisions. *Omega* lays out the legal standard that Teva cannot meet, and there is no

reason to ignore that legal standard. Indeed, *Omega*'s holding that there is no substantial foreclosure if "competitors can reach the ultimate consumers" by "alternative channels" applies at the pleading stage. *See Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018). While Teva argues *Omega* featured "undisputed evidence," Teva makes no plausible allegations that provide a basis to exclude the alternatives that Teva admits exist. *See PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7–8 (N.D. Cal. Apr. 25, 2014) (citing *Omega* and dismissing exclusive dealing claim as plaintiff "does not explain why" alternative channels insufficient).

### B.   Teva's Other "Considerations" Do Not Save Its Exclusive Dealing Claims

Teva asserts that "considerations" like the duration of the Corcept-Optime deal, the deal's terminability provisions, and alleged "coercive" behavior support Teva's exclusive dealing claims. Opp. at 14–17. As an initial matter, Teva's failure to plausibly establish substantial foreclosure, *see supra* Section I.A., ***itself*** requires dismissal of Teva's exclusive dealing claims. *See Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, 2018 WL 4904918, at *4–5 (N.D. Cal. Oct. 9, 2018) (Freeman, J.) (claim dismissed due to admission other "distributors exist," without reaching length of contracts).

Teva's assertion that "the exclusive arrangement has been in place for "more than seven years" since 2017 misleadingly ignores the actual duration of the contracts. Opp. at 14. It elsewhere acknowledges that the original agreement was in effect for five years until 2022, then renewed for two years until 2024, and then renewed in 2024 for a three-year term. (¶¶137–38.). But Teva does not respond to Defendants' cited authority, which explains that three or even five-year contracts do not automatically foreclose competition. MTD at 19–20 (citing *W. Parcel* and *Pro Search*). Teva suggests that notwithstanding these temporal terms, the agreements are *"de facto* long term." Opp. at 15. But Teva's cited case, *Tevra*, does not help it, as that case involved credible claims that retailers and distributors were *de facto* precluded from distributing the defendant's rival products because they "would lose millions" and "not be able to profitably sell" if they did so. 2024 WL 1909156, at *1. Yet, Teva alleges the opposite here—it claims "Optime could potentially make more money by distributing Teva's generic" (¶139), which belies its "*de facto*" theory.

Teva's allegations of "coercive" behavior are similarly misguided. Opp. at 15–17. Teva never explains, for example, how an allegedly "one-sided" termination provision means a freely-negotiated

agreement is the product of coercion. Teva also pleads "[o]n information and belief" that Optime is "heavily dependent on its relationship" with Corcept. (¶146.) Even if that were true, that could be said of nearly any distributor subject to an exclusive deal during the life of that agreement. As another of Defendants' unrebutted, cited cases confirms, what matters is whether customers are "free to seek other" suppliers "at the conclusion of the contracts." MTD at 20 (citing *Indeck*). The actual operative contract confirms that freedom exists for both Optime and Corcept. § 14, Ex. F to MTD. Teva asks the Court to ignore the contract anyway, based on hearsay from some unidentified Optime employees that supposedly said during an alleged meeting that "Optime . . . was not allowed to distribute Teva's product, no matter what terms Teva might propose." (¶139.) That is wholly insufficient to state a claim. *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 558 (D.N.J. 2019) (dismissing exclusive dealing claim based on statement from "unnamed person" that challenged deal meant plan could not deal with plaintiff in the future due to supposed exclusive dealing arrangement, as unclear unnamed person "had authority" to make statement or that statement not negotiation posturing).

### C.    Teva's Exclusive Dealing Claims Are Time-Barred

Finally, Teva fails to explain how its Optime claims are timely. Opp. at 17–20. Contrary to Teva's statement, "statute of limitations defenses are appropriately considered on a motion to dismiss." *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co*., 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (Freeman, J.). As discussed *infra* in Sections II.A. & III.A., Teva's assertions as to accrual, the speculative damages exception, FDA approval, and the continuing violations doctrine all fail.

## II.    TEVA'S ORANGE BOOK SHERMAN ACT CLAIMS FAIL

Teva's assertion that Defendants "do not dispute that" Corcept "improperly listed" its '348 and '495 patents in the Orange Book is false. MTD at 4 (Corcept listed patents as statute required). Teva's problem is that its claims fail on other grounds even if its listing allegations are credited.

### A.    Teva's Orange Book Claims Are Time-Barred

Corcept listed the '348 and '495 patents in the Orange Book on January 27, 2015 and on November 28, 2017, respectively. (¶82.) That is years before June 13, 2020—the start of the four-year limitations period preceding Teva's filing of this case—making Teva's Orange Book claims time-barred. MTD at 7. Teva's arguments to the contrary fail. Opp. at 22–23.

