Michael Shipley (SBN 139582)
KIRKLAND & ELLIS LLP
555 South Flower Street, 37th Floor
Los Angeles, California 90071
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C. (*Pro Hac Vice*)
Kevin M. Neylan, Jr. (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

Additional Counsel for Plaintiff
listed on signature page

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Teva Pharmaceuticals USA, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Corcept Therapeutics, Inc., and Optime Care Inc., <br><br> Defendants. | Case No. 5:24-cv-03567-NW <br><br> **L.R. 7-3(d)(2) STATEMENT OF RECENT DECISION** <br><br> Ctrm: 3 – 5th Floor <br> Judge: Honorable Noël Wise |

To the Court and the Parties and their Counsel of Record, PLEASE TAKE NOTICE, pursuant Local Civil Rule 7-3(d)(2), that on June 23, 2025, the Ninth Circuit Court of Appeals issued a published opinion in *CoStar Group, et al. v. Commercial Real Estate Exchange*, No. 23-55662, 2025 WL 1730270, in which the court addressed several issues relevant to Defendants' pending motion to dismiss, which has been fully briefed and for which oral argument is currently set for July 17, 2025. *See, e.g.*, *id.* at *5 (holding that "a § 1 exclusive dealing claim requires a substantial foreclosure of competition, and monopoly power establishes such a foreclosure. So if [an antitrust plaintiff] plausibly alleges that [a defendant] has monopoly power under § 2, it has also plausibly alleged that any exclusive agreements that [the defendant] entered into also foreclosed competition in a substantial share of the relevant market under § 1…. Thus, even though monopoly power is not a necessary element of a § 1 claim, it is sufficient to allege the substantial foreclosure element of exclusive dealing."); *see also, e.g.*, FAC ¶¶ 71-72, 126-131, 148, 188-201 (alleging Corcept has monopoly power). A copy of the *CoStar Group* opinion is attached as Exhibit A.

Dated: June 24, 2025          Respectfully submitted,

By: /s/ Michael Shipley

Michael Shipley
KIRKLAND & ELLIS LLP
555 South Flower Street, 37th Floor
Los Angeles, California 90071
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C. (*Pro Hac Vice*)
Kevin M. Neylan, Jr. (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446 5967
devora.allon@kirkland.com
kevin.neylan@kirkland.com

Jennifer M. Joslin (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
95 State Street
Salt Lake City, UT 84111
Tel: (801) 877-8144
jennifer.joslin@kirkland.com

*Attorneys for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Michael Shipley, attest that concurrence in the filing of this document has been obtained.

*/s/ Michael Shipley*
Michael Shipley

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, I caused to be filed the foregoing document with the United States District Court for the Northern District of California using the CM/ECF system and caused it to be served on all registered participants via notice of electronic filing.

*/s/ Michael Shipley*
Michael Shipley

# EXHIBIT A

2025 WL 1730270
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

COSTAR GROUP, INC.; CoStar Realty Information, Inc., Plaintiffs-counter-defendants-Appellees,
v.
COMMERCIAL REAL ESTATE EXCHANGE, INC., Defendant-counter-claimant-Appellant.

No. 23-55662
|
Argued and Submitted October 9, 2024 San Francisco, California
|
Filed June 23, 2025

Appeal from the United States District Court for the Central District of California, Consuelo B. Marshall, District Judge, Presiding, D.C. No. 2:20-cv-08819-CBM-AS

**Attorneys and Law Firms**

Melissa A. Sherry (argued), Roberto J. Borgert, Nicholas J. Boyle, Sarah A. Tomkowiak, and Jeremy L. Brown, Latham & Watkins LLP, Washington, D.C.; Jessica S. Bina and Elyse M. Greenwald, Latham & Watkins LLP, Los Angeles, California; Belinda S. Lee, Latham & Watkins LLP, San Francisco, California; Plaintiffs-Counter-Defendants-Appellees.

Nicholas S. Goldberg (argued), Warren A. Braunig, Daniel E. Jackson, and Elliot R. Peters, Keker Van Nest & Peters LLP, San Francisco, California, for Defendant-Counter-Claimant-Appellant.

Bradley D. Grossman, Attorney; Mariel Goetz, Acting Deputy General Counsel for Litigation; Anisha S. Dasgupta, General Counsel; Geoffrey M. Green, Patricia M. McDermott, Karna Adam, Kathleen Clair, Elizabeth Gillen, and Austin R. Heyroth, Of Counsel; Federal Trade Commission, Washington D.C.; for Amicus Curiae Federal Trade Commission.

Cody L. Reaves and Benjamin M. Mundel, Sidley Austin LLP, Washington, D.C., for Amici Curiae Former Antitrust officials and Antitrust Scholars.

Before: Lucy H. Koh and Anthony D. Johnstone, Circuit Judges, and Michael H. Simon,[*] District Judge.

