July 23, 2025

**VIA ECF**

| | |
|---|---|
| The Honorable Virginia K. DeMarchi<br>United States District Court for the<br>Northern District of California<br>San Jose Courthouse, Courtroom 2 – 5th Floor<br>280 South First Street<br>San Jose, California 95113 | **PURSUANT TO SECTION 4(C) OF<br>THE COURT'S STANDING ORDER<br>RE CIVIL CASES** |

Re:   Joint Discovery Dispute Letter Brief Regarding Discovery Into Teva's Conduct in *Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc., and Optime Care Inc.*, Case No. 5:24-cv-03567-NW

To the Honorable Judge DeMarchi:

Pursuant to Section 4 of Your Honor's Standing Order for Civil Cases, Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") and Defendant Corcept Therapeutics, Incorporated ("Corcept") submit this joint discovery letter. The parties have engaged in discussions regarding this discovery over the course of five months, including a lead-counsel meet-and-confer on July 7, 2025, but they remain at an impasse.

1.  **Statement of Dispute Requiring Resolution**

Corcept seeks to compel Teva to comply with this Court's May 27, 2025 Order (Dkt. 105) requiring the production of "exclusive" dealing agreements concerning the distribution of Teva's approximately 20 branded drugs. Corcept respectfully requests that Teva be ordered to produce all of its exclusive dealing contracts, for all of its branded drugs, whether based on contractual terms or rebates (or other incentives), within seven days of the Court's order.

2.  **Parties' Position Statements**

    **(a)   Corcept's Position**

**Background**. On May 16, 2025, the Court found "Teva's own practices regarding exclusive dealing agreements … may yield information relevant to whether Corcept's conduct was reasonable and consistent with industry norms." Dkt. 105. Accordingly, on May 27, the Court ordered Teva to "identify and produce any exclusive dealing agreements for all of its approximately 20 branded drugs by June 24, 2025." Dkt. 108. Teva did not do so by June 24. Since then, Teva has produced only a single exclusive dealing agreement and incomplete addenda for only a single one of its branded drugs (Copaxone). Even that incomplete production only came on

July 18, and it took multiple correspondence, a further lead counsel meet-and-confer, and Corcept providing multiple drafts of this letter brief to Teva.

Teva's use of exclusive dealing arrangements is widely reported. A 2020 Congressional report indicates Teva has "contracted with specialty pharmacies and PBMs to limit generic substitution." Drug Pricing Investigation: Teva—Copaxone (Sept. 30, 2020), https://tinyurl.com/2u84c69r at 35. The report cites internal Teva documents acknowledging a "Brand over Generic (House Brand) Contracting Strategy," "Contracts" that contain "Brand over Generic terms" like "all 40mg Rx will be switched to Brand," and two specific contracts "executed at the specialty pharmacy level" under which the "Pharmacy will fill [Teva's] brand regardless if prescribed as generic." *Id.* at 36–37. These forms of exclusive deals are the subject of multiple antitrust litigations against Teva in at least New Jersey and Vermont.

After Teva failed to meet the Court's prior June 24 deadline, Corcept raised this evidence with Teva in writing and as part of the post-deadline meet-and-confer. Nonetheless, Teva continued to refuse to produce its "House Brand" and similar agreements on the grounds they are "rebate," not "exclusive dealing" agreements. Teva seemingly draws a distinction between an agreement that includes an express covenant not to provide services to a competing treatment/drug and one that achieves the same result by conditioning the receipt of compensation on exclusively dispensing the branded drug over competing generics. In other words, Teva contends it may withhold these agreements because their exclusivity is enforced by the threat of losing access to payments, rather than the threat of breaching the contract.

Only after receiving Corcept's initial draft of this brief did Teva partially relent and propose to produce some portion of the Copaxone agreements. Then, after Corcept provided yet another draft of this brief, Teva finally produced a sampling of the Copaxone agreements in a strategic effort to moot this motion—after requiring Corcept to send multiple correspondence, request multiple meet-and-confers, and draft and send multiple versions of this motion. The copy of the agreement that Teva produced on July 18 confirms Teva uses exclusive dealing arrangements with respect to its House Brands: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *See* Ex. A (TEVA-MIF_00210538 at -541) (emphasis added). Teva, however, refuses to produce all such "House Brand," "Brand over Generic," and similar agreements containing incentive-based (or other) exclusivity provisions for its other branded drugs. While Teva is free to argue such agreements are not "germane" to the question of whether the Corcept-Optime agreement "is within industry norms," Corcept is equally free to argue that such agreements are comparable to its agreement with Optime—this is ultimately a question for the trier of fact after discovery is completed. Importantly, Teva does not deny that such additional agreements exist for the rest of its branded drugs beyond Copaxone; rather, Teva unconvincingly argues that the Court's May 27 Order does not reach such agreements because they are not "exclusive" in their "truest form."[1]

