1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

TEVA PHARMACEUTICALS USA, INC.,

Plaintiff,

8

9

v.

10

CORCEPT THERAPEUTICS, INC., et al.,

Defendants.

11

12

Case No. 24-cv-03567-NW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Re: ECF No. 55

13        Plaintiff Teva Pharmaceuticals USA, Inc. ("Plaintiff") asserts various claims against

14   Corcept Therapeutics, Inc. ("Corcept") and Optime Care Inc. ("Optime") (collectively,

15   "Defendants") under federal and state antitrust laws.  Teva alleges that Defendants have engaged

16   in anti-competitive practices for years by unreasonably restraining trade and monopolizing the

17   market for Corcept's drug Korlym (mifepristone) used to treat endogenous Cushing's syndrome.

18   *See* FAC, ECF No. 77.  The Court GRANTS IN PART AND DENIES IN PART Defendants'

19   motion.

20   **I.    BACKGROUND**

21        Teva's FAC alleges interrelated factual allegations and legal theories of antitrust liability.

22   ***First***, Teva alleges that Corcept improperly listed patents in the FDA's Orange Book (the "Orange

23   Book Listing Theory").  ***Second***, on the basis of those fraudulent Orange Book listings, Corcept

24   brought meritless, sham lawsuits in bad faith (the "Sham Litigation Theory").  ***Third***, Corcept and

25   Optime allegedly stifled competition through an improper exclusive-dealing agreement that

26   foreclosed Teva's entry into the market (the "Exclusive-Dealing Theory").  ***Finally***, Defendants

27   supposedly compensated physicians (who routed Korlym prescriptions through Corcept's

28   exclusive-distributor Optime) for loyalty by paying kickbacks and bribes in violation of federal

United States District Court
Northern District of California

law (the "Kickback Theory").  As alleged by Teva, these four interconnected schemes demonstrate that Defendants were engaged in illegal market manipulation that made and continues to make it impossible for generic brands to enter Korlym's market.  This has caused Teva direct injury and continues to harm the drug market accordingly.

### A.    The Regulatory Framework

A major slice of Teva's FAC relies on the workings of the Drug Price Competition and Patent Term Restoration Act of 1984—commonly known as the "Hatch-Waxman Act"—which governs brand and generic competition in the pharmaceutical drug industry.  21 U.S.C. § 355; *see also* Pub. L. No. 98–417, 98 Stat. 1585.  A few elements are relevant here:

First, a manufacturer that seeks to market a new brand-name drug must file a New Drug Application ("NDA") with the FDA and "undergo a long, comprehensive, and costly testing process."  *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013).  "[I]f successful, the manufacturer will receive marketing approval from the FDA."  *Id.* (citing 21 U.S.C. § 355(b)(1)).  Manufacturers seeking approval for a drug "must identify all patents (regardless of the patent owner) that it believes cover the drug in question, which the FDA lists in a publication called the 'Orange Book.'"  *AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*, No. C 16-00443 WHA, 2016 WL 3648623, at *1 (N.D. Cal. July 6, 2016), *aff'd,* 890 F.3d 986 (Fed. Cir. 2018); 21 U.S.C. § 355(b)(1).

Second, to "speed the introduction of low-cost generic drugs to market," *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405, "the Hatch-Waxman Act permits a generic manufacturer to file an Abbreviated New Drug Application [("ANDA")] specifying that the generic has the 'same active ingredients as,' and is 'biologically equivalent' to, the already-approved brand-name drug."  *Actavis*, 570 U.S. at 142 (quoting *Caraco*, 566 U.S. at 405).  "In this way, the generic manufacturer can obtain approval while avoiding the 'costly and time-consuming studies' needed to obtain approval 'for a pioneer drug.'"  *Id.* (citing *Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 676 (1990).

Third, the Act requires an ANDA applicant to certify that their generic version does not infringe the brand drug's associated patents, *i.e.*, those patents listed in the Orange Book.

§ 355(j)(2)(A)(vii)(I)–(IV).  The ANDA applicant can make that assurance in several ways, one of which "is to file a so-called paragraph IV certification, which states that a listed patent 'is invalid or will not be infringed by the manufacture, use, or sale of the [generic] drug.'" *Caraco*, 566 U.S. at 407 (quoting § 355(j)(2)(A)(vii)(IV)).  A paragraph IV certification is considered an "act of infringement" under federal law and often provokes litigation.  *See id.*; 35 U.S.C. § 271(e)(2)(A). "If the brand-name patentee brings an infringement suit within 45 days, the FDA then must withhold approving the generic, usually for a 30-month period, while the parties litigate patent validity (or infringement) in court." *Actavis,* 570 U.S. at 143.

If the case is not resolved within 30 months, then the FDA may move forward in approving the ANDA.  § 355(j)(5)(B)(iii).  A pre-ruling approval allows the generic manufacturer to launch its product "at risk"—that is, "with the risk of losing the infringement case against it hanging over its head." *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 245 (D. Mass. 2014), *aff'd,* 842 F.3d 34 (1st Cir. 2016).  "Losing an infringement case after launching at risk can result in significant liability for the generic manufacturer, as damages typically are calibrated by the amount of its at-risk sales." *Id.* (citing 35 U.S.C. § 271(e)(4)(C)).

### B.    Factual Allegations

Korlym, the brand-name drug at the center of this case, treats endogenous Cushing's syndrome, a rare and debilitating disease affecting approximately 20,000 patients in the United States with treatment provided by a small set of doctors.  FAC ¶¶ 58-64, 149.  The FDA approved Korlym's launch on February 17, 2012, and awarded the drug "orphan" status under the Orphan Drug Act of 1983, entitling Corcept to drug exclusivity for the seven years that followed its FDA approval.  *Id.* ¶¶ 65-68.  Since launch, Corcept has sold Korlym at supracompetitive prices for upwards of several hundred thousand dollars per year.  *Id.* ¶¶ 71-72.  Corcept's orphan drug status expired on February 17, 2019.  *Id.* ¶ 69.

On December 15, 2017, Teva filed an ANDA seeking approval to manufacture and market a generic version of Korlym once Korlym's orphan drug exclusivity ("ODE") status expired in 2019.  *Id.* ¶ 73.  Because Corcept had two patents for Korlym listed in the Orange Book—U.S. patent numbers 8,921,348 (the '348 patent) and 9,829,495 (the '495 patent)—Teva's ANDA

3

included a Paragraph IV certification with respect to both patents explaining in detail why Teva's generic would not infringe Corcept's patents. *Id.* ¶¶ 74-75, 106. Based on that certification, Corcept sued Teva for infringement in the District Court of New Jersey in March 2018 triggering the statutory 30-month stay of final approval on Teva's ANDA. *Id.* ¶ 76. On October 12, 2018, the FDA tentatively approved Teva's ANDA. *Id.* ¶ 77. According to the approval letter from the FDA, the only thing preventing Teva from receiving final approval was the 30-month stay triggered by Corcept's March 2018 suit. *Id.* ¶ 76. The letter did not mention Korlym's orphan drug status as a barrier to Teva receiving final approval and launching a generic Korlym. *Id.* ¶¶ 77-78. Had Teva received final FDA approval in October 2018, "Teva would have launched as early as that date, or shortly thereafter." *Id.* ¶ 79. Instead, Teva's ANDA received final approval when the 30-month stay expired in August 2020. *Id.* ¶ 78. Though there were no barriers to launch beginning in September of 2020, Teva chose not to launch its generic Korlym until January 2024, three weeks after the court in New Jersey found that Teva did not infringe on the two patents that Corcept asserted at trial. *See id.* ¶ 123.

