Michael Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, California 90067
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C. (*Pro Hac Vice*)
Kevin M. Neylan, Jr. (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Attorneys for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CORCEPT THERAPEUTICS, INC., AND OPTIME CARE INC., <br><br> Defendants. | Case No. 5:24-cv-03567-NW <br><br> **PLAINTIFF TEVA PHARMACEUTICALS USA, INC.'S MOTION FOR LEAVE TO SERVE SUPPLEMENTAL PLEADING UNDER FED. R. CIV. P. 15(d)** |

**TABLE OF CONTENTS**

Introduction ............................................................................................................................. 1

Background ............................................................................................................................ 2

Argument ................................................................................................................................ 6

Conclusion ............................................................................................................................ 10

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Chase Nat. Bank v. City of Norwalk, Ohio*,
 291 U.S. 431 (1934)..................................................................................................8

*Food & Water Watch, Inc. v. EPA*,
 2021 WL 1893063 (N.D. Cal. May 11, 2021)..............................................6, 7, 8, 9

*FTC v. Shkreli*,
 581 F. Supp. 3d 579 (S.D.N.Y. 2022)........................................................................3

*GTE Mobilnet of California Ltd. P'ship v. City of Berkeley*,
 2021 WL 308605 (N.D. Cal. Jan. 29, 2021).........................................................8, 9

*Keith v. Volpe*,
 858 F.2d 467 (9th Cir. 1988) .......................................................................6, 7, 8, 9

**Rules**

Fed. R. Civ. P. 15(d) ............................................................................................ *passim*

**Other Authorities**

Wright & Miller, 6A *Fed. Prac. & Proc. Civ.* §1504 (3d ed.) ......................................7, 8

# INTRODUCTION

Plaintiff Teva alleges that Defendants Corcept and Optime have stifled competition in the market for Korlym by engaging in a variety of anticompetitive tactics, including entering into a long-term, highly unusual, express exclusive-dealing agreement that has been remarkably effective at protecting Corcept's monopoly by cutting off Teva's access to the only pharmacy distribution channel that is practically effective at reaching Korlym patients. (SAC ¶¶135-68.) Teva also brings claims related to fraudulent Orange Book listings, sham patent litigation, and illicit payments to physicians, which have worked together with the Corcept-Optime agreement to entrench Corcept's monopoly and to block fair competition on the merits. (SAC ¶¶73-122, 167-87.) As a result of this overarching scheme, Teva has been unable to compete in the market for Korlym, despite launching the first generic version of Korlym in early 2024 and offering a material price discount compared to Corcept's prices ever since. (SAC ¶¶126-27.) At the time Teva filed this lawsuit, five months after entering the market, Teva's market share was close to zero. (Initial Compl. ¶128.) To this day—nearly *two years* after Teva launched—Teva's market share remains less than 4%. Results like these are unheard-of in properly functioning pharmaceutical markets. (SAC ¶10.)

The Court has already held that Teva's complaint states a claim for relief under federal and state antitrust laws. (Dkt. 134.) With respect to the Corcept-Optime exclusive-dealing agreement, Orange Book fraud, and illicit physician payments, the Court denied Defendants' motion to dismiss in its entirety. (Dkt. 134, at 16-20 (exclusive dealing), 23 (Orange Book fraud), 27 (illicit physician payments).) With respect to sham patent litigation, the Court denied Defendants' motion to dismiss as to two patents, and granted it as to the remainder. (Dkt. 134, at 23-27.)

Teva now moves for leave to serve a supplemental complaint under Rule 15(d) because Corcept recently entered into another exclusive-dealing agreement, similar to the Corcept-Optime agreement, with a different specialty pharmacy, called Curant Health. Corcept's decision to lock up yet another specialty pharmacy is a brazen doubling down on its anticompetitive tactics, particularly as it comes in the face of this Court's decision holding that Teva's complaint plausibly alleges substantial foreclosure and harm to consumers from the Corcept-Optime exclusive-dealing agreement. Corcept's tactics confirm that it cannot compete on the merits in the Korlym market.

