**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
Michael D. Powell (Bar No. 202850)
  mikepowell@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:          (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Fax:          (415) 875-6700

*Attorneys for Defendant Corcept Therapeutics, Incorporated*

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CORCEPT THERAPEUTICS, INC., et al., <br><br> Defendants. | Case No. 5:24-cv-03567-NW <br><br> Honorable Noël Wise <br><br> **CORCEPT'S SUPPLEMENTAL BRIEF REGARDING MOTION TO DISMISS AND TEVA'S EXCLUSIVE DEALING CLAIMS** <br><br> Hearing Date: February 18, 2026 at 9:00 a.m. |

**TABLE OF CONTENTS**

Page

I.  PRELIMINARY STATEMENT ................................................................................1

II. ARGUMENT .........................................................................................................1

    A.  Teva's Amendments Render Implausible Any Claim of Substantial Foreclosure ..................................................................................................1

        1.  Teva's New Allegations About Optime and Curant Are Contradictory ................................................................................................2

        2.  Teva's New Allegations Confirm Curant Was Available For Years .............3

        3.  Teva's New Allegations Render Those About Alternatives Implausible ..................................................................................................4

    B.  Teva's Amendment Confirms that Teva Simply Seeks Access to Whatever Channel Corcept Cultivates, Which Antitrust Law Forbids ......................................6

    C.  Teva Alleges the Curant Agreement is Relatively Short Term and Terminable ................................................................................................7

III. CONCLUSION .........................................................................................................7

# TABLE OF AUTHORITIES

**Page**

## Cases

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
  49 F.4th 520 (5th Cir. 2022) ............................................................................................ 3

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
  868 F. Supp. 2d 876 (N.D. Cal. 2012) ............................................................................. 5

*Demartini v. Microsoft Corp.*,
  662 F. Supp. 3d 1055 (N.D. Cal. 2023) ........................................................................... 2

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016) ............................................................................................ 5

*GovernmentGPT Inc. v. Axon Enter. Inc.*,
  769 F. Supp. 3d 959 (D. Ariz. 2025) ............................................................................... 2

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ......................................................................................... 2

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  733 F. App'x 380 (9th Cir. 2018) .................................................................................... 4

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) .......................................................................................... 7

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
  2016 WL 264909 (D. Del. Jan. 21, 2016) ....................................................................... 5

*Maximum Availability Ltd. v. Vision Sols., Inc.*,
  2010 WL 11508470 (C.D. Cal. Dec. 16, 2010) .............................................................. 4

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) .............................................................................. 2, 3, 4, 5, 6

*Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*,
  917 F. Supp. 1208 (W.D. Tenn. 1995) ............................................................................ 7

*PNY Techs., Inc. v. SanDisk Corp.*,
  2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ................................................................ 4

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
  2013 WL 3936394 (C.D. Cal. July 30, 2013) ................................................................. 7

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) ......................................................................................... 1

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ....................................................................................... 7

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007) ........................................................................................ 5

*Woman's Clinic v. St. John's Health Sys.*,
    252 F. Supp. 2d 857 (W.D. Mo. 2002) ....................................................................................... 7

## I. PRELIMINARY STATEMENT

From the beginning, Teva has repeatedly claimed that the "focus" of its case "is the exclusive dealing arrangement" between Corcept and Optime (Dkt. 62 at 4), a small pharmacy in Missouri. It claimed Optime is "the key distribution channel that *alone* can effectively reach Korlym patients." Dkt. 65 at 1 (emphasis added). Teva's latest complaint (Dkt. 165-1, "TAC"), its fourth, now pivots and claims that it is Corcept's nascent partnership with Curant, a pharmacy in Georgia, that forecloses competition. Teva's about-face illustrates its exclusive dealing theory's implausibility and why its federal and state law claims based on that theory—as to both Optime and Curant—fail.

