Michael Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, California 90067
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C. (*Pro Hac Vice*)
Kevin M. Neylan, Jr. (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Attorneys for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CORCEPT THERAPEUTICS, INC., AND OPTIME CARE INC., <br><br> Defendants. | Case No. 5:24-cv-03567-NW <br><br> **PLAINTIFF TEVA PHARMACEUTICALS USA, INC.'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

# TABLE OF CONTENTS

Introduction ................................................................................................................................ 1

I.  Teva's Optime and Curant Claims Are Both Plausible and Internally Consistent. ................. 1

II. Teva's Claim Targeting the Corcept-Curant Agreement Is Plausible. ..................................... 7

Conclusion ................................................................................................................................ 7

# TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*CoStar Group, et al. v. Commercial Real Estate Exchange*,
    150 F.4th 1056 (9th Cir. 2025) ...................................................................................1, 6, 7

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................................7

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983) ................................................................................................6

*In re Loestrin 24 Fe Antitrust Litig.*,
    433 F. Supp. 3d 274 (D.R.I. 2019) .......................................................................................2

*LyricFind, Inc. v. Musixmatch, S.p.A.*,
    798 F. Supp. 3d 1040 (N.D. Cal. 2025) ................................................................................7

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ..............................................................................................2, 6

*Seagood Trading Corp. v. Jerrico, Inc.*,
    924 F.2d 1555 (11th Cir. 1991) ............................................................................................6

*Sinclair v. City of Seattle*,
    61 F.4th 674 (9th Cir. 2023) .................................................................................................4

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    622 F. Supp. 3d 22 (E.D. Pa. 2022) ......................................................................................2

*In re Tecfidera Antitrust Litig.*,
    791 F. Supp. 3d 852 (N.D. Ill. 2025) ....................................................................................2

*Tevra Brands LLC v. Bayer HealthCare LLC*,
    2024 WL 1909156 (N.D. Cal. May 1, 2024) ........................................................................7

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ......................................................................................5, 7

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ..............................................................................................6, 7

**Statutes**

15 U.S.C. § 26 ...............................................................................................................................7

**INTRODUCTION**

There is nothing inconsistent about Teva's exclusive-dealing claim targeting the Corcept-Optime agreement, and its exclusive-dealing claim targeting the Corcept-Curant agreement. Teva's Optime claim alleges that from 2017 to late 2025, Corcept established Optime as the only effective channel for reaching Korlym patients, as proved by Teva's inability to gain market share since launching a lower-priced generic two years ago. The Court has already held that those allegations state a valid claim. (Dkt. 134 at 16-20.) Teva's Curant claim alleges that starting in late 2025, Corcept has been using the same playbook to establish Curant as a successor to Optime, with similar anticompetitive effects going forward. Far from introducing any inconsistency, Teva's new allegations about Curant confirm the plausibility of Teva's prior allegations about Optime: both pharmacies are able to stifle competition thanks to similar tactics by Corcept, and Corcept's ability to erect Curant as a successor pharmacy is possible only because Corcept was so successful in making Optime the key bridge to patients, just as Teva has always alleged. These claims are mutually reinforcing, and the Court should reject Defendants' renewed bids for dismissal.

**I.    Teva's Optime and Curant Claims Are Both Plausible and Internally Consistent.**

The Ninth Circuit's framework for exclusive-dealing claims is straightforward. As this Court explained, an exclusive-dealing agreement is unlawful if it "forecloses competition in a substantial share of the relevant market." (Dkt. 134 at 16.) The Ninth Circuit recently clarified what it takes to allege substantial foreclosure. In *CoStar Group, et al. v. Commercial Real Estate Exchange*, 150 F.4th 1056, 1067 (9th Cir. 2025), the Ninth Circuit held that "when a plaintiff plausibly alleges that exclusive agreements cover a market in which the defendant allegedly holds monopoly power, that is sufficient to allege the substantial foreclosure element of exclusive dealing." In this case, the Court has already held that Teva has sufficiently alleged that Corcept has monopoly power in the market for Korlym. (Dkt. 134 at 17-18; TAC ¶¶208-21.) Defendants have never challenged that allegation. And there is no dispute that the preexisting Optime and new Curant agreements are both exclusive-dealing agreements that cover the Korlym market. (TAC ¶¶136, 197.) Under *CoStar*, nothing more is required for Teva to state a claim targeting each agreement. *CoStar*, 150 F.4th at 1067.

