Lucas C. Wohlford (admitted *Pro Hac Vice*)
**DUANE MORRIS LLP**
200 Crescent Court, Suite 900
Dallas, TX 75201
Telephone: +1 214 257 7200
Facsimile: +1 214 257 7201
E-Mail: lwohlford@duanemorris.com

Attorneys for Defendant
OPTIME CARE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CORCEPT THERAPEUTICS, INC., AND OPTIME CARE INC., <br><br> Defendants. | Case No. 5:24-CV-03567-NW <br><br> **DEFENDANT OPTIME CARE, INC.'S REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Hon. Noël Wise <br><br> Hearing Date: February 18, 2026 at 9:00 a.m. |

Teva's Opposition (ECF No. 170) is based on distortions of Ninth Circuit precedent, generic substitution laws, and Teva's own allegations. Teva's arguments are unavailing, its exclusive dealing claims are fatally flawed, and all its claims against Optime should be dismissed with prejudice.

## ARGUMENT AND AUTHORITIES

### A. Teva's Distortion of Ninth Circuit Precedent

Teva argues the "Ninth Circuit recently clarified what it takes to allege substantial foreclosure" in *CoStar Group et al. v. Commercial Real Estate Exchange, Inc.*, 150 F.4th 1056 (9th Cir. 2025). (ECF No. 170 at p. 1). Teva also notes that Optime has not addressed *CoStar* in its briefs. (*Id.*). But there is a good reason why Optime has not previously addressed *CoStar*—it is simply not applicable to this case.

In *CoStar*, the Ninth Circuit considered claims that an alleged monopolist foreclosed competition by locking up **end users** of its services with exclusive dealing agreements. *CoStar*, 150 F.4th at 1067 ("CREXi alleges that any exclusive agreements CoStar entered into apply to all brokers using CoStar's services."). That is not what Teva alleges here. Rather, Teva alleges that Corcept has foreclosed competition by locking up only two **distributors** at different times with exclusive dealing agreements. This is a critical distinction that Teva conspicuously ignores.

In *Omega*, a case Teva notably fails to address, the Ninth Circuit explained that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Here's why. By definition, a monopolist controls a substantial share of end-user purchases in a relevant market. Consequently, when an alleged monopolist enters into exclusive agreements with the end users of its product or service, those agreements necessarily foreclose competition in a substantial share of the relevant market, because there is no way for the monopolist's competitors to reach the substantial share of end users whose purchases the monopolist controls. *CoStar*, 150 F.4th at 1067 ("when a plaintiff plausibly alleges that exclusive agreements cover a market in which the defendant allegedly holds monopoly power, that is sufficient to allege the substantial foreclosure element of exclusive dealing"). Conversely, when an alleged monopolist enters into exclusive agreements with distributors, those agreements do not necessarily foreclose any competition because

the monopolist's competitors may still be able to reach end users via alternative distribution channels. Indeed, "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market." *Omega*, 127 F.3d at 1163.  Thus, when a court considers the foreclosure effect of exclusive agreements between a monopolist and the end users of the monopolist's product or service—as the Ninth Circuit did in *CoStar*—it need not evaluate the viability of alternative distribution channels because the monopolist's exclusive agreements with end users block competitors from reaching those end users by any means.  However, where, as here, a court considers the foreclosure effect of exclusive agreements between an alleged monopolist and its distributors, the court must consider whether the plaintiff can reach end users via alternative distribution channels, because such alternative channels "eliminate substantially any foreclosure effect [the exclusive agreements] might have." *Omega*, 127 F.3d at 1163.

Significantly, in *CoStar*, the Ninth Circuit did not suggest that it was overruling *Omega* or otherwise changing the relevant analysis for exclusive agreements that operate at the distributor level. In fact, the *CoStar* court cited *Omega* for the proposition that exclusive agreements often have pro-competitive benefits.  *CoStar*, 150 F.4th at 1067.  Because Teva's claims against Optime concern a single exclusive agreement with a single distributor rather than exclusive agreements covering a substantial share of end users in the relevant market, Teva's reliance on *CoStar* is misplaced.

B.   **Teva's Distortion of Generic Substitution Laws**

Teva's arguments regarding state generic substitution laws are equally misplaced.  Teva argues the Corcept-Optime Agreement "impeded generic substitution laws by design," but Teva never explains how generic substitution laws actually operate or how they were supposedly impeded. (ECF No. 170 at pp. 2-3).  Moreover, the TASC does not even identify the specific statutes Teva is referring to, but it does acknowledge that 40 of the unidentified statutes are permissive, and that the 12 unidentified mandatory statutes require generic substitution only when "all prescription requirements are met."  (ECF No. 166 ¶¶ 51-52).  The TASC contains no detail about what these "prescription requirements" are or how the 52 unidentified statutes Teva invokes actually operate. Notably, in one of the cases Teva cites, the court dismissed the plaintiffs' exclusive dealing claims

because, like Teva, the plaintiffs had "not explained how drug substitution laws actually work." *In re Tecfidera Antitrust Litig.*, 791 F.Supp.3d 852, 864 (N.D. Ill. 2025).

