**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
Michael D. Powell (Bar No. 202850)
  mikepowell@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Fax:                (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Fax:                (415) 875-6700

*Attorneys for Defendant Corcept Therapeutics, Incorporated*

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CORCEPT THERAPEUTICS, INC., et al., <br><br> Defendants. | Case No. 5:24-cv-03567-NW <br><br> Honorable Noël Wise <br><br> **CORCEPT'S REPLY IN SUPPORT OF SUPPLEMENTAL BRIEF REGARDING MOTION TO DISMISS TEVA'S EXCLUSIVE DEALING CLAIMS** <br><br> Hearing Date: February 18, 2026 at 9:00 a.m. |

Teva's opposition (Dkt. 170, "Opp.") to Corcept's supplemental brief (Dkt. 169, "Mot.") does not save Teva's exclusive dealing claims. They remain contradictory and implausible.

**Teva Is Incorrect About *CoStar***. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc*., holds that "when a plaintiff ***plausibly*** alleges that exclusive agreement**s** cover a market in which" the defendant has power, that can establish substantial foreclosure. 150 F.4th 1056, 1068 (9th Cir. 2025) (emphases added). In that case, plausibility stemmed from allegations that "a monopolist enter[ed] into exclusive agreements with" "all" "its ***customers***." *Id.* at 1064, 1067, 1071 (emphasis added). Teva, however, challenges Corcept's deal with a single ***distributor*** (Optime, then Curant). The Ninth Circuit's decision in *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997)—which *CoStar* cites and does not purport to change in any way, *see* 150 F.4th at 167, and which Teva never even mentions—makes clear that exclusive deals with "distributors rather than end-users [such as those at issue here] are generally less cause for anticompetitive concern." *Id.* at 1162. That is why cases applying *Omega*—which Corcept cited, but Teva ignores—confirm a manufacturer's exclusive deals with one or even several distributors do not foreclose competition. Mot. 3–5.

Thus, Teva's burden under *CoStar* and *Omega* remains to plausibly explain why Teva is foreclosed from the market (not just one channel), including why whatever pharmacy Corcept chooses suddenly becomes the only viable channel for Teva's generic—particularly when Teva's own TAC demonstrates it distributes its generic through multiple other channels and it is indeed reaching patients. As *Omega* (unchanged by *CoStar*) instructs, foreclosure of "one mode of distribution" is not enough, and there is "no anticompetitive impact where plaintiffs [are] not foreclosed from every alternative[.]" 127 F.3d at 1163 (cleaned up). That is the core problem with Teva's claims.

**Substitution Laws Say Nothing About the Plausibility of Teva's Specific Claims.** Teva asserts that "state generic substitution laws" support the plausibility of its exclusive dealing claims. Opp. at 2–3, 6. However, as the only case Teva cites that actually involves exclusive dealing and generic substitution laws confirms, merely invoking state substitution laws does not itself plausibly establish substantial foreclosure for an exclusive dealing claim against a branded drug manufacturer. *In re Tecfidera Antitrust Litig*., 791 F. Supp. 3d 852, 857, 863–67 (N.D. Ill. 2025).

Even assuming those laws applied, the key is whether there is a choice and mechanism to

avoid "the features complained of in Plaintiffs' allegations." *Tecfidera*, 791 F. Supp. 3d at 867 If so, "the Court cannot see how generic competition was meaningfully stifled." *Id.* (dismissing claims). Here, Teva itself alleges that doctors can prescribe Corcept's Korlym (brand or authorized generic) and send that prescription to Optime or, now, Curant. TAC ¶ 150. But Teva also does not dispute doctors can prescribe Teva's generic and send those prescriptions to whatever pharmacies carry it. If doctors pick Korlym over Teva's generic for *other* reasons, that is not a function of any exclusive deal or a generic substitution problem. And, if Teva chooses not to market, promote, or reach out to prescribers to compete for the prescriptions in the first place, generic substitution laws are irrelevant. Where a generic chooses not to expend money or effort, "relying instead on the 'promotion' provided by state automatic substitution laws," it is "a 'victim' of its own business strategy[.]" *Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*, 2015 WL 1736957, at *13 (E.D. Pa. Apr. 16, 2015) (claims failed).

