# EXHIBIT A

# Hearing on Defendants' Motions to Dismiss

*Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc. et al*, No. 5:24-cv-03567-NW

February 18, 2026

**KIRKLAND & ELLIS**

# Optime & Curant Claims: No Inconsistency

- **Teva's theory:**
  - Corcept's tactics made Optime the only practically effective distribution channel from 2017 to late 2025.
  - Corcept's tactics will make Curant the only practically effective distribution channel going forward.

- **At least three independent reasons Teva could not have used Curant—or any other pharmacy—as a practically effective alternative to Optime while the Optime agreement was in force:**
  1. The Optime agreement impaired generic substitution laws, ensuring other pharmacies—including Curant—were not feasible or practical alternatives for generic competition. (TAC ¶¶7, 50-56, 127-28, 155-56, 158, 161, 191)
  2. Corcept leveraged relationships with prescribers and made illicit payments to keep prescriptions flowing to Optime, ensuring other channels—including Curant—were not feasible or practical alternatives. (TAC ¶¶149-66, 167-87)
  3. We now know—because Corcept has told us—that no pharmacy, including Curant, can be made into an effective alternative to Optime without Optime's help, which the Optime agreement prohibited Teva from accessing. (TAC ¶¶199-203)

  ➡ Corcept is now (1) leveraging its relationships with Optime and prescribers to redirect prescriptions to Curant, (2) continuing to impair generic substation laws, and (3) continuing to block Teva from working with Optime, all to ensure other channels will remain ineffective going forward. (TAC ¶¶167-87, 194-207, 242)

- Allegations explain why Teva could not have used Curant, or any other pharmacy, as an effective alternative to Optime while the Optime agreement was in force, and how Corcept will use Curant to protect monopoly power going forward.

1

# Generic Substitution: Only Cost-Efficient Means Of Distribution

### *Namenda*, 787 F.3d at 655-56 (2d. Cir. 2015)

"[C]ompetition through state drug substitution laws is the only cost-efficient means of competing available to generic manufacturers. For there to be an antitrust violation, generics need not be barred 'from all means of distribution' if they are 'bar[red] ... from the cost-efficient ones.'"

### *Loestrin*, 433 F. Supp. 3d at 330 (D.R.I. 2019)

"That Loestrin generics eventually entered the market does not preclude a finding of anticompetitive conduct — the jury could still find that Warner Chilcott may have engaged in anticompetitive conduct by obstructing automatic generic substitution, a cost-efficient means of increasing competition."

### *Tecfidera*, 791 F. Supp. 3d at 864 (N.D. Ill. 2025)

"[H]ealthy competition in prescription drug markets requires the smooth operation of drug substitution laws, insofar as these laws provide generic manufacturers with the only cost-efficient and commercially viable means to compete. Courts recognizing this have credited antitrust claims premised on restraints and conduct that undermine the operation of these laws."

### *Suboxone*, 622 F. Supp. 3d at 58 (E.D. Pa. 2022)

"The mere availability of generic tablets on the market and some doctors' willingness to prescribe those tablets do not undermine the potential for exclusion resulting from Reckitt's actions…. [A]bsent AB-rated, automatic substitution, generics must rely on the less efficient and far less effective method of therapeutic substitution."

# Corcept's Agreements Impair Generic Substitution By Design

- **Teva has alleged since Day 1** that the Optime agreement stifles generic competition by impairing the operation of generic substitution laws. (TAC ¶¶7, 50-56, 127-28, 131, 155-56, 158, 161)

  – Teva's allegations explained how generic substitution laws work and how the Corcept-Optime agreement obstructs them. (TAC ¶¶7, 50-56, 127-28, 131, 155-56, 158, 161)

- **Court's prior motion-to-dismiss decision recognized** that the "[m]ost pernicious" aspect of the Corcept-Optime agreement, as alleged by Teva, "is Defendants' use of the arrangement to end-run state generic substitution laws designed to promote generic drug use." (Dkt. 134 at 6)

  – Based on Teva's allegations, the Court explained how generic substitution laws work and how the Corcept-Optime agreement obstructs them. (Dkt. 134 at 6-7)

- **Corcept's President of Endocrinology confirmed** the Optime agreement impairs generic substitution laws by design: he told investors that the Optime agreement is one of the "barriers to generic adoption," and protects Corcept's monopoly by ensuring that "automatic substitution does not happen" in the Korlym market, like it would in a "typical pharmaceutical market." (TAC ¶156)

- **Defendants never before disputed** that the Corcept-Optime agreement deliberately impairs generic substitution laws.

