United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., | Case No. 24-cv-03567-NW |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| CORCEPT THERAPEUTICS, INC., et al., | Re: ECF No. 151 |
| Defendants. | |

Before the Court is Corcept Therapeutics, Inc. ("Corcept") and Optime Care Inc. ("Optime") (collectively, "Defendants") motion to dismiss Plaintiff Teva Pharmaceuticals USA, Inc.'s ("Plaintiff" or "Teva") third amended and supplemental complaint ("TASC"). For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion.

I.    BACKGROUND

A.    Factual Background

The Court has recounted the facts of this action in a previous Order and substantially does not repeat them here. *See* Order, ECF No. 134. Briefly, Plaintiff alleges that Defendants spent years restraining trade and monopolizing the market for Corcept's drug Korlym (mifepristone) used to treat endogenous Cushing's syndrome. As part of a multipronged scheme, Teva alleges that Corcept:

> created a "long-term, unprecedented, blanket" exclusive-dealing arrangement between Corcept and Optime Care Inc. ("Optime"), the specialty pharmacy that distributes Korlym. [FAC] ¶ 135. Under the agreement . . . Corcept distributes Korlym exclusively through Optime. *Id.* ¶ 136-137. In return, Optime is contractually prohibited from distributing any competing products, including generic versions of Korlym. *Id.*

. . . .

Teva alleges that the arrangement has created nearly 100% market foreclosure, as Corcept distributes 100% of its Korlym orders through Optime, and Optime appears to be the only realistic distribution channel. *Id.* ¶ 148. Most pernicious, Teva contends, is Defendants' use of the arrangement to end-run state generic substitution laws designed to promote generic drug use. *Id.* ¶ 155. Because generic drugs generally cost much less than branded drugs, state substitution laws require pharmacies to use generic drugs where possible to save health plans' and patients' money. *Id.* But, if a prescription is routed to a pharmacy like Optime that does not stock the generic, the pharmacy will dispense the branded drug instead. *Id.* Teva has attempted to break Corcept's stranglehold on the market by making its generic available at all major national, regional, and specialty wholesalers and pharmacies, but these efforts have been ineffective. *Id.* ¶ 158.

The real problem, Teva alleges, is that Corcept has forged "sticky, durable patterns of prescribing behavior" that have entrenched Korlym's small number of prescribing physicians into exclusively using Optime as the supplier for their patients. *Id.* ¶ 161. According to Teva, even if Corcept used only legitimate means to "convince physicians to rely exclusively on Optime . . . that would not detract from the harm to competition and patients that the exclusive arrangement is causing." *Id.*

Order at 6-7.

### B.    Procedural History

After extensive briefing on the sufficiency of Plaintiff's first amended complaint ("FAC"), the Court on September 12, 2025, mostly denied Defendants' motion to dismiss the first six causes of action in the complaint,[1] granted the motion with leave to amend the omnibus state law claim, and granted the motion with prejudice as to the unjust enrichment claim. *See generally* Order.

On September 26, 2025, Teva filed its second amended complaint ("SAC") consistent with the Court's prior Order. ECF No. 146. On October 31, 2025, Defendants timely moved to dismiss portions of the SAC and reserved a February 11, 2026 hearing date. ECF No. 151. However, on January 14, 2026, after the parties had fully briefed the motion, Teva filed a motion for leave to file a TASC pursuant to Fed. R. Civ. P. 15(d). ECF No. 155. Teva explained that Corcept had recently ended its relationship with Optime and "entered into another exclusive-

---

[1] The Court denied Defendants' motion to dismiss Plaintiffs' monopolization and attempted monopolization claims except for "the allegations related to the sham litigations that Plaintiff failed to allege were objectively baseless." Order at 30.

dealing agreement, similar to the Corcept-Optime agreement, with a different specialty pharmacy, called Curant Health." *Id.* at 1. Accordingly, Teva sought leave to add "a new claim targeting the recent Corcept-Curant exclusive-dealing agreement" and sought to add "Curant as a defendant." *Id.* at 2. After hearing from Defendants, *see* ECF Nos. 159, 160, the Court granted in part and denied in part Plaintiff's motion. Specifically, the Court found the case to be "too far advanced" and the "prejudice too severe to add another Defendant [*i.e.*, Curant] at this stage in the litigation." ECF No. 163. Nevertheless, given the new claim's "factual and legal resemblance to the claims" already pending before the Court, the Court granted Teva's motion to file a TASC "solely to add an additional claim for exclusive dealing against Corcept *alone* related to Corcept's new relationship with Curant." *Id.* Consistent with the Court's ruling, Teva filed a TASC that was substantively identical to the SAC but for approximately two dozen new factual allegations (¶¶ 188-207) and a new Count IV (¶¶ 251-258) which concerned Corcept's relationship with Curant. *See* ECF No. 166-1.