***First***, Teva cannot invoke the "speculative damages" exception, which provides that "if harm is 'uncertain' or 'speculative' at the time of the antitrust violation," then the "limitations period begins on the date that the plaintiff's damages first accrued and became ascertainable." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014). The ***FAC*** does not contain any such allegations regarding supposedly speculative damages. *See Perrigo Co. v. AbbVie Inc.*, 2022 WL 2870152, at *5 n.12 (3d Cir. July 21, 2022) (disregarding speculative damages assertions not in complaint). *Samsung* and *Oliver* also do not—contrary to Teva's statement—involve "FDA approval" at all or save its claims. Opp. at 22–23. Rather, they involved SD card licensing deals, explained "the key question" "is whether the existence of the harm is determinable, not the specific dollar of that harm," and noted it was unclear whether the plaintiffs would ***ever*** enter the market. *Samsung*, 747 F.3d at 1204–05; *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086–87 (9th Cir. 2014). Accepting Teva's own allegations, the Orange Book harm—delayed entry—was determinable by March 2018, when Corcept sued over the listed patents, triggering the 30-month stay of Teva's FDA application, and just prior to when Teva claims it was ready to and would have entered. (¶79); *Perrigo*, 2022 WL 2870152, at *4–5 (antitrust claim dismissed and speculative damages exception inapt, claim accrued and non-speculative harm felt when manufacturers sued generic over patents, triggering stay).

***Second***, Teva misstates the law in arguing it could not have sued on its Orange Book claims prior to obtaining FDA approval and entering the market "because it would have been unable to show antitrust injury and causation." Opp. at 23. Teva claims it was delayed in obtaining FDA approval ***because of*** Corcept's Orange Book conduct. In such circumstances, the absence of FDA approval does ***not*** bar an antitrust claim. Teva knows this, having itself brought—***prior to obtaining FDA approval***—antitrust counterclaims against a branded manufacturer over Orange Book listings and the ensuing 30-month stay. *See Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 2022 WL 34347571, Case No. 02-cv-1512 (D. Del.), Dkt. 20 at ¶¶ 103, 107, 163–66 (pgs. 20–22, 26, 37) (Teva's counterclaims). Teva's cited cases do not say otherwise. Opp. at 23. *Aventis Pharma S.A. v. Amphastar Pharms., Inc.*, acknowledges that, notwithstanding the lack of FDA approval, an antitrust claim may lie where there is "misconduct ***by***" the defendant that "caused the FDA not to approve [the plaintiff's] generic." 2009 WL 10674453, at *2–3 (C.D. Cal. May 15, 2009); *see also Aventis*, 2009 WL 8727693,

at *14 (C.D. Cal. Feb. 17, 2009) (prior order in same case, confirming "lack of FDA approval does not bar causation or damages per se."). That is what Teva claims Corcept's Orange Book listings did here. The Third Circuit's decision in *Ethypharm S.A. France v. Abbott Lab'ys*, is also inapt, as it assessed whether a foreign manufacturer was a "competitor in the market" so as to have antitrust standing to sue where it sold through a domestic distributor, and actually noted that where, like here, a manufacturer already submitted information "for FDA approval," it had standing. 707 F.3d 223, 225–31, 236 n.20 (3d Cir. 2013); *see also Perrigo*, 2022 WL 2870152, at *3 n.7, *4–5, *5 nn. 11–12 (post-*Ethypharm* case determining lack of FDA approval does not bar generic from bringing claims).

*Third*, the "continuing violation" doctrine does not render Teva's Orange Book claims timely. Opp. at 23. Teva's argument that supposed acts during the limitations period related to alleged exclusive dealing, bribes, and sham lawsuits "restart the clock" as to its Orange Book claims misconstrues the doctrine. A "plaintiff *cannot* use an independent, new act as a bootstrap to" recover for "other predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181, 189 (1997). Thus, for each new overt act, "a cause of action accrues to. . . recover the damages caused by *that act*." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Teva does not dispute that it neither alleges nor challenges *any* Orange Book-related conduct during the limitations period. Therefore, Teva raises no new Orange Book-related claim that accrued in the last four years. That Teva purports to "also allege, additional later" acts during the limitations period does not "alter that [the] statute of limitations has run" on its stale Orange Book claims. *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *15–17 (E.D. Cal. Sept. 3, 2010) (antitrust claim dismissed as time-barred, continuing violation doctrine inapplicable).