[*] The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

**OPINION**

JOHNSTONE, Circuit Judge:

CoStar Group, Inc., and CoStar Realty Information, Inc., (collectively, "CoStar") and Commercial Real Estate Exchange, Inc., ("CREXi") are online platforms that compete for brokers in the commercial real estate listing, information, and auction markets. CoStar holds the largest share in these markets. CREXi is a recent entrant. After CoStar sued CREXi for infringing its intellectual property by listing images and other information that CoStar hosts, CREXi counterclaimed on antitrust grounds. The crux of CREXi's antitrust complaint: CoStar is a monopolist that wields its platform licensing and technology to prevent its customers from doing business with its competitors. CREXi argues that CoStar's conduct is: (1) unlawful monopolization and attempted monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful exclusive dealing under § 1 of the Sherman Act, 15 U.S.C. § 1, and California's analogous Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; (3) and "unfair" and "unlawful" under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq. The district court dismissed CREXi's antitrust counterclaims and directed entry of final judgment on those claims under Rule 54(b), permitting this appeal.

**\*2** We conclude that CREXi successfully states claims under §§ 1 and 2 of the Sherman Act and under California's Cartwright Act and UCL. It plausibly alleges that CoStar has monopoly power in the relevant markets. And it plausibly alleges that CoStar engaged in anticompetitive conduct by entering exclusive deals with brokers and imposing technological barriers, which prevents brokers from working with competitors. A monopolist wielding its power to exclude competitors and maintain monopoly power in its markets violates § 2 of the Sherman Act. Using exclusive deals to do so is a "contract ... in restraint of trade" that violates § 1 of the Sherman Act and the Cartwright Act. This same anticompetitive conduct violates the "unfair" and "unlawful" prongs of the UCL. So we reverse.

**I. CoStar's copyright claims and CREXi's antitrust counterclaims**

CoStar and its competitor CREXi provide listing, information, and auction services to help brokers research and transact commercial real estate ("CRE"). CoStar, founded in 1987, is the established industry leader. For listing services, CoStar offers LoopNet, an online marketplace, and LoopLink, software that enables brokers to display LoopNet listings on their websites. For information services, CoStar offers the CoStar database, which provides current and historical data about CRE properties. And for auction services, CoStar offers Ten-X, a sales platform for bidding on and selling real estate. CREXi, founded in 2015, offers alternatives to all of CoStar's products.

CoStar sued CREXi for copyright infringement and related claims in September 2020. Among other allegations, CoStar claims that CREXi stole tens of thousands of copyrighted property images, and misappropriated other valuable content from CoStar's services and databases, including listing information from LoopNet. The district court denied CREXi's motion to dismiss CoStar's claims, which are still pending there. CREXi then counterclaimed against CoStar, including the antitrust counterclaims in this appeal. As relevant to this appeal, CREXi asserted counterclaims under § 2 of the Sherman Act for unlawful monopolization and attempted monopolization (claims 1–6); under § 1 of the Sherman Act and the Cartwright Act for exclusive dealing (claims 7–8); and for unfair and unlawful competition under the UCL (claims 12–13).[1]

[1] CREXi also claims that CoStar intentionally interfered with its broker contracts and its prospective economic advantage (claims 10–11). But because CREXi first alleged those claims in its amended counterclaims and they were outside the scope of the district court's order granting leave to amend, the district court properly dismissed them. *See* Fed. R. Civ. P. 15(a)(2).

CREXi alleges that CoStar perpetrates a "scheme" of anticompetitive conduct to prevent its broker customers from doing business with CoStar's competitors. First, CoStar imposes contract terms on its broker customers that expressly or implicitly prohibit them from providing their own listings to CoStar's competitors. Second, CoStar builds technological barriers into its platforms that prevent brokers from freely transferring their own listings to competing platforms.[2] The effect of this conduct, according to CREXi, is to build "a moat" around CoStar's vast customer base to the exclusion of its competitors.

[2] CREXi also alleges that CoStar falsely claims copyright over data and images that brokers and others own and improperly uses CREXi's trademarked name to advertise and misrepresent that CREXi is affiliated with CoStar's Ten-X auction service. CREXi's false copyright ownership allegations may be related to or overlapping with its technological barriers theory. However, because we hold that CREXi's allegations of exclusive agreements and technological barriers are sufficient to state a § 2 monopolization claim, we do not address CREXi's additional allegations of anticompetitive conduct. On remand, the district court should revisit these allegations in light of our decision.

**\*3** The district court dismissed most of CREXi's claims—including all of its antitrust claims—with prejudice. The court held that CREXi did not state a § 2 monopolization claim because it failed to show through either direct or indirect evidence that CoStar has monopoly power. And it held that CREXi did not state a § 1 exclusive dealing claim because the agreements at issue were not exclusive. The court also rejected CREXi's UCL counterclaims because they were derivative of its antitrust claims.