---

[1] Teva's argument that Corcept failed to identify a specific RFP is incorrect, and, in any case, moot. This motion is to compel compliance the May 27 Order. At the hearing, the Court noted: "[T]he parties have framed this dispute, in terms of four categories of information, which don't exactly map to the document request that I understand are at issue, but I'm going to go with how

**Argument**. Teva should be compelled to comply with this Court's Order and immediately produce all its House Brand, incentive, and other contracts intended to discourage generic substitution for its branded drugs. **First**, Teva's characterization of its House Brand agreements as "rebate"—not "exclusive"—is unsupported. The Congressional report references Teva's "Contracting Strategy" to "contract with—and pay rebates to—PBMs and specialty pharmacies" to make Teva's Copaxone "the only version of the drug covered or dispensed." While Teva's use of contractual terms and paid rebates to achieve *de facto* exclusivity would be enough to render these agreements probative on the questions presented in this case, Teva's agreements—as quoted above—expressly demand "exclusivity" from its partners in exchange for substantial monetary rebates.

**Second**, the Court's May 27 Order *was not limited to* Teva's claim (*see infra*) of any Teva "exclusive dealing agreement in its truest form"—which Teva characterizes as "an agreement that categorically forbids [pharmacy] from distributing products that compete with [Brand drug] […], under any circumstances." While Teva can argue its brand-related agreements are rebate, not exclusive, deals (which is contrary to the language used in the Copaxone agreement), Corcept is entitled to discover all these supposed rebate agreements for Teva's branded drugs to: (a) test that assertion, and (b) argue otherwise.

**Third**, even if Teva's agreements could be considered "*de facto*" rather than "explicit" exclusive dealing arrangements, that is immaterial. Antitrust authorities—including the very Areeda & Hovenkamp treatise Teva cites below—recognize "[a] discount conditioned on exclusivity should generally be treated as ***no different*** from an orthodox exclusive-dealing arrangement" and there should be no differentiation "between the manufacturer … that explicitly impose exclusive dealing on its dealers and the manufacturer that gives such dealers a discount or rebate for dealing exclusively in the manufacturer's" products. Areeda & Hovenkamp, *Antitrust Law*, ¶ 1807b (emphasis added). Indeed, in a recent decision Teva itself raised with the Court (Dkt. 115), the Ninth Circuit recognized that to be actionable, a contract need not "expressly exclude one party from dealing with the other party's competitors"; instead, a *de facto* arrangement can suffice, and "rebate programs" are one such example. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 1730270, at *9–10 (9th Cir. June 23, 2025). Indeed, in antitrust litigation against Teva involving these very "House Brand" agreements, the court rejected Teva's argument that they should not be treated as exclusive dealing agreements. *Mylan Pharms. Inc. v. Teva Pharms. Indus. Ltd.*, 2025 WL 756793, at *17–20 (D.N.J. Feb. 27, 2025) (applying the test for "evaluating the legality of an exclusive dealing arrangement.").

In light of all this, Teva's claim that the Court's Order does not require productions of such agreements is unreasonable and bad faith. The Copaxone agreements confirm in plain English that Teva pays its partners in exchange for carrying only Teva's branded drugs to the exclusion of available generics.  The Court ordered Teva to "identify and produce **any** exclusive dealing

---

you've presented the matter and just deal with … the four categories." 5/15/25 Hrg. Tr. at 3:17-21. Moreover, in the parties' Court-ordered joint status report following the hearing, Teva acquiesced and agreed to produce distribution agreements for its branded drugs. Dkt. 107 at 6. Thereafter, this Court ordered that "Teva must investigate reasonably accessible non-custodial source(s) to identify and produce any exclusive dealing agreements for all of its approximately 20 branded drugs by **June 24, 2025**." Dkt. 108 at 2 (emphasis in original).

agreements for **all** of its approximately 20 branded drugs." Dkt. 108 at 2. Teva has no basis to withhold its incentive-based distribution agreements for its other branded drugs, Teva has never said such agreements do not exist, and Teva should identify and produce them.

Finally, even if the agreements were only somewhat relevant (in fact, they are highly relevant), that would not foreclose their discovery. Teva identifies no burden associated with collecting or producing agreements for its approximately twenty branded drugs, and it has already "conceded that it could undertake [database] queries" to identify its agreements with minimal burden. Dkt. 105. Corcept therefore requests that the Court, at the very minimum, clarify that Teva must produce *all* of its exclusive dealing agreements—including any agreements which condition benefits on a party selling, dispensing, or paying for any of Teva's branded drugs over generics.