### 1.    Patent Manipulation and Sham Litigation

The instant suit alleges that Corcept's listing of the '348 and the '495 patents in the Orange Book served as the opening salvo in Corcept's scheme to maintain its monopoly past its permitted period of exclusivity. Teva alleges that the patents were fraudulently listed in the Orange Book because they did "not actually read on the Korlym NDA or its FDA-approved labeling." *Id.* ¶ 89. Nevertheless, despite knowing they were doing so in bad faith, Corcept listed the two patents because it gave them the ability to trigger the automatic 30-month stay when a generic attempted to enter the market. *Id.* ¶ 76; *see also Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*, 124 F.4th 898, 898, 903 (Fed. Cir. 2024) ("[S]imply by listing a patent as claiming a drug, the brand-name manufacturer can make the FDA withhold approval of the generic company's application for thirty months . . . . [A]n NDA holder [has] significant incentives to improperly list patents in the Orange Book.").

According to Teva, Corcept admitted to this scheme when its CFO, Charles Robb, stated in February 2019 that the '348 and the '495 patents did not have "a direct read on the Korlym label"

or any "express connection." FAC ¶ 99. Corcept only acquired a patent with a "direct read on the Korlym label" when it acquired U.S. patent number 10,195,214 (the '214 patent) **nine months after** Corcept sued Teva for infringement. *Id.* Upon Corcept's acquisition of the '214 patent, Corcept immediately filed another infringement suit against Teva. *Id.* ¶ 116. "In all, Corcept asserted nine different patents against Teva in **four** separate lawsuits Corcept filed between 2018 and 2023, strategically timing each lawsuit to maximize delay." *Id.* ¶ 120 (emphasis in original).

| Patent(s) Asserted | Date Patent Acquired | Date Corcept Alleged Infringement (↓) | Final Disposition | Date of Final Disposition |
|---|---|---|---|---|
| '348 and '495[1] | Dec. 2014 & Nov. 2017 respectively. FAC ¶ 82. | Mar. 2018. | Voluntarily dismissed. | Jan. 2021. |
| '526 | Not alleged. | July 2018. | Voluntarily dismissed. | July 2019. |
| '242 and '243 | Not alleged. | Feb. 2019. | Voluntarily dismissed. | July 2019. |
| '214 | Feb. 2019. *Id.* ¶¶ 116. | Feb. 2019. *Id.* ¶¶ 116, 121. | Consolidated bench trial ('214 & '800) finding no infringement. *Id.* ¶ 121. | Dec. 2023. |
| '216 | Not alleged. | Dec. 2019. | Voluntarily dismissed. | Aug. 2023. |
| '800 | Nov. 2020. *Id.* ¶ 117. | Mar. 2023. *Id.* ¶¶ 117, 121. | Consolidated bench trial ('214 & '800) finding no infringement. *Id.* ¶ 121. | Dec. 2023. |
| '801 | Nov. 2020. *Id.* ¶ 117. | Mar. 2023. | Voluntarily dismissed. | Aug. 2023. |

After approximately 34 months of litigation, Corcept voluntarily dismissed the suit alleging '348 and '495 patent infringement in January 2021. *Id.* ¶ 113. In fact, despite a half decade of litigation, Corcept voluntarily dismissed its infringement suits for all but two patents. *Id.* ¶ 121. In the sole action Corcept brought to verdict, the Court found that Teva had not infringed on either of the two asserted patents.[2] *Id.*

Though Teva's ANDA received final approval from the FDA in August 2020 when the 30-month stay expired, *see id.* ¶ 77, Teva only entered the market after it had prevailed in the infringement action. *See id.* ¶ 123. Five years after Corcept filed its first infringement action,

---

[1] Corcept filed all its infringement actions in the District of New Jersey. Unless otherwise noted, all information within this table comes from FAC ¶ 120.

[2] "[W]hen the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. at 60 n.5 (internal quotations omitted)).

United States District Court
Northern District of California

1    Teva launched generic Korlym on January 19, 2024, just three weeks after the New Jersey court

2    found for Teva in the infringement suit.  *Id.*

3                    **2.    Exclusive Distribution Agreement**

4            Teva alleges that during and following Corcept's web of sham litigations, Corcept pursued

5    another avenue to maintain its monopoly, namely by creating a "long-term, unprecedented,

6    blanket" exclusive-dealing arrangement between Corcept and Optime Care Inc. ("Optime"), the

7    specialty pharmacy that distributes Korlym.  *Id.* ¶ 135.  Under the agreement, which has been

8    effective since August 2017 and remains so to this day, Corcept distributes Korlym exclusively

9    through Optime.  *Id.* ¶ 136-137.  In return, Optime is contractually prohibited from distributing

10   any competing products, including generic versions of Korlym.  *Id.*

11           Corcept and Optime have amended their agreement three times since signing: first on

12   August 1, 2022, then on September 16, 2022, and finally on April 1, 2024.  FAC ¶ 138.

13   According to the FAC, Corcept's SEC filings indicate that the two companies have made

14   substantive adjustments to the agreement "including revising the fees, services, and other

15   obligations that Corcept and Optime owe each other in connection with the distribution of

16   Korlym."  *Id.*  The final amendment executed in 2024 "amend[ed] and restate[d] the 2017

17   Distribution Services Agreement in its entirety."  *Id.*

18           Teva contends that this arrangement between Corcept and Optime is "highly unusual in the

19   pharmaceutical industry."  *Id.* ¶ 147.  Among other things, the exclusivity agreement is severely

20   one-sided because (1) Corcept can terminate the at-will agreement but Optime cannot, *id.* ¶ 141,

21   and (2) the agreement automatically renews every three years, *id.* ¶ 137.  Teva alleges that the

22   arrangement has created nearly 100% market foreclosure, as Corcept distributes 100% of its

23   Korlym orders through Optime, and Optime appears to be the only realistic distribution channel.

24   *Id.* ¶ 148.  Most pernicious, Teva contends, is Defendants' use of the arrangement to end-run state

25   generic substitution laws designed to promote generic drug use.  *Id.* ¶ 155.  Because generic drugs

26   generally cost much less than branded drugs, state substitution laws require pharmacies to use

27   generic drugs where possible to save health plans' and patients' money.  *Id.*  But, if a prescription

28   is routed to a pharmacy like Optime that does not stock the generic, the pharmacy will dispense

United States District Court
Northern District of California

6

the branded drug instead. *Id*. Teva has attempted to break Corcept's stranglehold on the market by making its generic available at all major national, regional, and specialty wholesalers and pharmacies, but these efforts have been ineffective. *Id*. ¶ 158.

The real problem, Teva alleges, is that Corcept has forged "sticky, durable patterns of prescribing behavior" that have entrenched Korlym's small number of prescribing physicians into exclusively using Optime as the supplier for their patients. *Id*. ¶ 161. According to Teva, even if Corcept used only legitimate means to "convince physicians to rely exclusively on Optime . . . that would not detract from the harm to competition and patients that the exclusive arrangement is causing." *Id*.