1  Teva therefore seeks leave to serve a supplemental complaint that adds a new claim targeting
2  the recent Corcept-Curant exclusive-dealing agreement, and that names Curant as a defendant.
3  Granting Teva's motion would promote judicial efficiency and the speedy disposition of this entire
4  controversy because there is substantial overlap in the factual and legal questions presented by the
5  existing complaint and the proposed supplemental complaint. Requiring Teva to bring its claim
6  against Corcept and Curant in a separate lawsuit would result in duplicative discovery and motion
7  practice, and would risk inconsistent rulings on common questions. Furthermore, granting leave to
8  supplement would not cause any prejudice to Corcept or Optime. The parties are nearing the
9  completion of document discovery, but numerous discovery disputes are unresolved, and depositions
10 have not yet begun. Additional document discovery related to Curant is likely to be limited in scope
11 given how recently Curant began working with Corcept. And allowing Teva to name Curant as a
12 defendant now would ensure that key witnesses will not need to be deposed twice. To the extent
13 Teva's motion requires adjusting the case schedule, Teva is committed to minimizing any delay and
14 moving as expeditiously as possible to ensure that all parties are on the same track proceeding toward
15 a joint trial.

16 A copy of Teva's proposed supplemental pleading is attached as Exhibit A in clean form, and
17 as Exhibit B in the form of a redline to the Second Amended Complaint.

## BACKGROUND

19 Teva filed this lawsuit on June 13, 2024 (Dkt. 1), and filed the operative Second Amended
20 Complaint on September 26, 2025 (Dkt. 146). A core aspect of Teva's case is the allegation that
21 Corcept and Optime have thwarted generic competition in the market for Korlym by entering into a
22 long-term, highly unusual, exclusive-dealing agreement that expressly forbids Optime from
23 distributing Teva's generic mifepristone. (SAC ¶¶135-66.) As explained in detail in the complaint,
24 Korlym treats a small patient population and is prescribed by an even smaller number of doctors.
25 (SAC ¶¶60, 64, 149.) Optime was the only specialty pharmacy distributing Korlym since 2017, which
26 meant doctors had no choice but to send prescriptions to Optime for nearly a decade. (SAC ¶¶136-
27 37.) As a result, doctors developed ingrained prescribing behaviors (reinforced by Corcept's illicit
28 payments), and Optime became entrenched as the only practically viable distribution channel to reach

Korlym patients. (SAC ¶¶148-66.) That market reality has persisted since Teva's entry into the market, and has made the Corcept-Optime exclusive-dealing agreement a powerful barrier to generic competition. (*Id.*) It explains why Corcept continues to enjoy a nearly 100% market share, despite the fact that Teva has been on the market for nearly two years with an identical, lower-priced generic product, and has made its product available "at all major national wholesalers and a specialty wholesaler," as well as "all major national specialty pharmacies, several regional specialty pharmacies, and several other national retail pharmacies." (SAC ¶158.)

On September 12, 2025, the Court denied Defendants' motion to dismiss in substantial part. (Dkt. 134.) With respect to exclusive dealing, the Court denied the motion in full. First, the Court held that Teva had plausibly alleged Corcept has monopoly power in the market for Korlym; in fact, the Court noted that Defendants "appear to concede that Korlym has no meaningful substitutes." (Dkt. 134, at 17; *id.* 17-18.) Second, the Court held that Teva properly alleged the Corcept-Optime agreement has had a substantial foreclosure effect in the Korlym market. (Dkt. 134, at 18-20.) As the Court explained, "[i]n the pharmaceutical context, 'generics need not be barred from all means of distribution if they are barred from the cost-efficient ones.'" (Dkt. 134, at 18-19 (quoting *FTC v. Shkreli*, 581 F. Supp. 3d 579, 627 (S.D.N.Y. 2022)).) The Court further held that "[w]hen considering alternate channels courts must look at whether the alternative is practical or feasible in the market as it exists and functions," and that "Teva has alleged that it has already tried the alternate channels, to the extent they exist, without any success. Channels that provide negligible impact on the market are neither practical nor feasible." (Dkt. 134, at 20.) The Court also held that the Corcept-Optime agreement is not easily terminable, and is not incentive-based, which are among "the hallmarks of substantial foreclosure." (Dkt. 134, at 19-20.)