*First*, the TAC continues to allege that Optime is "the key distribution channel" and "the key pharmacy pipeline that is necessary to permit Teva to compete effectively." TAC ¶¶ 5, 135, 188, 199. Yet, Teva now also asserts the "Corcept-Curant exclusive-dealing agreement" "restrains competition, and "foreclose[s] Teva from accessing the *only* effective means of reaching Korlym patients." *Id.* ¶¶ 253–57 (emphasis added). Both cannot be true. Moreover, because Teva alleges that its market share has increased **400%** without either Optime or Curant, this confirms Teva has suitable alternative options and that there is no substantial foreclosure. Thus, Teva's claims directed to Optime and Curant are facially implausible; they must be dismissed.

*Second*, Teva's shifting sands pleading approach demonstrates that its claims are not actually about any specific pharmacy at all. Teva simply wants to distribute through whatever pharmacy Corcept uses and invests in. The antitrust laws, however, do not require a company that cultivates its own distributor to then share that distributor with its competitor and allow it to free-ride.

*Finally*, Teva's allegations about the Corcept-Curant agreement confirm it is ***not*** anticompetitive. Teva concedes that the agreement "has a term of three years," and "[e]ither party can terminate the agreement without cause[.]" TAC ¶ 197. That is the opposite of long-term and interminable, negating whatever hypothetical potential foreclosure effect the agreement allegedly has.

## II. ARGUMENT

### A. Teva's Amendments Render Implausible Any Claim of Substantial Foreclosure

Exclusive dealing is actionable only where it "substantially foreclose[s] competition[.]" *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1071 (9th Cir. 2021). "If competitors can reach the

ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (emphasis in original). In other words, there is "no anticompetitive impact where plaintiffs [are] not foreclosed from every alternative[.]" *Id.* Teva's amendments confirm there is no such foreclosure here.

### 1. Teva's New Allegations About Optime and Curant Are Contradictory

Teva's shifting allegations about Optime and Curant highlight the implausibility of any substantial foreclosure from Corcept's agreements with either of them. The TAC alleges that **Optime** is "**the key** distribution channel" and "**the key** pharmacy pipeline that is **necessary** to permit Teva to compete effectively," because Optime is "the *only* practically effective channel[.]" TAC ¶¶ 5, 135, 188, 199, 203 (emphases added). However, now that Corcept is transitioning to Curant, the TAC simultaneously maintains that Corcept's contract with that single pharmacy itself "restrains competition" and will "foreclose Teva from accessing *the only effective means* of reaching Korlym patients." TAC ¶¶ 204, 253, 257 (emphasis added). These inherently contradictory allegations highlight the implausibility of Teva's pleading.

Beyond these fatal contradictions, the TAC itself questions the effectiveness of both Optime and Curant. It alleges that "Optime has been unable to fill Korlym prescriptions in a timely manner" or deliver various basic "services," resulting in "Optime's deficient performance[.]" TAC ¶¶ 189, 192. At the same time, Teva alleges that Curant is *not* yet a viable channel because Corcept and Curant require "Optime's help," and, in any event, "it will take Corcept *up to six months or more* to establish Curant as an effective alternative distribution channel." *Id.* 199–200 (emphasis added).

Even at the pleading stage, district courts must use their "judicial experience and common sense" to evaluate the plausibility of the predicates for antitrust claims. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018). This includes whether the claims "make economic sense." *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1063 (N.D. Cal. 2023). The TAC confirms Teva's exclusive dealing claims do not. The TAC is "confusing" and "inconsistent" and thus "fails to properly plead" an antitrust claim. *GovernmentGPT Inc. v. Axon Enter. Inc.*, 769 F. Supp. 3d 959, 997 (D. Ariz. 2025).

If Curant is the "only" effective channel (as Teva alleges), then Optime is not. In that case,

Corcept's prior contract limiting Optime from dispensing Teva's generic mifepristone could not have substantially foreclosed competition. This is all the more true given that Teva now alleges Optime was so "deficient" it could not even perform its obligations. TAC ¶ 189. Teva's inability to access one lone pharmacy in Missouri that is not "the key" and that Teva alleges is unable to competently perform basic tasks is competitively insignificant. And if Optime is the "only" effective channel (as Teva continues to allege), then Curant is not. That means Corcept's contract with Curant does not and will not substantially foreclose Teva. Indeed, Teva itself suggests this, given Curant is supposedly ineffective "without Optime's help" and Curant will allegedly not even become "an effective alternative distribution channel" for "up to six months or more[.]" TAC ¶¶ 200, 203–04. Teva's inability to access a single pharmacy in Georgia that Teva itself claims is not even an "effective" channel yet, likewise, cannot be preclusive either.