Defendants have never addressed *CoStar* in any of their briefs in this case. Rather than do so

now, they try to manufacture a basis for dismissal by arguing that there is some inconsistency between Teva's prior allegations about Optime and its new allegations about Curant. These arguments fail.

Defendants' main argument is that Teva's new allegations suggest that Curant, or some other pharmacy, would have been an effective alternative to Optime if Teva had partnered with it when Optime was Corcept's exclusive pharmacy. (Dkt. 168 at 2, 6-7; Dkt. 169 at 2-5.) But Teva alleges the opposite: Teva's new allegations make clear that *no* pharmacy, including Curant, could have served as an effective alternative to Optime for as long as Corcept distributed Korlym exclusively through Optime, precisely because the Optime agreement barred Optime from distributing generic competitors, thereby thwarting the operation of state generic substitution laws. As the Court previously held, "[i]n the pharmaceutical context, 'generics need not be barred from all means of distribution if they are barred from the cost-efficient ones.'" (Dkt. 134 at 18-19.) And as other courts have explained, "competition through state drug substitution laws is the only cost-efficient means of competing available to generic manufacturers. For there to be an antitrust violation, generics need not be barred 'from all means of distribution' if they are 'bar[red] ... from the cost-efficient ones.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 655-56 (2d Cir. 2015) ("*Namenda*"). Or as another court recently put it, "healthy competition in prescription drug markets requires the smooth operation of drug substitution laws, insofar as these laws provide generic manufacturers with the only cost-efficient and commercially viable means to compete. Courts recognizing this have credited antitrust claims premised on restraints and conduct that undermine the operation of these laws." *In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 864 (N.D. Ill. 2025); *see also, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 330 (D.R.I. 2019) (denying summary judgment where brand company "engaged in anticompetitive conduct by obstructing automatic generic substitution, a cost-efficient means of increasing competition"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 58 (E.D. Pa. 2022) ("absent AB-rated, automatic substitution, generics must rely on the less efficient and far less effective method of therapeutic substitution").[1]

---

[1] Some of these cases involve alleged "product hop" schemes, where a brand manufacturer tries to switch patients from a branded product that has AB-rated generics, to a next-generation product that does not have AB-rated generics and is therefore not subject to automatic substitution. Relying on exclusive-dealing cases, the decisions cited above hold that product hops can be anticompetitive. Corcept's conduct is even worse, because when brand companies engage in a product hop, patients at

2

That is how the Optime agreement worked—it impeded generic substitution laws by design, as Corcept publicly boasted, even though Teva's generic is less expensive for patients and health plans. (TAC ¶¶7, 50-56, 127-28, 155-56, 158, 161, 191.) That is a key reason the Optime agreement was so effective at stifling generic competition, and why neither Curant nor any other pharmacy could have served as an effective alternative to Optime while Corcept distributed Korlym exclusively through Optime. The Curant agreement will replace the Optime agreement but function the same way; it, too, will impede substitution laws, perpetuating this anticompetitive scheme going forward by ensuring no pharmacy can serve as a practical alternative to Curant while Corcept distributes Korlym exclusively through Curant. (TAC ¶¶7, 204, 207.) These theories bolster each other; there is no inconsistency.

Beyond obstructing generic substitution laws, Teva has consistently alleged that during Corcept's nearly 12 years alone on the market, Corcept cultivated close relationships with the small number of prescribers who write Korlym prescriptions, and established Optime as the key pathway to patients by leveraging those relationships—including by making illicit payments to encourage sending prescriptions to Optime notwithstanding the availability of Teva's lower-priced generic. (TAC ¶¶149-66, 167-87.) Teva's Curant claim alleges that starting in late 2025, Corcept has been using the same playbook to establish Curant as a successor to Optime by inducing prescribers to continue favoring Corcept's own products, which will now require routing prescriptions to Curant. (TAC ¶¶194-99, 204, 207, 242; *id.* ¶¶167-87.) There is nothing inconsistent with alleging that Corcept used a set of unlawful strategies to establish Optime as the dominant pharmacy from 2017 to 2025, and is trying to use the same strategies to replace Optime with Curant as the dominant pharmacy from 2025 onward.