The closest Teva comes to explaining how the Corcept-Optime Agreement supposedly impedes generic substitution laws is its allegation that "[g]eneric substitution laws can only operate as intended if the relevant pharmacy carries the generic version of the prescribed drug." (ECF No. 166 ¶ 53). But this allegation demonstrates Teva's fundamental misunderstanding of generic substitution laws. Indeed, the upshot of Teva's allegation is that generic substitution laws require any pharmacy that carries a branded drug to also carry the branded drug's generic equivalents. Teva has never provided any authority for this position because there is none. To be sure, Optime has not located a single state substitution law that requires pharmacies who carry a branded drug to also purchase and carry the branded drug's generic equivalents. Quite the opposite. Even so-called mandatory generic substitution laws require generic substitution only if the prescriber approves the substitution and the pharmacy already stocks the generic. *See, e.g.,* 35 Pa. Code. § 960.3 ("Substitution of a less expensive generically equivalent drug shall be contingent on whether the pharmacy has the brand name or generically equivalent drug in stock"); Minn. Stat. § 151.21.3 (substitution required when "there is available in the pharmacist's stock a less expensive generically equivalent drug"). Thus, even if Optime does not carry Teva's generic because of the Corcept-Optime Agreement, that does not impede the generic substitution laws Teva vaguely invokes but fails to explain, since those laws do not require Optime to carry Teva's generic in the first place.

Unlike the cases cited by Teva, this is not a case in which a generic manufacturer plausibly alleges it has been blocked entirely from competing via generic substitution. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 655 (2d Cir. 2015) (alleging brand product hop left "few to no prescriptions for which generics would be able to compete"); *see also FTC v. Shkreli*, 581 F.Supp.3d 579, 610 (S.D.N.Y. 2022) (alleging exclusive distribution and supply agreements blocked generic manufacturers from accessing active pharmaceutical ingredient needed to perform required testing for FDA approval of generic). At most, Teva alleges that generic substitution will not happen at Optime because Optime does not carry Teva's generic. But because no generic substitution law requires Optime to carry Teva's generic, and because the Corcept-Optime Agreement has no impact

on generic substitution at any other pharmacy, Teva does not plausibly allege that the Corcept-Optime Agreement has any effect whatsoever on the operation of generic substitution laws.

### C. Teva's Distortion of its own Allegations

Finally, Teva argues the TASC is not internally inconsistent because "Teva's theory is that Optime was the key from 2017 to late 2025, and Curant will be the key going forward." (ECF No. 170 at p. 4). But that is not what Teva actually alleges. For more than a year, Teva claimed Optime is the "*only* effective distribution channel," and that "access to the Optime distribution channel is a prerequisite to effectively compete in this market." (ECF No. 1 ¶¶ 24, 149; ECF No. 146 ¶¶ 24, 151). Now, Teva alleges that both Optime and Curant are the "*only* effective distribution channel," but also that Optime is a completely inept distributor. (ECF No. 166 ¶¶ 24, 154, 189-92, 257). These allegations are obviously inconsistent and irreconcilable, and they completely erode the fundamental premise of Teva's claims against Optime.

Teva has no coherent explanation for these obvious inconsistencies. Teva does not explain why, if Curant is an effective distribution channel, Teva could not have effectively distributed its generic through Curant to begin with. Teva does not explain how Optime could be the only effective distribution channel while also providing deficient and worthless services to patients. Teva does not explain how Corcept's claim that it needs various patient and other data, which Teva would never be entitled to receive or use, to transition from Optime to Curant, is somehow a powerful validation that Optime is the only effective means of distributing Teva's generic. And Teva does not explain how it is not simply attempting to free ride on whatever distribution channels Corcept uses. Instead, Teva erroneously cites *CoStar*, (ECF No. 170 at pp. 1, 6), vaguely and erroneously invokes generic substitution laws, (*id.* at pp. 2-3, 6), confusingly argues that its own increased market share shows Corcept has grown its monopoly, (*id.* at p. 5), repeats its misleading allegations about Corcept's transition from Optime to Curant, (*id.* at pp. 3-4), and argues, in conclusory fashion, that "it is *not* attempting to free ride." (*Id.* at p. 6). Teva's inability to directly and coherently explain its conflicting allegations is, to borrow a phrase from Teva, powerful validation of Optime's arguments.

### CONCLUSION

All Teva's claims against Optime should be dismissed with prejudice.

Dated: February 13, 2026

DUANE MORRIS LLP

By: */s/ Lucas C. Wohlford*
  Justin J. Fields
  Lucas C. Wohlford (admitted *Pro Hac Vice*)
  Randy D. Gordon (admitted *Pro Hac Vice*)
  Attorneys for Defendant
  OPTIME CARE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026, I caused to be filed the foregoing document with the United States District Court for the Northern District of California using the CM/ECF system and caused it to be served on all registered participants via notice of electronic filing.

  */s/ Lucas C. Wohlford*
  Lucas C. Wohlford