Indeed, Teva's case law confirms substitution laws matter, if at all, and if they even apply, when they are "the *only* cost-efficient and commercially viable means [for a generic] to compete." *Tecfidera*, 791 F. Supp. 3d at 864; Opp. 2 (emphasis added). But Teva does not say it lacks *any* other cost-efficient distribution channels for its generic drug. TAC ¶¶ 155–57. Teva specifically alleges that it distributes nationwide through a wide variety of "other channels," including "wholesalers," "distributors," the government, and both "specialty" and "retail" pharmacies. *Id.* ¶¶ 9, 158. The apparent problem is Teva's view that the distribution channels Corcept cultivates are attractive. But a desire for access to a *preferred* distribution channel is not the same as plausibly alleging it is the *only* cost-effective and commercially viable channel. Indeed, Teva now alleges its market share has increased in a matter of months, belying the claim it cannot compete through other channels.

Further, Teva appears to misunderstand its own substitution law-related citations. As Teva concedes, besides *Tecfidera* (which supports Defendants, not Teva), Teva's cases involve a "product-hop," *not* exclusive dealing. Opp. 2–3 n.1. In a product hop, a branded drug manufacturer whose branded product's patents are set to expire withdraws that product and introduces a new one subject to different patents with longer exclusivity. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 642–43 (2d Cir. 2015) ("*Namenda*"). *That* can thwart substitution laws, because those laws "prohibit pharmacists from substituting generic drugs that are not therapeutically equivalent to the

-2-    Case No. 5:24-cv-03567-NW
CORCEPT'S REPLY ISO SUPPLEMENTAL BRIEF REGARDING TEVA'S EXCLUSIVE DEALING CLAIMS

1  brand drug," the generic versions of the old brand drug are not equivalent to the new brand drug, and
2  the old brand drug that would trigger substitution is no longer available, making substitution
3  impossible. *Namenda*, 787 F.3d at 645, 656. That has nothing to do with exclusive dealing. And,
4  generic substitution *is* possible here: Corcept has an authorized generic (which can be substituted for
5  brand Korlym at Optime/Curant), and Teva's generic is nationally available. TAC ¶¶ 158, 197.

6  **Teva's Allegations Are Inconsistent.** Teva wrongly states Corcept "regurgitated" its
7  "earlier" dismissal arguments. Opp. 3–6. A premise for the Court's Order was Teva's allegation that
8  Optime is "the only realistic distribution channel." Dkt. 134 at 6. Teva's new allegations contradict
9  that. Teva now says it "dispute[s] that Optime provides genuinely valuable services in the first
10 place[.]" Opp. 6. Why, then, is Teva demanding access to Optime? How is Teva foreclosed from the
11 market if it is unable to access one pharmacy that Teva says provides no value anyway? Similarly, if
12 Curant is "the" or even "a" key so Corcept's new deal with it now forecloses Teva (TAC ¶ 257), how
13 was Teva previously foreclosed when Curant was open as an alternative to Optime? If Teva claims
14 Curant is *not* yet viable because it requires others' "help" to even operate (Opp. 4), then how is Teva
15 foreclosed from being unable to access one lone, infeasible channel? These are tensions Teva does
16 not grapple with. They are made more implausible by Teva's amendment showing that despite
17 Corcept's exclusive deals, Teva has the *opportunity* to reach consumers through other means and *is*
18 doing so. Corcept's citations (Mot. 5–6), which Teva fails to address, confirm no more is required.

19 **Teva's Free-Riding Arguments Fail.** Nothing changes that Teva simply wants to be in
20 whatever pharmacy that Corcept partners with. That is free-riding. Teva cites to no law that requires
21 Optime or anyone to carry Teva's generic, or that says automatic substitution is unsatisfied simply
22 with respect to a single pharmacy. While Teva points to *Namenda* to claim that generic substitution
23 laws countenance such free-riding, Teva is wrong. The "free-riding" argument *Namenda* rejected was
24 that a defendant could extend its monopoly "beyond the expiration of [its] patents" by forcing a switch
25 to a new product covered by different patents with longer terms. 787 F.3d at 657. That is no issue
26 here, and generic substitution laws do not give a generic manufacturer like Teva license to do nothing
27 and coast off a branded manufacturer's time and investment. *Mylan*, 2015 WL 1736957, at *13. Nor
28 is Corcept "recast[ing] Teva's exclusive-dealing claim as a refusal-to-deal." Opp. 6–7. As *exclusive*

*dealing cases* like *Omega* confirm, a defendant "does not have to share" with its competitor the distributor it cultivated and protects its investment in through an exclusive deal. 127 F. 3d at 1163.