  – Teva's complaint and prior motion-to-dismiss opposition made this argument prominently. (Dkt. 65 at 1, 3, 17)

  – Defendants' briefs never responded to it. (*See* Dkt. 55, Dkt. 68)

3

# Corcept's Agreements Impair Generic Substitution By Design

| Defendants' Argument | Fails Because |
|---|---|
| **Teva did not explain how generic substitution laws work or how they are impaired here?** | ✗ Complaint has always explained that generic substitution laws allow, or require, pharmacists to switch out the brand company's products and replace them with lower-priced generics, driving generic market share—but substitution can only happen if the pharmacy that stocks the brand company's products also stocks the generics. (TAC ¶¶7, 50-56, 155-56, 158, 161, 191)<br><br>✗ Here, substitution would ordinarily happen because there is no dispute that Teva's generic is cheaper than Corcept's products. (TAC ¶¶127-28, 131, 191)<br><br>✗ But substitution cannot happen here because Optime was Corcept's exclusive distributor, but was not allowed to stock Teva's generic; the same is now true for Curant. (TAC ¶¶7, 155-56, 158, 161, 191, 204, 207)<br><br>✗ Corcept's President of Endocrinology confirmed that the Optime agreement deliberately impaired generic substitution laws to protect Corcept's monopoly; the Curant agreement does the same. (TAC ¶¶156, 207)<br><br>✗ The Court's motion-to-dismiss order explained all of this as well. (Dkt. 134 at 6-7) |
| **Generic substitution laws do not require pharmacies to stock generics?** | ✗ Teva is not suing for violation of generic substitution laws—it is suing for violation of antitrust laws.<br><br>✗ If excluding generics impairs substitution, that is an antitrust violation. *Namenda*, 787 F.3d at 655-56; *Tecfidera*, 791 F. Supp. 3d at 864; *Loestrin*, 433 F. Supp. 3d at 330-31; *Suboxone*, 622 F. Supp. 3d at 57-58. |
| **Generic substitution could happen at some other pharmacies?** | ✗ Not what generic substitution means; substitution only works if doctors and patients can continue writing same prescriptions and using same pharmacies but still access cheaper generics when pharmacist substitutes the generic at the pharmacy counter.<br><br>✗ Contradicts Corcept's President of Endocrinology, who admitted the Optime agreement impairs generic substitution. (TAC ¶156)<br><br>✗ In product hop cases, generics are still available at pharmacies and can be prescribed by doctors, but lack of automatic substitution impairs competition—same as here. *Namenda*, 787 F.3d at 655-56; *Loestrin*, 433 F. Supp. 3d at 330-31; *Suboxone*, 622 F. Supp. 3d at 57-58. |

# Corcept Is Using Same Playbook With Curant As Optime

- **Corcept's Optime Tactics: 2017 – 2025**
    - ✓ Leverage relationships with prescribers;
    - ✓ Illicit payments to favor Corcept products;
    - → Entrench durable prescribing behaviors to keep prescriptions flowing to Optime, make other channels—including Curant—ineffective.

    (TAC ¶¶149-66, 167-87)

- **Corcept's Curant Tactics: 2025 – forward**
    - ✓ Leverage relationships with prescribers;
    - ✓ Illicit payments to favor Corcept products;
    - ✓ Leverage relationship with Optime to transition patients;
    - → Redirect prescriptions to Curant, make other channels ineffective.

    (TAC ¶¶194-99, 204, 207, 242; *id.* ¶¶167-87)

⇒ **No inconsistency:** similar set of tactics, worked for Optime, will work for Curant.

**Defendants never responded to this argument.**

5

# Corcept Cannot Establish Curant Without Optime's Help

- **Corcept admits** it cannot establish <u>any</u> pharmacy, including Curant, as a practical alternative to Optime without Optime's active assistance.