Because the TASC did "not amend the substance of the claims challenged in [Defendants' motion to dismiss the SAC], the Court" explained that it would "apply the arguments within the briefing to their equivalent claims in the . . . TASC." ECF No. 163. The Court also allowed Corcept the opportunity to "file supplemental brief(s) in support of their pending motion to dismiss, ECF No. 151, to address the new claim in the . . . TASC." *Id.* The Court cautioned that Defendants could "only move on one or both of the following two grounds: (1) Teva's new claim creates an internal inconsistency in the complaint, rendering dismissal of one or both of the exclusive dealing claims appropriate, and (2) the new claim (and only the new claim) is deficient for one or more of the reasons set forth in Federal Rule of Civil Procedure 12." *Id.* The Court set an expedited briefing schedule and reset the February 11, 2026 hearing to February 18, 2026. *Id.* The parties timely filed their supplemental briefs, *see* ECF Nos. 168-172, and the Court heard argument on February 18, 2026, *see* ECF No. 179, Hearing Tr.

Accordingly, the Court's current task is to rule on (1) Defendants' joint motion to dismiss the SAC (as now applied to the TASC) and (2) Defendants' respective supplemental briefs addressing deficiencies in the TASC.

United States District Court
Northern District of California

## II.    LEGAL STANDARD

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "can provide the framework of a complaint" but "must be supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

## III.    DISCUSSION

### A.    Defendants' Joint Motion to Dismiss the SAC

The Defendants' joint motion to dismiss the SAC (which the Court considers as brought against the equivalent claims in the TASC) challenges the complaint on two grounds: (1) that Plaintiff's verbatim recitation of its previously dismissed sham litigation allegations contravenes the Court's Order and (2) that Teva's amended omnibus state law claim fails for want of standing and other factual predicates.

The first basis for Defendants' motion is meritless. In its previous Order, the Court found that Teva's "monopolization and attempted monopolization claims (Counts I and II) based on Corcept's assertion of seven patents—the '214, '526, '242, '243, '216, '800, and '801 patents— failed." Mot. at 6. Defendants complain that Teva "does not even attempt to add any new allegations" and merely restates verbatim that which was previously alleged. Perhaps so, but Defendants do not ask for any of those repeated allegations to be stricken; instead, they ask only that they be dismissed, which the Court has already done. *See* Order at 27. Teva was not required to omit those allegations as "[t]he Court did not order that all allegations originally offered as support for the now dismissed claims also be stricken." *Henning v. Arya*, No. 214CV00979RFBNJK, 2018 WL 6606054, at *2 (D. Nev. Dec. 17, 2018). Indeed, "[n]ot every statement in a complaint must give rise to liability." *United States v. Cmty. Recovery Res., Inc.*,

No. 2:13-CV-01004-TLN-AC, 2017 WL 2257175, at *11 (E.D. Cal. May 23, 2017).[2]  Thus, Defendants' request to dismiss these already-dismissed facets of Plaintiff's first two claims is DENIED AS MOOT.

The second basis for Defendants' motion—the sufficiency of Teva's realleged omnibus state law claim—is more complicated.  Originally, Teva's state law claim "consist[ed] solely of a few paragraphs and a list of 48 different antitrust and competition statutes and 37 consumer protection statutes."  Order at 29.  The Court explained that

> [t]his type of pleading [wa]s woefully insufficient to meet the standards set forth in Federal Rule of Civil Procedure 8.  Under *Twombly*'s well-established pleading standard, "a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  550 U.S. 544, 555 (2007).  [In the FAC], Plaintiffs d[id] no more than gesture at state statutes and fail[ed] to include even a "formulaic recitation of the elements" of causes of action under state law.  *Id.*

*Id.*

In response to the Court's Order, Teva pared down the number of alleged statutes by more than half, now advancing 21 antitrust state statutes.  For each realleged statute, Teva set forth the specific language giving rise to the claim, the relevant statute of limitations, and the statute's similarity to the Sherman Act.  According to Defendants, however, these claims still fail for two reasons: (i) because Teva fails to plausibly allege standing; and (ii) because Teva fails to allege specific elements required under a subset of those laws.  The Court takes each argument in turn.