**B.    Teva's Allegations of Orange Book-Related Antitrust Injury Are Implausible**

Teva claims Corcept's Orange Book conduct caused a 30-month delay of Teva's FDA approval until August 2020. Opp. at 21–22. Analyzing Teva's Orange Book allegations temporally makes clear why they fail to plausibly establish antitrust injury.

**Pre-February 2019.** Teva does not dispute that a regulatory bar to a plaintiff's market entry defeats antitrust injury because that bar—not the defendant's challenged conduct—is the source of the plaintiff's exclusion from the market. MTD at 7–9; Opp. at 21. Teva weakly suggests that no such

bar existed here. That is wrong: independent from whatever Teva claims Corcept did as to the Orange Book, Teva could not have obtained FDA approval ***prior to February 2019*** because the FDA separately awarded Corcept seven years of ODE until that time. Teva therefore could not have suffered any antitrust injury from Corcept's Orange Book conduct prior to February 2019.

Teva's only responses are that the FDA silently cancelled Corcept's ODE by not mentioning it in a form letter sent to Teva (though supposedly required to do so by a CFR regulation) and that an antitrust plaintiff "need not rule out all possible alternative sources of injury." Opp. at 21–22. Neither response passes muster. As to the former, Teva provides ***zero*** authority for the implausible proposition that the FDA somehow silently canceled its grant of ODE by neglecting to mention it in a single letter that was sent to ***Teva*** (not even to Corcept). Nor does Teva respond to the fact that in binding admissions in the parties' underlying patent litigation, Teva acknowledged Corcept's ODE was in effect through February 2019. MTD at 8. Nor does Teva engage with the reality that the FDA's public website—which Teva does not dispute the Court can consider now—confirms the "Exclusivity End Date" for Corcept's ODE was February 17, 2019. MTD at 8 & Ex. E. Teva's claim that Corcept's ODE was cancelled is thus wholly implausible.

Teva's handwaving that the Orange Book conduct was an "alternative[] source[] of injury" notwithstanding the separate ODE bar makes no sense as to the pre-February 2019 period. If Teva were right, then an entire body of law—like the First, Third, and Eighth Circuits' *RSA*, *Wellbutrin*, and *Canadian Import* decisions about separate regulatory bars—would be wrong. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017). Teva does not and cannot make that claim.

**February 2019–August 2020.** Teva also misstates Defendants' arguments that Teva does not plausibly establish antitrust injury from the Orange Book conduct for the remaining post-ODE period between February 2019 and August 2020. Opp. at 21–22. For Teva to have suffered cognizable harm from any delay of its final FDA approval until August 2020, Teva must plausibly allege that it would have otherwise entered prior to August 2020 had it received final approval earlier. Defendants' point is that Teva's allegations on this front are "implausible, unsupported, and undermined by its own conduct." MTD at 9. While Teva baldly asserts that "Teva would have launched as early" as October 2018 "or shortly thereafter" (¶79), Teva alleges ***no facts***—such as business plans, readiness, or

affirmative steps towards launching—that make this allegation non-conclusory. *Aventis*, 2009 WL 8727693, at \*14–15. If anything, that Teva in the actual world waited more than three years to launch after receiving final FDA approval renders implausible its claim that in the but-for world, Teva would have nonetheless launched as soon as it received final FDA approval in 2018 "or shortly thereafter."

## III.    TEVA SHAM LITIGATION SHERMAN ACT CLAIMS FAIL

### A.    Teva's Claims Based On Seven of the Nine At-Issue Patents Are Time-Barred

Teva admits Corcept sued over the '348 and '495 patents in March 2018, the '526 patent in July 2018, the '214, '242, and '243 patents in February 2019, and the '216 patent in December 2019. (¶¶76, 116, 120.) Because Corcept sued over these seven patents before June 13, 2020—the start of the limitations period here—Teva's claims based on these seven patents (*i.e.*, all but the two '800 and '801 patents) are untimely. MTD at 9, 11. Teva's arguments to the contrary fail. Opp. at 27–28.

***First***, as explained in Section II.A., the speculative damages exception does not help Teva. Teva's FAC (as distinct from its opposition brief), contains no allegations as to speculative damages. The gravamen of Teva's sham litigation claims is that Corcept's patent lawsuits delayed Teva's FDA approval and launch, and the first suit in March 2018 is what triggered the 30-month stay. Opp. at 27; (¶76.) In such circumstances, non-speculative injury is inflicted—and a sham claim accrues—"when the lawsuit, which is alleged to have been a sham, is filed." *Perrigo*, 2022 WL 2870152, at \*4–5 (sham claim properly dismissed and speculative damages exception inapplicable). Teva's cases do not say otherwise. *See supra* Section II.A. (discussing *Aventis*, *Ethypharm*, *Samsung*, and *Oliver*).