CREXi sought final judgment on, and an immediate appeal of, its dismissed claims under Rule 54(b). Fed. R. Civ. P. 54(b) (permitting final judgment on "fewer than all[ ] claims" where a district court "determines that there is no just reason for delay"). The district court directed entry of final judgment as to the dismissed counterclaims, finding that doing so would not lead to duplicative appellate review. Although there is factual overlap between CREXi's claims on appeal and CoStar's and CREXi's unresolved copyright and trademark claims, we agree with the district court that the claims are sufficiently legally severable and will not result in a "piecemeal appeal[ ]." *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878–80 (9th Cir.2005) (quoting *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)). Nor will CoStar suffer any prejudice from having to defend this antitrust appeal now rather than later. *See Gregorian v. Izvestia*, 871 F.2d 1515, 1519 (9th Cir. 1989). Thus, it is a final judgment under Rule 54(b) over which we have jurisdiction. 28 U.S.C. § 1291.

We review de novo the district court's order of dismissal for failure to state a claim. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023). When considering a motion to dismiss, we accept all facts alleged in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party. *Ass'n for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). At this stage, a plaintiff need only state a facially plausible claim, such that a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## II. CREXi's claims under Sherman Act §§ 1 and 2 and related laws

CREXi claims that CoStar engages in anticompetitive conduct by itself and through its contracts with brokers. Under the Sherman Act's § 2, which targets unilateral anticompetitive conduct, CREXi claims that CoStar wields or attempts to wield monopoly power to exclude competitors from the market by signing exclusionary contracts with brokers and putting up technical barriers. Under the Sherman Act's § 1, which targets concerted anticompetitive conduct, CREXi claims that those same exclusionary contracts are exclusive agreements that prevent the brokers from doing business with competitors. CREXi's claim under California's Cartwright Act mirrors its § 1 claim. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.8 (9th Cir. 2022) (en banc). And based on all this conduct, CREXi claims that CoStar violated the "unfair" and "unlawful" prongs of California's UCL. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 539–40, 544 (1999) (explaining that the "unlawful" prong " 'borrows' violations of other laws and treats them as unlawful practices" and that the "unfair" prong targets "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws").

 *4  CREXi's §§ 1 and 2 claims are both governed by antitrust law's "rule of reason." *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023). Under the rule of reason, CREXi's §§ 1 and 2 claims converge on the same question: does "the challenged [conduct have] a substantial anticompetitive effect that harms consumers in the relevant market[?]" *Fed. Trade Comm'n v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541, 138 S.Ct. 2274, 201 L.Ed.2d 678 (2018)). So although CREXi's Sherman Act claims have different elements, in this case both claims turn primarily on whether CoStar entered exclusive agreements while holding monopoly power in the markets at issue. Allegations of such anticompetitive conduct, if proven, would show that CoStar harms consumers in violation of the Sherman Act.

We begin by introducing the elements of CREXi's § 2 monopolization claim and its § 1 exclusive dealing claim.

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Section 1 supports several theories of antitrust liability, including CREXi's theory of exclusive dealing. To state an exclusive dealing claim under § 1, a plaintiff must plausibly allege (1) the existence of an exclusive agreement that (2) forecloses competition in a substantial share of the relevant market. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016).

Section 2 of the Sherman Act prohibits "monopoliz[ing] ... trade or commerce among the several States." 15 U.S.C. § 2. Under § 2, plaintiffs can claim that a defendant both attempted to monopolize and actually monopolized a market. To state an attempted monopolization claim, plaintiffs must start by plausibly alleging that the defendant specifically intended to control prices or destroy competition in the market and has a dangerous probability of achieving monopoly power. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995). To state a monopolization claim, plaintiffs must start by plausibly alleging that the defendant has monopoly power in the relevant market. *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996). For both claims, plaintiffs must then plausibly allege that the defendant engaged in anticompetitive conduct to achieve (or attempt to achieve) monopoly power and caused antitrust injury. *See id.*; *Rebel Oil*, 51 F.3d at 1433.

Here, we can bypass some of these elements at the pleading stage. CoStar does not dispute that CREXi plausibly alleged that it specifically intended to control prices or destroy competition, or that it caused antitrust injury. So for CREXi's attempted monopolization claim, the only remaining elements are whether CoStar has a dangerous probability of achieving monopoly power and engaged in anticompetitive conduct in pursuit of that power. And for its monopolization claim, the only remaining elements are whether CoStar has monopoly power and willfully acquired it through anticompetitive

conduct. If CREXi has plausibly alleged that CoStar has monopoly power in the relevant market, it necessarily has alleged that CoStar has a dangerous probability of achieving monopoly power. Thus, if CREXi plausibly alleges that CoStar has monopoly power and willfully acquired that power through anticompetitive conduct, it will have stated both a monopolization and attempted monopolization claim under § 2.

### A. The overlapping Sherman Act elements at issue

**\*5** We can further simplify our consideration of CREXi's §§ 1 and 2 claims by mapping the overlap of their remaining elements.