### (b) Teva's Position

This motion is a misuse of the discovery process. Corcept does not identify any request for production as the basis for its effort to compel Teva to produce any and all "incentive-based distribution agreements." That is because Corcept moves to compel production of documents that were not the subject of any request under Rule 34. Corcept does not even attach the operative set of requests to this brief. But the Rules authorize a motion only when "a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—*as requested under Rule 34*." Fed. R. Civ. P. 37(a)(3)(B)(iv) (emphasis added). It is thus a basic rule of civil discovery that a "party seeking discovery must first serve a [Rule] 34 document request or a [Rule] 45 subpoena; a motion to compel may be brought only after the opposing party fails to comply with formal discovery." Stevenson, *Federal Civil Procedure Before Trial* § 11:2351.1 (2025 online ed.) (citing *James v. Wash Depot Holdings, Inc.*, 240 F.R.D. 693, 694 (S.D. Fla. 2006)). Corcept makes no serious effort to contest this point.[2]

Corcept instead attempts to shoehorn its improper effort to compel "incentive-based distribution agreements" by pretending they are within the scope of the Court's May 16 and 27, 2025 Orders. Dkt. 105, 108. That argument is baseless too. The Court directed Teva to produce "exclusive dealing agreements" because they could be relevant to "whether Corcept's conduct was reasonable and consistent with industry norms." Dkt. 105. The Corcept-Optime exclusive dealing agreement, however, is *not* an "incentive-based" agreement that uses rebates or other forms of price competition to encourage Optime to favor Korlym over generic competitors. It is, instead, an exclusive dealing agreement in its truest form—it categorically forbids Optime from distributing products that compete with Korlym, including Teva's generic, under any circumstances. First Am. Compl., Dkt. 39, at ¶¶ 5, 143, 147; *accord* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1800 ("In its simplest form, an exclusive-dealing arrangement is a contract between a manufacturer and a buyer that forbids the buyer from purchasing the contracted good from any other seller or that requires the

---

[2] Corcept's argument, fn. 1, that Teva somehow acquiesced by litigating Corcept's demand for "exclusive agreements" even though Corcept never demanded them is entirely tautological. Teva may have done so for the actual exclusive agreements that were the subject of the prior briefing. But Teva certainly did not and could not forfeit its right to demand that Corcept follow the Federal Rules as to agreements that were not addressed in the prior motion.

4

buyer to take all of its needs in the contracted good from that manufacturer."). Corcept itself has recognized the distinction between exclusive dealing and rebates when it confirmed that it "does not offer 'rebates, discounts, chargebacks' or the like to 'PBMs … or health insurers,'" and it "does not offer 'rebates' or 'net pricing' to distributors or pharmacies (including Optime)." (6/18/25 letter from B. Pepperman to A. Garg; 6/2/25 letter from B. Pepperman to J. Joslin.)

It is thus unsurprising that the concept of "incentive-based" or similar agreements went without mention in Corcept's briefing on the prior motion. Dkt. 98. The reason for that is obvious. For one, it was not until June 23, 2025—a month after the Court's discovery order—that the Ninth Circuit first recognized the premise that incentive-based agreements can, depending on their particular facts, sometimes warrant scrutiny under the law of exclusive dealing. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc*., 2025 WL 1730270, at *9 (9th Cir. June 23, 2025). Nothing in the prior briefing or the Court's order anticipated *CoStar*. Of course, if Corcept thought that *CoStar* changed the landscape, it could have sought clarification of the Court's order to account for *CoStar*. N.D. Cal. L. Civ. R. 7-9(b)(1), (2). Instead, Corcept rushed to baselessly accuse Teva of deliberately flouting the Court's Order. That is over the line. And, in any event, Corcept never argued that Teva's use of incentive-based agreements had any bearing on whether Corcept's admittedly *non-incentive-based* exclusive-dealing agreement was "reasonable and consistent with industry norms." *That* was the point of the Court's order directing Teva to produce exclusive-dealing agreements. *See* Dkt. 105.

Corcept never demanded incentive-based agreements. And the Court never ordered their production. The motion should be denied.

Corcept's musings about Teva's agreements with specialty pharmacies that distribute Copaxone—arguments it could have, but did not make in its prior motion—are beside the point, for the same reason. As the Staff Report cited by Corcept explains, these contracts "pay rebates to … PBMs and specialty pharmacies" to provide incentives for them to favor brand Copaxone over generic versions, with the proviso that "such contracts required the pharmacy to ensure that patients and health plans are left in the same position as if the prescription had been filled with the generic." (Staff Report, https://tinyurl.com/2u84c69r, at 36 & n.134). That is borne out by the text of the agreement itself, which permits a "▮▮▮▮▮" to receive a reduced "▮▮▮▮▮" only "▮▮▮▮▮": (i) the ▮▮▮▮▮ and (ii) the ▮▮▮▮▮ ensures that it will be "▮▮▮▮▮" Ex. A. Corcept never argued that a conditional discount was germane to show that the Corcept-Optime agreement—an *actual* exclusive dealing agreement that is neither incentive-based, nor financially neutral to patients and health plans—was within industry norms. Yet, despite its valid objections, Teva agreed to produce the Copaxone agreements in an effort to avert this dispute through compromise. Although Corcept is unsatisfied, Teva's willingness to make practical compromises in the discovery process is not a concession that Corcept's grasping theories have any merit.