### 3.    Physician Bribery and Kickback Scheme

Teva's final theory of antitrust liability concerns Corcept's allegedly illegal payments to physicians in return for brand loyalty. Teva points to several facts as evidence that Corcept is paying illicit kickbacks and bribes to prescribers:

- Payments from Corcept to physicians tripled from $380,000 in 2016 to over $1 million by 2018 (when Teva filed its generic application), *id*. ¶ 168;

- Multiple physicians showed suspicious patterns of dramatically increased Korlym prescribing coinciding with large payments from Corcept, *id*. ¶ 170;

- Corcept paid more than $100,000 between 2017 to 2022 to at least one physician known to have accepted kickbacks from another pharmaceutical company, *id*. ¶ 177;

- The U.S. Attorney's Office for the District of New Jersey is currently investigating Corcept for potential criminal violations related to payments to healthcare professionals, *id*. ¶ 185; and

- Between 2017-2023, Corcept's top 10 payment recipients each received between $187,000-$444,000, with some receiving over 100 times more than comparable physicians received from all other pharmaceutical companies combined, *id*. ¶ 184.

Teva alleges that Corcept's kickbacks and bribes caused physicians to continue prescribing brand Korlym, and routing their prescriptions to Optime, despite the availability of Teva's lower-priced generic. *Id*. ¶ 186.

United States District Court
Northern District of California

### C.    Procedural Posture

Teva filed this action on June 13, 2024.  The operative complaint, filed September 13, 2024, has seven causes of action alleging violations of:  Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the California Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200 *et seq.*; California's prohibition on contracts in restraint of trade ("Section 16600"), Cal. Bus. & Prof. Code § 16600, *et seq.*; various state antitrust and consumer protection laws; and a claim for unjust enrichment.  FAC, ECF No. 39.  Defendants timely moved to dismiss the FAC on October 14, 2024, *see* ECF No. 55, followed by an opposition, a reply, and supplemental briefing as requested in the Court's July 25, 2025, Order.  ECF Nos. 65, 68, 122, 123.[3]

As to Counts I and II, Teva alleges "an anticompetitive scheme" wherein components from all four theories described above, "alone or in combination . . . blocked and delayed entry of generic versions of mifepristone."  FAC ¶¶ 215, 222.  But for the Unjust Enrichment claim, Teva's remaining claims deal only with the Exclusive-Dealing Theory and/or the Kickback Theory.

The table below summarizes the Court's understanding regarding which of Teva's theories of liability give rise to its various claims in the FAC.

| | Cause of Action | Source of Injury |
|---|---|---|
| **Count I\*** | Sherman Act, Section 2 (Monopolization) | All theories |
| **Count II\*** | Sherman Act, Section 2 (Attempted Monopolization) | All theories |
| **Count III** | Sherman Act, Section 1 (Conspiracy to Restrain Trade) | Exclusive-Dealing Theory |
| **Count IV** | UCL, Cal. Bus. & Prof. Code § 17200 (Unfair Competition) | Exclusive-Dealing Theory; Kickback Theory |
| **Count V** | Cal. Bus. & Prof. Code § 16600 (Restraint of Trade) | Exclusive-Dealing Theory |
| **Count VI** | Omnibus State Law Antitrust Claims | Exclusive-Dealing Theory; Kickback Theory |
| **Count VII** | Unjust Enrichment (pleaded in the alternative) | All theories |

\* Counts I and II are brought solely against Defendant Corcept.

United States District Court
Northern District of California

---

[3] This case was reassigned to the undersigned judge on February 24, 2025.  ECF No. 81.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "can provide the framework of a complaint" but "must be supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when "the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). Thus, "a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995). "[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) (internal citation omitted)).

## III.    DISCUSSION

Corcept's challenges to the FAC fall broadly into two categories: timeliness and merit. For the reasons discussed further below, the Court considers the issue of timeliness collectively and then discusses the merits of each claim individually.

### A.    Statute of Limitations

All parties agree that claims under the Sherman Act (Counts I-III), UCL (Count IV), and Section 16600 (Count V) are all subject to a four-year statute of limitations. *See Garrison v. Oracle Corp.*, No. 14-CV-04592-LHK, 2015 WL 1849517, at *6 (N.D. Cal. Apr. 22, 2015)

United States District Court
Northern District of California

1    (applying four-year statute of limitations) (citing 15 U.S.C. § 15b (Sherman Act); Cal. Bus. &

2    Prof. Code § 17208 (UCL); Cal. Civ. Proc. Code § 343 (catch-all limitations statute applicable to

3    Section 16600)); *see also Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at

4    *10-12 (N.D. Cal. Apr. 10, 2015) (concluding that all three statutes are subject to a four-year

5    limitations period).[4]  Teva filed this action on June 13, 2024.  *See* ECF No. 1.  Thus, any claims

6    that accrued prior to June 13, 2020, are time barred unless an exception to the statute of limitations

7    applies.  Two such exceptions are relevant here: the continuing violation doctrine and the

8    speculative damages doctrine.  These doctrines, Teva argues, save Teva's claims in full, even

9    though many of the allegations reach back to conduct that occurred before 2020.

10                              **1.    Continuing Violation**

11           "A cause of action in antitrust accrues 'each time a plaintiff is injured by an act of the

12    defendant and the statute of limitations runs from the commission of the act.'" *Pace Indus., Inc. v.*

13    *Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citing *Zenith Radio Corp. v. Hazeltine*

14    *Rsch., Inc.*, 401 U.S. 321 (1971)).  Under this "continuing violation" doctrine, "each overt act that

15    is part of the [antitrust] violation and that injures the plaintiff . . . starts the statutory period

16    running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotations

17    omitted).  In the Ninth Circuit, an overt act restarts the statute of limitations if it: (1) is "a new and

18    independent act that is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and

19    accumulating injury on the plaintiff." *Pace Industries*, 813 F.2d at 238.  "This standard is meant to

20    differentiate those cases where a continuing violation is ongoing—and an antitrust suit can

21    therefore be maintained—from those where all of the harm occurred at the time of the initial

22    violation." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).  In other

23    words, to withstand Defendants' motion to dismiss, Teva must plausibly allege a series of

24    continuing overt wrongs, as opposed to mere ripple effects of a single past act.

25

26    _____

[4] Because the Court dismisses the state court claims (Count VI) with leave to amend, it will not

27    consider specific state statute of limitations arguments at this juncture, not least because different
      states have different limitations periods.  If Plaintiff elects to reallege certain state law claims, it

28    must provide the necessary information for the Court to consider their timeliness.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Thus, the Court must answer a threshold question before considering the implications of

2    the continuing violation doctrine: does the FAC allege four separate acts of monopolization based

3    on the four different types of conduct, or does it allege a single overarching monopolistic scheme?

4    If, for example, the Court considers the theories separately, are claims based on fraudulent Orange

5    Book listings time-barred because Teva does not allege that Defendants unlawfully listed any

6    patents within the four-year limitations period?  Or should the Court consider all allegations to be

7    part and parcel of a larger scheme that has been continuing from the first Orange Book listing to

8    the last kickback?  Though not stated explicitly in the papers, Defendants advance the first

9    interpretation by briefing the timeliness issue on a patent by patent and litigation by litigation

10   basis.  Teva endorses the second interpretation, arguing that each overt act in furtherance of the

11   monopoly serves to restart the statute of limitations, even though the doctrine "applies differently

12   across various types of antitrust cases."  *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 648 F.