As set forth in Teva's proposed supplemental pleading, on October 1, 2025, specialty pharmacy Curant Health announced that it had entered into a pharmacy partnership with Corcept. (Ex. A, ¶195.) On October 10, 2025, Corcept terminated its agreement with Optime, with an effective date of February 5, 2026. (Ex. A, ¶196.) Since that time, Teva has reached out to Curant on more than one occasion, with the aim of persuading Curant to dispense Teva's generic product alongside Corcept's products. Curant has refused to engage with Teva, ignoring outreach by email and going so far as to

1  terminate a phone call abruptly as soon as Teva's representative identified himself as a Teva employee.
2  (Ex. A, ¶197.)  That is despite the fact that Teva is prepared to offer financial terms that would make
3  Curant better off by dispensing Teva's products alongside Corcept's, as opposed to dispensing
4  Corcept's products alone.  (Ex. A, ¶197.)  Curant has never given Teva an explanation for its refusals
5  to entertain offers from Teva, but its conduct strongly suggests that Curant is subject to the same
6  exclusive-dealing restrictions as contained in the Corcept-Optime agreement.  (Ex. A, ¶197.)  Curant's
7  refusal to engage with Teva shows that Curant's agreement with Corcept is not incentive-based, and
8  that Curant does not consider itself free to terminate the agreement in practice.  (Ex. A, ¶197.)

[Redacted content, lines 9–15]

16  Corcept's decision to lock up yet another specialty pharmacy with an exclusive-dealing
17  agreement is a brazen decision to continue the same anticompetitive conduct Corcept has been engaged
18  in for years, all to stifle generic competition so that Corcept can continue to line its pockets while
19  Teva—not to mention Korlym patients and their health plans—pay the price.
20  Moreover, as detailed in Teva's proposed supplemental complaint, Corcept filed a lawsuit
21  against Optime on October 30, 2025, in the Delaware Court of Chancery, and Corcept's allegations
22  corroborate many of Teva's core allegations in this case.  (Ex. A, ¶¶190-93, 200-08.)  Corcept's own
23  words confirm that Optime has become firmly entrenched as the only viable distribution channel
24  capable of reaching Korlym patients—so much so that *even Corcept* cannot establish other pharmacies
25  as alternative distribution channels, including Curant, without Optime's direct assistance.  (Ex. A,
26  ¶¶200-04.)  According to Corcept, "Optime is more than a dispenser; it is a critical link between
27  patients and critical medication," to such an extent that switching patients to a different pharmacy
28  "requires Optime's active participation, including in data transfers, system integration, and patient

communications," capabilities that "are largely or exclusively within Optime's control." (Ex. A, ¶¶201, 203.) Simply put, again quoting Corcept, "switching specialty pharmacies—especially switching a program for Cushing's syndrome, which requires an extensive suite of patient support and education—is not like going down the street to Walgreen's instead of CVS," and if Optime does not actively assist in setting up an alternative pharmacy, it will "block[] patient access and prevent[] any successor pharmacy from serving patients." (Ex. A, ¶¶202-03.) Corcept's lawsuit therefore seeks to compel Optime's assistance in setting up Curant as a successor pharmacy. (Ex. A, ¶200.)

Corcept's own words are a clear validation of Teva's allegation that Optime has become firmly entrenched as the only practically effective channel for reaching Korlym patients, and that by blocking Teva's access to Optime, the Corcept-Optime agreement has made it practically infeasible for Teva to establish an alternative distribution channel to compete with Corcept. Teva's inability to reach Korlym patients through alternative channels should come as no surprise in light of Corcept's concession that it cannot do so either, at least not without Optime's help, which has been categorically unavailable to Teva as a result of the Corcept-Optime agreement.

By selecting Curant to serve as a successor pharmacy to Optime—subject to the same exclusive-dealing restrictions—and by seeking to compel Optime's assistance in facilitating the transition, Corcept is aiming to establish Curant as a bulwark to generic competition just like Optime has provided until now. (Ex. A, ¶205.) The Corcept-Curant agreement therefore threatens to cause the same anticompetitive effects as the Corcept-Optime agreement has caused, once again blocking patients from accessing Teva's generic mifepristone and protecting Corcept's monopoly from meaningful erosion. (Ex. A, ¶205.)

To make matters worse, as explained in Teva's proposed supplemental pleading, Corcept appears to be taking the position that Optime shall remain forbidden to distribute Teva's generic product even after the Corcept-Optime agreement's termination becomes effective. (Ex. A, ¶207.) There is no legitimate justification for Corcept to forbid Optime from distributing rival products even after it ceases performing services for Corcept. Corcept's conduct evidences a clear strategy of protecting its monopoly power through anticompetitive exclusive-dealing agreements, by blocking Teva's access to the only practically effective channels for reaching Korlym patients.