Where a plaintiff challenges "an exclusive-dealing arrangement" but does not "tell a coherent story" dismissal is proper. *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 531 (5th Cir. 2022). The TAC's paradoxical allegations about Optime and Curant fail to clear that bar.

### 2.    Teva's New Allegations Confirm Curant Was Available For Years

Even putting aside Teva's contradictions about which of Optime or Curant is the "key" channel, the TAC's allegations make clear one of those channels was available to Teva all along. Teva alleges that Corcept contracted with Curant effective October 1, 2025. TAC ¶ 194. Teva also alleges that Curant is effective enough that Corcept's partnership with Curant now threatens to "foreclose" Teva. *Id.* ¶ 257. In the more than five years between when it received FDA approval (*id.* ¶ 77) and October 2025, Teva could have partnered with Curant (before Corcept did) to compete with Corcept (and Optime). This should have been easy, since Teva apparently knew about Curant and had other of its drugs distributed through Curant before Corcept did.

This shows that in addition to a litany of other distributors (which apparently ***are*** succeeding for Teva, *see infra*), Curant was also available to Teva as a potential alternative to Optime. This fact confirms the lack of substantial foreclosure, because "foreclosure of even a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available." *Omega*, 127 F.3d at 1163 (cleaned up). There can be "no anticompetitive impact where plaintiffs [are] not

foreclosed from every alternative." *Id.*; *accord Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (dismissing exclusive dealing claim for lack of foreclosure where plaintiff "alleged that (at most) four" distributors "refused to do business with" it); *Maximum Availability Ltd. v. Vision Sols., Inc.*, 2010 WL 11508470, at *4 (C.D. Cal. Dec. 16, 2010) (similar; explaining "the existence of a single exclusive dealing arrangement with a distributor is insufficient").

Teva's TAC adding Curant shows there was no substantial foreclosure to Teva during the Corcept-Optime agreement, since Curant—so effective so as to be a "bulwark"—was open to Teva as an alternative to Optime during that time. This requires dismissal of Teva's Optime-based claims.

### 3. Teva's New Allegations Render Those About Alternatives Implausible

Even assuming Teva plausibly alleged substantial foreclosure from Corcept's agreements first with Optime and later Curant, it fails to plausibly explain how the existence of alternatives does not "eliminate substantially any foreclosure effect" that Corcept's alleged exclusivity "policy might have." *Omega*, 127 F.3d at 1163. The TAC's amended allegations show alternatives have worked, requiring dismissal of Teva's claims regarding both Optime and Curant.

According to Teva, the fact that it has "tr[ied] to make inroads" using alternative channels but those efforts have "been ineffective" shows those alternatives are not "viable, practical, or feasible[.]" TAC ¶¶ 157–58. But that is a naked conclusion because it does not explain *why*, specifically, the other channels are impractical. *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *8 (N.D. Cal. Apr. 25, 2014) (dismissing exclusive dealing claim; "simply alleg[ing] that the existing channels are insufficient . . . does not explain why that is the case" but just "simply says that it is"). The only "reason" Teva gives is that *Optime* is "entrenched." TAC ¶ 159. But Teva's new allegations about Optime's "deficient performance" and Curant replacing Optime undermine any notion Optime is itself special, defeating Teva's own premise as to why other alternatives are supposedly inadequate.

Teva's new allegations also render implausible its assertion that it tried hard to make "inroads" using alternatives and that the failures of its efforts show those alternatives are not viable. A key predicate is that Teva "expended significant efforts over many months" with the alternatives. TAC ¶ 158. Yet, despite the TAC now claiming that Curant is viable enough that Corcept's contract with it "threatens . . . to foreclose Teva" (*id* ¶¶ 204, 257), Teva never alleges it even sought out Curant as an

alternative to counteract Optime before Corcept did. Instead, Teva admits it only reached out to Curant after Corcept had contracted with it. TAC ¶¶ 195–96.