In addition, there is no inconsistency between Teva's prior allegations about Optime and its new allegations about Curant, because Teva's new allegations explain that *even Corcept* cannot make Curant an effective alternative to Optime without Optime's active assistance, which confirms just how successful Corcept's strategy was at making Optime the only effective path to Korlym patients during the life of the Optime agreement. Using Corcept's own words, the TAC explicitly alleges that "'Optime is more than a dispenser; it is a critical link between patients and critical medication,'" to

---

least allegedly receive a product that is superior to generics, whereas Corcept's scheme results in patients receiving Corcept's products, which are identical to Teva's generic only far more expensive.

3

1  such an extent that "if Optime does not actively assist [Corcept] in setting up an alternative pharmacy,
2  it will 'block[] patient access and prevent[] any successor pharmacy from serving patients.'" (TAC
3  ¶¶200, 202 (emphasis removed).)  As the TAC explains, these facts are "a powerful validation of
4  Teva's allegations in this lawsuit, because they demonstrate that over the past eight-plus years, Optime
5  has become firmly entrenched as the only practically effective channel for reaching Korlym patients—
6  so much so that any attempt to establish an alternative channel is not practically feasible without
7  Optime's help, even for Corcept…. Teva's inability to reach Korlym patients through alternative
8  channels should come as no surprise in light of Corcept's concession that it cannot do so either, at
9  least not without Optime's help, which has been categorically unavailable to Teva as a result of the
10 Corcept-Optime agreement." (TAC ¶¶200, 202-03.)  The Court cannot ignore these allegations, and
11 must "construe them in the light most favorable to" Teva.  *Sinclair v. City of Seattle*, 61 F.4th 674,
12 678 (9th Cir. 2023).  These allegations refute any supposed inconsistency.  Corcept's dependence on
13 Optime for its transition to Curant proves that Teva has been right all along in alleging that up until
14 now, Optime has been the key distribution channel in this market, and that Teva has not been able to
15 reach patients by going through alternative channels, because—without Optime's help—not even
16 Corcept would be able to reach patients by going through alternative channels, including Curant.

17      In fact, as Teva alleges, Corcept's efforts to entrench Optime were so successful that Optime
18 continues to be a highly effective bridge to Korlym patients even after the termination of its agreement
19 with Corcept, which is why Corcept is taking the nakedly anticompetitive position that Optime remains
20 forbidden to distribute Teva's generic going forward—because Corcept knows that if Teva could
21 access Optime now, Teva would have a more cost-efficient path to reach Korlym patients than if Teva
22 has to continue trying to compete through other channels. (TAC ¶¶206-07.)  There is no other reason
23 why Corcept would continue blocking Teva from working with Optime even after Optime stops
24 providing services to Corcept.  (TAC ¶¶206-07.)  These allegations again corroborate Teva's theory
25 that until now, Optime has been the only feasible channel to reach Korlym patients.

26      Defendants are therefore fundamentally wrong to insist that Teva must choose either Optime
27 or Curant as the key pharmacy.  Teva need not choose because Teva's theory is that Optime was the
28 key from 2017 to late 2025, and Curant will be the key going forward, because Corcept is deploying

similar strategies and because Optime is helping Corcept to pass the baton. (TAC ¶204.) These allegations fit together to explain how Corcept has been so adept at preventing Teva from eroding Corcept's monopoly, and how it will perpetuate its anticompetitive scheme with a replacement pharmacy from now on. These allegations more than suffice to state claims targeting both agreements.