**The Curant Deal Is Short-Term and Terminable.** Teva's argument (Opp. 7) that *CoStar* eliminates other factors in the foreclosure analysis beyond share, like duration and terminability, is baseless. *CoStar* cites *Omega*, which describes these factors (*see* 127 F.3d at 1163–64), and this Court considered them vis-à-vis the Optime deal's different terms in its post-*CoStar* decision. Dkt. 134 at 18–19. Teva (Opp. 7) fails to address Corcept's citations (Mot. 7) demonstrating contracts like the Curant deal that are three years and can be terminated by either side without cause, with six months' notice, do not foreclose competition. Teva's citations do not hold otherwise. *United States v. Google LLC* found that unlike a deal with no "unilateral right to terminate without cause" term, a three-year deal that "could be cancelled without cause upon six-months' notice" *is* terminable and not anticompetitive. 747 F. Supp. 3d 1, 157–59 (D.D.C. 2024) (cleaned up). *Feitelson v. Google Inc*. found deals *were* short in duration and terminable, and it dismissed the claims for lack of plausible foreclosure. 80 F. Supp. 3d 1019, 1031–32 (N.D. Cal. 2015). *Tevra Brands LLC v. Bayer HealthCare LLC* acknowledged three- and five-year contracts can be "short-term," and a contract "terminable on 12-month's notice" can be easily-terminated. 2024 WL 1909156, at *7 (N.D. Cal. May 1, 2024).

Contrary to Teva's claim (Opp. 7) Corcept "blow[s] past" Teva's allegation that the 180-day notice period "give[s] Corcept enough runway" to establish a successor if "Curant terminates," Corcept addressed it. Mot. 7. It is Teva that fails to explain how a term allowing Curant to end its deal with six-month's notice renders *that deal* anything other than easily terminable. Cases Corcept cited but Teva ignores confirm it is. Mot. 7. And while Teva handwaves the Curant deal is "unusual" "like the Optime agreement," what Teva alleges made the Optime deal "unusual"—*i.e.*, "one-sided, blanket, perpetual exclusivity"—are *not* terms of the Curant deal. TAC ¶¶ 147, 197. The Curant deal's duration and terminability terms are permissible, as Corcept's and Teva's own citations confirm.[1]

---

[1] Teva's claim (Opp. 7) that the deal is "is not incentive-based" because Teva was "prepared to offer financial terms" that Curant did not entertain is also a non-sequitur. TAC ¶ 196. Being *prepared* to offer supposedly "better" terms that Teva tellingly does not even specify does not mean that Teva *did* offer such terms and Curant specifically rejected them. Notably, Teva does not make that allegation. Regardless, whether a contract is "incentive-based" is but one factor in the foreclosure analysis.

DATED: February 13, 2026

By: /s/ Robert W. Stone

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
Michael D. Powell (Bar No. 202850)
  mikepowell@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:               (650) 801-5100

Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Fax:               (415) 875-6700

Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone:    (213) 443-3000
Fax:               (213) 443-3100

Steig D. Olson (admitted *pro hac vice*)
  steigolson@quinnemanuel.com
295 Fifth Avenue
New York, New York 10016
Telephone:    (212) 849-7000
Fax:               (212) 849-7100

*Attorneys for Defendant Corcept Therapeutics, Incorporated*


Case 5:24-cv-03567-NW    Document 172    Filed 02/13/26    Page 7 of 7

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of February 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   */s/ Robert W. Stone*
      Robert W. Stone


-6-    Case No. 5:24-cv-03567-NW
CORCEPT'S REPLY ISO SUPPLEMENTAL BRIEF REGARDING TEVA'S EXCLUSIVE DEALING CLAIMS