  - **Corcept:** "Optime is more than a dispenser; it is a critical link between patients and critical medication." (TAC ¶200)

  - **Corcept:** setting up an alternative pharmacy "requires Optime's active participation." (TAC ¶202)

  - **Corcept:** if Optime does not help Corcept set up an alternative pharmacy, it will "block[] patient access and prevent[] any successor pharmacy from serving patients." (TAC ¶202)

  - ✓ Optime's assistance is not available to Teva because of Corcept-Optime agreement. (TAC ¶203)

  - ✓ If Corcept cannot reach Korlym patients through Curant—or any other pharmacy—without Optime's help, Teva cannot do so either. (TAC ¶203)

  - **Corcept:** Optime still barred from working with Teva even after Corcept-Optime agreement is terminated. (TAC ¶206)

  - ✓ Only reason for Corcept to continue foreclosing Optime is because Corcept knows Optime is a key bridge to patients; aside from Curant, there are no other effective alternatives. (TAC ¶207)

  ➡ **No inconsistency:** proves other distribution channels are not practically feasible alternatives. (TAC ¶203)

  ➡ **No inconsistency:** explains why Teva could not compete effectively through Curant while Optime agreement was in force. (TAC ¶203)

**Defendants never responded to these arguments.**

6

# No Inconsistency In Optime's Poor Performance

- **Corcept is taking the same positions,** alleging in Delaware case that Optime's performance has been deficient, but Optime remains the key bridge to Korlym patients.  (TAC ¶¶188-92, 199-203)

- **Teva has consistently alleged** that Optime's services are pretextual.  (TAC ¶¶164-66)

    – Corcept agrees—confirms harm to consumers Teva has alleged from the beginning. (TAC ¶¶188-92)

    – Corcept was able to grow its business despite Optime's poor performance. (TAC ¶¶128-30)

    – Fact that Corcept did not lose business despite Optime's poor performance Confirms Teva's allegation that Corcept and Optime benefit from entrenched, durable prescribing habits by Korlym prescribers, as Teva has alleged the whole time. (TAC ¶¶150-54 61)

- ➡ **No inconsistency:** new allegations about Optime's deficient performance confirm prior allegations about sticky distribution channel, lack of bona fide services, and harm to consumers.

7

# Teva Is Not Attempting To Free-Ride

- **Utilizing generic substitution laws is not free-riding.**

> *Namenda*, 787 F.3d at 657 (2d. Cir. 2015)
>
> "[W]hat Defendants call 'free riding'—generic substitution by pharmacists following the end of [Korlym's] exclusivity period—is authorized by law; is the explicit goal of state substitution laws; and furthers the goals of the Hatch-Waxman Act by promoting drug competition."

- **Teva has alleged since Day 1 that it is not attempting to free-ride.**

  - Corcept could allow Optime to dispense Teva's generic while saying that Corcept's services are only available to patients who pay a premium to stick with the brand. (TAC ¶165)

  - Would be competition on the merits, show if patients actually value Defendants' services. (TAC ¶165)

  - Corcept has never disputed it could compete on the merits in this way.

  - Decision not to compete on the merits shows services are pretextual.

8

# Teva Alleges Substantial Foreclosure For Both Claims

- *CoStar* **controls: monopoly power + exclusive dealing = inference of substantial foreclosure.** *CoStar*, 105 F.4th at 1067.

- Defendants wrong to emphasize difference between exclusive agreements with distributors versus end-consumers.

  - Logically, inference of monopoly power is just as compelling when defendant has monopoly power plus exclusive distribution agreements: fact defendant has monopoly power proves end-consumers are not purchasing through alternative distribution channels.

  - *CoStar* never mentions difference or suggests different legal framework applies.

  - *CoStar* relies on many cases that involved exclusive distribution agreements, never suggested distinction mattered.

    - *ZF Meritor*, 696 F.3d at 264, 287: exclusive distribution agreements between a manufacturer of truck transmissions and its distributors;

    - *Microsoft*, 253 F.3d at 67-68, 70: exclusive distribution agreements between Microsoft and distributors of web browsers;

    - *LePage's*, 324 F.3d at 158, 160 & n.14: exclusive distribution agreements between 3M and retail outlets like Kmart and Staples;

    - *McWane*, 783 F.3d at 819, 837, 840: exclusive distribution agreements between a manufacturer of pipe fittings and its distributors.

9

# Key Cases All Involve Exclusive Distribution Agreements

- *ZF Meritor*, 696 F.3d at 264, 287: exclusive distribution agreements between a manufacturer of truck transmissions and distributors;

- *Microsoft*, 253 F.3d at 67-68, 70: exclusive distribution agreements between Microsoft and distributors of web browsers;

- *LePage's*, 324 F.3d at 158, 160 & n.14: exclusive distribution agreements between 3M and retail outlets like Kmart and Staples;

- *McWane*, 783 F.3d at 819, 837, 840: exclusive distribution agreements between a manufacturer of pipe fittings and its distributors.