### 1.    Standing for State Law Claims

The "irreducible constitutional minimum" of Article III standing contains three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be capable of redressing by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).  A competitor

---

[2] To the extent Defendants' request is rooted in a concern that Teva "will seek discovery beyond the scope of the claims that survive[d]" beyond the Court's previous Order, they "can raise that concern before the magistrate judge or this Court, where needed, and when the adjudicator will ha[s] more concrete facts before it."  *Gjovik v. Apple Inc.*, No. 23-CV-04597-EMC, 2024 WL 4369656, at *22 (N.D. Cal. Oct. 1, 2024).

<div style="margin-left:auto">United States District Court<br>Northern District of California</div>

"has standing to challenge the conduct of rival(s) that . . . tends to exclude rivals from the market, thus leading to reduced output and higher prices." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 348a; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (holding that competitors have standing to challenge exclusionary contracts with customers). Defendants do not argue that Teva, as Corcept's competitor, lacks standing for its *federal* antitrust claims. Instead, Defendants contend that Plaintiff lacks standing to bring *state law* antitrust claims because standing in those circumstances is subject to an additional prerequisite. According to Defendants, Plaintiff must demonstrate that it was injured or "resides" within each state referenced in the omnibus claim, and Plaintiff fails to plausibly allege either condition. Mot. at 6-7 (citing *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019)).

Defendants, however, fail to acknowledge that the standing principles they recite in their motion are rooted in class action jurisprudence and do not apply here.[3] *See id.* ("[A] plaintiff in *a putative class action* lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured.") (emphasis added)). This is a competitor suit: Teva brings its own claims on its own behalf based on its own injuries. The standing inquiry here is correspondingly straightforward: Teva lost sales (injury) because of Defendants' conduct (causation) that can be recouped through a successful lawsuit (redressability). Where, as here, a

---

[3] Defendants insist that the cases they cite are applicable here even though those cases are class actions. *See* Mot. at 8 n.3. The Court disagrees. As an initial matter, the Court notes that the "interplay between Article III standing and class standing presents a surprisingly difficult question," one that has not been answered consistently across federal courts. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14–MD–02503–DJC, 2015 WL 5458570, at *13 (D. Mass. Sept. 16, 2015). Defendants' cases are therefore difficult to parse or apply in non-class action contexts, even assuming the reasoning within to be sound. Further, Defendants' cited cases uniformly consider the question at issue here (*i.e.*, whether a lead plaintiff may pursue claims under the laws of states in which he was not injured and does not reside) to be one of standing, an approach many courts in the Ninth Circuit have rejected. *See Sultanis v. Champion Petfoods USA Inc.*, No. 21-CV-00162-EMC, 2021 WL 3373934, at *6 (N.D. Cal. Aug. 3, 2021) ("[W]hether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing."); *Patterson v. RW Direct, Inc.*, No. 18-CV-00055-VC, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018). In sum, because the "standing" analyses in Defendants' cases are technically Rule 23 considerations, those cases are not applicable here.

plaintiff alleges that its product has nationwide reach yet is foreclosed from nearly 100% of the market, the alleged injuries in lost sales—when considered in the light most favorable to Plaintiff—occur in every state. *See e.g., In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 644 (N.D. Ill. 2025) ("Because the Court has found a plausibly alleged federal antitrust violation, the Court also finds the direct action plaintiffs have plausibly alleged state antitrust violations"); *see also LyricFind, Inc. v. Musixmatch, S.p.A.*, 798 F. Supp. 3d 1040, 1076 (N.D. Cal. 2025) ("Having concluded LyricFind states a claim under the Sherman Act, LyricFind has thus stated a claim under the Cartwright Act."). At this stage, the Court finds such allegations sufficient to allege the requisite injury, causal connection, and redressability to confer Article III standing for Plaintiff's state law claims.

### 2.    State Specific Deficiencies

Defendants additionally argue that Teva fails to state a claim as to certain subsets of the state statutes. According to Defendants, the antitrust statutes in D.C., Massachusetts, Michigan, Missouri, North Carolina, South Dakota, West Virginia, and Wisconsin require explicit allegations of *intra*state commerce that are lacking in the TASC. Defendants are incorrect. As numerous courts across the country have found, allegations of nationwide antitrust violations generally satisfy the intrastate statutory requirement. *See, e.g.*, *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp.3d 352, 375 (D.R.I. 2019) ("This Court joins the majority of courts in concluding that the [plaintiffs] have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) ("In light of the obvious fact that Broilers are purchased in substantial numbers throughout the United States, these allegations plausibly establish "substantial" *intra*state effects[.]"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14–MD–02503–DJC, 2015 WL 5458570, at *16 (D. Mass. Sept. 16, 2015) (holding that nationwide antitrust violation allegations that result in increased prices paid within each state are sufficient to allege intrastate commerce). And the alleged effects need not occur entirely or predominately within a state to satisfy this requirement. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) (noting that there are

7

United States District Court
Northern District of California

"virtually no sales" anywhere in the United States that are wholly intrastate); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 665-70 (E.D. Mich. 2000) (rejecting argument that state antitrust statutes only apply to conduct that is "wholly or predominantly intrastate in character").