***Second***, Teva misstates the law in arguing that a sham litigation claim does not accrue and cannot be brought until there is "proof that the litigation was unsuccessful, which can only be determined upon the termination of the initial action." Opp. at 28. ***Teva*** has brought sham litigation counterclaims before the underlying patent litigation alleged to have been a sham has concluded. *Abbott*, 2002 WL 34347571, Case No. 02-cv-1512 (D. Del.), Dkt. 20 at ¶¶ 137–166 (pgs. 30–37).

Teva's only support for its about-face is a single district court opinion from another circuit, *Chemi SpA v. GlaxoSmithLine*, 356 F. Supp. 2d 495, 500 (E.D. Pa. 2005). However, *Chemi SpA* cites no caselaw and has been criticized on that basis. *Med. Mut. of Ohio, Inc. v. Braintree Lab'ys*, 2011 WL 2708818, at \*4 & n.10 (D. Del. July 12, 2011). And in a later decision, the Third Circuit explained

"sham litigation claims generally accrue" and resulting injury is felt "at the time that the lawsuit alleged to have been a sham was filed." *Perrigo*, 2022 WL 2870152, at *4 n.10, *4–5. Other courts have held the same. *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991).

Moreover, while Teva criticizes Corcept's citation to the Ninth Circuit's decision in *Pace Industries, Inc. v. Three Phoenix*, Teva does not dispute that *Pace* holds "the initiation of judicial proceedings is the last overt act" for statute of limitations proceedings where the "judicial process" is supposedly used anticompetitively. 813 F.2d 234, 237–239. Other Circuits have relied on *Pace* to determine that a sham litigation antitrust claim accrues at the time the alleged sham lawsuit was filed. *Perrigo*, 2022 WL 2870152, at *4 n.10 (citing *Pace*); *Al George*, 939 F.2d at 1274–75.

***Third***, the continuing violation doctrine does not save Teva's sham litigation claims based on Corcept's pre-2020 assertion of seven of the nine patents. Opp. at 28. Teva's claim that "[e]ach suit between 2018 and 2023 . . . restarted the clock on all of Teva's patent litigation claims" is wrong. Seven of the nine patents were asserted by December 2019, which is before the limitations period (June 2020), so Teva's claims based on them are late and cannot "restart" themselves. Nor does Corcept's suit over the two remaining patents ('800 and '801) in 2023 or non-sham litigation conduct during the limitations period revive Teva's sham claims based on the initial seven patents. As discussed above in Section II.A., *Zenith, Klehr*, and *Stanislaus* confirm that, at best, the continuing violation doctrine creates new causes of action as to new and overt, limitations period acts—it does not resuscitate old claims or allow a plaintiff to "bootstrap" those claims to potentially timely ones.

**B.**    ***Noerr-Pennington* Immunity Bars Teva's Claims, and No Exception Applies**

Teva fails to establish the "sham" or "series" exceptions to *Noerr-Pennington* immunity apply.

**Series Exception.** Teva does not respond to Defendants' arguments about the exception's unavailability in antitrust cases involving the Hatch-Waxman Act, there being too few suits to be a "series" (*e.g.*, under *Relevant*), and no allegations of a "crushing burden." MTD at 14–15.

**'348 and '495 Patents.** Teva argues that because the '348 and '495 patents supposedly "do not have a direct read" or "express connection" to the Korlym label (¶99), Corcept's suit over them is "automatically a sham." Opp. at 24. But Teva's entire argument is based on its selective citation to and misinterpretation of a single statement of one Corcept employee, which in any event does not

1    plausibly allege Teva's product would not have infringed the '348 or '495 patents. MTD at 10–11.

2          Teva's arguments about the import of the denial of its motion to dismiss Corcept's claims also

3    fail. Opp. at 24. While Teva cites its own allegations characterizing that order, it does not address: (1)

4    the order's language finding "a factual dispute that" required "expert input and claim construction";

5    (2) Defendants' argument that denial of Teva's motion means the claims were plausible and thus not

6    frivolous; or (3) Defendants' cases finding a claim that survives a motion to dismiss is not a sham.

7    MTD at 11. Teva cites *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, but that

8    case addressed whether a defendant's failure to file a dismissal motion means the claim is not a sham

9    (not the significance of the denial of an actually-filed dismissal motion). 383 F. Supp. 3d 187, 232

10   (S.D.N.Y. 2019). Nor does Teva address Corcept's technical expert disclosures as to its infringement

11   theories as to these patents, which the inventors then detailed in their depositions. MTD at 11.

12         **'526, '242, '243, '216, and '801 Patents.** Teva's arguments as to the "five other patents . . .