*First*, a § 2 monopolization claim requires monopoly power, while a § 1 exclusive dealing claim does not. But a § 1 exclusive dealing claim requires a substantial foreclosure of competition, and monopoly power establishes such a foreclosure. So if CREXi plausibly alleges that CoStar has monopoly power under § 2, it has also plausibly alleged that any exclusive agreements that CoStar entered into also foreclosed competition in a substantial share of the relevant market under § 1.

By their nature, exclusive agreements can prevent a contracting party's competitors from doing business with respect to the contracted goods or services. Often these agreements have pro-competitive benefits. *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). So § 1 only prohibits exclusive agreements if they substantially foreclose competition, that is exclude competitors from so much of the market that they cannot gain a solid foothold to compete. *See Allied Orthopedic*, 592 F.3d at 996; *see also Interface Grp., Inc. v. Mass. Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987). Because monopoly power "is the substantial ability 'to control prices or exclude competition,'" *Epic Games*, 67 F.4th at 998 (quoting *United States v. Grinnell*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)), if a monopolist enters into exclusive agreements with its customers, those agreements can substantially foreclose competition, *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("[I]f the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals."). Thus, even though monopoly power is not a necessary element of a § 1 claim, it is sufficient to allege the substantial foreclosure element of exclusive dealing.

*Second*, a § 1 exclusive dealing claim requires an exclusive agreement, while a § 2 monopolization claim does not. But a § 2 monopolization claim requires anticompetitive conduct, and exclusive agreements are an example of anticompetitive conduct. So if CREXi plausibly alleges that CoStar entered into exclusive agreements that foreclose competition under § 1, it has also plausibly alleged that CoStar engaged in anticompetitive conduct under § 2.

"The anticompetitive-conduct requirement [of § 2] is 'essentially the same' as the Rule of Reason inquiry applicable to [§ 1] claims." *Epic Games*, 67 F.4th at 998; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001).

Exclusive dealing is also an exclusionary practice akin to monopolization. P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application §§ 768b2, 1821b (5th ed. 2018). Thus, even though exclusive dealing is not a necessary element of a § 2 claim, it is sufficient to show anticompetitive conduct.

In short, a monopolist that wields exclusive agreements to foreclose competition violates both §§ 1 and 2 of the Sherman Act. This means we must answer only two questions in this appeal: whether CREXi plausibly alleged that CoStar (1) has monopoly power, including the power to substantially foreclose competition, and (2) entered exclusive agreements, an example of anticompetitive conduct. If CREXi has done so, it will have stated a claim under both §§ 1 and 2 of the Sherman Act. Because CREXi's claim under the Cartwright Act mirrors its § 1 claim, it also will have stated a claim under the Cartwright Act. *See Olean Wholesale*, 31 F.4th at 665 n.8. And because CREXi's claims under the UCL depend on the same underlying conduct as its §§ 1 and 2 claims, it also will have stated a claim under both the "unfair" and "unlawful" prongs of the UCL. *See Cel-Tech*, 83 Cal.Rptr.2d 548, 973 P.2d at 539–40, 544.

### B. CREXi's monopoly power allegations

**\*6** We now consider whether CREXi plausibly alleges that CoStar has monopoly power in the relevant markets. CREXi alleges that there are three relevant product markets—listing services, information services, and auction services—that are further divided into markets for each of fifty metropolitan areas. CoStar does not contest this market definition.

Monopoly power "is the substantial ability 'to control prices or exclude competition.'" *Epic Games*, 67 F.4th at 998

(quoting *Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698). A plaintiff may plead monopoly power in two ways. Either a "predominant share of the market" or an "ability to manage ... prices with little regard to competition" can "support[ ] an inference of market dominance." *Greyhound Comput. Corp. v. Int'l Bus. Machs.,* 559 F.2d 488, 497 (9th Cir. 1977). Thus, monopoly power can be shown either directly, through evidence of the exercise of monopoly power, or indirectly, through evidence of a firm's predominant market share. *See Rebel Oil,* 51 F.3d at 1434; *Epic Games,* 67 F.4th at 998. CREXi plausibly alleges monopoly power both directly and indirectly.

*1. Direct evidence of monopoly power*

A plaintiff can plausibly allege that a defendant has monopoly power with "direct evidence of the injurious exercise" of that monopoly power—evidence of either supracompetitive pricing or reduced output. *Rebel Oil,* 51 F.3d at 1434; *see Epic Games,* 67 F.4th at 998 ("Like market power, monopoly power can be established either directly or indirectly."). "A supracompetitive price is simply a 'price[ ] above competitive levels.' " *Epic Games,* 67 F.4th at 984 (omission in original) (quoting *Rebel Oil,* 51 F.3d at 1434); *see also Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475–76 (9th Cir. 1997), *overruled in part on other grounds by Lacey v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012) (distinguishing high prices from supracompetitive prices). Because monopoly power "is the abilit[y] (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion," evidence of supracompetitive pricing is direct proof of the actual exercise of monopoly power. Areeda & Hovenkamp, § 501.