Finally, Corcept's arguments about what a jury might find and the various ways that "exclusivity" might be found functionally similar to a rebate under substantive antitrust law are entirely obtuse to Teva's point. Corcept *did not* demand these documents. In its prior motion, Corcept *did not* make that argument to the Court. And it accordingly would make no sense to pretend that, in ordering the production of "exclusive agreements" the Court was somehow, *sub*

5

*silentio*, accepting an argument that was not made. Corcept's post-hoc relevancy arguments cannot alter the historical facts. No doubt, some of the documents addressed in this motion *may* arguably be responsive to Corcept's recently-served RFP 89, which seeks all of Teva's "distribution agreements and drug-specific addenda with respect to each of Teva's drugs available in the United States." *See* Exhibit B, RFP 89. Had Corcept bothered to follow the rules that apply to discovery by serving appropriate RFPs before filing this motion, the arguments Corcept presents in this letter might even have been well taken by Teva and avoided the need for a motion.[3]

But RFP 89 was not served on Teva until June 6, 2025—after the Court issued its orders. That raises the question: If Corcept actually believed that the Court had already ordered these documents produced, why the new demand? In any event, Teva's response is that Corcept's request for the distribution agreements and drug-specific addenda for *every one of Teva's 500 drugs* available in the United States is overly broad and unduly burdensome. *See United States v. Real Property*, 2024 WL 4474867, at *11 (C.D. Cal. June 17, 2024) ("[W]hile the scope of discovery is broad, Rule 26(b)(1) does not countenance the kind of speculative fishing expedition called for in these document requests."); *Moser v. Health Ins. Innovations, Inc.*, 2018 WL 6078308, at *4 (S.D. Cal. Nov. 20, 2018) (denying motion to compel where the "discovery requests at issue are overly broad on their face ... and do not appear to seek documents and information that meet the relevance standard of Federal Rule 26(b)(1)"). Perhaps the arguments Corcept makes above justify the relevance and discoverability of *some* of the requested documents. But the parties are still conferring on RFP 89; a conference of lead counsel has not occurred. Until the parties have met and conferred and attempted to chart a reasonable path forward, that dispute is not ripe for the Court's review. Corcept's zeal does not afford it a license to abuse the discovery process and jump to the head of the line.

### 3. Parties' Views Regarding the Need For A Hearing

#### (a) Corcept's Position

Corcept believes that a hearing on this matter would be helpful to the Court, so Corcept can further discuss the relevance and importance of this discovery, including to Corcept's defenses.

#### (b) Teva's Position

Given that the entire premise of this motion is procedurally improper, Teva believes that this matter may be resolved without a hearing. Were the Court to find a hearing helpful, Teva will be prepared to discuss why the Court should deny Corcept's improper motion to compel without a corresponding request for production.

---

[3] The imprudence of litigating discovery disputes untethered from the procedures set out in the Federal Rules is evident from the development of this motion. Corcept did not raise several of these arguments until its *third* iteration of edits to this joint brief. It is thus evident that Corcept's failure to serve proper RFPs for the documents at issue in this motion was an obstacle to the parties' frank discussion, and potential compromises, on the issues raised herein. *Cf.* Fed. R. Civ. P. 1.

### 4. Discovery Cut-Off Dates for Fact and Expert Discovery

The Court has currently set fact discovery to close on November 21, 2025 and expert discovery to close on March 27, 2026 (Dkt. 116).

### 5. Compliance With Meet and Confer Requirement

The parties held a further lead counsel meet-and-confer on these issues on July 7, 2025 via Zoom video call. Michael Shipley served as lead counsel for Teva, accompanied by Jen Joslin and Kevin Neylan. Mike Powell served as lead counsel for Corcept, accompanied by Brantley Pepperman, Jeffrey Boxer, and Steven Becker.

### 6. Attachments

An example of Teva's Copaxone Agreement is attached as Exhibit A. An excerpted copy of Teva's Responses and Objections to Corcept's Second Set of Requests for Production is attached as Exhibit B.

Respectfully submitted,

Dated: July 23, 2025                                KIRKLAND & ELLIS LLP

*/s/ Michael Shipley*
Michael Shipley

*Attorney for Plaintiff Teva Pharmaceuticals USA, Inc.*

Dated: July 23, 2025                                QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Michael D. Powell*
Michael D. Powell

*Attorney for Defendant Corcept Therapeutics, Inc.*