13   Supp. 3d 679, 693 (E.D. Va. 2023), *aff'd,* 114 F.4th 280 (4th Cir. 2024), *cert. denied,* 145 S. Ct.

14   1921 (2025).  In *CSX*, the court described the application of the continuing violation doctrine as

15   "easily understood at a basic level . . . [but] exceedingly complex" in practice.  *Id.*  "Exceedingly

16   complex" aptly describes the issues currently before this Court where Plaintiff's various theories

17   of antitrust liability are like a net of ropes that Teva alleges Defendants wove over the better part

18   of a decade.

19        In an endeavor to gain clarity on these issues, the Court issued an order on July 25, 2025,

20   that asked the parties to provide supplemental briefing that would answer, among other things,

21   "whether an injury occurring within the statute of limitations under one theory is sufficient for all

22   theories" for statute of limitations purposes.  ECF No. 121.  Unsurprisingly, Defendants answered

23   with an emphatic "no," stating that "[a] timely act or injury related to one antitrust liability theory

24   does ***not*** suddenly render other untimely theories actionable simply because a plaintiff asserts

25   them in the same lawsuit."  ECF No. 122.  In support of this contention, Defendants cite to *Klehr

26   v. A.O. Smith Corp*., 521 U.S. 179 (1997), where the Supreme Court held that a "plaintiff cannot

27   use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier

28   predicate acts that took place outside the limitations period."  *Id.* at 190 (emphasis added).  This is

because "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts **outside the limitations period**." *Id*. (emphasis added).

Defendants misinterpret the import of *Klehr*. That case concerned the continuing violation doctrine's effect on recoverable damages, not cognizable injury. *Klehr* stands only for the proposition that a plaintiff cannot collect **damages** for conduct that occurred "outside the limitations period," restricting recovery to those acts that occurred within the limitations period that (1) are new and independent and (2) inflict new and accumulating injury. *Id*.; *see also Newcal Indus., Inc. v. IKON Off. Sols., Inc.*, No. C 04-02776 JSW, 2011 WL 1899404, at *3 (N.D. Cal. May 19, 2011) (limiting damages to "antitrust injuries caused by the alleged overt acts within the limitations period."); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("When a plaintiff alleges a continuing violation of the law, an overt act is required to restart the statute of limitations."); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1072 (N.D. Cal. 2016) (plaintiffs failed to plead a continuing violation where they did not "allege an overt act by [defendant] during the limitations period"). *Klehr* does not speak to whether an overt act under one theory of liability, *e.g.*, a new exclusive dealing arrangement, can restart the statute of limitations on otherwise time-barred conduct occurring under a different theory of liability, *e.g.*, long ago and allegedly fraudulent Orange Book listings.

In contrast, Teva points to the influential Areeda treatise, which explains that "[w]hen the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted provided that the subsequent acts fall within the definition of 'independent' predicate acts." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶320c4. The treatise makes no reference to theories of liability.

The Court has also done its own review of the caselaw and has not found a case that explicitly considers the intersection of the continuing violation doctrine and the existence of multiple theories of liability. That said, courts in this District have considered the larger question of whether a Sherman Act violation should be considered theory-by-theory or in the aggregate.

Though there is no consensus, this Court is convinced that, within the current landscape of persuasive precedent, it should consider all conduct going to the overarching scheme in the aggregate.[5]  As one court recently noted:

> "The Supreme Court has instructed courts to give plaintiffs in antitrust actions 'the full benefit of their proof without tightly compartmentalizing' each individual allegation, because the character and effect of an antitrust injury should not 'be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.' " *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (quoting *Cont. Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). As such, "a series of activities [can] combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation." *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021). If a plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions, as an overall scheme, may trigger antitrust liability.

*LyricFind, Inc. v. Musixmatch, S.p.A.*, No. 25-CV-02265-JSC, 2025 WL 2537755, at *22 (N.D. Cal. Sept. 3, 2025).  For these reasons, the Court considers all the conduct alleged as part of one continuing violation of the Sherman Act.  This aligns with Plaintiffs' own articulation of its case: a "multifaceted scheme to suppress generic competition" predicated on a "multitude of unlawful tactics to stifle competition and keep prices high."  FAC ¶¶ 5, 24.

    With this foundation, the application of the continuing violation doctrine in this case is clear:  Defendants restarted the clock on Teva's antitrust claims each time it paid a new kickback or bribe.  Each constituted a new and independent act that inflicted new and accumulating injury

---

[5] Despite reaching this conclusion, the Court notes that other well-reasoned lower courts have held differently.  *See Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 699 F. Supp. 3d 1086, 1115 (D. Or. 2023) ("Each of the anticompetitive theories Plaintiffs advance here involves a different set of rules and applicable case law for evaluating whether it is adequately pled. Plaintiffs' theory of synergistic conduct would eviscerate these bodies of case law by transforming the anticompetitive conduct element of a Section 2 claim into a 'totality of the circumstances' analysis devoid of any guidelines by which to evaluate the legality of such conduct.").  To the Court, these holdings reflect the complexity of antitrust law generally, and the lack of clear, binding precedent.  *See, e.g.*, *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F. Supp. 3d 468, 472 (D.R.I. 2018) ("[T]he area of antitrust law governing the claims is, to put it kindly, confused and opaque.").

United States District Court
Northern District of California

1    on Teva and the market.  *See, e.g., In re EpiPen Direct Purchaser Litig.*, No. 20-CV-0827

2    (ECT/JFD), 2022 WL 1017770, at *8 n.10 (D. Minn. Apr. 5, 2022) (Sherman Act claim

3    adequately pled where "bribes and kickbacks were made with the purpose, and had the effect," of

4    restraining the market.); *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 296–97 (S.D.N.Y.

5    2023), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, No. 23-720-CV, 2024 WL

6    1613907 (2d Cir. Apr. 15, 2024) ("[W]hen bribery is offered to support a Sherman Act claim, the

7    correct inquiry is . . . whether [the defendant's] practices hobbled competition.").

8            Accordingly, Teva's Sherman Act claims are not time-barred.[6]

9                    **2.    Speculative Damages Doctrine**

10           A claim for injury in the antitrust context does not begin to accrue until the damage

11   becomes certain.  *See Pace Indus.*, 813 F.2d at 240; *Samsung Elecs.*, 747 F.3d at 1204 (If "harm is

12   uncertain or speculative at the time of the antitrust violation, the statute of limitations period

13   begins on the date that the plaintiff's damages first accrued and became ascertainable.") (internal

14   quotation marks omitted).  "[T]he key question in determining whether damages were overly

15   speculative such that recovery would be unavailable at the time of the initial act is whether the

16   existence of the harm is determinable, not the specific dollar value of that harm." *Samsung Elecs.,*

17   747 F.3d at 1204 (citing *Pace Industries,* 813 F.2d at 240).  In other words, a plaintiff can only

18   make use of the speculative damages doctrine "where it is not certain that a plaintiff has been

19   injured at the time a defendant commits the relevant anticompetitive act."  *Ryan v. Microsoft*

20   *Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at *12 (N.D. Cal. Apr. 10, 2015).