Finally, as explained in Teva's proposed supplemental pleading, Corcept's recent allegations against Optime confirm that the so-called services performed by Optime are illusory, and that patients' dependence on Optime has made them far worse off than if Optime were allowed to distribute Teva's generic. (Ex. A, ¶¶190-93.) By forbidding Optime from dispensing Teva's generic and directing Optime to pursue insurance approval for its more expensive products instead, Corcept's anticompetitive tactics have caused scores of patients to experience material delays in receiving their medicine—jeopardizing their health—while at the same time, Optime has been failing to provide the pharmacy services Corcept touts for well over a year at least. (Ex. A, ¶¶190-91.) These allegations confirm that the Corcept-Optime agreement harms competition and consumers, just as Teva has alleged.

In light of these recent developments, Teva seeks leave of Court to supplement its complaint to add the above allegations, name Curant as a defendant, and assert a claim alleging that the Corcept-Curant agreement is an unlawful exclusive-dealing agreement.

## ARGUMENT

Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Rule 15(d) "is a tool of judicial economy and convenience" and "is intended to give district courts broad discretion in allowing supplemental pleadings." *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). The rule "enable[s] a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." *Id.* "[N]ew claims, new parties, and events occurring after the original action are all properly permitted under" Rule 15(d). *Id.* at 475.

"[B]ecause the goal of Rule 15(d) is to promote judicial efficiency, supplementation is generally favored." *Food & Water Watch, Inc. v. EPA*, 2021 WL 1893063, at *3 (N.D. Cal. May 11, 2021). In addition to judicial efficiency, courts in the Ninth Circuit consider the so-called "*Foman* factors," which include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party

by virtue of allowance of the amendment, futility of amendment, etc." *Id.* at *4. But these factors are not given equal weight, and courts "liberally construe Rule 15(d) absent a showing of prejudice to the defendant." *Keith*, 858 F.2d at 475; *see also, e.g.*, Wright & Miller, 6A *Fed. Prac. & Proc. Civ.* §1504 (3d ed.) ("Wright & Miller") ("An application for leave to file a supplemental pleading is addressed to the discretion of the court and should be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action.").

These considerations all weigh in favor of granting Teva's motion to supplement.

**Judicial Efficiency:** "[M]ost importantly, allowing [Teva] to supplement the allegations in [its] complaint would surely promote judicial economy…. Judicial efficiency is achieved where 'the entire controversy between the parties could be settled *in one action*.'" *Food & Water Watch*, 2021 WL 1893063, at *7 (emphasis in original). That is the case here. Teva's exclusive-dealing claim against Corcept and Curant arises out of the same set of facts as Teva's existing claims against Corcept and Optime, because the Corcept-Curant agreement is another mechanism in Corcept's ongoing scheme to suppress generic competition in the market for Korlym. Adjudicating Teva's claim against Corcept and Curant will require the Court to make many of the same legal and factual determinations implicated by Teva's existing claims, including, among other things, (1) whether Corcept has market power in the market for Korlym, (2) whether alternative distribution channels are practically effective ways for Teva to reach Korlym patients, (3) whether similar exclusive-dealing agreements are common in the industry, (4) whether consumers have been injured by the barriers Corcept, Optime, and now Curant have erected to impede access to Teva's generic mifepristone, (5) whether Corcept's exclusive-dealing agreements have any procompetitive benefits, (6) whether any such procompetitive benefits outweigh the agreements' anticompetitive effects, and (7) issues related to Teva's alleged damages. If Teva were required to file a new lawsuit just against Corcept and Curant, the parties would have to engage in duplicative discovery and motion practice related to the above issues, and would risk inconsistent rulings from the courts on these common questions.

Given the overlap between Teva's existing claims and its proposed claim against Corcept and Curant, allowing Teva to litigate these claims together will "promote the economical and speedy

disposition of the controversy" and allow the Court "to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." *Keith*, 858 F.2d at 473.  Indeed, given the current state of the facts, the Court likely cannot award or enforce the injunctive relief sought by Teva—invalidating Corcept's exclusive-dealing arrangements that lock up the market for Korlym (SAC ¶ 259)—without adding Curant as a party.  *See Chase Nat. Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 437 (1934); *see also* Wright & Miller § 2956.  In short, "[t]he concern in the original action … and the supplemental complaint is the same," which counsels in favor of supplementation.  *Keith*, 858 F.2d at 474; *see also Food & Water Watch*, 2021 WL 1893063, at *7 ("[A]voiding the need for Plaintiffs to file a second lawsuit … is the entire *raison d'être* of Rule 15(d)."). Moreover, "[t]he proposed amendments do not add any appreciable complexity to the existing case." *GTE Mobilnet of California Ltd. P'ship v. City of Berkeley*, 2021 WL 308605, at *7 (N.D. Cal. Jan. 29, 2021).