Finally, Teva's new allegations about its generic's performance render implausible its claims regarding the supposed infeasibility of alternatives besides Optime and Curant. In September 2025, Teva's SAC alleged that Teva's market share in its contrived "Korlym market" was 1%. Dkt. 146 ¶ 128. The TAC now alleges that in the mere four months between the SAC and TAC, Teva's share increased by 400% to about 4%. TAC ¶ 128. This illustrates why "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Omega*, 127 F.3d at 1162–63. It shows that unlike a situation where ultimate ***consumers*** are themselves "locked up" such that they cannot take product from the defendant's rival, a defendant's exclusive arrangement with a ***distributor*** generally does not preclude the rival's product from reaching consumers, because the rival can nonetheless break through to them with other channels.

Even if Teva's market share had remained stagnant, that would not, itself, show alternative channels are ineffective. That is because "the relevant inquiry is what products are *reasonably available* to a consumer, not what products the consumer ultimately chooses to buy." *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 904 (N.D. Cal. 2012) (partially vacated on other grounds) (emphasis in original); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403–04 (3d Cir. 2016) ("[i]n analyzing the amount of foreclosure," the fact that a "competitor remains unable to increase its market share . . . does not automatically mean competition has been foreclosed."). Stated another way, "antitrust law does not require competitors to be able to *succeed* in alternative channels; it merely requires them to have the *opportunity* to succeed." *Church*, 868 F. Supp. 2d at 915 (emphases in original). Teva's new allegation as to its growing market share, then, actually shows that alternatives to Optime and Curant are both available and effective, because they allowed Teva to quadruple its share in a matter of months. *Omega*, 127 F. 3d at 1163 ("no anticompetitive impact where plaintiffs not foreclosed from every alternative"); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *6 (D. Del. Jan. 21, 2016) (dismissing exclusive dealing claim; that market participant could "reach approximately 5% of the U.S. market" showed effective alternatives available); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 295 (S.D.N.Y.

2007) (similar; "claim of outlet foreclosure . . . implausible" since "plaintiff's products are available to consumers").

### B. Teva's Amendment Confirms that Teva Simply Seeks Access to Whatever Channel Corcept Cultivates, Which Antitrust Law Forbids

Teva's exclusive dealing claims regarding both Optime and Curant also separately fail because Teva's amendment confirms that what Teva actually seeks is admission into whatever pharmacy Corcept happens to partner with. Teva admits that it was "reliant on access to Optime to compete" and now wants similar access to Curant. *Id.* ¶¶ 161, 257. Teva can try to dress those claims up, but the common denominator is Corcept and its chosen pharmacy at any given time. That fails.

Multiple cases confirm this. In *Seagood Trading Corp. v. Jerrico, Inc.*, for example, the Eleventh Circuit rejected "concerted refusal to deal" claims (analogous to exclusive dealing) based on a distributor's and franchisor's "conspiracy" to block the distributor from "stor[ing] and deliver[ing]" the plaintiffs' products. 924 F.2d 1555, 1572 (11th Cir. 1991). The court explained that such claims "must fail" as a matter of law, because: "[t]he plaintiffs have not been prevented from obtaining every storage or delivery service available in the market"; the plaintiffs instead sought a "free ride" to "use, to their benefit," the franchisor's distributor; and the distributor at issue was "but one provider[.]" *Id.* at 1572–73. The "plaintiffs could hire a different deliverer and emulate the service," and if they did not or would not do so, that was not an antitrust problem. *Id.* at 1573.

The Ninth Circuit has stated the same. In *Omega*, the court explained that where a plaintiff seeks out a defendant's exclusive distributors, a plaintiff is "free to sell directly, to develop alternative distributors or to compete for the services of the existing distributors. Antitrust laws require no more." *Omega*, 127 F.3d at 1163. Likewise, in *Gen. Bus. Sys. v. N. Am. Philips Corp.*, the Ninth Circuit rejected a challenge to exclusive dealing between a manufacturer and its distributors. 699 F.2d 965, 978–79 (9th Cir. 1983). It explained "[a]lternatives did exist," "a defendant, having succeeded in legitimately controlling the best, most efficient and cheapest source of supply . . . does not have to share[,]" and "[i]n trying to secure direct access" to the defendant's distributors, the plaintiff "was attempting to accomplish just that." *Id.* at 978–79.