Defendants are also wrong that there is something inconsistent between Teva's foreclosure theory and its allegations, based on Corcept's lawsuit against Optime, that Optime has done a poor job providing services to Korlym patients since late 2024. (TAC ¶¶188-92; *see* Dkt 168 at 6; Dkt. 169 at 2.) The fact is that notwithstanding Optime's allegedly deficient performance, Corcept has been able to expand its Korlym business substantially, while Teva's market share remains negligible at just 4%, compared to Corcept's 96% market share. (TAC ¶¶128-30.) Corcept's ability to grow its monopoly despite Optime's deficient performance demonstrates the truth of Teva's allegation—which Teva has made since day one of this lawsuit—that "Corcept's vague claims about the importance of 'support' from Corcept and Optime are almost certainly pretextual," and that patients are worse off, not better off, as a result of Corcept's scheme to keep prescriptions flowing through Optime. (TAC ¶¶164-66.) Those facts confirm the harm to patients that Teva has alleged from the outset. (TAC ¶¶191-92.)

Without any genuine inconsistency, both Defendants regurgitate many of the arguments they made in their earlier briefs, citing many of the same cases to argue that Teva cannot allege substantial foreclosure by focusing on one or two pharmacies because alternative channels exist, at least in theory. (Dkt. 168 at 1-2, 3-5; Dkt. 169 at 3-5, 6-7; *compare* Dkt. 55 at 17-20, Dkt. 68 at 2-5 (Defendants making same arguments citing most of same cases); Dkt. 65 at 7-17 (Teva opposing same).) The Court already rejected these arguments. (Dkt. 134 at 20 ("Teva has alleged that it has already tried the alternate channels, to the extent they exist, without any success. Channels that provide negligible impact on the market are neither practical nor feasible.").) The Court should not entertain them again. (Dkt. 163 at 2 (with respect to Optime claim, limiting Defendants to arguments about "an internal inconsistency," and instructing that "Defendants may not renew any other arguments" resolved by the Court's prior order).) Regardless, as exclusive-dealing cases have long held, "market realities matter more than what is theoretically possible," *United States v. Google LLC*, 747 F. Supp. 3d 1, 148 (D.D.C. 2024), and "[t]he paltry penetration in the market by [Teva] ... has been a refutation of [Defendants']

theory by tangible and measurable results in the real world," *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 285 (3d Cir. 2012). Those facts are as true today as they were when the Court rejected Defendants' arguments last time. Defendants' regurgitated foreclosure arguments are also foreclosed by the Ninth Circuit's recent, controlling decision in *CoStar*, which holds that a plaintiff adequately pleads substantial foreclosure when exclusive agreements cover a market in which the defendant holds monopoly power. *CoStar*, 150 F.4th at 1067. That is indisputably the situation here. And Corcept's exclamation that Teva's "market share has increased *400%*" (Corcept's emphasis)—from 1% to 4%—is silly. (Dkt. 169 at 1, 5.) A foreclosure effect of 96% "is obviously enough." (Dkt. 134 at 19.)

The Court should also reject Defendants' regurgitated argument that Teva is just trying to "free ride" on Corcept and Optime's services. (Dkt. 168 at 7; 169 at 6.) Teva has consistently explained that it is *not* attempting to free ride, and Teva has always disputed that Optime provides genuinely valuable services in the first place, which Teva's recent allegations reinforce. (TAC ¶¶164-66, 188-92.) And insofar as Corcept suggests there is nothing anticompetitive about blocking Teva from accessing Optime and Curant and thereby thwarting state generic substitution laws (Dkt. 169 at 6-7), Corcept is wrong. As discussed above, numerous cases hold that obstructing generic substitution laws is anticompetitive. *See supra* at 2 (collecting cases). Corcept cites no case to the contrary; not one case involving the pharmaceutical industry or generic substitution laws. Indeed, "what Defendants call 'free riding'—generic substitution by pharmacists following the end of [Korlym's] exclusivity period—is authorized by law; is the explicit goal of state substitution laws; and furthers the goals of the Hatch-Waxman Act by promoting drug competition." *Namenda*, 787 F.3d at 657. Here, there is no dispute that Corcept's exclusive agreements—first with Optime, now with Curant—impede generic substitution laws by design. (TAC ¶¶7, 155-56, 191, 207.) That is anticompetitive.