- *Dentsply*, 399 F.3d at 184, 189-90: exclusive distribution agreements between a manufacturer of artificial teeth and its dealers;

- *U.S. v. Google*, 747 F. Supp. 3d at 142, 156, 163: exclusive distribution agreements between Google and distribution channels for online search engine queries;

- *Tevra*, 2024 WL 1909156, at *1, *9-10: exclusive distribution agreements between animal health company and retailers/distributors;

- *U.S. v. Visa*, 344 F.2d at 237, 242: exclusive distribution agreements between Visa/MasterCard and banks that distributed their cards.

- *Omega*, 127 F.3d at 1163: an exclusive distribution agreements <u>is</u> anticompetitive if alternative channels are not practically effective at allowing a competitor to "reach the ultimate consumers of the product" in reality, not just in theory.

| 18D Areeda & Hovenkamp, *Antitrust Law* §1821a1 (Sept. 2025) |
|---|
| "In the typical 'foreclosure' case the dominant firm as seller imposes exclusive dealing on a distributor or dealer, thus making it more difficult for the dominant firm's upstream rivals to find adequate dealership below.  If successful, this scheme injures not only the rival and final consumers, but also the distributor or dealer upon whom exclusive dealing is imposed." |

10

# Curant Termination Provision Is Not Basis For Dismissal

- *CoStar* **controls, establishes substantial foreclosure because of Corcept's monopoly power.** *CoStar*, 105 F.4th at 1067.

- **Three-year term, 180-day termination period is not sufficient for dismissal.**

  - Curant agreement "is not incentive-based." (TAC ¶196)

  - Curant "does not consider itself free to terminate the agreement in practice." (TAC ¶196)

  - Teva cannot lure Curant away by making a better offer because Curant does not consider itself free to entertain offers from Teva. (TAC ¶196)

    - *Feitelson*, 80 F. Supp. 3d at 1030-31 (exclusive agreement raises antitrust concerns if it is not "incentive-based")

    - *Tevra*, 2024 WL 1909156, at *1 (exclusive agreement can be anticompetitive if it is "de facto long term and not easily terminable").

  - 180-day notice period does not mitigate foreclosure effects because designed to give Corcept enough runway to establish successor. (TAC ¶205)

- **Curant agreement is highly unusual, like Optime agreement:** no other examples of pharmaceutical companies expressly forbidding pharmacies to stock competing products; Defendants have never disputed. (TAC ¶¶5, 147)

  - Significantly heightens antitrust concerns. *ZF Meritor*, 696 F.3d at 272; *Mylan*, 666 F. Supp. 3d at 292.

11

# Teva's State-Law Claims Are Valid

- **Teva has Article III standing** because it is injured in every state where Corcept sells Korlym.

  - Teva's theory is that it has suffered an injury everywhere Corcept sells Korlym, because Corcept's sales would be Teva's sales if not for Defendants' anticompetitive conduct. (TAC ¶¶158, 208, 226-29, 278(2)(-(21))

  - Because Corcept sells Korlym in every state, Teva would have made sales in every state absent Defendants' anticompetitive conduct, which means Teva has been injured in every state. (TAC ¶¶158, 208, 226-29)

  - Teva's allegations establish injury in each state sufficient for Article III jurisdiction over all Teva's state-law claims.

- **Teva has stated a claim under the 10 state laws** Defendants challenge.

  - **Intrastate Effects:** Teva has alleged intra-state effects for each state for the same reason it has alleged Article III jurisdiction for each state—because absent the Defendants' anticompetitive conduct, Teva would have made sales in every state. (TAC ¶¶158, 208, 226-29, 278(2)-(21))

  - **Concerted Action:** Teva has sufficiently alleged concerted action with respect to its bribery/kickback allegations because Optime is a key bridge between Corcept and Korlym prescribers and patients, and Optime has been integral to keeping prescriptions flowing to Optime and has greatly benefited from the scheme. (TAC ¶¶167-87)

    - The Court's prior motion-to-dismiss decision held that "it should consider all conduct going to the overarching scheme in the aggregate … as part of one continuing violation of the Sherman Act." (Dkt. 134 at 13.)