Defendants also allege that Teva fails in part to allege the requisite "unilateral conduct" that the Kansas and Ohio antitrust statutes supposedly require. Defendants acknowledge that, to the extent the claims under these two statutes are based on the Corcept-Optime agreement, they satisfy the statutes. Defendants ask only that the Court dismiss Teva's Kansas and Ohio claims to the extent they rely on Corcept's alleged kickbacks. On this limited ground, the Court agrees, and Teva may not invoke Corcept's alleged physician payments in bringing its Kansas and Ohio claims.

### B.    Defendants' Respective Supplemental Briefs

Corcept and Optime filed separate briefs and replies setting forth their challenges to the new exclusive dealing claim advanced in the TASC. Optime argues that the Court's previous Order is incompatible with Plaintiff's new claim and invalidates any previous finding of an exclusive deal between Corcrpt and Optime. Optime insists that an identical, successive exclusive dealing arrangement between Curant and Corcept following the arrangement between Optime and Corcept demonstrates that Optime is not the "***only*** practically effective means of reaching Korlym's patients." Accordingly, Optime argues, Plaintiff's complaint cannot sustain its exclusive dealing claim against Optime. Optime Mot. Corcept argues that these new allegations defeat the entire action for the same reasons Optime advances, plus two others: (1) the new allegations demonstrate that Teva's claims are premised on an impermissible desire to free-ride Corcept's distribution channels and (2) the Curant allegations specifically evidence an agreement that does not bear the hallmarks of an anticompetitive exclusive agreement.

The Court sees the merits of Defendants' arguments: at first blush, it does seem implausible for Curant to now be the only practically effective means of reaching Korlym's patients when only a few months earlier Optime held that title. On the other hand, the Court cannot (at the motion to dismiss stage) question the authenticity of Plaintiff's allegations, only whether they meet the necessary elements of the claim. Here, they do. Plaintiff has alleged that

United States District Court
Northern District of California

the arrangement between Optime and Corcept substantially "foreclose[d] competition in a substantial share of the line of commerce affected," namely the sale of Korlym and its generic equivalents. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). Plaintiff has likewise alleged that the arrangement between Curant and Corcept substantially "foreclose[s] competition" in that same line of commerce. And in both circumstances, Plaintiff has alleged that "the challenged restraint has [had] a substantial anticompetitive effect"—here, supracompetitive prices—"that harms consumers." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). This is enough to withstand a motion to dismiss.

That's not to say that inconsistent allegations cannot doom an otherwise viable complaint. *See, e.g.*, *U.S. Med. Instruments, Inc. v. CFS N. Am., Inc.*, No. 13-CV-349-BEN DHB, 2013 WL 6055387, at *9 (S.D. Cal. Nov. 13, 2013) ("[W]here inconsistent allegations are not pled in the alternative . . . an allegation may constitute a judicial admission . . . which allows dismissal of the complaint." (citing *Maloney v. Scottsdale Ins. Co.*, 256 F. App'x 29, 31 (9th Cir. 2007)). But the Court here finds that what may be inconsistent in a conventional market—the existence of two back-to-back exclusive dealing agreements with different distributors—is not necessarily so. This appears to be a function of the particulars of the pharmaceutical marketplace. As the Second Circuit has observed:

> the pharmaceutical market is not a well-functioning market. In a well-functioning market, a consumer selects and pays for a product after evaluating the price and quality of the product. In the prescription drug market, however, the party who selects the drug (the doctor) does not fully bear its costs, which creates a price disconnect . . . As a result, the doctor may not know or even care about the price and generally has no incentive to take the price into account.

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 645–46 (2d Cir. 2015) ("*Namenda*") (citations omitted).

State governments have attempted to correct for the market's disfunction by enacting drug substitution laws. Under these laws, when a doctor prescribes a brand name drug, pharmacies must dispense the typically lower-priced, bioequivalent generic — provided the pharmacy carries the generic. *See* Order at 6-7. Substitution laws shift "drug selection . . . from doctors[] to pharmacists and patients, who have greater financial incentives to make price comparisons."