13   that Corcept asserted and then voluntarily dismissed" likewise fail. Opp. at 24. Teva points to one

14   conclusory allegation as to why assertion of these patents was a sham (¶120); that is insufficient.

15   MTD at 12–13 (collecting cases). Moreover, Teva ***lost*** its motion to dismiss the '526 patent claim.

16   *Corcept Therapeutics, Inc. v. Teva Pharms. USA*, *Inc.*, 2018 WL 5263278, at *2 n. 2, *4 (D.N.J. Oct.

17   23, 2018). In addition, there are many reasons why a party may choose to dismiss a claim, and Teva's

18   cited cases do not actually hold that doing so means the claim is a sham. *See IPtronics Inc. v. Avago*

19   *Techs. U.S.*, *Inc.*, 2015 WL 5029282, at *7–8 (N.D. Cal. Aug. 25, 2015) (party's "own expert admitted

20   that the evidence was insufficient to demonstrate infringement"); *Keurig*, 383 F. Supp. 3d at 231–32

21   (unlike here, plaintiffs "detail" why patent claims sham); *Netflix, Inc. v. Blockbuster*, Inc., 2006 WL

22   2458717, at *3, *8 (N.D. Cal. Aug. 22, 2006) (pre-*Twombly*, applying *Conley* pleading standard).

23         **'214 and '800 Patents.** Teva does not dispute that the '214 patent survived Teva's summary

24   judgment motion, and the '214 and '800 patents both proceeded all the way to trial. Teva argues that

25   surviving a summary judgment motion "does not always conclusively" mean the underlying claim is

26   not a sham. Opp. at 26. Teva's one cited case, *In re Relafen Antitrust Litig.*, acknowledges that

27   "several courts, including the Federal Circuit, have suggested that denial of a summary judgment

28   motion precludes a finding of objective baselessness" but found "***the specific circumstances here***

compelled a different conclusion." 346 F. Supp. 2d 349, 362–63 (D. Mass. 2004). Teva provides no explanation of why such unusual circumstances are present here (they are not), and Teva does not address Corcept's cited cases—*Gen-Probe*, *Harris*, and *Twin City*—at all. MTD at 13.

Teva also harps on Corcept's trial loss, which is on appeal. But it misrepresents the court's trial ruling, which nowhere states the claims were "shams." While Teva points out the court did not find "credible record evidence" of **prior infringement**, Opp. at 25, it omits the court's acknowledgement that Corcept submitted sworn post-trial declarations from medical professionals attesting to past infringement and ruling that past infringement is "not required" to succeed on an induced infringement claim. *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, 709 F. Supp. 3d 138, 154, 156 n.6 (D.N.J. 2023). As to **future** infringement, Teva glosses over the court's finding it was "not likely," which means not impossible. *Id.* at 156–57; *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 65 (1993) (suit not sham where plaintiff "had **some chance** of winning"). That Corcept was unsuccessful at trial does not mean the claims were shams. *Id.* at 61 n.5.

### C.  The "*Hynix* Test" Does Not Save Teva's Sham Litigation Claims

Teva argues that even if Corcept's patent suits "were not shams," they are still actionable as "part of a larger anticompetitive scheme." Opp. at 26–27. Teva cannot invoke the limited "*Hynix* test." *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1088 (N.D. Cal. 2007); *Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 11230167, at *9 (N.D. Cal. May 21, 2018).

To the extent the *Hynix* test is even cognizable, *Aventis*, 2009 WL 8727693, at *6 n.7, Teva does not meet it. For example, the test's "first step" requires Teva to show actionable "exclusionary conduct" aside from its claims based on the patent litigation. *Arista*, 2018 WL 11230167, at *12. Teva claims its "exclusive dealing and bribery" allegations suffice. Opp. at 26–27. But as Defendants have explained, those theories fail to state a Sherman Act claim, so Teva fails step one.

Teva also fails step two of *Hynix*, which requires that the challenged litigation be "'causally connected' to the disputed anticompetitive conduct discussed in step one." *Arista*, 2018 WL 11230167, at *14. While Teva contends Corcept's patent litigation bought it "time alone on the market" which allowed it to "entrench," "fortify," and "shor[e] up" the alleged exclusive dealing and bribery conduct, Opp. at 27, that is conclusory, would render step two meaningless by erasing the

1  causal connection requirement, and gets it backwards. The suit must be a "mechanism" to "carry out"

2  or further the non-litigation conduct. *Arista*, 2018 WL 11230167, at *14 (lawsuit was enforcement

3  tool for "open early, closed late scheme"); *Hynix*, 527 F. Supp. 2d at 1098 (defendant deceived as to

4  its patent rights, then brought litigation "to extract royalties"); *Realtek Semiconductor Corp. v.*

5  *MediaTek, Inc.*, 2024 WL 1975478, at *8 n.7 (N.D. Cal. May 3, 2024) (*Hynix* "applies only where

6  the core of the alleged anticompetitive scheme" is not petitioning and "litigation is simply a means of

7  furthering that core conduct."). Teva does not explain how—and cannot establish that—Corcept's

8  patent litigation against Teva is the enforcement mechanism for Corcept's alleged exclusive dealing

9  with Optime (the "focus" of Teva's case) or Corcept's payments to prescribers. That is dispositive.