CREXi plausibly alleges that CoStar charged supracompetitive prices and thus has monopoly power. CREXi repeatedly alleges that CoStar has "impose[d] prices much higher than those of its competitors for years, and has not been forced to reduce them." CREXi provides specific examples of how CoStar has increased its prices as competitors have been either forced from the market by CoStar or acquired by CoStar. For example, CREXi alleges that CoStar hiked its average prices by 80% for new customers several months after CoStar used litigation tactics to drive a former competitor, Xceligent, from the market. CREXi also points to anecdotes from CoStar's customers complaining about CoStar's pricing and the unavailability of alternatives that could drive down prices. For example, one customer complained that after CoStar merged with a former competitor, CoStar "decided to gouge brokers" by "drastically rais[ing] their prices" by 300 to 500%. These allegations are enough to create a plausible inference of long-term supracompetitive pricing—an exercise of monopoly power.

Despite determining that CREXi plausibly alleged supracompetitive pricing, the district court held that CREXi failed to plausibly allege monopoly power because it did not also allege that CoStar restricted output in the relevant markets. But a plaintiff need not allege both output restrictions and supracompetitive pricing to plead direct evidence of monopoly power. As the Supreme Court recently explained, "reduced output, increased prices, *or* decreased quality in the relevant market" may serve as "proof of actual detrimental effects [on competition]." *Am. Express,* 585 U.S. at 542, 138 S.Ct. 2274 (emphasis added) (alteration in original); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 237, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("[A] jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted *or* prices were above a competitive level." (emphasis added)); *Fed. Trade Comm'n v. Ind. Fed'n of Dentists,* 476 U.S. 447, 461–62, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[P]roof of actual detrimental effects, *such as a reduction of output*, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (emphasis added) (internal citations omitted)); *Epic Games,* 67 F.4th at 983 ("To prove a substantial anticompetitive effect directly, the plaintiff must provide 'proof of actual detrimental effects [on competition],' such as *reduced output, increased prices, or decreased quality* in the relevant market. Importantly, showing a reduction in output is one form of direct evidence, but it 'is not the only measure.' " (emphasis altered) (citations omitted)). So even if CREXi did not plausibly allege that CoStar restricted output,[3] it still plausibly alleged CoStar has monopoly power.

[3] Because we conclude that no such showing is necessary, we need not reach the question of whether CREXi has plausibly alleged restricted output. *See INS v. Bagamasbad,* 429 U.S. 24, 25, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976) ("As a general rule courts ... are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

**\*7** It makes economic sense that a plaintiff need only allege evidence of supracompetitive pricing to raise a plausible inference of monopoly power. Pricing and output are "two sides of the same coin." *United States v. AMR Corp.*, 335 F.3d 1109, 1115 n.6 (10th Cir. 2003) (citation omitted). "If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted." *Calif. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 777, 119 S.Ct. 1604, 143 L.Ed.2d 935 (quoting *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594–95 (7th Cir. 1984)); *see also Brooke Grp.*, 509 U.S. at 233, 113 S.Ct. 2578 ("Supracompetitive pricing entails a restriction in output."). And if firms restrict output, prices will increase. *See Rebel Oil*, 51 F.3d at 1434 ("Prices increase marketwide in response to the reduced output because consumers bid more in competing against one another to obtain the smaller quantity available." (citing *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986))). So to allege monopoly power via direct evidence, an antitrust plaintiff need only allege that a firm raised prices to a supracompetitive level *or* restricted output. CREXi does. Thus, the district court erred in dismissing CREXi's monopoly power claim.

### 2. Indirect evidence of monopoly power

Moreover, CREXi's monopoly power allegations are sufficient at the motion to dismiss stage for an independent reason. The district court overlooked indirect evidence showing that CoStar has a "predominant share of the market" which "support[s] an inference of market dominance" even without direct evidence that it exercises monopoly power. *Greyhound*, 559 F.2d at 497. To establish monopoly power through indirect evidence a plaintiff must, with respect to a defined market, show (1) "that the defendant owns a dominant share of that market," and (2) "that there are significant barriers to entry and ... that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434. CREXi also plausibly alleges that CoStar has monopoly power through indirect evidence.

#### a) Dominant share of the market

"[M]arket shares on the order of 60 percent to 70 percent have supported findings of monopoly power." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (explaining that "[c]ourts generally require a 65% market share to establish a prima facie case of market power" to sustain a monopolization claim). Here, CREXi alleges that CoStar has a 90% share of the CRE listing market, a 90% share of the information market, and a 95% share of the auction services market. Those allegations rely on two sources: local estimates of CoStar's market share in fifty metropolitan areas based on property sales, and national data about CRE activity and the number of visitors to CoStar's LoopNet website.