21           Teva contends that its claims could not have accrued before it entered the market in

22   January 2024 because any damage before that time was speculative.  Plaintiff is wrong.  Teva's

23

---

24   [6] California state law also permits antitrust recovery "for actions that take place outside the
     limitations period if these actions are sufficiently linked to unlawful conduct within the limitations
25   period."  *In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 867 (N.D. Cal. 2020).  Because
     Teva's state law claims are predicated on the same conduct animating the federal antitrust claims,
26   the UCL and § 16600 claims are likewise not time-barred.  *See, e.g., In re Animation Workers*
     *Antitrust Litig.*, 87 F. Supp. 3d 1195, 1211 (N.D. Cal. 2015) ("As Plaintiffs' UCL claim here is
27   based purely on Defendants' alleged anticompetitive conduct, the Court concludes that Plaintiffs'
     UCL claim is also subject to the injury rule.")
28

United States District Court
Northern District of California

exclusion from the market occurred when Corcept fraudulently listed a patent in the Orange Book, and at best (in terms of Teva's claims) as soon as Corcept filed its first litigation and triggered the 30-month delayed FDA approval.  *See CSX Transportation*, 648 F. Supp. 3d at 692 ("When the injury at issue involves exclusion from an industry or market based on an antitrust violation, the excluded would-be competitor typically has knowledge of the 'public' act of exclusion, and thus, the injury is felt immediately.").  For Plaintiff to invoke the speculative damages exception, Teva must show that prior to June 2020, it was uncertain whether it would suffer damages, not simply that it was uncertain about the ***degree*** of damages.  Teva itself alleges that it was ready to enter the market in August 2018, and that it would have launched but for the 30-month stay.  This is textbook exclusion from the market and textbook antitrust injury.

### 3.    Damages

As referenced above, a plaintiff can only collect on damages that accrue within the statute of limitations.  *See Arcell v. Google LLC*, No. 5:22-CV-02499-EJD, 2023 WL 5336865, at *5 (N.D. Cal. Aug. 18, 2023) ("[E]ven if Plaintiffs properly alleged continuing overt acts that caused injury within the statute of limitations, they are only entitled to relief for injuries occurring from that overt act within the statute of limitations."); *California Crane Sch., Inc. v. Google LLC*, No. 21-CV-10001-HSG, 2023 WL 2769096, at *7 (N.D. Cal. Mar. 31, 2023) (continuing violation does not "enable Plaintiff to recover for any damages incurred outside the statutory limitations period."); *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 828 (9th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) ("[D]iscrete" acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.); *see also* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶320c7 ("Even in the case of the continuing conspiracy or violation . . . plaintiffs are ordinarily limited to damages for the four years immediately preceding the filing of their lawsuit.").

Though Teva's federal antitrust claims therefore survive beyond a statute of limitations challenge, its ability to collect damages is limited to the four years preceding the filing of the complaint.  This is no small thing: a significant portion of Defendants' allegedly violative conduct

occurred and was felt most acutely before 2020. Those damages are now lost to Teva. Teva failed to launch its generic in the market when the opportunity became available, and it failed to bring this claim until after it eventually went to market. Teva will need to "separate harm stemming from the limited conduct within the limitations period . . . from the established inertial effects of the acts committed prior to, or during the [period preceding 2020]." *CSX Transportation*, 648 F. Supp. 3d at 708. While the Court is not convinced Teva will be able to make such a showing, the Court's skepticism, particularly when Teva has not had the benefit of discovery, is an insufficient and inappropriate basis for the Court to dismiss the case at this stage. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (A plaintiff "cannot recover [antitrust] damages unless it can show that (and when) it would have entered the market in the absence of anticompetitive practices, and how much money it would have made . . . [but] a prediction that the plaintiff will be unable to meet its challenges is not a good reason to dismiss a complaint under Rule 12(b)(6).").

### B.    Restraint of Trade (Sherman Act, Section 1)[7]

Section 1 of the Sherman Act "makes unlawful 'every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States.'" *Parker v. Brown*, 317 U.S. 341, 350 (1943) (quoting 15 U.S.C. § 1). To state an exclusive dealing claim under § 1, a plaintiff must plausibly allege (1) the existence of an exclusive agreement that (2) forecloses competition in a substantial share of the relevant market. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016). The parties here do not dispute the existence of an exclusive agreement, only whether the agreement itself unlawfully restrains trade.

Restraints that are not per se unreasonable, as is the case here, are "judged under the 'rule of reason.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose

---

[7] Though the § 1 claim is Teva's third cause of action, the Court considers it first here as its disposition has waterfall effects on Teva's other claims. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 23-55662, 2025 WL 2573045, at *6 (9th Cir. Sept. 5, 2025) ("[A] § 2 monopolization claim requires anticompetitive conduct, and exclusive agreements are an example of anticompetitive conduct.")

competition in a substantial share of the line of commerce affected.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  A three-step, burden-shifting framework applies, but only the first is applicable at the pleading stage.  To survive a motion to dismiss, a plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 585 U.S. at 541.

### 1.    Relevant Market

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm Inc*., 969 F.3d 974, 992 (9th Cir. 2020) (citing *Am. Express*, 585 U.S. at 541).  The relevant market has two components: the product market and the geographic market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  Defendants only challenge Plaintiff's alleged product market.  Teva alleges that the relevant product market is the market for Korlym and its AB-rated generic equivalents.  FAC ¶ 189.

To withstand a motion to dismiss, a plaintiff must "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *In re eBay Seller Antitrust Litig*., 545 F.Supp.2d 1027, 1031 (N.D. Cal. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza Inc*., 124 F.3d 430, 436 (3d Cir. 1997)).  "'Reasonable interchangeability of use' means that the products have reasonable interchangeability based upon price, use and qualities, while 'cross-elasticity of demand' is the degree to which purchasers will accept substitute products based upon changes in characteristics such as price." *Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *5 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011) (internal citations and quotations omitted).

Teva has alleged both.  First, both parties appear to concede that Korlym has no meaningful substitutes.  Defendants proudly note that "Korlym is the first FDA-approved drug for . . . Cushing's syndrome," Mot. at 1, and the FDA awarded Korlym orphan drug status in recognition of the effort Corcept expended developing the only FDA-approved treatment for the disease.  FAC ¶ 2.  Further, "in the pharmaceutical context[,] courts have limited the market to

similar classes of drugs or even more narrowly, down to the brand product itself in absence of cross-elasticity evidence." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1171 (N.D. Cal. 2017) (collecting cases); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) ("[L]ower courts across the country have on numerous occasions ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant market.").

Defendants take issue, however, with Teva's failure to provide "more information regarding the players in and dynamics of the relevant market." Mot. at 17. But Teva has alleged that all Korlym sales go through Optime, notwithstanding that Teva's generic has been available at other pharmacies with greater national reach for an appreciably lower cost. Because Teva's generic is not available at Optime, it has been foreclosed from reaching the providers who actually prescribe Korlym. Teva has alleged that prescribers have turned exclusively to Optime. Considering the allegations in the light most favorable to Teva, Optime is the only relevant market for this pleading-stage analysis.

The Court finds that Teva's market definition does not suffer from any fatal defect. At this stage, that is enough to survive a Rule 12(b)(6) motion to dismiss. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (market definition depends on "a factual inquiry into the 'commercial realities' faced by consumers") (citation omitted).

### 2.    Substantial Foreclosure

To determine whether an exclusive agreement forecloses competition, courts look to the agreement's duration, the ease with which it may be terminated, whether it is incentive-based, and whether it leaves open alternative channels for competition by rivals. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271–72 (3d Cir. 2012); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (substantial foreclosure is not "total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."). In the pharmaceutical context, "generics need not be barred from all means of distribution if they

are barred from the cost-efficient ones." *FTC v. Shkreli*, 581 F. Supp. 3d 579, 627 (S.D.N.Y. 2022) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015)).