**Prejudice:**  Granting Teva's motion will not cause prejudice to Corcept or Optime.  Corcept, Optime, and Curant have aligned interests in contesting Teva's allegations.  Teva, Corcept, and Optime are nearly finished with document discovery (although several discovery disputes are unresolved), but depositions have not yet taken place, and all parties have an interest in avoiding duplicative discovery and inconsistent rulings.  Were Teva's claim against Corcept and Curant required to proceed separately, many of the same people would need to be deposed twice, the parties would have to engage in duplicative motion practice and potentially complicated efforts to share discovery, and complex questions related to preclusion could arise from separate trials.

Furthermore, discovery from Curant will be relevant to Teva's claims against Corcept and Optime, and vice versa.  Discovery from Curant will shed further light on how the distribution channel for Korlym works in practice, including whether pharmacies other than Optime are effective channels for reaching patients, and what it would take to transition patients from Optime to different pharmacies.  In fact, as detailed above and in Teva's proposed supplemental pleading, Corcept's allegations in its lawsuit against Optime—which concerns Corcept's ongoing transition from Optime to Curant—strongly support Teva's allegation that Optime is firmly entrenched as the key avenue for reaching Korlym patients, and that it is practically infeasible to set up alternative channels without

8

1  Optime's help.  Discovery from Curant will fill out that picture, which will help Teva prove its claims
2  against Corcept and Optime, as well as its claim against Corcept and Curant.  Similarly, discovery
3  Teva has already collected from Corcept and Optime will help Teva prove its claim against Corcept
4  and Curant, by demonstrating Corcept's market power and the anticompetitive effects that its
5  exclusive-dealing agreement has already had, which will be perpetuated into the future thanks to the
6  new agreement with Curant.

7  To the extent supplementation would require adjusting the case schedule to permit additional
8  time for discovery, Teva is committed to minimizing any delay and to working with Defendants to
9  conduct discovery expeditiously and to ensure all parties proceed on a unified track to trial as quickly
10 as possible.  And the additional discovery should be limited in scope given that Corcept and Curant
11 have been working together for a relatively short time.  That said, additional discovery obligations like
12 those at issue here do not give rise to prejudice for Rule 15(d) purposes: "[a]s to the need to conduct
13 discovery related to the [proposed supplemental] claim, '[t]he burden of having to defend a new claim
14 alone is not undue prejudice under Rule 15.'"  *GTE Mobilnet*, 2021 WL 308605, at *7.

15 **Remaining Factors:**  The remaining *Foman* factors do not weigh against supplementation.
16 Teva's motion does not involve undue delay, bad faith, or dilatory motive, and its proposed claim
17 against Corcept and Curant is not futile.  *Food & Water Watch*, 2021 WL 1893063, at *4.  As to undue
18 delay, Teva filed this motion within a short time after learning enough facts to understand that Corcept
19 had entered into yet another exclusive-dealing agreement through its partnership with Curant.  As to
20 bad faith and dilatory motive, Teva's motion is a good-faith attempt to litigate all of its claims against
21 Defendants in a single action, and to do so in a way that makes the most efficient use of the Court's
22 and the parties' resources.  As to futility, the Court has already denied Corcept and Optime's motion
23 to dismiss Teva's nearly identical exclusive-dealing claim against them.  The same outcome will be
24 warranted as to Teva's claim against Corcept and Curant, should Corcept and Curant choose to file a
25 motion to dismiss.

26 In sum, "[t]he interests of judicial economy and the liberal interpretation of Rule 15(d) favor
27 granting leave to file the supplemental complaint in this case."  *Keith*, 858 F.2d at 476.

28

## **CONCLUSION**

For the foregoing reasons, Teva's motion should be granted.

Dated: January 14, 2026         Respectfully submitted,

By: /s/ Michael Shipley

Michael Shipley
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, California 90067
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C.
Kevin M. Neylan, Jr.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446 5967
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Attorneys for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Michael Shipley, attest that concurrence in the filing of this document has been obtained.

*/s/ Michael Shipley*
Michael Shipley

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2026, I caused to be filed the foregoing document with the United States District Court for the Northern District of California using the CM/ECF system and caused it to be served on all registered participants via notice of electronic filing.

*/s/ Michael Shipley*
Michael Shipley