Teva might *prefer* to be in the same pharmacy as the one Corcept cultivates with its patient

and prescriber list, support and education programs, and training. But antitrust law does not *require* Corcept to share the fruits of its time, labor, and investment with its competitor. *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*, 917 F. Supp. 1208, 1230 (W.D. Tenn. 1995) ("no guarantee . . . that manufacturers will always have unrestricted access to any and all outlets through which they desire").

### C. Teva Alleges the Curant Agreement is Relatively Short Term and Terminable

Teva's new claims based on the Corcept-Curant contract also fail for the independent reason that the contract is short in duration and easily terminable. Teva alleges the contract "has a term of three years," TAC ¶ 197. But exclusive contracts up "to 3 years" have "relatively short durations[.]" *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394, at *2, *4 (C.D. Cal. July 30, 2013) (dismissing exclusive dealing claims at pleading stage where contacts had three and five year terms).

Similarly, Teva concedes "[e]ither party can terminate the agreement without cause," with "180 days prior written notice." TAC ¶ 197. Courts have found agreements terminable without cause on similar notice do not foreclose competition. *Pro Search*, 2013 WL 3936394, at *2, *4 (dismissing exclusive dealing claim where one contract was terminable on "12 Months' Notice"); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) (contract can be "easily terminable" where it can "be cancelled without cause upon six-month's notice") (cleaned up). Teva claims the fact that either side can terminate the deal without cause does not "lessen[]" foreclosure because "it takes three-to-six months to stand up a new specialty pharmacy" and Corcept could set up another pharmacy in that time. TAC ¶ 205. That is implausible. Teva, too, can establish its own pharmacy. And if Corcept or Curant ended their arrangement, Teva could seek out Curant while Corcept moves on. To the extent Teva complains the contract "automatically renews for one-year terms unless either party" cancels in advance (TAC ¶ 197), that is of no moment either. *Woman's Clinic v. St. John's Health Sys.*, 252 F. Supp. 2d 857, 866 & n.6 (W.D. Mo. 2002) (contract terminable on short notice even though it automatically renewed if not terminated).

### III. CONCLUSION

For the foregoing reasons, Corcept respectfully requests that the Court dismiss with prejudice all of Teva's claims based on exclusive dealing involving Optime and Curant.

| | |
|---|---|
| DATED: February 5, 2026 | By: */s/ Robert W. Stone* <br> **QUINN EMANUEL URQUHART & SULLIVAN, LLP** <br> Robert W. Stone (Bar No. 163513) <br>   robertstone@quinnemanuel.com <br> Michael D. Powell (Bar No. 202850) <br>   mikepowell@quinnemanuel.com <br> 555 Twin Dolphin Drive, 5th Floor <br> Redwood Shores, California 94065 <br> Telephone:     (650) 801-5000 <br> Fax:              (650) 801-5100 <br><br> Adam B. Wolfson (Bar No. 262125) <br>   adamwolfson@quinnemanuel.com <br> 50 California Street, 22nd Floor <br> San Francisco, California 94111 <br> Telephone:     (415) 875-6600 <br> Fax:              (415) 875-6700 <br><br> Brantley I. Pepperman (Bar No. 322057) <br>   brantleypepperman@quinnemanuel.com <br> 865 South Figueroa Street, 10th Floor <br> Los Angeles, CA 90017-2543 <br> Telephone:     (213) 443-3000 <br> Fax:              (213) 443-3100 <br><br> Steig D. Olson (admitted *pro hac vice*) <br>   steigolson@quinnemanuel.com <br> 295 Fifth Avenue <br> New York, New York 10016 <br> Telephone:     (212) 849-7000 <br> Fax:              (212) 849-7100 <br><br> *Attorneys for Defendant Corcept Therapeutics, Incorporated* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By  */s/ Robert W. Stone*
      Robert W. Stone