Finally, Corcept cannot recast Teva's exclusive-dealing claim as a refusal-to-deal claim. (Dkt. 169 at 6-7 (citing, inter alia, *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1572 (11th Cir. 1991), and *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 978-79 (9th Cir. 1983)).) This argument is also foreclosed by *CoStar*, which reversed a district court's dismissal because the court wrongly "applied a refusal-to-deal framework" to an exclusive-dealing claim. *CoStar*, 150 F.4th at 1072. Applying a refusal-to-deal framework would be error because refusal-to-deal "is not [Teva's]

theory of liability…. Instead, [Teva] contends that [Corcept's] exclusionary practices kept [Corcept's] [pharmacy] customers—not [Corcept] itself—from dealing with [Teva]. A monopolist's efforts 'to limit the abilities of third parties to deal with rivals' is a matter of exclusive dealing with the monopolist's customers, not a refusal to deal with the monopolist's competitors." *Id.*

## II.     Teva's Claim Targeting the Corcept-Curant Agreement Is Plausible.

Corcept is wrong that Teva's Curant claim should be dismissed because the Curant agreement has a three-year term and can be terminated without cause on 180 days' notice. (Dkt. 169 at 7.) First, *CoStar* already establishes that Teva's allegations state a claim because Corcept's monopoly power suffices to plead substantial foreclosure, without more. *CoStar*, 150 F.4th at 1067. In addition, Teva alleges—based on its stymied attempt to negotiate a deal with Curant—that the Curant agreement "is not incentive-based, and that Curant does not consider itself free to terminate the agreement in practice." (TAC ¶196.) Corcept ignores those allegations, but they suffice to state a claim. *Google*, 747 F. Supp. 3d at 158-59; *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030-31 (N.D. Cal. 2015) (exclusive agreement raises antitrust concerns if it is not "incentive-based"); *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 1909156, at *1 (N.D. Cal. May 1, 2024) ("the contractual provisions at issue [are] '*de facto* long term and not easily terminable'"). Corcept also tries to blow past Teva's allegation that the 180-day notice period was designed to give Corcept enough runway to establish another successor in the unlikely event Curant terminates, which heightens the agreement's foreclosure effects. (TAC ¶205; Dkt. 169 at 7.) But the Court cannot disregard this allegation—which is based on Corcept's own words—simply because Corcept believes it is "dubious." *LyricFind, Inc. v. Musixmatch, S.p.A.*, 798 F. Supp. 3d 1040, 1067 (N.D. Cal. 2025). Furthermore, Corcept ignores Teva's allegation that the Curant agreement is highly unusual, just like the Optime agreement (TAC ¶5), which reinforces its anticompetitive nature. *ZF Meritor*, 696 F.3d at 272. Finally, insofar as Corcept suggests that Curant is "not yet a viable channel" (Dkt. 169 at 2 (emphasis removed)), Corcept ignores that Teva seeks injunctive relief in addition to damages (TAC ¶¶252-58), and injunctive relief requires only that injury be "threatened," 15 U.S.C. §26, which Teva has alleged (TAC ¶204).

## CONCLUSION

Defendants' motions to dismiss should be denied.

Dated: February 11, 2026          Respectfully submitted,

By: /s/ Michael Shipley

Michael Shipley
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, California 90067
Tel: (213) 680-8400
michael.shipley@kirkland.com

Devora W. Allon, P.C.
Kevin M. Neylan, Jr.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446 5967
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Attorneys for Plaintiff*
*Teva Pharmaceuticals USA, Inc.*

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Michael Shipley, attest that concurrence in the filing of this document has been obtained.

                                             */s/ Michael Shipley*
                                             Michael Shipley

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2026, I caused to be filed the foregoing document with the United States District Court for the Northern District of California using the CM/ECF system and caused it to be served on all registered participants via notice of electronic filing.

*/s/ Michael Shipley*
Michael Shipley