United States District Court
Northern District of California

*Namenda*, 787 F.3d at 646. Crucially, these laws only work when the pharmacy carries a generic equivalent; if it does not, then the pharmacy dispenses the brand name prescription at the brand name cost.

The TASC alleges that Corcept developed and implemented exclusive dealing arrangements with specialty pharmacies to directly impede these laws. Optime, and now Curant, are contractually prohibited from carrying Teva's Korlym generic. Even today the Corcept-Optime agreement forbids Optime from dispensing Teva's generic, despite the dissolution of the agreement itself. Consequently, if Corcept routes all prescribing doctors to either Optime or Curant, the pharmacy can only dispense Corcept-branded Korlym. And, as discussed above, prescribing doctors have no stake in *where* a prescription is filled, so the typical incentives shaping the market are not in play.

The *Namenda* court held, and this Court agrees, that "competition through state drug substitution laws is the only cost-efficient means of competing available to generic manufacturers." *Id*; *see also In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 864 (N.D. Ill. 2025); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 330 (D.R.I. 2019). In circumventing the administration of these laws, Teva contends that Corcept and Optime have thwarted all competition in the market. Teva maintains that this is evidenced by even a cursory look at the success of Corcept's strategy, which has left Teva's market share almost entirely unchanged following the launch of Teva's generic. As Corcept's President of Endocrinology boasted in an earnings call, Teva's generic "hasn't had any impact on [Corcept's] business." TASC ¶ 129.

The Ninth Circuit's framework for exclusive-dealing claims is straightforward. To succeed, "a plaintiff must plausibly allege (1) the existence of an exclusive agreement that (2) forecloses competition in a substantial share of the relevant market." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1066 (9th Cir. 2025) (citing *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016)). Further, "when a plaintiff plausibly alleges that exclusive agreements cover a market in which the defendant allegedly holds monopoly power, that

is sufficient to allege the substantial foreclosure element of exclusive dealing too." [4] *Id.* at 1067. There is no dispute that Corcept, with 95% of the market and a more expensive product, has monopoly power. Under *CoStar*, the existence of Corcept's exclusive dealing arrangements is sufficient to allege an exclusive dealing claim. *Id.*[5]

Defendants' rely heavily and almost exclusively on the Ninth Circuit decision in *Omega. Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997). But the arguments Defendants proffer are no different than those advanced in the previous round of briefing. Though there are now two agreements at issue, the substance of the allegations related to substantial foreclosure have not changed. Just as before, the Court finds that as alleged, Teva remains unable to "reach the ultimate consumers of the product." *Omega*, 127 F.3d at 1163. And "[t]he mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005); Areeda & Hovenkamp ¶ 1821d4; *MLW Media LLC v. World Wrestling Ent., Inc.*, No. 22-CV-00179-EJD, 2023 WL 4053802, at *6 (N.D. Cal. June 15, 2023) (denying motion to dismiss where plaintiff alleged substantial foreclosure from 92% of the relevant market through exclusive agreements with two primary distribution channels; citing *United States v. Microsoft Corp.*, 253 F.3d 34, 72 (D.C. Cir. 2001)). The Court finds that in this context, on these facts, and at this stage in the litigation, Teva has adequately alleged that Defendants' agreements substantially foreclose competition. *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,* 611 F.3d 495, 501 (9th Cir.

---

[4] The Court is not persuaded that the Ninth Circuit's reference to "exclusive agreements," plural, forecloses a § 1 Sherman Act claim predicated on a single operative exclusive dealing arrangement. *See* Corcept Supp. Reply at 1, ECF No. 172. The opinion itself expresses no such limitation, and the Court refuses to apply one. The Court instead views the plural use of exclusive agreements to encompass situations involving one or more agreements, but does not require more than one.

[5] Defendants claim that *CoStar*'s holding is limited to circumstances where *end users* are locked in by Defendants conduct. The Court disagrees. First, because *CoStar* makes no such attempt to limit its holding in the manner Defendants suggest. Second, the distinction between end user and distributor holds little weight where, as here, the underlying industry is so atypical. Unlike other consumer products that may be freely purchased by consumers, prescription drugs can only be acquired through a doctor's prescription at a licensed pharmacy. The law prohibits end users (i.e., patients) from acquiring prescription-medication without a distributor (i.e. doctor/pharmacy).

2010) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles.") (citing *Twombly,* 550 U.S. at 556)).

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion and supplemental briefing to dismiss portions of the operative complaint are DENIED but for Teva's Kansas and Ohio claims, to the extent they rely on Corcept's alleged kickbacks.

**IT IS SO ORDERED.**

Dated: May 5, 2026

_____
Noël Wise
United States District Judge