10       **D.      Teva Fails to Plausibly Establish Antitrust Injury from Alleged Sham Litigation**

11       Teva's assertions that it suffered antitrust injury from sham litigation also fail. Opp. at 27.

12  ***First***, Corcept's assertion of the '348 and '495 patents against Teva in March 2018 cannot cause

13  antitrust injury through at least February 2019 because a separate regulatory bar (Corcept's ODE)

14  prevented Teva's entry, and Teva's allegations as to the post-ODE period are implausible. MTD at

15  7–10; *supra* Section II.B. ***Second***, to the extent Teva claims Corcept's assertion of five other patents

16  in 2018 and 2019 and the two patents in 2023 delayed Teva's entry, those claims fail. It was Corcept's

17  March 2018 suit over the '348 and '495 patents that triggered a stay, not Corcept's later assertion of

18  these other patents. MTD at 12–14. Moreover, Teva provides no explanation as to how Corcept's

19  2023 claims as to the '800 and '801 patents delayed Teva's entry given that when Corcept asserted

20  those patents, Teva had had final FDA approval for years. *Id.* at 13. ***Finally***, to the extent Teva, even

21  after receiving final FDA approval in 2020, ***chose*** to wait to launch until 2024 rather than launch "at

22  risk," Teva cannot attribute antitrust injury to any of Corcept's patent claims. MTD at 9–10, 12–14.

23  **IV.     TEVA'S BRIBERY SHERMAN ACT CLAIMS FAIL**

24       **A.      Teva's Allegations that the Payments Are Illicit "Bribes" Are Implausible**

25       Teva's claims that Corcept's payments to prescribers were illicit "bribes" hinge on what it

26  asserts is "an extensive analysis of publicly available payment and prescription data." Opp. at 28–29.

27  But Teva does not dispute that the same data it points to facially characterizes these payments as ones

28  for speaker, consulting, honoraria, and related food/travel fees. MTD at 20; Opp. at 29. Defendants'

argument—which Teva flatly misstates—is that against this undisputed backdrop, Teva alleges nothing that plausibly raises the inference that Corcept's payments are anything other than for the proper payment of these fees, which Teva itself makes and defends as lawful.

Defendants' motion cited caselaw, CFR regulation, and Office of Inspector General guidance describing the factors used to determine whether speaker and similar fees are proper or illicit. MTD at 21–22. Teva's opposition does not dispute that: (1) these are the sorts of factors courts, regulators, and prosecutors consider in assessing whether speaker and similar payments are proper or not; (2) courts (*e.g.*, *Novartis*) have dismissed as implausible allegations that speaker payments (like those at issue here) are "bribes" even where a plaintiff included allegations as to at least **some** of these factors; and (3) Teva's FAC includes no allegations bearing on any of these factors. This is fatal.

Teva's claim that "Defendants ignore" allegations that Corcept's payments "are astronomical and far outside the norm" is also false, and in any case irrelevant. Opp. at 29. Defendants' motion pointed out—and Teva does not dispute—that Teva itself made many more payments (both in number and total dollar amount) than Corcept in the same period, and each of Teva's "top 10 payment recipients" received multiple times more than Corcept's "top 10 payment recipients." MTD at 21. Corcept's payments are therefore not "far outside the norm." And even if they were, Teva cites no authority for the proposition that a pharmaceutical company's paying more to speakers in comparison to other companies raises the inference of anything untoward. If it did, Teva would apparently be admitting that its own speaker and similar payments (which far outpace Corcept's) are illicit bribes.

Teva's assertion that its bribery allegations are "reinforced by" "investigative journalists," "a securities class action," and a U.S. Attorney's Office "investigation" is also wrong. Opp. at 28–29. Defendants' motion addressed each of these points. MTD at 23–24. Teva's opposition does not engage with Defendants' arguments or cited authorities at all.