For local market shares, CREXi divided the dollar value of for-sale CRE listings on CoStar's platform by the total value of closed CRE sales transactions in each metropolitan area. Based on these figures, CREXi estimates that CoStar's market share equals or exceeds 90 percent in twelve of the metropolitan areas, 80 percent in thirty-one of the metropolitan areas, 70 percent in thirty-eight metropolitan areas, 60 percent in forty-six metropolitan areas, and 57 percent in all fifty areas. We recognize that these estimates may be inflated; properties can be listed on multiple sites, and the estimates include properties listed but never sold. But the degree of overestimation and its effect on CoStar's overall market share is a fact-intensive inquiry that cannot be resolved on a motion to dismiss. *See Newcal Indus. Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008); *Greyhound*, 559 F.2d at 496 n.17. Drawing reasonable inferences in CREXi's favor, any overestimation would not make CREXi's monopoly power allegations implausible.

**\*8** National data bolsters CREXi's market share estimates: "nearly 90% of all CRE activity occurs on a CoStar Network," and LoopNet receives over 85% of website visitors as compared to listing competitors. Although "CRE activity" and website visitors to LoopNet are unlikely to mirror CoStar's market share in the listing market, it is reasonable to infer that these datapoints are correlated with market share. Taken together, CREXi's local and national data render CREXi's allegation that CoStar holds a dominant share of the listing market facially plausible. It is also facially plausible that CoStar holds a dominant share of the information and auction services markets. While the LoopNet data only relates to the listing market, the CoStar network data could pertain to all three alleged markets. And CoStar's information and auction services are complementary products to its listing services, so it is plausible its shares in all three markets are closely correlated.

#### b) Significant barriers to entry

We next examine whether there are significant barriers to entry into the defined markets. CREXi plausibly alleges that there are. "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.' " *Rebel Oil*, 51 F.3d at 1439 (citing *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993)). CREXi alleges that the relevant markets are characterized by "network effects," or economies of scale in consumption, a classic barrier to entry. See *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 779–80 (N.D. Cal. 2022); *Epic Games*, 67 F.4th at 984–85. Services with network effects become more valuable as the number of users increases. See *Klein*, 580 F. Supp.3d at 780. CREXi alleges that an increase in brokers who use CoStar's listing services increases the value of CoStar's listing to those brokers. A new entrant cannot attract sellers' brokers to list properties unless there are enough buyers' brokers using the service to search properties. But a new entrant cannot attract buyers' brokers to search properties unless there are enough sellers' brokers using the service to list properties. This "catch-22" increases the barriers to entry for new competitors.

In sum, CREXi plausibly alleges that CoStar has monopoly power via direct and indirect evidence under § 2. So CREXi has also plausibly alleged that any exclusive agreements CoStar entered substantially foreclosed competition under § 1. That alone violates neither section of the Sherman Act. For its § 2 monopolization claim, CREXi also must plausibly allege that CoStar engaged in anticompetitive actions to acquire or maintain its monopoly. And for its § 1 exclusive dealing claim, CREXi also must plausibly allege that CoStar entered into exclusive agreements that restrained trade. We now turn to those elements.

### C. CREXi's allegations of CoStar's exclusive agreements and anticompetitive conduct

CREXi alleges that CoStar engaged in anticompetitive conduct by entering exclusive contracts with brokers and imposing technological barriers. "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). So a firm with monopoly power is "precluded from employing otherwise lawful practices that unnecessarily exclude[ ] competition" from a relevant market. *Greyhound*, 559 F.2d at 498. Usually, exclusionary conduct is costly to firms. For example, most consumers prefer not to enter exclusive deals that prevent them from shopping around. See *Microsoft*, 253 F.3d at 87. Typically, a firm must reduce prices to compensate consumers for an exclusive deal, or else forgo their business. Only those firms with monopoly power can recoup those costs by excluding rivals from the market. See *Rebel Oil*, 51 F.3d at 1434; see also *LePage's Inc. v. 3M*, 324 F.3d 141, 164 (3rd Cir. 2003) ("[E]xclusionary practice has been defined as 'a method by which a firm ... trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it.' ") (alterations in original) (quoting Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976)).

**\*9** Here, CREXi alleges that the exclusive agreements and technological barriers increase brokers' costs of working with CoStar's competitors. If CoStar had monopoly power, it could engage in this exclusionary conduct. And by exercising its monopoly power in this way, it could exclude competitors, like CREXi, from the market. This, in turn, could allow CoStar to maintain its monopoly power and recoup any losses incurred through its exclusionary conduct. See Richard A. Posner, *Antitrust Law* 251–54 (2d. Ed. 2001) (explaining the "methods by which a firm that has a monopoly share of some market in a new-economy industry might seek to ward off new entrants," and thereby extend its monopoly). This would be the precise type of conduct that § 2 prohibits. See *Qualcomm*, 969 F.3d at 988–89; *Rebel Oil*, 51 F.3d at 1434.