The FAC explicitly alleges that "[t]he Corcept-Optime exclusive agreement has had a near-total foreclosure effect on the market for Korlym," as evidenced by Teva's miniscule market share eight months after launching its generic at a substantial markdown. FAC ¶ 148. "The amount of market foreclosure the Ninth Circuit considers to be 'substantial' varies widely based on the underlying facts of the exclusive dealing agreements at issue in particular cases," *see Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-CV-04312-BLF, 2024 WL 1909156, at *9 (N.D. Cal. May 1, 2024), but the allegation of nearly 100% foreclosure is obviously enough. According to Teva, "[b]ecause Corcept has nearly a 100% share of the market for Korlym, and because Corcept sells 100% of its Korlym product through Optime, and because experience has proven that alternative distribution channels are not realistically able to threaten Corcept's dominant market share, the exclusivity provision that forbids Optime from distributing Teva's product has a nearly 100% foreclosure effect in the relevant market." FAC ¶ 148.

Furthermore, Teva sufficiently alleges many of the hallmarks of substantial foreclosure:

### a.    Ease of Termination

The Corcept-Optime agreement is ostensibly limited to three-years, but Teva alleges that Optime employees referred to the contract as evergreen and automatically renewing. *Id.* ¶ 139. It has been in place since 2017 and appears it will continue through at least 2027. *Id.* ¶ 142. Optime cannot terminate without Corcept materially breaching the agreement, and even then Optime must give Corcept the opportunity to cure before terminating. *Id.* ¶ 141; *see also Patt v. Antech Diagnostics, Inc.*, No. 818CV01689JLSDFM, 2020 WL 5076970, at *5 (C.D. Cal. May 18, 2020) (exclusive dealing violation where contract termination required 12-month written notice and affirmative opt-out before.)

### b.    Incentive Based

A plaintiff fails to plead foreclosure where "a competing manufacturer need only offer a better product or a better deal to acquire their services." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997). Here, however, notwithstanding Teva's offer to Optime of

1    potentially better pricing, terms, and benefits, Teva could not convince Optime to distribute its

2    generic.  "Optime representatives would not even entertain a bid from Teva," and they made

3    "clear that there was nothing Teva could do to gain access to the Optime distribution channel."  *Id.*

4    ¶ 139.  Hemmed in by an inexorable contract, Optime had "no choice but to work exclusively with

5    Corcept."  *Id.* ¶ 144.

6                                    **c.      Alternate Channels**

7              When considering alternate channels courts must look at whether the alternative is

8    practical or feasible in the market as it exists and functions.  *Dentsply Int'l.*, 399 F.3d at 193; *see*

9    *also GN Netcom, Inc. v. Plantronics, Inc.*, 278 F. Supp. 3d 824, 829 (D. Del. 2017) (explaining

10   that "the mere existence of other avenues of distribution is not enough on its own . . . . Instead,

11   there must be an assessment of [the alternative means'] overall significance to the market, and

12   such alternative means must be practical or feasible in the market as it exists and functions")

13   (internal quotation marks and citation omitted).  Teva has alleged that it has already tried the

14   alternate channels, to the extent they exist, without any success.  Channels that provide negligible

15   impact on the market are neither practical nor feasible.

16                                          * * *

17             Teva has alleged an exclusive agreement and substantial market foreclosure.  Defendants'

18   motion to dismiss Teva's Sherman Act, § 1 claim (Count III) is DENIED.

19            **C.      Antitrust Monopolization (Sherman Act, Section 2)**

20            Section 2 of the Sherman Act makes it a crime to "monopolize, or attempt to monopolize,

21   or combine or conspire with any other person or persons, to monopolize any part of the trade or

22   commerce among the several States, or with foreign nations."  15 U.S.C. § 2 (2006).  Section 4 of

23   the Clayton Act, in turn, establishes a private right of action to "any person who shall be injured in

24   his business or property by reason of anything forbidden in the antitrust laws" and provides

25   "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's

26   fee."  15 U.S.C. § 15 (2006).

27            To state an unlawful monopolization claim, a plaintiff must allege "(1) [p]ossession of

28   monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and

United States District Court
Northern District of California

20

(3) causal antitrust injury." *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 23-55662, 2025 WL 2573045, at *6 (9th Cir. Sept. 5, 2025).

To state a claim for attempted monopolization, a party must plead "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010).

Teva has successfully alleged all the necessary elements of a monopolization claim and an attempted monopolization claim (Counts I and II). Defendants' motion to dismiss Counts I and II are accordingly DENIED. Nevertheless, there are certain factual allegations that fail to give rise to a claim for monopolization or attempted monopolization, and those allegations will be dismissed going forward consistent with this order.

### 1. Possession of Monopoly Power

For the purposes of a Section 2 claim, "monopoly power" is defined "as the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (internal quotation marks omitted). Monopoly power is the ability to "'(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion,' evidence of supracompetitive pricing is direct proof of the actual exercise of monopoly power." *CoStar Grp.*, 2025 WL 2573045, at *6 (quoting Areeda & Hovenkamp, § 501).

Here, Corcept does not challenge Teva's allegation that it is in possession of monopoly power. After all, despite Teva's entry into the market in January 2024 at a 13% discount to Korlym, Teva's market share has been close to zero. FAC ¶ 126; *id.* ¶ 130 (Corcept executive reported that "[t]he Teva product has been available in the channel for many months, so it's out there, but it has had very little impact on our business.").

### 2. Anticompetitive Conduct

"The possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V.*

*Trinko, LLP*, 540 U.S. 398, 407 (2004). The alleged monopolist must have acted in manner "that harms the competitive process as a whole," which does not necessarily depend on "the success or failure of individual competitors." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)). Acting with intent to harm a competitor is not enough—the alleged monopolist must intend to foreclose all competition in the market. *See Aerotec Int'l*, 836 F.3d at 1184 ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws.") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)).

Teva, however, has alleged anticompetitive conduct by successfully pleading its § 1 claim. "A § 2 monopolization claim requires anticompetitive conduct, and exclusive agreements are an example of anticompetitive conduct." *CoStar Grp.*, 2025 WL 2573045, at *6. Because Teva "plausibly alleges that [Corcept] entered into [an] exclusive agreement[] that foreclose[s] competition under § 1, it has also plausibly alleged that [Corcept] engaged in anticompetitive conduct under § 2." *Id.*

### 3.    Causal Antitrust Injury

"A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990)). To allege such an injury, a "plaintiff . . . must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) ("[A]ntitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'"). Teva's injury is the delayed launch of its generic and the continued failure of that generic to gain traction in the market. The injury to the market itself is the supracompetitive prices consumers are forced to pay for Korlym. Distilled, Plaintiff alleges

that but for Corcept's illegal monopoly, Teva would have been able to widely sell its generic, significantly decreasing the price for Korlym to all consumers.

But mere injury is not enough: Teva must demonstrate that its and the market's injuries flow from Defendants' conduct, *i.e.*, the "cause" in causal antitrust injury. Teva is mostly successful in linking alleged injuries to Defendants' alleged conduct, but for a few exceptions detailed below. The conduct that did not cause any injury cannot form the basis of a § 2 claim.