### B.     Teva's Allegations of Sporadic Payments Do Not Establish Harm to Competition

Teva's arguments as to harm to competition from the alleged bribes also miss the mark. Citing out-of-circuit opinions, Teva asserts that "[n]umerous courts have held that bribery can implicate the Sherman Act[.]" Opp. at 29. But Teva does not address the ***Ninth Circuit's*** ruling that "commercial bribery, standing alone, does not constitute a violation of the Sherman Act." *Calnetics Corp. v.*

*Volkswagen of Am.*, *Inc.*, 532 F.2d 674, 687 (9th Cir. 1976). Defendants' point—which Teva's cited cases confirm—is that the alleged bribery must "hobble competition." *See* Opp. at 30 (citing cases).

Contrary to Teva's suggestion, the mere payment of alleged bribes "does not support an inference that the bribes restrained competition." *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383 (D. Conn. 1988). Teva must plausibly allege that the alleged bribes ***did*** materially harm competition, and its allegations on this front are entirely lacking. Teva admits it does not actually allege how many prescribers or prescriptions were actually subject to or influenced by the alleged improper bribes (either as a percentage or in absolute terms). Opp. at 6 (data is "limited"). While Teva quibbles that these are details about "the *extent* of the scheme," they are necessary at the pleading stage to plausibly establish that the supposed bribes actually impacted competition.[1] And as to Teva's handwaving that it "is entitled to" discovery to "uncover" the details, the Ninth Circuit has confirmed Teva has it backwards: a plaintiff must ***first*** satisfy Rule 8 and 12(b)(6) with well pleaded allegations to advance to discovery, rather than "rely on anticipated discovery" to state a claim, a "procedure" that "especially makes sense" in "antitrust cases." *Whitaker v. Tesla Motors*, *Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

## V.    <u>TEVA'S STATE LAW CLAIMS ALL FAIL</u>

**UCL.** Teva's only defense of its UCL claim is that stating a Sherman Act claim also states a claim under the UCL's unlawful and unfair prongs. Opp. at 30. But Teva's argument says nothing about the other statutes on which its UCL claim purports to rely (*e.g.*, Cal. Penal Code § 641.3 and Cal. Ins. Code § 1871.7), which Defendants addressed in their motion. Moreover, even assuming Teva has stated a claim under the Sherman Act—and it has not, as explained *supra*—that does not suffice. The UCL ***also*** requires that a plaintiff "allege the lack of an adequate legal remedy[.]" *Forrett v. Gourmet Nut*, *Inc.*, 634 F. Supp. 3d 761, 768–69 (N.D. Cal. 2022) (Freeman, J.). Teva's UCL claim

---

[1]    While Teva baldly refers to supposed payments more broadly, the only allegations of specific payments Teva ***actually*** makes are to ***six prescribers***. (¶¶174–83.) While even these allegations that payments to these six prescribers were bribes are implausible and should be disregarded, *supra* Section IV.A., they are, at best, the only allegations of specific payments that the Court can consider.

must be dismissed because it nowhere makes this allegation, much less explains why legal remedies are inadequate, and Teva failed in its opposition to address Defendants' arguments on this point.

**Section 16600.** Teva's sole response to Defendants' arguments as to Teva's Section 16600 claim based on the Corcept-Optime agreement is that "Section 16600 has been applied in cases considering agreements to secure monopolies or fix prices—the sort of context addressed by section 1 of the Sherman Act." Opp. at 30. But Teva does ***not*** assert claims for conspiracy to monopolize or price-fixing. Teva's citation to *Meta Platforms, Inc. v. BrandTotal Ltd.* is also inapt, as it omits both the rest of the citation explaining that such Section 16600 claims are "***subject to the rule of reason***," and the case's holding that the Section 16600 claim ***failed*** for lack of harm to competition. 605 F. Supp. 3d 1218, 1250 (N.D. Cal. 2022). That is Defendants' unrebutted point here. MTD at 27–28.

**Omnibus Antitrust and Consumer Protection.** Teva argues its omnibus claim is "adequately pled because Teva has been clear about what wrongdoing has allegedly been committed by Defendants." Opp. at 30. That is a non sequitur. Defendants do not seek dismissal of Teva's claim on the grounds that its gravamen—the failed exclusive dealing and bribery allegations—is unclear. Instead, Teva's claim fails since it violates Rule 8 in that it consists solely of: (1) a non-exhaustive, non-committal list of at least 85 different "exemplar" statutes; without (2) allegations as to which specific provision of each statute Teva claims Defendants violated; (3) identification of the specific elements of each statute; or (4) facts demonstrating those elements are met for each statute. MTD at 28–29. This Court and others have dismissed state law tag-along claims that provide no further specificity or no "attempt to set forth facts showing that claims lie under each of those laws." MTD at 28 (citing *Los Gatos*, *Revlimid*, *Chavez*). Teva does not respond to these arguments or authorities.