#### 1. Exclusive agreement allegations

In examining CoStar's contracts with brokers, the district court applied a refusal-to-deal framework, asking whether this was the rare instance where a firm had a duty to deal with its competitor. *Aerotec*, 836 F.3d at 1184; *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009) ("There are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability."). But that is not CREXi's theory of liability under § 2. Instead, CREXi contends that CoStar's exclusionary practices kept CoStar's broker customers—not CoStar itself—from dealing with CREXi. A monopolist's efforts "to limit the abilities

of third parties to deal with rivals" is a matter of exclusive dealing with the monopolist's customers, not a refusal to deal with the monopolist's competitors. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *see also Allied Orthopedic*, 592 F.3d at 996 (recognizing that exclusive dealing claims involving "an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor" can violate antitrust law). Thus, we ask whether CREXi plausibly alleges that the contracts are exclusive agreements under § 1. And if it does, then it has also plausibly alleged anticompetitive conduct under § 2.

The foundation of "any exclusive dealing claim is an agreement to deal exclusively." *Aerotec*, 836 F.3d at 1181 (citation omitted). CREXi concedes, however, that the agreements of which it complains "expressly disavow[ ] any ownership in or claim to [brokers'] data, agreeing that CoStar's right to use the data will be 'non-exclusive.' " But CREXi alleges that these promises are "illusory and contradicted" by other contractual provisions and by CoStar's conduct. Thus, CREXi frames the agreements as "de facto" exclusive.

We have yet to recognize a de facto exclusive dealing theory. *Aerotec*, 836 F.3d at 1182. But we have "readily acknowledge[d] that tying conditions," a similar restraint of trade, "need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions." *Id.* at 1179; *see also Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954) ("To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement."). To dismiss an exclusive dealing claim just because a contract does not expressly require exclusivity would be the type of overly formalistic rule that the Supreme Court has cautioned against in antitrust cases. *See Qualcomm*, 969 F.3d at 1004 (considering the "practical effect" of an exclusive dealing agreement (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961))); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). Accordingly, we cannot inquire only into whether an agreement's terms expressly exclude one party from dealing with the other party's competitors.

*10 Other courts of appeals have recognized de facto exclusive agreements. These agreements all contained "specific features" that "effectively coerced" parties to work exclusively with a dominant firm. *Aerotec*, 836 F.3d at 1182–83. "Just as in any exclusive dealing claim ... the court first had to be satisfied that specific features of the agreement required exclusivity." *Id.* at 1183. For example, in *ZF Meritor, LLC v. Eaton Corp.*, the Third Circuit held that "a dominant supplier enter[ed] into de facto exclusive dealing arrangements with every customer in the market," 696 F.3d at 281, by offering rebate programs—backed by purchase and volume targets—that "induce[d] customers to deal exclusively with the firm offering the rebates," *id.* at 275. And in *McWane, Inc. v. FTC*, the Eleventh Circuit held that a defendant's "Full Support Program"—which required distributors to buy "all of their domestic fittings from [defendant]" or else lose their rebates and access to defendant's supply—was an exclusive agreement even though it was short-term and voluntary. 783 F.3d 814, 819–20, 833–35 (11th Cir. 2015).

CREXi's allegations are different because the contracts at issue do not contain rebate or discount terms that create de facto exclusivity in those cases. Still, CREXi plausibly alleges that specific provisions of each contract contradict the express promise of non-exclusivity. There are four agreements at issue: the LoopNet and LoopLink terms that both govern CoStar's listing service; the CoStar terms that govern its information service; and the Ten-X terms that govern its auction service. The LoopNet terms forbid brokers from using or reproducing content available on LoopNet "in connection with any other ... listing service" and from "integrat[ing] or incorporat[ing] any portion of the Content into any other database." CREXi alleges that the LoopNet terms also require brokers to treat "all information obtained from the Service," including brokers' own listings, as "proprietary" to LoopNet. In their contracts, brokers must also agree that it "shall constitute a prima facie breach" of the LoopNet terms if CoStar determines that "any third party," including a competitor, "has access to property listings" provided by brokers and modified by CoStar. The LoopLink, CoStar, and Ten-X terms all contain similar provisions. CREXi alleges that CoStar leverages its market power to ensure these contract terms are "non-negotiable" for individual brokers.

These contractual provisions are not expressly exclusive, and their terms define "Content" as only material "contained on or provided through" CoStar's platform. But CREXi alleges that, in practice, they require brokers to exclusively use CoStar's services. CREXi alleges that the terms of the contracts condition access to LoopNet and to brokers' own LoopLink-

hosted websites on an agreement not to support or share equivalent data with CoStar's competitors. In other words, if brokers provide data to CoStar, the terms forbid brokers from also providing that data to a competitor of CoStar. CREXi alleges that the terms, "by design, limit brokers' ability to use other listing platforms ... and have a chilling effect on brokers' willingness to work with competitors, for fear that they will run afoul of CoStar's overbroad terms."

These allegations of actual de facto exclusivity are not speculation: CREXi provides specific examples of brokers who understand CoStar's contract terms to *actually* foreclose their ability to work with CREXi and other CoStar rivals. For example, when CREXi offered to match listings posted on a broker's own website, the broker stated that this would be "problematic in regard to [his] contractual relationship with CoStar." Another broker explained that she could not allow CREXi to post her listings because "from what [she] underst[ood], that would be some sort of breach of contract with [CoStar]." A third broker explained that he could not work with CREXi because it would "conflict with our National CoStar agreement." Further proceedings may show that brokers misunderstand the operation of these contracts. But at the pleading stage, these allegations are sufficient to support an inference that the contracts create an exclusive relationship.