### a.    Orange Book Theory

Defendants contend that Teva fails to allege "a plausible basis to establish causation between [listing patents in the Orange Book] and any injury to Teva or competition." Mot. at 7. According to Defendants, "Teva cannot establish antitrust injury from Corcept's Orange Book listings . . . because the FDA's award of ODE to Corcept precluded Teva's entry until ***February 2019***, and even after ODE expiration, Teva ***chose*** not to enter the market for reasons other than the 30-month stay, which expired in August 2020." Opp'n at 8. Plaintiff disagrees for two reasons: (1) because Corcept waived Korlym's ODE sometime before Teva filed its ANDA in October 2018, and (2) because, regardless of whether Korlym had orphan drug exclusivity through February 2019, the 30-month stay extended Corcept's monopoly another 18 months. According to Teva, it does not matter that Teva chose not to enter the market when Corcept's government-sponsored exclusivity expired in August 2020; so long as Teva has alleged that the antitrust injury is the reason for Teva's delayed entry into the market, that is enough to survive a motion to dismiss.

At this stage of the litigation, Teva is right. It has alleged that one of the factors that delayed launch of its generic was Corcept's fraudulent patent listing, and, considered in the light most favorable to the Plaintiff, that is enough to allege injury.

### b.    Sham Litigation Theory

Corcept next argues that Teva fails to plausibly establish antitrust injury as a result of the various infringement litigations Corcept brought against Teva between 2018 and 2023. The filing of a baseless litigation against a competitor is, in this Court's view, prima facie evidence of injury.

1    Defendants also argue that they are entitled to *Noerr-Pennington* immunity.  Some of

2  Defendants' conduct does not withstand the heightened *Noerr-Pennington* analysis.

3    The *Noerr–Pennington* doctrine "safeguards the First Amendment right to 'petition the

4  government for a redress of grievances' . . . by immunizing citizens from the liability that may

5  attend the exercise of that right." *Waugh Chapel S., LLC v. United Food & Com. Workers Union*

6  *Loc. 27*, 728 F.3d 354, 362 (4th Cir. 2013) (citation omitted).  Petitioners are "generally immune

7  from statutory liability for their petitioning conduct," such as the filing of a lawsuit, *Sosa v.*

8  *DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006), but "[n]ot all petitioning activity is

9  immunized." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009).  "A 'sham'

10  exception to the doctrine developed to prevent the immunization of conduct that used

11  'governmental process . . . as an anticompetitive weapon.'" *Id.* (quoting *Kottle v. Nw. Kidney*

12  *Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998)).

13    In the context of litigation, the Ninth Circuit has identified three circumstances in which

14  the sham exception to *Noerr-Pennington* immunity may apply: (1) "where the lawsuit is

15  objectively baseless and the defendant's motive in bringing it was unlawful"; (2) "where the

16  conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings

17  without regard to the merits' and for an unlawful purpose"; and (3) where "a party's knowing

18  fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its

19  legitimacy." *Sosa*, 437 F.3d at 938 (citations omitted); *see also Kottle*, 146 F.3d at 1060.

20    The latter two exceptions do not apply here.  The Ninth Circuit recently held that the

21  allegation of "five sham lawsuits . . . is insufficient for [the series exception] to apply." *Pac. Surf*

22  *Designs, Inc. v. Whitewater W. Indus., Ltd.*, No. 23-2609, 2024 WL 5200171, at *2 (9th Cir. Dec.

23  23, 2024) (citing *Relevant Group, LLC v. Nourmand*, 116 F.4th 917, 931 (9th Cir. 2024)).  Teva

24  only alleges four. *See id.* at 929  ("[C]ases in our circuit . . . have occasionally blurred the lines

25  concerning which test should apply and when . . . . Because this case only involves four actions

26

27

28

United States District Court
Northern District of California

resembling 'lawsuits' in the traditional sense," the objectively baseless exception applies.).[8]  As to the third exception, Teva does not allege that Defendants explicitly defrauded the Court.

That leaves the first exception as the only viable way forward for the sham litigations to constitute antitrust injury.  The Ninth Circuit applies a "a strict two-step analysis to assess whether a single action constitutes sham petitioning."  *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810–11 (9th Cir. 1994).  "First, the suit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits; second, the baseless lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor."  *Id.* at 810 (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("PREI"), 508 U.S. 49, 60 (1993)).  "The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent."  *Id.* at 810.

An action is "objectively baseless" when "no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under [*Noerr-Pennington*]."  *PREI*, 508 U.S. 49, 60 (1993).  This is a high bar: patents are presumed valid and "it will be a rare case in which a patentee's assertion of its patent . . . will be so unreasonable as to support a claim that the patentee has engaged in sham litigation."  *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345-46 (Fed. Cir. 2014).  Nevertheless, Teva makes a sufficient showing for Corcept's first infringement suit.  The statements of Corcept's CFO in 2019 demonstrate that Corcept did not believe that the '348 and '495 patents had "a direct read on the Korlym label" or any "express connection" to the Korlym label.  FAC ¶ 99; *see also* FAC, Ex. A (detailed statement explaining why Teva's ANDA did not infringe either patent provided as part of the paragraph IV notice).  That, coupled with the incentives of the 30-month stay and Corcept's voluntary dismissal of the

---

[8] Before the Ninth Circuit issued this opinion in 2024, many courts applied the series exception more liberally.  *See, e.g.*, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 881 (N.D. Cal. 2021) ("[Defendant's] suits plausibly involved one overarching purpose: imposing the "crushing burden" of litigation and the 30-month automatic stay to delay generic entry into the [Korlym] market. This is a harm that the sham litigation exception to *Noerr-Pennington* aims to prevent.").  To the extent Teva advances this argument, it is no longer good law.

United States District Court
Northern District of California

United States District Court
Northern District of California

suit 34 months after filing is enough to raise the inference that the suit itself was objectively baseless. Moving to the second step, as alleged, Corcept's subjective intent in bringing the first suit is crystal-clear: it allowed Corcept to impermissibly extend its monopoly beyond the period granted by the orphan drug status. Teva has sufficiently alleged that this suit inflicted a causal antitrust injury.

The question on the '214 patent is closer. Corcept stated publicly that it believed that the '214 patent had a "direct read on the Korlym label . . . an express connection." FAC ¶ 99. Korlym filed an infringement suit that same month, and litigated it through verdict and appeal. A reasonable litigant could realistically expect that the '214 patent infringement suit could succeed; in other words, that it was not objectively baseless. As such, the analysis immediately ends, and Corcept's subjective intent becomes immaterial. Plaintiff may have alleged enough to demonstrate that Corcept wanted to tangle Teva further in costly litigation, but that doesn't render Corcept's claim meritless. The same reasoning applies to the assertion of the '800 patent that Corcept filed in 2023. Though Teva grumbles over Corcept's admittedly questionable decision to wait some years before bringing that case, that does not render the suit objectively baseless.

The remaining suits that Corcept filed asserting various patents were voluntarily dismissed; because the Court must presume the patents valid, it cannot infer that the suits were objectively baseless such that no reasonable litigant could believe each would succeed. Beyond alleging a pattern of voluntary dismissals, Teva does not allege how or why these suits were objectively baseless. There are no allegations about the substance of those patents, and likewise no non-conclusory allegations that Corcept knew that the asserted patents were invalid or not infringed. *Cf. C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998) ("Conduct prohibited under antitrust law includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes."); *Abbott Lab'ys. v. Teva Pharms. USA, Inc.*, 432 F.Supp.2d 408, 428 (D. Del.2006) (finding that plaintiffs sufficiently alleged that the defendant's patent infringement suits were objectively baseless because it knew that the patents were unenforceable). What's more, even the 2023 suit, the latest of those Corcept filed, had no delaying effects on Teva's generic because the 30-month stay had

1    already lapsed, and the filing of the case had no effect on trial timing for the '214 patent suit (later

2    consolidated for trial with the '800 patent).