Teva's only cited case, *Staley v. Gilead Scis., Inc.*, does not help it. Excusing a plaintiff from identifying—and pleading facts to satisfy—the "specific requirements of each state's" laws is ***not*** the standard that this Court (in *Los Gatos*, *Vance*, and *Nexus 6P*, MTD at 28–30) and others have applied. Moreover, *Staley* held that if a defendant "believes that specific elements . . . have not been met," then it "is their obligation to identify those specific elements." 446 F. Supp. 3d 578, 633 (N.D. Cal. 2020). Defendants submit it is Teva's burden—not Defendants'—to identify the elements of each statute Teva seeks to invoke and explain why those elements are met, but Defendants ***have*** identified

1    specific defects as to those elements. MTD at 28–29. Teva's opposition addresses none of this.

2        **Unjust Enrichment.** Teva does not engage with any of Defendants' arguments or authorities

3    regarding its unjust enrichment claim. MTD at 29–30. It simply asserts that its unjust enrichment

4    claim can proceed since its FAC includes "antitrust claims under the Sherman Act." Opp. at 30. For

5    one, Teva has ***not*** adequately stated a Sherman Act claim. Moreover, Teva's argument would mean

6    that every Sherman Act claim also gives rise to an unjust enrichment claim, which is not the law.

7        Teva's citation to a single case—*In re TFT-LCD (Flat Panel) Antitrust Litig.*—does not save

8    its unjust enrichment claim. Only an unjust enrichment claim under California law was at issue in that

9    case. 2011 WL 4345435, at *3 (N.D. Cal. Sept. 15, 2011). But where, as here, a plaintiff asserts an

10   unjust enrichment claim under the laws of ***multiple*** states (in Teva's case, ***all*** states), "Plaintiffs must

11   identify and plead the elements of unjust enrichment for each state," which Teva does not do. *Los*

12   *Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 4774611, at *11 (N.D. Cal. Sept.

13   22, 2014) (Freeman, J.); MTD at 29–30. Even as to California law, *TFT* addresses only whether an

14   unjust enrichment claim may nonetheless "proceed under a different title," such as for quasi-contract

15   and/or restitution. 2011 WL 4345435, at *3–4. That is undisputed; Defendants' point is that under a

16   quasi-contract and/or restitution theory—how California courts construe an unjust enrichment

17   claim—Teva pleads no contract between Teva and Defendants (quasi or otherwise), or any basis for

18   restitution (since Teva provided no direct benefit ***to*** Defendants, such as payment of a specific sum

19   of money that should be returned). MTD at 30. Courts addressing these issues (which *TFT* and Teva

20   do not) hold that they bar an unjust enrichment claim under California law. *Id.*

## VI.    TEVA'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

22       Teva should not be granted leave to amend because it has already amended once and further

23   amendment would be futile. MTD at 30. While Teva asserts it "should be given leave to amend" if

24   Defendants' motion "is granted in any respect," Opp. at 30, it "fail[s] to state what additional facts

25   [it] would plead if given leave to amend." *Koller v. Monsanto Co.*, 2023 WL 8429796, at *6 (N.D.

26   Cal. Dec. 4, 2023) (cleaned up). Teva's claims, and this case, should therefore be dismissed for good.

## CONCLUSION

28       For the foregoing reasons, the Court should dismiss Teva's claims and this case with prejudice.

DATED:  November 25, 2024

By:    */s/ Robert W. Stone*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:        (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Fax:        (415) 875-6700

Steig D. Olson (admitted *pro hac vice*)
  steigolson@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Fax:        (212) 849-7100

*Attorneys for Defendant Corcept Therapeutics, Inc.*

By:    */s/ Lucas C. Wohlford*

Lucas C. Wohlford (admitted *Pro Hac Vice*)
**DUANE MORRIS LLP**
100 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: +1 214 257 7200
Facsimile: +1 214 257 7201
E-Mail: lwohlford@duanemorris.com

Justin J. Fields (SBN 259491)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200 San Francisco, CA 94105-1127
Telephone: +1 415 957 3000
Facsimile: +1 415 957 3001
E-Mail: jfields@duanemorris.com

*Attorneys for Defendant Optime Care Inc.*

DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION TO DISMISS TEVA'S FAC WITH PREJUDICE

### CIVIL LOCAL RULE 5-1 ATTESTATION

I, Robert W. Stone, am the ECF user whose credentials were utilized in the electronic filing of this document.  In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the signatories listed above.

DATED:  November 25, 2024


By _____/s/ Robert W. Stone_____
     Robert W. Stone


### CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of November 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.


By _____/s/ Robert W. Stone_____
     Robert W. Stone

DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION TO DISMISS TEVA'S FAC WITH PREJUDICE