 **\*11**  Even if CoStar's contracts do not expressly require brokers to work only with CoStar, CREXi has plausibly alleged that specific provisions in all four of CoStar's contracts in practice lock brokers into exclusive agreements with CoStar. CREXi therefore plausibly alleges that the contracts operate as a de facto exclusive agreements for purposes of § 1, and that they are anticompetitive under § 2.

### 2. Technological barriers

CREXi's allegations of exclusive dealing are not its only allegations of anticompetitive conduct under § 2 of the Sherman Act. It also alleges that CoStar constructed technological barriers.

CREXi alleges that CoStar constructed technological barriers that impede CREXi's ability to access brokers' listing information that is otherwise available to the public on brokers' own websites. CoStar's LoopLink service powers brokers' personal websites, which commonly function as a comprehensive database for a broker's listings. Listing information may include addresses, sale prices or lease rates, square footage, photographs, narrative descriptions of the properties, and brokers' contact information. When several brokers who worked with CoStar tried to do business with CREXi, they asked CREXi to add listings to its platform by taking their listings from their own websites. But CREXi could not access those listings because, unbeknownst to the brokers, CoStar blocks its competitors—and only its competitors—from viewing them. Because it is costly to maintain a dynamic database of listings on several different platforms at once, many brokers keep their listings only on LoopLink-powered websites. CREXi's inability to access brokers' listings on brokers' own websites frequently means there is no practicable way for brokers to do business with CREXi and other CoStar competitors. For example, one broker explained that he "do[es] not keep lists of our listings on [E]xcel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get [CREXi my brokerage]'s listing at this time."

As alleged by CREXi, these technological barriers are particularly problematic because of their deceptive element. It is only after brokers contract with CoStar and build CoStar-powered websites that the brokers realize that they cannot transmit their own listing information and photographs to other listing companies via their own publicly available websites. At least one broker explained that he was surprised that CREXi was unable to access listings on the brokers' own website, stating: "I'm not sure why you can't access these [listings] because they are on our own website." By blocking only rivals' access to otherwise publicly available listings on brokers' own websites without disclosing such blockage, CoStar deceives its customers and protects its monopoly in a manner not attributable to competition on the merits. *See Microsoft,* 253 F.3d at 76-77 (concluding that Microsoft had engaged in anticompetitive conduct where it led developers to believe they were developing cross-platform applications when, in reality, they were producing applications that would run only on the Windows operating system).

In purpose and effect, CREXi alleges that these barriers "inhibit the free transfer of information from brokers to companies that compete with CoStar" and "prevent competition in the marketplace." This plausibly alleges that the technological barriers are anticompetitive. *See Cascade Health Sols.,* 515 F.3d at 894 (holding that conduct is anticompetitive if its only purpose is to drive up rivals' costs and cut off access to inputs necessary for competition).

### III. Conclusion

*12  CREXi plausibly alleges that CoStar has monopoly power in the relevant markets and engaged in anticompetitive conduct by entering de facto exclusive agreements and constructing technological barriers. Because the other elements are also met, CREXi states monopolization and attempted monopolization claims under § 2. Therefore, we reverse the district court's dismissal of claims 1–6. CREXi also plausibly alleges that CoStar's agreements with brokers are de facto exclusive, and that those agreements may substantially foreclose competition in the relevant market. So CREXi states a claim under both § 1 of the Sherman Act and California's analogous Cartwright Act. Therefore, we reverse the district court's dismissal of claims 7–8. And because CREXi states claims under both §§ 1 and 2 of the Sherman Act, it also states claims under both the "unfair" and "unlawful" prongs of the UCL, which rely on the same allegations. Therefore, we reverse the district court's dismissal of claims 12–13. Lastly, we affirm the district court's dismissal of CREXI's tortious interference claims, claims 10–11, as they were improperly raised in CREXi's amended counterclaims.

Sections 1 and 2 of the Sherman Act consist of different elements and are aimed at different conduct. But at bottom, the Act aims to protect consumers through competition in the marketplace. CREXi has plausibly alleged that CoStar engaged in anticompetitive conduct to protect its monopoly power, and that the conduct is an unreasonable restraint of trade. CREXi must now prove its allegations. And CoStar may raise defenses, such as procompetitive rationales for its conduct. At this stage, however, it is plausible that CoStar's alleged conduct while in possession of monopoly power causes a substantial anticompetitive effect that harms consumers in the CRE listing, information, and auction services markets.

Plaintiffs-counter-defendants-Appellees shall bear all costs on appeal.

**AFFIRMED in part; REVERSED in part; REMANDED for further proceedings.**

**All Citations**

--- F.4th ----, 2025 WL 1730270

---