3        Thus, though Corcept's first infringement action—the one that triggered the 30-month

4    stay—suffices to demonstrate antitrust injury, the remaining suits do not.  Teva cannot base its

5    monopoly claims on those litigations.

6                    **c.    Exclusive Dealing Theory**

7        "The standard for exclusive dealing under Section Two of the Sherman Act is lower than

8    under Section One."  *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 36 (S.D.N.Y. 2016) (citing

9    *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)).  Given the analysis conducted

10   above, Teva sufficiently alleges injury.  *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 23-

11   55662, 2025 WL 2573045, at *6 (9th Cir. Sept. 5, 2025) ("[A] monopolist that wields exclusive

12   agreements to foreclose competition violates both §§ 1 and 2 of the Sherman Act.").

13                   **d.    Kickback Theory**

14       The FAC alleges that Corcept made illicit payments to prescribers for years, to induce

15   them to continue routing prescriptions to Optime and selecting brand Korlym notwithstanding the

16   availability of Teva's lower priced generic.  FAC ¶¶ 167-187.  Teva insists that these payments are

17   "astronomical and far outside the norm," and they ramped up after Teva filed its ANDA.  *Id*. ¶

18   184.  Defendants' insistence that Teva fails to allege "facts" makes no sense when Teva points to

19   specific amounts paid to specific doctors and compares that data to typical payments.  *See, e.g.,*

20   FAC ¶ 175.  Corcept disputes that the payments are illicit, and it may be right when they insist that

21   there are innocuous, permissible reasons to make such payments.  But the Court must consider the

22   facts in the light most favorable to Plaintiff.  Under that standard, Teva has alleged enough.  That

23   Teva also makes payments to prescribers is immaterial both because Teva does not allege in and

24   of itself that payments are illegal and because Teva's actions are not the ones at issue here.

25   **D.    Unfair Competition Law and § 16600**

26       Teva alleges that Corcept and Optime's exclusive dealing agreement and kickback scheme

27   were both unfair and unlawful under the UCL.  For the unlawful prong of the UCL, the survival of

28   Teva's § 1 claim is facially enough to maintain a UCL claim.  *AliveCor, Inc. v. Apple Inc.*, 592 F.

*United States District Court*
*Northern District of California*

27

1   Supp. 3d 904, 919 (N.D. Cal. 2022) ("Because the Court finds that [Plaintiff] has plausibly alleged

2   its antitrust claims, [Defendants'] motion to dismiss the UCL claim is DENIED.")

3        As to the unfair prong, Teva alleges that Corcept and Optime's conduct "threaten[s] an

4   incipient violation of the antitrust laws" that "continue to have, a substantial and foreseeable effect

5   on the commerce of California by artificially suppressing competition, and raising prices, for

6   brand Korlym paid for and/or dispensed in California."  FAC ¶¶ 234-35.  Where, as here, there is a

7   business dispute between competitors, the "competitor test" applies, and conduct is "unfair" where

8   it "threatens an incipient violation of an antitrust law" or harms competition.  *Levitt v. Yelp! Inc.*,

9   765 F.3d 1123, 1136–37 (9th Cir. 2014).  As the Ninth Circuit recently stated, "because

10  [plaintiff's] claims under the UCL depend on the same underlying conduct as its §§ 1 and 2

11  claims, it also will have stated a claim under both the 'unfair' and 'unlawful' prongs of the UCL."

12  *CoStar Grp.*, 2025 WL 2573045, at *6.

13       Defendants' argument that Teva's UCL claim must fail because it has an adequate remedy

14  at law is not persuasive.  Teva specifically requests injunctive relief invalidating the exclusive-

15  dealing arrangement, which can only be remedied in equity.

16       Section 16600 provides that, in absence of a statutory exception, "every contract by which

17  anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that

18  extent void." Cal. Bus. & Prof. Code § 16600.  Though not often used in the context of antitrust

19  exclusive dealing arrangement, § 16600 has been applied in "the sort of context addressed by

20  section 1 of the Sherman Act."  *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218,

21  1250 (N.D. Cal. 2022).  Defendants turn to the exact arguments they unsuccessfully use to attack

22  Teva's § 1 claim, namely that Teva does not allege a substantial foreclosure of competition and

23  fails the rule of reason test.  "[T]he same issues discussed above in the context of the Sherman Act

24  therefore also apply to section 16600." *Id.*

25       Accordingly, the Court finds that Teva's UCL and § 16600 claims (Counts IV and V) may

26  proceed.

27

28

United States District Court
Northern District of California

28

### E.      Omnibus State Law Claims

Teva's Count VI consists solely of a few paragraphs and a list of 48 different antitrust and competition statutes and 37 consumer protection statutes.  This type of pleading is woefully insufficient to meet the standards set forth in Federal Rule of Civil Procedure 8.  Under *Twombly*'s well-established pleading standard, "a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" 550 U.S. 544, 555 (2007).  Here, Plaintiffs do no more than gesture at state statutes and fail to include even a "formulaic recitation of the elements" of causes of action under state law.  *Id.*  The Court therefore need not reach the other arguments made regarding this issue by Defendants at this time.  *See Adams v. Target Corp.*, No. 2:13-cv-05944-GHK-PJW, 2014 WL 12558290, at *6 (C.D. Cal. Mar. 3, 2014) ("A cursory listing of the other states' statutes is insufficient to satisfy *Twombly* and *Iqbal*'s pleading requirements.").

Therefore, Defendants' motion to dismiss Count VI is GRANTED, with leave to amend. If Teva elects to proceed with these claims, it must explicitly provide: (1) a specific citation to the relevant antitrust or consumer protection law giving rise to the claim, (2) the elements for the private right of action created by that provision, (3) the governing statute of limitations and any state-specific tolling/accrual standards, (4) a restatement of, or citation to, the facts currently alleged in the FAC that establish a claim under that provision, and (5) the degree of similarity between the state law claim and the federal claims alleged in the FAC.

### F.      Unjust Enrichment

Teva cannot maintain its unjust enrichment claim because, in California, "[u]njust enrichment is not a cause of action." *De Havilland v. FX Networks*, LLC, 21 Cal. App. 5th 845, 870 (2018) (quoting *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011)).  Thus, state and federal "courts have consistently dismissed stand-alone claims for unjust enrichment." *Brodsky v. Apple Inc.,* 445 F. Supp. 3d 110, 132 (N.D. Cal. 2020).  Defendants' motion to dismiss Count VI is GRANTED.

United States District Court
Northern District of California

**IV.    CONCLUSION**

Defendants' motion is granted in part and denied in part.

- Defendants' motion to dismiss Counts I and II is DENIED but for the allegations related to the sham litigations that Plaintiff failed to allege were objectively baseless.  *See* Section III.C.3.b.
- Defendants' motion to dismiss Counts III, IV, and V of the FAC is DENIED.
- Defendants' motion to dismiss Count VI is GRANTED with leave to amend.
- Defendants' motion to dismiss Count VII is GRANTED without leave to amend.

If Teva elects to amend its complaint consistent with this order, it must do so within 14 days of this order.  Teva may not add any new facts or claims to a possible amended complaint.

If Teva elects not to amend, Defendants must answer the FAC within 28 days of this order.

**IT IS SO ORDERED.**

Dated: September 12, 2025

Noël Wise
United States District Judge